IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF NEW YORK

_____

TRAZZ SAWYER,

                         Plaintiff,              Civil Action No.
                                                 9:14-CV-1198 (DNH/DEP)

        v.

ALBERT PRACK, *et al.*,

                         Defendants.

_____

<u>APPEARANCES</u>:                              <u>OF COUNSEL</u>:

<u>FOR PLAINTIFF</u>:

TRAZZ SAWYER, *Pro se*
97-B-2413
Orleans Correctional Facility
3531 Gaines Basin Road
Albion, NY 14411

<u>FOR DEFENDANTS</u>:

HON. ERIC T. SCHNEIDERMAN          KEVIN M. HAYDEN, ESQ.
Attorney General of the
State of New York
The Capitol
Albany, NY 12224

DAVID E. PEEBLES
CHIEF U.S. MAGISTRATE JUDGE

## REPORT AND RECOMMENDATION

*Pro se* plaintiff Trazz Sawyer, a New York state prison inmate, has commenced this civil rights action against several employees of the New York State Department of Corrections and Supervision ("DOCCS"), four who are identified by name and three of whom are sued as "John Doe" defendants, pursuant to 42 U.S.C. § 1983. In his complaint, plaintiff alleges that he was assaulted by corrections officers, and that a prison nurse failed to intervene and later refused to treat his injuries resulting from the beating. Plaintiff also contends that he was denied procedural due process at a related disciplinary hearing, resulting in a finding of guilt and service of five months confinement in a special housing unit ("SHU").

Currently pending before the court is a motion for summary judgment brought by the defendants seeking dismissal of plaintiff's pending claims. In their motion, defendants argue that (1) plaintiff failed to exhaust his administrative remedies before commencing suit, (2) no reasonable factfinder could conclude plaintiff's procedural due process rights were violated based upon the record now before the court, (3) the claim asserted against defendant Albert Prack, the DOCCS Director of Special Housing/Inmate Disciplinary Program should alternatively be dismissed for lack of personal involvement, (4) the John Doe defendants should be

dismissed from the action based upon plaintiff's failure to timely identify and serve process upon them, and (5) in any event all defendants are entitled to qualified immunity from suit. For the reasons set forth below, I recommend that defendants' motion be granted, in part, but otherwise denied, and that plaintiff's claims against defendants Phelix and Prack and the John Doe defendants be dismissed.

I. BACKGROUND[1]

Plaintiff is a New York State prison inmate currently being held in the custody of the DOCCS. *See generally* Dkt. No. 1. At the times relevant to his claims in this action, he was confined at the Bare Hill Correctional Facility ("Bare Hill"), located in Malone, New York. *Id.*

On the morning of October 1, 2011, plaintiff was working in the music room at Bare Hill. Dkt. No. 1 at 8; Dkt. No. 37-1 at 1; Dkt. No. 35-21 at 1. For reasons that are in dispute, the plaintiff was ordered to submit to a pat frisk, and was holding a pen in his hand when corrections officers Richards and Langdon, both of whom are defendants in this case, began conducting the frisk. Dkt. No. 35-21 at 1-2; Dkt. No. 37-1 at 1-2. Defendants Richards and Langdon forcibly removed the pen from plaintiff's hand and took him to the

---

[1]     In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in plaintiff's favor. *Terry v. Ashcroft*, 336 F.3d 128, 137 (2d Cir. 2003).

ground. *Id.* Dkt. No. 1 at 11-12; Dkt. No. 35-21 at 1-2; Dkt. No. 37-1 at 1-2.

The parties dispute whether additional force was used once plaintiff was on

the ground. Dkt. No. 35-21 at 2; Dkt. No. 37-1 at 2-3. Plaintiff claims that

defendants Richards and Langdon "violently slammed him to the floor" and

dislocated his shoulder. Dkt. No. 1 at 12.

Plaintiff alleges that after being transported to the Bare Hill SHU, he

was again assaulted by corrections personnel. Dkt. No. 1 at 3, 12-14. At the

time he filed his complaint, plaintiff did not know the identities of the

corrections officers who assaulted him, and therefore asserted claims

related to this alleged second assault against three John Doe defendants.

*Id.* Plaintiff now "believe[s]" that one of the three corrections officers who

assaulted him in the SHU was defendant Richards. Dkt. No. 37-2 at 5.

Based on the events of October 1, 2011, plaintiff was issued a Tier III

misbehavior report for violent conduct, disobeying a direct order,

interference, and harassment.[2] Dkt. No. 1 at 15; Dkt. No. 35-21 at 2; Dkt.

No. 37-1 at 3. In preparation for the hearing, plaintiff met with a counselor,

---

[2]     The DOCCS conducts three types of inmate disciplinary hearings. *See* 7
N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace*, 143 F.3d 653, 655 n.1 (2d Cir. 1998).
Tier I hearings address the least serious infractions and can result in minor punishments
such as the loss of recreation privileges. *Hynes*, 143 F.3d at 655 n.1. Tier II hearings
involve more serious infractions, and can result in penalties which include confinement
for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations
and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

who plaintiff refers to as an employee assistant, three days before the hearing. Dkt. No. 35-21 at 4; Dkt. No. 37-1 at 5. Plaintiff contends that the "employee assistant was inadequate." Dkt. No. 37-2 at 5. Plaintiff also contends that his due process rights were violated at the ensuing Tier III disciplinary hearing, and with respect to the notice that gave rise to the hearing. Dkt. No. 37-2 at 5-6.

On October 6, 2011, a disciplinary hearing was conducted by Deputy Superintendent of Security D. Phelix, another defendant in this action. Dkt. No. 35-21 at 3; Dkt. No. 37-1 at 3. During the hearing, defendants Langdon and Richards testified regarding the incident that occurred on the morning of October 1, 2011. Dkt. No. 35-21 at 3; Dkt. No. 37-1 at 4; Dkt. No. 35-10 at 17, 22. Defendant Phelix also heard testimony from plaintiff and considered the following documents: (1) the October 1, 2011 misbehavior report signed by defendant Richards; (2) a memorandum from defendant Richards to Sergeant Carey, dated October 1, 2011; (3) a memorandum written by Sergeant Carey to Lieutenant Munson, dated October 1, 2011; (4) a use of force report, dated October 1, 2011; and (5) an inmate injury report, dated October 1, 2011. Dkt. No. 35-10 at 7-16.

As part of his defense, plaintiff requested that inmates Ponder and Farrell be called to testify on his behalf. Dkt. No. 35-21 at 4; Dkt. No. 37-1 at

5. While inmate Ponder was called as a witness, he testified that he was not present during the encounter between the plaintiff and defendants Langdon and Richards. Dkt. No. 35-21 at 4; Dkt. No. 37-1 at 5. Inmate Farrell refused to appear as a witness at the plaintiff's disciplinary hearing. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7.

During the hearing plaintiff also requested a sign-in sheet from the music room. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7. Defendant Phelix recessed the hearing so that an attempt could be made to locate the requested sign-in sheet. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7. Upon reconvening the hearing, defendant Phelix advised plaintiff that the sign-in sheets are not kept on file, and were therefore unavailable. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7.

Defendant Phelix then called Officer Sauve as a witness, who testified that the sign-in sheets are not maintained by Bare Hill staff. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7. Officer Sauve did, however, provide defendant Phelix with a list of ten porters who worked in the music room area on October 1, 2011. Dkt. No. 35-10 at 49; Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7. Plaintiff requested that he be permitted to call all ten of the listed porters as witnesses. Dkt. No. 35-10 at 49. Plaintiff was unable to identify which of the ten porters were working in the music room during the relevant events

on October 1, 2011, stating only that he "saw a whole bunch of guys that day." Dkt. No. 35-10 at 50. Defendant Phelix declined to allow plaintiff to call all ten porters as witnesses, but did permit him to identify five inmate porters that he desired to call as witnesses, and then contacted each of those five porters. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7; Dkt. No. 35-10 at 50-51. All five of the requested inmate porters that defendant Phelix contacted refused to testify. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7. There was no testimony at the hearing from any witnesses other than the officers involved and plaintiff as to what happened during the pat frisk. Dkt. No. 35-21 at 5; Dkt. No. 37-1 at 7; Dkt. No. 35-10 at 7-12. Plaintiff also did not provide defendant Phelix with any documentary evidence, other than medical records, in defense of the charges brought against him. Dkt. No. 35-21 at 4; Dkt. No. 37-1 at 5-6.

At the conclusion of the hearing, defendant Phelix found plaintiff guilty of all charges, except as to the allegation of interference, and sentenced Sawyer to two years of disciplinary SHU confinement. Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. Plaintiff appealed the hearing officer's determination to defendant Prack, another defendant in this case. Dkt. No. 1 at 16-17; Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. In his decision, defendant Prack upheld the hearing officer's finding of guilt, but reduced the sentence to six months in SHU. Dkt. No. 16-17; Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. Plaintiff

subsequently filed a petition pursuant to Article 78 of the New York Civil Practice Law and Rules in New York state court. Dkt. No. 1 at 17; Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. While that petition was pending, the disciplinary determination was administratively reversed. Dkt. No. 1 at 17; Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. By that time, plaintiff had spent approximately five months in SHU confinement. Dkt. No. 1 at 17; Dkt. No. 35-3 at 79.

Plaintiff claims that defendant Phelix violated his Fourteenth Amendment right to due process by failing to provide him with proper notice regarding the charges against him, finding him guilty without supporting evidence, denying him adequate assistance in preparation for the hearing, and rejecting his request for witnesses. Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8. Plaintiff claims that defendant Prack violated plaintiff's Fourteenth Amendment right to due process by ignoring "strong" evidence that would have warranted a reversal of defendant Phelix's determination. Dkt. No. 1 at 17-18; Dkt. No. 35-21 at 6; Dkt. No. 37-1 at 8.

II.    PROCEDURAL HISTORY

Plaintiff, who is proceeding *pro se* and *in forma pauperis*, commenced this action on October 1, 2014. Dkt. No. 1. Plaintiff's complaint named as defendants the following DOCCS employees: (1) Albert Prack, the DOCCS

Director of Special Housing/Inmate Discipline Program; (2) D. Phelix, a deputy superintendent of security at Bare Hill; (3) Bare Hill corrections officers D. Richards and S. Langdon; (4) Ms. Mulverhill, a registered nurse at Bare Hill; and (5) two John Doe corrections officers and a John Doe corrections sergeant at Bare Hill. *Id.* at 1.

On December 31, 2014, the court issued an order granting plaintiff's request for leave to proceed *in forma pauperis* and *sua sponte* dismissing certain causes of action in his complaint pursuant to 28 U.S.C. §§ 1915(e) and 1915A. Dkt. No. 4. Based on that decision, plaintiff's two remaining claims include: (1) excessive use of force and failure to protect claims under the Eighth Amendment, asserted against defendants Richards, Langdon, John Doe #1, John Doe #2, and John Doe #3; and (2) a violation of due process cause of action under the Fourteenth Amendment, asserted against defendants Phelix and Prack. *Id.* at 9-11, 22-23. As relief, plaintiff seeks compensatory damages for his injuries, including for pain and suffering, as well as for his allegedly wrongful disciplinary confinement. Dkt. No. 1 at 18-20.

Following the close of discovery, defendants filed a motion for summary judgment, arguing that plaintiff's complaint should be dismissed because the record evidence conclusively establishes that plaintiff

inexcusably failed to exhaust his administrative remedies and, in any event, defendants are all entitled to qualified immunity. *See generally* Dkt. No. 35. In their motion, defendants additionally argue that the John Doe defendants should be dismissed from the action based upon plaintiff's failure to identify them and serve them with process, and that the record evidence does not give rise to a genuine dispute of material fact regarding whether (1) defendants Phelix and Prack violated plaintiff's due process rights; or (2) defendant Prack was personally involved in the Fourteenth Amendment constitutional violation alleged. *Id.* Defendants' motion, which is now fully briefed, has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed. R. Civ. P. 72(b).

III.   DISCUSSION

   A.   Summary Judgment Standard

   Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Sec. Ins.*

*Co. of Hartford v. Old Dominion Freight Line, Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004). A fact is "material" for purposes of this inquiry if it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248; *see also Jeffreys v. City of N.Y.*, 426 F.3d 549, 553 (2d Cir. 2005). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson*, 477 U.S. at 250 n.4; *Sec. Ins. Co.*, 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed. R. Civ. P. 56(e); *Celotex*, 477 U.S. at 324; *Anderson*, 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities, and draw all inferences, in a light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255; *Jeffreys*, 426 F.3d at 553; *Wright v. Coughlin*, 132 F.3d 133, 137-38 (2d Cir. 1998). The entry of summary judgment is justified only in the event of a finding that no

reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan*, 311 F.3d 501, 507-08 (2d Cir. 2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

      B.    <u>Exhaustion of Available Administrative Remedies</u>

          1.    <u>Controlling Legal Principles</u>

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Woodford v. Ngo*, 548 U.S. 81, 84 (2006) ("Exhaustion is . . . mandatory. Prisoners must now exhaust all 'available' remedies[.]"); *Hargrove v. Riley*, No. 04-CV-4587, 2007 WL 389003, at *5-6 (E.D.N.Y. Jan. 31, 2007) ("The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section

1983.").[3] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Woodford*, 548 U.S. at 95; *accord, Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007).

Compliance with the PLRA's exhaustion requirement may be excused when administrative remedies are "unavailable" to an inmate. *Ross v. Blake*, 136 S. Ct. 1850, 1858 (2016). The Supreme Court recently identified three circumstances in which such unavailability can be found. *Id.* at 1859-1860. First, administrative procedures are unavailable when they "operate[] as a simple dead end – with officers unable or consistently unwilling to provide any relief[.]" *Id.* at 1859. Second, they are unavailable when "an administrative scheme [is] so opaque that it becomes, practically speaking, incapable of use." *Id.* at 1859-1860. Lastly, exhaustion can be excused "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or

---

[3]    Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff.

intimation."[4] *Id.* at 1860.

## 2. The DOCCS IGP

The DOCCS has instituted a grievance procedure, entitled the Inmate Grievance Program ("IGP"), and made it available to inmates. The IGP is comprised of three steps that an inmate must satisfy when he has a grievance regarding prison conditions. 7 N.Y.C.R.R. § 701.5; *Mingues v. Nelson*, No. 96-CV-5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb. 20, 2004). Embodied in 7 N.Y.C.R.R. § 701, the IGP requires that an inmate first file a complaint with the facility's IGP clerk within twenty-one days of the alleged occurrence. 7 N.Y.C.R.R. § 701.5(a)(1). If a grievance complaint form is not readily available, a complaint may be submitted on plain paper. *Id.* Representatives of the facility's inmate grievance resolution committee ("IGRC") have up to sixteen days after the grievance is filed to informally resolve the issue. *Id.* at § 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen days after receipt of the grievance. *Id.* at § 701.5(b)(2).

A grievant may then appeal the IGRC's decision to the facility's superintendent within seven days after receipt of the IGRC's written

---

[4]     Notably, in *Ross* the Court specifically rejected the "special circumstances" exception to the PLRA's rule of exhaustion that had previously been engrafted into the exhaustion requirement by the Second Circuit in such cases as *Hemphill v. New York*, 380 F. 3d 680 (2d Cir. 2004).

decision. *Id.* at § 701.5(c). The superintendent must issue a written decision within a certain number of days after receipt of the grievant's appeal.[5] *Id.* at § 701.5(c)(i), (ii).

The third and final step of the IGP involves an appeal to the DOCCS Central Office Review Committee ("CORC"), which must be taken within seven days after receipt of the superintendent's written decision. *Id.* at § 701.5(d)(1)(i). The CORC is required to render a written decision within thirty days of receipt of the appeal. *Id.* at § 701.5(d)(2)(i).

Accordingly, at each step of the IGP process, a decision must be rendered within a specified time period. Generally, if a plaintiff fails to follow each of the required three steps of the above-described procedure prior to commencing litigation, he has failed to exhaust his administrative remedies. *See Ruggerio v. Cnty. of Orange*, 467 F.3d 170, 176 (2d Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits)." (quotation marks omitted)).

---

[5]    Depending on the type of matter complained of by the grievant, the superintendent has either seven or twenty days after receipt of the grievant's appeal to issue a decision. *Id.* at § 701.5(c)(3)(i), (ii).

3.    <u>Analysis</u>

Plaintiff has conceded that he did not fully exhaust his administrative remedies with respect to any of the claims currently remaining in this action. *Compare* Dkt. No. 35-21 at 7 *with* Dkt. No. 37-1 at 8-9. When asked during his deposition whether he attempted to exhaust his administrative remedies with respect to the first use-of-force incident that occurred on October 1, 2011, plaintiff testified that he did not file a grievance while he was in SHU because he thought "it would have been futile" to do so based on his understanding that mail he was "sending out" was not "arriving where it was going." Dkt. No. 35-3 at 70. Plaintiff further testified that he did not "believe" he filed a grievance once he was "out of that particular SHU," but further stated, "maybe I did[,] I'm not one hundred percent sure[,] I would have to look at the documents."[6] Dkt. No. 35-3 at 70. With regard to the alleged second incident of assault that occurred on October 1, 2011 in the Bare Hill SHU, plaintiff testified candidly that he did not file a grievance. *Id.* at 71. Plaintiff further testified that he did not file a grievance against either defendant Phelix or defendant Prack based on their alleged violations of his due process rights because, according to him, formal exhaustion is not a

---

[6]    Plaintiff testified that he was held in SHU at Bare Hill for sixteen days before being transferred into the Upstate Correctional Facility ("Upstate"). Dkt. No. 1 at 14; Dkt. No. 35-3 at 71.

requirement for raising a Fourteenth Amendment due process claim when an inmate has pursued an administrative appeal from a hearing officer's determination. *Id.* at 80; *see also* Dkt. No. 37-1 at 10.

The record evidence adduced by defendants in support of their non-exhaustion defense includes a declaration from Jeffery Hale, the Assistant Director of the DOCCS IGP, and the custodian of records maintained by the CORC. Dkt. No. 35-6. In his declaration, Hale states that his office conducted a search of the appeals filed by plaintiff with the CORC, which revealed that plaintiff filed twenty-four appeals to the CORC between August 21, 2000 and January 3, 2012. *Id.* at 2. Hale further states that plaintiff filed a grievance with the CORC bearing grievance number UST-48092-12, and that grievance alleges that "[p]laintiff tried to file a related grievance on October 26, 2011 at Bare Hill."[7] *Id.* at 3. Hale indicates that plaintiff's grievance dated October 26, 2011 was "properly returned to [p]laintiff by the Bare Hill IGRC" because plaintiff was not housed at Bare Hill at that time, and that plaintiff's subsequent filing of a grievance on December 27, 2011 at Upstate, where he was housed, was "untimely." *Id.*

Grievance Number UST-48092-12 mentions the October 1, 2011 use

---

[7]    A letter sent to plaintiff on November 9, 2011 from the Director of the Inmate Grievance Program, Karen Bellamy, identifies October 20, 2011, and not October 26, 2011, as the actual date that plaintiff attempted to file a grievance at Bare Hill. Dkt. No. 35-8 at 15.

of force incident, but does not name any specific officers and does not raise any due process complaints. *Id.*; Dkt. No. 35-8 at 6-10, 17-20. Plaintiff also states in that grievance that he "attempted to file a grievance" regarding the alleged assault as early as October 11, 2011,[8] "[f]irst at Bare Hill where the assault occurred, then here at Upstate[,]" and that "[e]very attempt to file a grievance concerning the assault by officers have [sic] been prevented[.]" Dkt. No. 35-8 at 17. Plaintiff identifies October 20, 2011 as the second date on which he attempted to file a grievance, and states that this grievance was mailed from Upstate to the Bare Hill IGRC, and responded to on October 26, 2011, with a notation that the grievance needed to be filed at Upstate. *Id.* Plaintiff further states that on November 7, 2011, after he was released from the hospital at Upstate, he sent a letter to the Upstate IGRC requesting a forty-five day extension of his deadline to grieve the events of October 1,

---

[8]    In that grievance, plaintiff initially states that he was assaulted on September 1, 2011, and first attempted to file a grievance on September 11, 2011. At a later point in the same grievance, plaintiff identifies the date he first attempted to file a grievance as October 11, 2011. Dkt. No. 35-8 at 17. In his affidavit submitted in opposition to defendants' motion, plaintiff identifies October 11, 2011 as the first date on which he attempted to file a grievance. Dkt. No. 37-2 at 7. The affidavit does not indicate whether the grievance plaintiff attempted to file on October 11, 2011 pertained to both alleged incidents of assault that occurred on October 1, 2011, or just the first use of force incident. Plaintiff also states in paragraph 72 of his statement of additional material facts that his reference to September 11 was incorrect, and should have read October 11, 2011. Dkt. No. 37-1 at 12. Defendants have not responded to plaintiff's statement of additional material facts. In light of this, the deference owed to plaintiff as the non-movant, the undisputed fact that a use-of-force incident occurred on October 1, 2011, and the impossibility of plaintiff filing a grievance in September with respect to an event that occurred in October of the same year, I view all references to a September date in Grievance Number UST-48092-12 as mistakes.

2011, and attached to that letter a copy of the grievance he filed on October 20, 2011. *Id.* at 18. Plaintiff claims he never received a response to that request, but did receive a letter from "director Bellamy" on November 9, 2011, informing him that "Upstate and Bare Hill claim their IGRC were not receiving [his] grievances and none were on file." *Id.* Against this backdrop, the court must decide whether plaintiff's failure to exhaust his administrative remedies regarding the use of excessive force is excusable.

Plaintiff has submitted record evidence, in the form of an affidavit, indicating that he attempted to file a grievance at Bare Hill on October 11, 2011, and that "guards at Bare Hill in-take the grievances and they would then disappear." Dkt. No. 37-2 at 7. Plaintiff also testified that, while he was confined in the SHU at Bare Hill, he attempted to mail letters to his sisters, and that those letters never arrived. Dkt. No. 35-3 at 71. While the court has not been provided with a copy of the October 11, 2011 grievance and understands defendants' position to be that no such grievance was ever filed, viewing the evidence in the light most favorable to plaintiff, these assertions create questions of fact regarding the filing of the grievance and availability of a grievance procedure to plaintiff. *See Ross*, 136 S. Ct. at 1860 (noting that "thwart[ing] [the] inmate[] from taking advantage of [the] grievance process through machination, misrepresentation, or intimidation"

may effectively render a grievance program unavailable to an inmate).

I note, moreover, that the undisputed record before the court conclusively establishes plaintiff mailed a grievance to the IGRC at Bare Hill on October 20, 2011, nineteen days after the incidents that occurred on October 1, 2011, pertaining to at least the first alleged assault.[9] While it is also undisputed that plaintiff should have filed this grievance at Upstate, where he was housed on October 20, 2011,[10] it appears that Bare Hill did not receive plaintiff's grievance until October 26, 2011, and therefore plaintiff did not receive a response notifying him of his mistake until October 26, 2011. *See* Dkt. No. 35-8 at 1, 18. This date, of course, is beyond the twenty-one day exhaustion deadline. Plaintiff's grievance dated December 29, 2011 also contains a statement by him that within twelve days of receiving a response from Bare Hill regarding his October 20, 2011 grievance, he submitted a request to the Upstate IGRC for an extension of his exhaustion deadline relative to the events of October 1, 2011, pursuant to 7 N.Y.C.R.R. § 701.6(g), and attached to that request a copy of the

---

[9]     Neither party has submitted a copy of this grievance. While I have serious doubts regarding whether plaintiff ever attempted to exhaust his administrative remedies with respect to the second alleged incident of assault, based on his deposition testimony, I am unable to decide this issue based on the current record.

[10]     *See* 7 N.Y.C.R.R. § 701.5.

October 20, 2011 grievance.[11] *See* Dkt. No. 35-8 at 8. Plaintiff states that he did not receive a response to his request, but did speak with a woman "whom [he was] told was grievance staff," which caused him to believe that his grievance was being investigated.[12] *Id.*; *see also* Dkt. No. 37-1 at 12.

The regulation on which plaintiff purportedly relied in requesting his extension, 7 N.Y.C.R.R. § 701.6(g), contemplates an extension of an inmate's time to grieve when the request is made beyond twenty-one days but within forty-five days of the incident, upon a showing of mitigating circumstances. Assuming plaintiff made his request to the Upstate IGRC on November 7, 2011, that is within forty-five days of October 1, 2011. Assuming further that plaintiff never received a response to his request for an extension of time, as he states, a question of fact remains regarding whether the process for requesting an extension of time under 7 N.Y.C.R.R. § 701.6(g) was available to plaintiff within forty-five days of October 1, 2011.

Moreover, plaintiff has adduced evidence of mitigating circumstances,

---

[11]     Plaintiff's grievance dated December 29, 2011 also indicates that he was in the hospital at Upstate beginning on an undisclosed date and concluding on November 7, 2011, and that he was unable to "mail anything" from the hospital during this period. Dkt. No. 35-8 at 8.

[12]     While not citing any record evidence in support of this statement, plaintiff has indicated in his statement of additional material facts that he submitted the October 20, 2011 grievance to the Upstate IGRC on November 7, 2011, and that the grievance was "held without filing until 45 days expired, then deemed untimely." *See* Dkt. No. 37-1 at 12.

in that he tried to timely file his grievance but submitted it to the wrong facility, and has further established that he filed a separate complaint grieving, among other things, the denial of an extension to the time limit. Dkt. No. 35-8 at 6-9. Defendants have not responded to plaintiff's contention that he requested an extension of time to exhaust his administrative remedies and never received a response to this request. It is therefore unclear whether, if the Upstate IGRC received plaintiff's request for an extension and the October 20, 2011 grievance within forty-five days of October 1, 2011, the request would have been granted. Based on these circumstances as well, I recommend that defendants' motion for summary judgment be denied to the extent it seeks dismissal of plaintiff's excessive force claims for failure to exhaust available administrative remedies.[13]

---

[13]     Recently, the Second Circuit ruled in *Williams v. Priatno*, --- F.3d ----, 2016 WL 3729383 (2d Cir. July 12, 2016) that a *pro se* inmate plaintiff was excused from exhausting his administrative remedies where the record showed that he (1) attempted to file a grievance at a facility where he was assaulted, (2) followed up with the Superintendent at the facility about the grievance after having received no response, (3) was then transferred to another facility, and (4) never appealed the grievance. 2016 WL 3729383, at *2, *5-*6. The *Williams* court rejected defendants' argument that the plaintiff in that case "still could have attempted to appeal the grievance in accordance with sections 701.6(g)(2) and 701.8(g)" even if the grievance was never filed in the first place and despite the fact that he had been transferred to a new facility prior to receiving a response, and concluded that "even if Williams technically could have appealed his grievance, . . . the regulatory scheme providing for that appeal is 'so opaque' and 'so confusing that ... no reasonable prisoner can use [it].'" *Id.* at *5 (quoting *Ross*, 136 S. Ct. at 1859). Based on the Second Circuit's holding in *Williams*, it would seem that plaintiff's failure to appeal the non-decision on his request for an extension, as well as plaintiff's failure to appeal the non-decision on his grievance submitted on October 11, 2011, is excusable.

With respect to plaintiff's due process claim, plaintiff does not contend that administrative remedies were not available to him. Rather, his argument appears to be that the IGP procedure need not be followed in situations where the claim is for a due process violation stemming from a disciplinary hearing and there has been a "final administrative appeal." Dkt. No. 35-21 at 7; Dkt. No. 37-1 at 10.

There is support for plaintiff's claim that formal exhaustion may not be required with respect to plaintiff's due process claim against defendant Phelix, based on his having appealed defendant Prack's affirmance of defendant Phelix's determination into the New York state courts. *See*, *e.g. Toliver v. Stefinick*, 12-cv-0077, 2016 WL 3351974, at *2 (N.D.N.Y. Mar. 22, 2016) (Baxter, M.J.) ("This court agrees that, before he initiated this lawsuit, plaintiff failed to exhaust his administrative remedies with respect to all of his remaining claims, except for the due process claims relating to disciplinary proceedings, which must be exhausted by administrative appeals of the sanctions imposed, not through the grievance process."), *adopted by* 2016 WL 3349316 (N.D.N.Y. June 15, 2016) (D'Agostino, J.); *see also LaBounty v. Johnson*, 253 F. Supp.2d 496, 502 n. 5 (W.D.N.Y. 2003) (citing *Flanagan v. Maly*, No. 99-CV-12336, 2002 WL 122921, at *2 (S.D.N.Y. Jan. 29, 2002)); *Samuels v. Selsky*, No. 01-CV-8235, 2002 WL

31040370, at *8 (S.D.N.Y. Sept. 12, 2002). Based upon these decisions, I recommend that plaintiff's due process claim be addressed on the merits.

C.    Merits of Plaintiff's Claims

Defendants maintain that in the event plaintiff is allowed to pursue his due process claim on the merits, summary judgment dismissing that claim is nonetheless appropriate because, based upon the record now before the court, no reasonable factfinder could conclude that plaintiff's due process rights were violated during the course of his disciplinary hearing.

As a general matter, to prevail on a section 1983 due process claim arising out of a disciplinary hearing, a plaintiff must show that he both (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *Tellier v. Fields*, 280 F.3d 69, 79-80 (2d Cir. 2000); *Hynes v. Squillace*, 143 F.3d 653, 658 (2d Cir. 1998); *Bedoya v. Coughlin*, 91 F.3d 349, 351-52 (2d Cir. 1996).

1.    Liberty Interest

In *Sandin v. Conner*, 515 U.S. 472 (1995), the Supreme Court determined that, to establish a liberty interest in the context of a prison disciplinary proceeding resulting in removal of an inmate from the general prison population, a plaintiff must demonstrate that (1) the state actually created a protected liberty interest in being free from segregation, and (2)

the segregation would impose an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 483-84; *Tellier*, 280 F.3d at 79-80; *Hynes*, 143 F.3d at 658. The prevailing view in this circuit is that, by its regulatory scheme, the State of New York has created a liberty interest in remaining free from disciplinary confinement, thus satisfying the first *Sandin* factor. *See*, *e.g.*, *LaBounty v. Coombe*, No. 95-CV-2617, 2001 WL 1658245, at *6 (S.D.N.Y. Dec. 26, 2001); *Alvarez v. Coughlin*, No. 94-CV-0985, 2001 WL 118598, at *6 (N.D.N.Y. Feb. 6, 2001) (Kahn, J.). Accordingly, I must next examine whether the allegations related to the conditions of plaintiff's SHU confinement rise to the level of an atypical and significant hardship under *Sandin*.

Atypicality in a *Sandin* inquiry is normally a question of law.[14] *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999). "[W]hether the conditions of a segregation amount to an 'atypical and significant hardship' turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker*, 139 F.3d 329, 336

---

[14] In cases where there is factual dispute concerning the conditions or duration of confinement, however, it may nonetheless be appropriate to submit those disputes to a jury for resolution. *Colon v. Howard*, 215 F.3d 227, 230-31 (2d Cir. 2000); *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999).

(2d Cir. 1998) (citing *Brooks v. DiFasi*, 112 F.3d 46, 48-49 (2d Cir. 1997)). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a court may not need to undergo a detailed analysis of these considerations. *Arce*, 139 F.3d at 336; *Hynes*, 143 F.3d at 658.

As to the duration of the disciplinary segregation, restrictive confinement of less than 101 days, on its own, does not generally rise to the level of an atypical and significant hardship. *Davis*, 576 F.3d at 133. Accordingly, when the duration of restrictive confinement is less than 101 days, proof of "conditions more onerous than usual" is required. *Davis*, 576 F.3d at 133 (citing *Colon*, 215 F.3d at 232-33 n.5). The court must examine "the [actual] conditions of [the plaintiff's] confinement 'in comparison to the hardships endured by prisoners in general population, as well as prisoners in administrative and protective confinement, assuming such confinements are imposed in the ordinary course of prison administration.'" *Davis*, 576 F.3d at 134 (quoting *Welch v. Bartlett*, 196 F.3d 389, 392-93 (2d Cir. 1999)). On the other hand, the Second Circuit has found that disciplinary segregation under ordinary conditions of more than 305 days rises to the level of atypicality. *See Colon*, 215 F.3d at 231 ("Confinement in normal SHU conditions for 305 days is in our judgment a sufficient departure from

the ordinary incidents of prison life to require procedural due process protections under *Sandin*.").

In this instance, the record evidence shows that, as a result of defendant Phelix's decision following the disciplinary hearing, plaintiff was held in disciplinary confinement for approximately 150 days before the decision was administratively reversed. Dkt. No. 35-3 at 79. Defendants do not dispute this fact.

The Second Circuit has explained that when an inmate plaintiff claims a due process violation plaintiff has been confined for an intermediate duration of between 101 and 305 days, the court must develop "a detailed record of the conditions of the confinement relative to ordinary prison conditions . . . and make a fact-intensive inquiry, . . . examining the actual circumstances of SHU confinement in the case before it without relying on its familiarity with SHU conditions in previous cases." *Palmer v. Richards*, 364 F.3d 60, 65 (2d Cir.2004) (internal quotation marks and citations omitted). "Disputes about conditions may not be resolved on summary judgment, . . . but where the conditions are undisputed, the *Sandin* issue should be resolved by the court as a matter of law." *Id.*

Plaintiff has introduced minimal evidence regarding the conditions of

his SHU confinement during the period in question.[15] Defendants, however, have failed to introduce any evidence concerning the conditions of SHU confinement at Bare Hill and Upstate. Because the parties have provided the court with little evidence regarding the conditions of plaintiff's SHU confinement, I have assumed, for purposes of this report, that plaintiff was deprived of a constitutionally cognizable liberty interest as a result of defendant Phelix's determination.

## 2. Procedural Safeguards

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established under *Wolff v. McDonnell*, 418 U.S. 539 (1974). In its decision in *Wolff*, the Court held that the constitutionally mandated due process requirements include (1) written notice of the charges to the inmate; (2) the opportunity to appear at a disciplinary hearing and a reasonable opportunity to present witnesses and evidence in support of his defense, subject to a

---

[15]     Plaintiff argues in his opposition brief that the conditions were atypical because he was denied medical treatment, prevented from filing complaints, and had his mail tampered with. Dkt. No. 37 at 12. Plaintiff has offered some evidence in support of his argument that his mail was tampered with and that, on one occasion, he was prevented from filing a grievance while in Bare Hill. However, plaintiff has not offered any evidence that he was denied medical treatment at either facility, aside from his conclusory statement, or subject to any atypical conditions of confinement while housed in Upstate's SHU. Plaintiff merely states that the conditions he experienced while confined in SHU were "terrible," and that while there he faced "extreme hostile, threating [sic] conditions." Dkt. No. 1 at 17.

prison facility's legitimate safety and penological concerns; (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken; and (4) in some circumstances, the right to assistance in preparing a defense. *Wolff*, 418 U.S. at 564-69; *see also Luna v. Pico*, 356 F.3d 481, 487 (2d Cir. 2004). To pass muster under the Fourteenth Amendment, it is also required that a hearing officer's disciplinary determination garners the support of at least "some evidence." *Superintendent, Mass. Corr. Inst., Walpole v. Hill*, 472 U.S. 445, 455 (1985); *Luna*, 356 F.3d at 487-88.

The due process clause of the Fourteenth Amendment also guarantees that "[a]n inmate subject to a disciplinary hearing is entitled to. . . an impartial hearing officer." *Allen v. Cuomo*, 100 F.3d 253, 259 (2d Cir. 1996) (citing *Wolff*, 418 U.S. at 570-71). The Second Circuit has explained that its "conception of an impartial decisionmaker is one who, *inter alia*, does not prejudge the evidence and who cannot say . . . how he would assess evidence he has not yet seen." *Patterson v. Coughlin*, 905 F.2d 564, 570 (2d Cir. 1990). "The degree of impartiality required of prison officials[, however,] does not rise to the level of that required of judges." *Allen*, 100 F.3d at 259. Indeed, "[i]t is well recognized that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in

other contexts." *Russell v. Selsky*, 35 F.3d 55, 60 (2d Cir. 1996). "A hearing officer may satisfy the standard of impartiality if there is 'some evidence in the record' to support the findings of the hearing." *Allred v. Knowles*, No. 06-CV-0456, 2010 WL 3911414, at *5 (W.D.N.Y. Oct. 5, 2010) (quoting *Hill*, 472 U.S. at 455).

Examining the record to determine whether plaintiff was afforded procedural due process at the disciplinary hearing, I find no reasonable factfinder could conclude that defendant Phelix or defendant Prack denied plaintiff the protections afforded under the due process clause. Plaintiff was served with formal notice of the charges against him four days before the hearing, was provided with an assistant three days prior to the hearing, was present for the hearing and allowed to question witnesses, had witnesses called on his behalf, and had the opportunity to respond to statements made by DOCCS employees as well as provide his own version of the events giving rise to the charges against him. Dkt. No. 35-10; Dkt. No. 35-21 at 3-5; Dkt. No. 37-1 at 3-7.

Plaintiff contends that the notice of charges provided to him was deficient, that defendant Phelix denied him the opportunity to call five witnesses, identified as inmate porters who may or may not have been working in the music room on October 1, 2011, that defendant Phelix was

biased, and that defendant Phelix's determination was not supported by any credible evidence. Dkt. No. 37-2 at 5-6. Plaintiff further claims that the assistant provided to him was "inadequate." *Id.* at 5.

With respect to plaintiff's challenge to the notice, plaintiff appears to be arguing that the notice charging him with "violent conduct" was procedurally improper because it did not identify the specific incident of violent conduct that gave rise to the charge. Dkt. No. 37-2 at 5-6. The misbehavior report that listed the charges against plaintiff, which was read into the record at the outset of plaintiff's disciplinary hearing,[16] set forth the date, time, and location of the incident giving rise to the charges, and included a very specific account of the interaction between plaintiff and defendants Richards and Langdon. *See* Dkt. No. 35-12. The description of the incident also explained that plaintiff refused to release an uncapped pen during a pat frisk procedure despite multiple orders for him to do so. *Id.*

It appears to be plaintiff's position that a refusal to release an uncapped pen when a guard is preparing a pat frisk cannot be construed as "violent conduct." It is unnecessary to resolve that question, since in any event there is no dispute that plaintiff was apprised of the charges against him in a manner that allowed him to prepare his defense, which is the

---

[16]      *See* Dkt. No. 35-10 at 10-11.

relevant inquiry as it relates to plaintiff's due process claim against defendant Phelix based on improper notice. *See, e.g., Kalwasinski v. Morse*, 201 F.3d 103, 108 (2d Cir. 1999) (rejecting inmate plaintiff's due process challenge based upon a "discrepancy as to the precise nature of the threatened harm" because the discrepancy "did not represent a failure of specificity that would impair Kalwasinski's ability to prepare his defense" given that the variance between the charge and proof arose in the context of an otherwise detailed misbehavior report). Moreover, to the extent plaintiff felt that the charge of violent conduct was improper or unwarranted, such a belief does not give rise to a due process claim against defendant Phelix. *See, e.g., Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir. 1986) (holding that an inmate who was found guilty by a prison disciplinary committee based on a false report did not have an actionable due process claim because the inmate was granted a hearing and the opportunity to rebut the false charges against him); *Fulmore v. Raimo*, 10-cv-1096, 2012 WL 4033731, at *4 (N.D.N.Y. Sept. 12, 2012) ("[J]ust as an inmate possesses no due process right to be free from being issued a false misbehavior report, an inmate possesses no due process right to be free from having that false misbehavior report relied on by a hearing officer at a disciplinary hearing."); *see also Boddie v. Schnieder*, 105 F.3d 857, 862 (2d Cir. 1997) ("[A] prison

inmate has no general constitutional right to be free from being falsely accused in a misbehavior report."); *Alexander v. Fischer*, 14-cv-0548, 2015 WL 10568892, at *8 (N.D.N.Y. Dec. 21, 2015) (Baxter, M.J.) ("A prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process."), *adopted by* 2016 WL 1261124 (N.D.N.Y. Mar. 30, 2016) (Sharpe, J.).

Turning next to the issue of uncalled witnesses, the record clearly shows that (1) plaintiff did not know which inmate porters were working in the music room on October 1, 2011, (2) plaintiff did not know whether any of the inmate porters who were working in the music room on October 1, 2011 witnessed the use of force by defendants Langdon and Richards, (3) plaintiff was allowed to choose five out of the ten inmate porters to call as witnesses, and (4) defendant Phelix asked the five inmate porters identified by plaintiff to be witnesses, and each declined. Dkt. No. 35-10 at 50-52. Plaintiff contends that, once the five inmate porters that he identified refused to testify as witnesses, defendant Phelix was obligated to ask the other five inmate porters to participate as witnesses, and his failure to do so violated plaintiff's due process rights. Dkt. No. 37 at 6-7, 15; Dkt. No. 37-2 at 5-6.

Prison disciplinary hearings are subject to judicial review for harmless error in a setting such as that now presented. *See Powell v. Coughlin*, 953 F.2d 744, 750 (2d Cir. 1991) ("If a person may be convicted and obliged to serve a substantial prison sentence notwithstanding a constitutional error determined to be harmless, surely the conditions of confinement of a sentenced prisoner may be made temporarily more severe as discipline for a prison rules infraction despite a harmless error in adjudicating the violation."). Moreover, it is well-established that "[d]isciplinary hearing officers . . . have the discretion to deny witnesses for valid reasons, including irrelevance, lack of necessity, and other factors particular to each case." *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 377 (N.D.N.Y. 2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J.) (citing *Wolff v. McDonnell*, 418 U.S. 539, 566-67 (1974).

In denying plaintiff's request to call all ten inmate porters, defendant Phelix noted that plaintiff's request was "a little excessive," and that whether any of these inmate porters had relevant testimony to offer was "a shot in the dark" given that plaintiff did not know who was in the music room on October 1, 2011, or what they witnessed, if anything. Dkt. No. 35-10 at 50. Plaintiff did not object to this characterization by defendant Phelix. Instead, he chose the witnesses he wanted to call, and informed defendant Phelix

that he spoke with one of these witnesses, implying that he knew the identity of at least one inmate porter who was working in the music room on October 1, 2011. Dkt. No. 35-10 at 50. That witness, as well as the other four inmate porters identified by plaintiff, refused to testify.

An inmate's refusal to testify at the disciplinary hearing of another inmate does not give rise to a due process claim against the hearing officer. *See, e.g., Creech v. Schoellkoph*, 688 F.Supp.2d 205, 213 (W.D.N.Y. 2010) (finding no due process violation where two witnesses called by inmate refused to testify). Similarly, an inmate's speculation regarding what testimony a potential witness might have offered is not enough to demonstrate prejudice and non-harmless error from a disciplinary hearing officer's refusal to ask that potential witness to participate in the hearing. *See Tafari v. Rock*, 10-cv-0729, 2012 WL 1340799, at *7 (W.D.N.Y. Apr. 18, 2012) (dismissing due process claim based on denial of right to call employee witnesses where inmate plaintiff "failed to show how he was prejudiced, if at all, by the alleged lack of their testimony" and "it appear[ed] that [the plaintiff did] not know whether [these witnesses] would have provided helpful or even relevant testimony"). Accordingly, defendant Phelix's decision not to ask five inmate porters whether they would be witnesses in plaintiff's disciplinary hearing based on plaintiff's speculation

that one or more of them could potentially possess relevant information regarding the charges against him does not rise to the level of a due process violation. *Id.*; *see also Hinton v. Prack*, 12-CV-1844, 2014 WL 4627120, at *12 (N.D.N.Y. Sept. 11, 2014) (although "a denial of the right to call witnesses without an explanation is a violation of New York's . . . regulations, . . . [the] decision to deny, without reason, Plaintiff's request to call . . . witnesses . . . did not rise to the level of a due process violation because Plaintiff failed to allege . . . how he was prejudiced").

Plaintiff's claim of bias on the part of defendant Phelix is entirely conclusory with no evidentiary support, and is therefore insufficient to withstand a motion for summary judgment. *See, e.g., Bunting v. Nagy*, 452 F.Supp.2d 447, 460-61 (S.D.N.Y. 2006) ("[I]n order to defeat a motion for summary judgment, a plaintiff-inmate must 'be armed with [something] more than conclusory allegations of bias and prejudgment'" of the disciplinary hearing officer) (quoting *Francis v. Coughlin*, 891 F.2d 43, 47 (2d Cir. 1989)). Indeed, there is no evidence in the record that defendant Phelix ever even had any interactions with plaintiff prior to the disputed disciplinary hearing, nor is there any evidence in the record that would in any way suggest a prejudging of the charges by defendant Phelix. Similarly, plaintiff's contention that his assistant was inadequate does not give rise to

a claim against defendant Phelix, who was not personally involved in any alleged inadequate services rendered by the corrections counselor assigned to assist plaintiff at his disciplinary hearing.

Finally, with respect to plaintiff's contention that defendant Phelix's ruling on the charges was not supported by "any real credible evidence," plaintiff is misguided. The Supreme Court has made clear that "where a prisoner claims he was denied due process in a prison disciplinary hearing because he was found guilty on the basis of insufficient evidence, the claim must be rejected if there was at least 'some evidence' to support the decision." *Gaston v. Coughlin*, 249 F.3d 156, 163 (2d Cir. 2001) (quoting *Superintendent, Massachusetts Correctional Institution v. Hill*, 472 U.S. 445, 455 (1985)).

In this case, plaintiff was charged with violent conduct, interference with an employee, harassment, violating a direct order, and refusal of a search and frisk. Dkt. No. 35-10 at 4-5, 17. Plaintiff was found guilty of all charges with the exception of the charge of interference with an employee. *Id.* at 55. In addition to both the misbehavior report and written memorandum created by defendant Richards setting forth grounds for the charges against plaintiff for which he was found guilty, defendants Langdon and Richards testified at plaintiff's disciplinary hearing. Dkt. No. 35-10 at

17-19, 23-25. Both testified that plaintiff refused several orders to drop an uncapped pen in his hand while he was in a pat frisk position, despite having time to drop the pen and knowing that defendants Langdon and Richards were ordered by Sergeant Carey to conduct a pat frisk. *Id.* Defendant Richards further testified that, after plaintiff was ordered to drop the pen, plaintiff cursed at defendant Richards and then resisted his and defendant Langdon's effort to place him in restraints, while still holding the pen. *Id.* at 17-19. This testimony constitutes "some evidence" that plaintiff was guilty of the charges against him other than interference, as defendant Phelix concluded. *Id.* at 55.

In short, for all the reasons discussed above, I recommend a finding that plaintiff's allegations regarding the violation of his due process rights are unfounded, and that no reasonable factfinder could conclude plaintiff was deprived of due process by defendant Phelix during the course of his disciplinary hearing. Accordingly, defendants' motion for summary judgment should be granted and plaintiff's claims against defendants Phelix and Prack should be dismissed.[17]

---

[17] It could be argued that plaintiff's due process claim against defendant Prack is also potentially subject to dismissal for lack of personal involvement. Plaintiff's claim against defendant Prack is based on defendant Prack's failure to overturn defendant Phelix's determination. While the issue is the subject of debate in this circuit, at least some courts have held that a failure to reverse a disciplinary hearing officer's determination at the administrative appellate level does not, by itself, give rise to a

D.    Qualified Immunity

Defendants also seek dismissal of plaintiff's claims asserted against them based on the doctrine of qualified immunity. Dkt. No. 35-22 at 20. Having already dismissed plaintiff's due process claims against defendants Phelix and Prack on the merits, I will only address this argument with respect to plaintiff's excessive force claims against defendants Langdon and Richards.

"Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012); *see also Pearson v. Callahan*, 555 U.S. 223, 231 (2009); *Sudler v. City of N.Y.*, 689 F.3d 159, 174 (2d Cir. 2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power

_____

separate constitutional violation. *See Jackson v. Bradt*, 13-cv-0004, 2014 WL 2505218, at *4 (W.D.N.Y. May 28, 2014) ("As to defendant Prack, the only allegation is that he affirmed Murray's disposition[, and] [t]his allegation alone is insufficient to state a claim against Prack."); *Parks v. Smith*, 08-CV-0586, 2011 U.S. Dist. LEXIS 102460, 2011 WL 4055415, at *13 (N.D.N.Y. Mar. 29, 2011) (Lowe, M.J.), *adopted by* 2011 WL 4055414 (N.D.N.Y. Sept. 12, 2011) (McAvoy, J.); *Woodward v. Mullah*, No. 08-CV-463A, 2009 U.S. Dist. LEXIS 113917, 2009 WL 4730309, at *2-3 (W.D.N.Y. Dec. 7, 2009); *but see Smith v. Rosati*, 10-cv-1502, 2013 WL 1500422, at *7 (N.D.N.Y. Feb. 20, 2013) (collecting cases holding that "the review and response to an appeal of a disciplinary conviction are sufficient to establish personal involvement because that conduct implicates the second of the five potential grounds for supervisor liability under *Colon* [*v. Coughlin*, 58 F.3d 865 (2d Cir. 1995)].") (Peebles, M.J.), *adopted by* 2013 WL 1501022 (N.D.N.Y. Apr. 10, 2013) (Hurd, J.).

irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler*, 689 F.3d at 174 (citing *Saucier v. Katz*, 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson*, 555 U.S. 223)).

Because qualified immunity is "an immunity from suit rather than a mere defense to liability," *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly . . . stressed the importance of resolving immunity questions at the earliest possible stage in the litigation," *Pearson*, 555 U.S. at 231 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991) (per curiam)).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff*, 642 F.3d 334, 345 (2d Cir. 2011). Specifically, the inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a statutory or constitutional right, and if so, whether that right "was clearly established at the time of the challenged conduct." *Terebesi v. Torreso*, 764 F.3d 217, 230 (2d Cir. 2014) (citing *Reichle*, 132 S. Ct. at 2093). The Supreme Court has said that an officer's "conduct violates

clearly established law when, at the time of the challenged conduct, the contours of a right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2083 (2011) (quotation marks and alterations omitted). "To this end, a plaintiff need not show a case 'directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate.'" *Terebesi*, 764 F.3d at 230 (quoting *al-Kidd*, 131 S. Ct. at 2083). However, '[e]ven where the law is 'clearly established' and the scope of an official's permissible conduct is 'clearly defined,' the qualified immunity defense also protects an official if it was 'objectively reasonable' for him at the time of the challenged action to believe his acts were lawful." *Higazy v. Templeton*, 505 F.3d 161, 169-70 (2d Cir. 2007) (citations omitted). This "objective reasonableness" part of the test is satisfied if "officers of reasonable competence could disagree on [the legality of the defendant's actions]." *Malley v. Briggs*, 475 U.S. 335, 341 (1986). Stated differently, a defendant has acted in an objectively unreasonable manner only "when no officer of reasonable competence could have made the same choice in similar circumstances." *Lennon v. Miller*, 66 F.3d 416, 420-21 (2d Cir.1995).

     In this case, when viewing the evidence in the light most favorable to plaintiff and drawing all inferences in his favor, I find that a question of fact

remains regarding whether it was objectively reasonable for defendants Langdon and Richards to believe their acts were lawful when they used force against plaintiff on the morning of October 1, 2011. For example, plaintiff testified that defendant Richards knew plaintiff to be in possession of a pen before commencing a pat frisk, and proceeded with the frisk while at the same time preventing plaintiff from releasing the pen. Dkt. No. 35-3 at 18-19, 38-45. The misbehavior report drafted by defendant Richards also indicates that plaintiff's possession of the pen was the reason why force was used against him.[18] Dkt. No. 35-12. Crediting plaintiff's version of the events, a reasonable factfinder could conclude that no amount of force was needed to effectuate a pat frisk under the circumstances such that defendant Richards and Langdon's use of force was not objectively reasonable. Plaintiff also testified that, as a result of the force used against him, he suffered a dislocated shoulder. Dkt. No. 35-3 at 56-57. Accordingly, I recommend that defendants' motion for summary judgment dismissing plaintiff's claims against defendants Langdon and Richards on the basis of qualified immunity be denied.

　　　　With respect to the second alleged use-of-force incident that occurred

---

[18]　　The misbehavior report notes that Sergeant Casey ordered defendants Richards and Langdon to take plaintiff to the floor. *See* Dkt. No. 35-12. Plaintiff, however, testified that it was defendant Richards who gave that order. *See* Dkt. No. 35-3 at 43-45.

on October 1, 2011, plaintiff testified that, while at the SHU facility and facing the wall in a room, he was approached from behind and punched in the ribs by a sergeant he did not know, after which point he was hit multiple times on the head, legs and inner-thigh by other unknown officers, all without provocation or any justification. Dkt. No. 35-3 at 58, 61-63. Defendants have not offered any evidence to contradict plaintiff's version of the events. Accordingly, when viewing the evidence in the light most favorable to plaintiff and drawing all inferences in his favor, I find that a question of fact remains regarding whether it was objectively reasonable for any force to be used against plaintiff while he was in SHU on October 1, 2011.

D.    Status of Doe Defendants

In his complaint, plaintiff alleges that he was assaulted twice on October 1, 2011. Dkt. No. 1 at 12-14. With respect to the second alleged incident of assault, plaintiff names as defendants John Doe #1, John Doe #2, and John Doe #3. *Id.* at 3. Plaintiff admitted during his deposition that he did not know the identity of anyone who participated in this second alleged incident of assault. Dkt. No. 35-3 at 63, 68. In plaintiff's response to defendants' motion for summary judgment, plaintiff now states for the first time that he believes defendant Richards was one of the individuals present

during this second assault. Dkt. No. 37-2 at 5. Plaintiff cites as support for this believe an inmate injury report. *Id.* (citing Dkt. No. 37-3 at 21).

Leaving aside the question of whether defendant Richards was involved in the second assault on October 1, 2011, plaintiff has failed to take any steps to identify any other of the Doe defendants despite his testimony that the names of the officers who escorted him "around in the SHU area to a cell" after the second alleged assault ended was "probably part of discovery" because he "asked who was present including those people who was working there." Dkt. No. 35-3 at 68.

Dismissal of a claim under Rule 41(b) for failure to prosecute is appropriate "where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe defendants" but has failed to do so. *Jones v. Rock*, No. 12-CV-0447, 2015 WL 791547, at *21 (N.D.N.Y. Feb. 24, 2015) (Mordue, J., *adopting report and recommendation by* Dancks, M.J.) (quotation marks and alteration omitted); *Le Sane v. Hall's Sec. Analyst, Inc.*, 239 F.3d 206, 209 (2d Cir. 2001) (Rule 41(b) "gives the district court authority to dismiss a plaintiff's case *sua sponte* for failure to prosecute"); *Delrosario v. City of N.Y.*, 07-cv-2027, 2010 WL 882990, at * 5 (S.D.N.Y. Mar.4, 2010) (*sua sponte* dismissing claims against John Doe Defendants for failure to prosecute "[w]here discovery was closed and the

Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants"); *Coward v. Town & Vill. of Harrison*, 665 F.Supp.2d 281, 301 (S.D.N.Y. 2009) ("Where a plaintiff has had ample time to identify a John Doe defendant but gives no indication that he has made any effort to discover the defendant's name, the plaintiff simply cannot continue to maintain a suit against the John Doe defendant."). Likewise, on a motion from a defendant, and in the absence of a showing of good cause by the plaintiff, dismissal of a claim under Rule 4(m) is appropriate if the defendant has not been served within ninety days after the complaint is filed.

The court's initial order reviewing plaintiff's complaint permitted plaintiff to proceed with his claims against the John Doe defendants, provided that plaintiff "take reasonable steps to ascertain the identity" of the Doe defendants so as to permit the timely amendment of the complaint and service of process on them. Dkt. No. 4 at 22. That order warned plaintiff, however, as follows: "If plaintiff fails to ascertain the identity of any defendant so as to permit the timely service of process, all claims against that individual will be dismissed." *Id.* The deadline for joining parties to this lawsuit and amending pleadings was originally July 2, 2015. Dkt. No. 15 at 5. That deadline was extended twice, and ultimately passed on September 8, 2015. Dkt. Nos. 19, 21. Discovery in this matter was originally scheduled

to close on September 4, 2015. Dkt. No. 15 at 5. That deadline was subsequently extended four times, ultimately to December 18, 2015. Dkt. Nos. 19, 21, 28, 31.

It is now more than ten months past the extended deadline for joinder of parties. Yet, despite the warnings given, plaintiff does not appear to have taken any steps to ascertain the identities of the unnamed corrections officers. As such, I recommend that the claims brought against these unnamed Doe defendants be *sua sponte* dismissed, without prejudice.

IV.    SUMMARY AND RECOMMENDATION

Defendants seek dismissal of all of plaintiff's claims set forth in the complaint based on a variety of grounds, both procedural and substantive. While plaintiff's due process claim is subject to dismissal on the merits, plaintiff's excessive force claim asserted against defendants Langdon and Richards should survive defendants' motion because questions of fact remain relating to the procedural issue of exhaustion, and at least the factual issue of whether the amount of force used against plaintiff was reasonable under the circumstances. Plaintiff's excessive force claim asserted against the John Doe defendants, however, should be dismissed based upon plaintiff's failure to take the steps necessary to identify the three Doe defendants and join them in the action. Accordingly, it is hereby

respectfully

RECOMMENDED that defendants' motion for summary judgment (Dkt. No. 35) be GRANTED in part and DENIED in part, as follows:

(1)     Plaintiff's due process claim asserted against defendants Phelix and Prack should be DISMISSED;

(2)     Plaintiff's excessive force claims asserted against the John Doe defendants should be DISMISSED; and

(3)     Plaintiff's excessive force claims, asserted against defendants Richards and Langdon, should survive defendants' motion; and it is further respectfully

RECOMMENDED that defendants Phelix, Prack, John Doe #1, John Doe #2 and John Doe #3 be DISMISSED from this action.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir. 1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules.

Dated:     July 29, 2016
           Syracuse, New York

_____
David E. Peebles
U.S. Magistrate Judge



Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

C   Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Wayne HARGROVE, Plaintiff,
v.
Sheriff Edward RILEY; Nassau County Correctional
Facility, et al; Nassau County University Medical Staff
and Nassau County Correctional Facility, Defendants.
**Civil Action No. CV-04-4587 (DGT).**

Jan. 31, 2007.

Wayne Hargrove, Ossining, NY, pro se.

Alexander V. Sansone, Troy & Troy, Lake Ronkonkoma,
NY, Joseph Carney, Mineola, NY, for Defendants.

*MEMORANDUM AND ORDER*

TRAGER, J.

*1 Inmate Wayne Hargrove ("Hargrove" or "plaintiff")
brings this *pro se* action pursuant to 42 U.S.C. § 1983
against the Nassau County Sheriff, Nassau County
Correctional Facility ("NCCF") and NCCF's medical staff,
(collectively, "defendants"), seeking damages for injuries
allegedly caused by defendants while he was incarcerated
at NCCF. Defendants now move for summary judgment
pursuant to Fed.R.Civ.P. 56 arguing, *inter alia,* that
Hargrove's claims should be dismissed because he failed
to exhaust administrative remedies, as required by the
Prison Litigation Reform Act of 1995 ("PLRA"), 42
U.S.C. § 1997e. For the following reasons, defendants'
motions for summary judgment are granted.

**Background**

On August 27, 2004,[FN1] Hargrove filed a complaint,
alleging that defendants violated his civil rights when they
forcibly administered purified protein derivative skin tests
("PPD test") to test for latent tuberculosis ("TB") in April
2002, 2003 and 2004 while he was incarcerated at NCCF.
Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A. Hargrove
named Nassau County Sheriff Edward Reilly ("Reilly"),
NCCF and Nassau County University Medical Staff [FN2] as
defendants.[FN3] On November 22, 2004, after discovery,
County Defendants and NHCC Defendants filed separate
motions for summary judgment pursuant to Fed.R.Civ.P.
56. Both defendants properly filed a Local Rule 56.1
Statement and served Hargrove a Notice to *Pro Se* Litigant
Opposing Motion for Summary Judgment, pursuant to
Local Civil Rule 56.2.

FN1. Hargrove signed the complaint August 27,
2004. The *pro se* clerk's office received and filed
the complaint on September 20, 2004. Under the
prison mail-box rule, a *pro se* prisoner's
complaint is deemed filed when it is delivered to
prison authorities. *See, e.g., Walker v.
Jastremski,* 430 F.3d 560, 562 (2d
Cir.2005)(deeming *pro* se prisoner's § 1983
action filed on date complaint was handed to
prison officials). There is no evidence in the
record as to when Hargrove handed the
complaint to prison officials. However, it is clear
the operative date is between August 27, 2004
and September 20, 2004. As discussed, *infra,*
both of these dates occur before Hargrove
properly exhausted the administrative remedies
available to him at NCCF.

FN2. The Nassau County University Medical
Staff are employed by the Nassau Health Care
Corporation ("NHCC"). Pursuant to the
Correctional Center Health Services Agreement
between the County of Nassau and NHCC, dated
September 24, 1999, NHCC provides medical
services for inmates at NCCF. County Defs.'s

© 2010 Thomson Reuters. No Claim to Orig. US Gov.
Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Not. of Motion, Decl., at 1.

FN3. Reilly and NCCF are represented separately from NHCC. Accordingly, when a distinction is necessary, Reilly and NCCF will be referred to as "County Defendants" and Nassau County University Medical Staff and NHCC will be referred to as "NHCC Defendants."

**(1)**

**Tuberculosis Testing at NCCF**

Upon entering NCCF, new prisoners must first go through medical intake. Aff. of Kim Edwards, ("Edwards Aff.") ¶ 3. This standard process usually takes seventy-two hours. Edwards Aff. ¶ 4. During medical intake, NCCF tests inmates for TB. Aff. of Getachew Feleke ("Feleke Aff.") ¶ 3. NCCF generally uses a PPD test to detect latent TB. Feleke Aff. ¶ 3. However, if an inmate has previously tested positive for TB, it is NCCF's policy to test for TB using an x-ray instead.[FN4] Feleke Aff. ¶ 3. As part of its Infectious Disease Program, NCCF re-tests inmates for TB each year, beginning after they have been housed in that facility for one year. Edwards Aff. ¶ 5.

FN4. According to WebMD, "[a] tuberculin skin test should not be done for people who have a(1) Known TB infection [or a] (2) Positive tuberculin skin test in the past. A second test may cause a more severe reaction to the TB antigens." Jan Nissl, RN, BS, *Tuberculin Skin Tests,* W E B M D , h t t p : / / www.webmd.com/hw/lab_tests/hw203560.asp (last visited Jan. 31, 2007).

**(2)**

**Hargrove's Tuberculosis Testing at NCCF**

On March 15, 2002, Hargrove was incarcerated at NCCF.

NHCC Defs.' 56.1 Statement ¶ 1. Before entering the general population, Hargrove was processed through medical intake. NHCC Defs.' 56.1 Statement ¶ 2. The NCCF Medical Intake Chart for Hargrove, dated March 15, 2002 ("3/15/02 Chart"), shows that Hargrove informed medical staff that he had previously been exposed to tuberculosis. NHCC Defs.' Notice of Mot., Ex. C, at 1; NHCC Defs.' 56.1 Statement ¶ 2. The 3/15/02 Chart also shows that Hargrove reported testing positive to a prior PPD test and that he had been treated for TB in 2000. NHCC Defs.' Notice of Mot., Ex. C, at 1. Hargrove alleges that he was exposed to and treated for TB in 1997. Hargrove's Aff. in Opp. to Mot. for Summary Judgment, ("Aff. in Opp."), Ex. A at 1-2. Defendants contend that Hargrove was given an x-ray during the medical intake process because of his reported positive PPD test, and that the x-ray was negative, showing no active TB infection. NHCC Defs.' 56.1 Statement ¶ 2; Edwards Aff. ¶ 3. Without specifying a date, Hargrove generally states that his "request to be x-rayed was denied." Aff. in Opp. at 3.

**\*2** Pursuant to NCCF's Infectious Disease Program, after being incarcerated in NCCF for a year, Hargrove was scheduled to be re-tested for TB. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. On May 24, 2003, Hargrove was given a PPD skin test. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. This test was negative. Edwards Aff. ¶ 5; NHCC Defs.' 56.1 Statement ¶ 4. According to Hargrove, he requested an x-ray instead of a PPD test because of his previous exposure to TB, but was forced to submit to the PPD test. He also alleges that defendants threatened to put him in "keep lock" or "lock up" unless he submitted to the PPD test.[FN5] Complaint, Ex. C; Aff. in Opp. at 1-4, Ex. A.

FN5. Hargrove has made contradictory statements about being placed in "keep lock" or "lock up". It is unclear whether he is alleging that defendants threatened to place him in "lock up" unless he submitted to the PPD test or whether he was actually placed in "lock up" until such time that he agreed to submit to the PPD tests. For example, in his complaint, Hargrove states that when he "refused to submit to another [PPD] test, the Correctional Authorities were brought in and placed [him] in lock up." Complaint ¶ 4. In a hearing before Magistrate Judge Bloom on

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

January 31, 2005, Hargrove stated that he took the PPD tests because he was told that he would be placed in "lock up" until he submitted to the test. Hr'g Tr. 6:1-18; 9:5-10:10. In Exhibit B to his complaint, Hargrove alleges both that he was given an unwarranted TB shot and that when he refused the same shot he was placed in "keep lock." Complaint, Ex. B. There is no evidence in the record that Hargrove was ever segregated from the general population while housed at NCCF, outside of the seventy-two hour initial medical intake period. Aff. of Sgt. Neumann ("Neumann Aff.") at 1-2 (referring to prison records showing Hargrove's holding locations which demonstrate that he was never placed in "lock up"); NCCF 56.1 Statement ¶ E. Whether or not Hargrove was actually placed in "lock up" is not a material fact for purposes of this motion; as explained in detail, *infra,* Hargrove's failure to exhaust administrative remedies under the PLRA precludes a consideration of the merits of his Section 1983 claim.

The following year, in June of 2004, Hargrove was scheduled to be retested. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Because of the contradiction between the negative May 2003 PPD test and his reported positive history, NCCF contacted the Infectious Disease Department of the Nassau County Medical Center. Edwards Aff. ¶ 6. It was suggested that Hargrove be given a two-step PPD test, administered fifteen days apart. Feleke Aff. ¶ 4; Edwards Aff. ¶ 6. Hargrove was given these two PPD skin tests in June 2004. Edwards Aff. ¶ 6; NHCC Defs.' 56.1 Statement ¶ 5. Again, Hargrove alleges that these tests were administered against his will and under threat of being placed in quarantine. Complaint, Exs. A, B; Aff. in Opp'n, Ex. A.

On December 3, 2004, Hargrove was seen by a physician's assistant. NHCC Defs.' 56.1 Statement ¶ 6. During this meeting, Hargrove complained of a dry cough and that the site on his forearm where the June 2004 PPD tests had been administered was red and swollen. NHCC Defs.' 56.1 Statement ¶ 6; 11/28/04 Sick Call Request.

Hargrove's December 18, 2004 chart notes a positive PPD

test and an order was placed in the chart that Hargrove not be submitted for future PPD tests. Edwards Aff. ¶ 7; NHCC Defs.' 56.1 Statement ¶ 8. *See also* 11/19/2004 Grievance.

Hargrove alleges that the following physical ailments were caused by the PPD tests: chronic coughing, high blood pressure, chronic back pain, lung infection, dizzy spells, blurred vision and a permanent scar on both his forearms. Complaint, Ex. C; Aff. in Opp'n at 3-4.

(3)

**NCCF's Inmate Grievance Procedure**

NCCF has had an inmate grievance program ("IGP") in place since 2001. Aff. of Kenneth Williams, ("Williams Aff."), at 2. NCCF's IGP is carried out in conformance with the New York State Commission of Corrections Minimum Standards and Regulations for Management of County Jails and Penitentiaries ("Minimum Standards"). *Id.*

The IGP is designed to resolve complaints and grievances that an inmate may have regarding the inmate's care and treatment while incarcerated at NCCF. Williams Aff. at 2. Upon entering NCCF, all inmates receive a copy of the NCCF inmate handbook, which outlines the IGP. *Id.*

**\*3** The record does not include an actual copy of NCCF's IGP, but the NCCF's IGP is detailed in the affidavit of NCCF Investigator Kenneth Williams. [FN6] The IGP encourages inmates to resolve their grievances informally with the staff member assigned to the inmate housing unit first. *Id.* If an acceptable resolution cannot be reached, inmates must then proceed through the formal three-step process set out in the IGP. *Id.* at 3.

FN6. Hargrove does dispute any statements made by Investigator Williams regarding the inmate grievance procedure, time limits or its availability to him. Furthermore, Hargrove does

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

not dispute that he received a handbook outlining the IGP.

The first step requires an inmate to submit his grievance form [FN7] to the Inmate Grievance Unit by placing it in a locked box located in each housing area, "within five days of the date of the act or occurrence giving rise to the grievance." [FN8] *Id.* at 2-3. NCCF indexes all grievance forms filed by inmates in a log book and in a computer system. *Id.* at 1, 3. Once a grievance form is received by the Inmate Grievance Unit, the grievance is investigated and the inmate will receive a written determination of the outcome from the Inmate Grievance Coordinator in Section II of the grievance form. [FN9] *Id.* at 3. The inmate is then given a choice to accept or appeal the decision by checking the desired selection and signing his name in Section III of the grievance form. *See, e.g.,* 11/19/2004 Grievance form. If the inmate is not satisfied with the decision of the Inmate Grievance Coordinator, the inmate may appeal the determination to the Chief Administrative Officer. Williams Aff. at 3. Finally, if the inmate is not satisfied with the Chief Administrative Officer's determination, the inmate may appeal to the New York State Commission of Correction Citizen's Policy and Complaint Review Council ("Council"). *Id.* at 3. The Council will then render a final determination. *Id.* at 3.

FN7. The grievance forms contain four sections to be utilized throughout all three steps of the IGP. Section I provides space for the inmate to explain his complaint and the actions he requests as relief. Section II is for the decision of the Inmate Grievance Coordinator. Section III is titled "Acceptance/Appeal of Grievance Coordinator's decision" and contains two mutually exclusive options in which the inmate must choose one or the other: "I have read and accept the Grievance Coordinator's decision," or "I have read and appeal the Grievance Coordinator's decision." Section IV provides space for the decision of the Chief Administrative Officer.

FN8. Hargrove has not argued that he was unaware of this five-day deadline.

FN9. There is no evidence in the record specifying the how long an inmate has to appeal inaction by the Inmate Grievance Unit.

(4)

**Authenticity of the Grievance Forms and Other Documents Submitted by Hargrove**

In support of his allegations that he continuously informed defendants that he had been exposed to TB and, therefore, should not have been given PPD tests, Hargrove submitted three letters with his complaint, two of which were addressed to the Inmate Grievance Committee and one of which was addressed to "To whom this may concern." Complaint, Exs. A-C. He also submitted five complaint letters written to Sheriff Reilly, seventeen sick call requests and nine grievance forms during discovery and with his Affidavit in Opposition to Defendants' Motion for Summary Judgment, explaining that some of the medical records and notarized letters were "missing." Aff. in Opp, Ex. A at 2. Defendants call the authenticity of most of these documents into question, contending that Hargrove never submitted any grievance form or complaint letter before he filed his complaint. County Defs.' Mem. of Law at 16-21; County Defs.' 56.1 Statement at ¶¶ B2, C3, D3.

Kenneth Williams, an investigator at NCCF in the Inmate Grievance Unit, testified that he reviewed all of the grievance forms, complaint letters and sick call requests annexed to Hargrove's Complaint and to Hargrove's Affidavit in Opposition to Defendants' Motion for Summary Judgment. Williams Aff. at 2. Williams testified that he examined the grievance records at NCCF and searched "for any grievances by plaintiff/inmate Hargrove" and found "only two." [FN10] Williams Aff. at 1. The first grievance, dated November 19, 2004, complained that the medical staff continued "forcing [Hargrove] to take a T.B. shot while [he] keep[s] telling them that [he] has been exposed to T.B." 11/19/2004 Grievance; Williams Aff. at 1. In response to this grievance, Hargrove's "positive" TB status was noted in his medical records and an order was placed in Hargrove's medical chart, stating that Hargrove not be subjected to future PPD tests. 11/19/2004 Grievance, Section II;

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

Williams Aff. at 1; NHCC Defs.' 56.1 Statement ¶ 8; Edwards Aff. ¶ 7. In Section III of the 11/19/2004 Grievance, Hargrove acknowledged that he had read the Grievance Coordinator's decision, and that he chose to accept the decision instead of appealing it. 11/19/2004 Grievance. The other grievance received by the Grievance Unit, dated May 11, 2005, complained of an unrelated matter. 5/11/2005 Grievance (complaining of back problems and requesting the return of his medical shoes); Williams Aff. at 1. Thus, Williams concluded that, beside the 11/19/2004 and 5/11/2005 Grievance Forms, none of the other documents were "received by the grievance unit, and, given the locked box system, the grievance-forms were never submitted by plaintiff/inmate." Williams Aff. at 2.

> FN10. It is NCCF's procedure to forward to the attention of the Grievance Unit all official grievance forms and complaint letters-even ones not specifically addressed to the Grievance Unit. Williams Aff. at 3.

*4 A visual examination of the grievance forms Hargrove submitted in support of his claims suggests forgery. Five of the nine grievance forms were requests to stop PPD testing. *See* April 19, 2002 grievance; April 28, 2002 grievance; April 20, 2003 grievance; April 28, 2003 grievance; November 19, 2004 grievance. The remaining grievance forms concerned Hargrove's requests for medical shoes. *See* March 18, 2002 grievance; July 6, 2002 grievance; February 20, 2003 grievance; May 11, 2005 grievance. Of the grievance forms complaining of unwanted PPD tests, the April 28, 2002 grievance form is a patent photocopy of the April 19, 2002 grievance form, and the April 28, 2003 grievance form is a patent photocopy of the April 20, 2003 grievance form, with only the handwritten dates changed. The only potentially authentic grievance forms relating to Hargrove's complaint about the PPD testing are dated April 19, 2002, April 20, 2003, and November 19, 2004. Of these grievance forms, only the November 19, 2004 has been authenticated by NCCF personnel. *See generally* Williams Aff. at 1-4.

Turning to the complaint letters addressed to Reilly, many contain notary stamps cut from the bottom of unrelated

documents and photocopied onto the bottom of the complaint letters. *See* County Defs.' Mem. of Law at 18-21. C.O. Thomas McDevitt and C.O. Paul Klein, both of whom perform notary services for prisoners at NCCF, have submitted sworn affidavits, stating that they kept individual Notary Log Books covering all dates relevant to this litigation. Aff. of C.O. Klein, ("Klein Aff."), at 1; Aff. of C.O. McDevitt, ("McDevitt Aff."), at 1. McDevitt's Notary Log Book shows that he notarized only one document for Hargrove. This document, dated May 13, 2002, was a motion related to Hargrove's criminal trial. McDevitt Aff. at 1-2. Hargrove signed the Notary Log Book acknowledging receipt of that notarized motion. McDevitt Aff. at 2. McDevitt states that he never notarized any other documents for Hargrove. McDevitt Aff. at 2. However, McDevitt's stamp and signature dated May 13, 2002 (the date of the legitimate notarization) appear on Hargrove's letter to Sheriff Reilly dated May 10, 2002. County Defs.' Not. of Motion, Ex. A.

These facts repeat themselves in regard to the documents bearing the notary stamp and signature of Klein. Klein had performed several legitimate notarizations for Hargrove in connection to Hargrove's criminal trial. Klein Aff. at 1-2. Hargrove signed Klein's Notary Log Book acknowledging receipt of those notarized documents. Klein Aff. at 2. However, Klein states that he never notarized any of Hargrove's letters addressed to Sheriff Reilly that bear Klein's stamp and signature. Klein Aff. at 2. On all of the documents that Hargrove submitted bearing Klein's stamp and signature, the dates and signatures of Klein match identically to the dates on which he had performed legitimate notarizations for Hargrove in connection with his criminal trial. Defendants argue it is clear that the documents bearing the stamps and signatures of McDevitt and Klein were not actually notarized by these notaries. County Defs.' Mem. of Law at 17-22.

*5 Hargrove does not deny these allegations. Instead, he resubmits the documents that McDevitt and Klein testify they did not notarize with his Affidavit in Opposition and insists that the documents "refute[ ] the assertions put forth by the defendants." Aff. in Opp. at 2.

**Discussion**

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

**(1)**

**Summary Judgment Standard**

A motion for summary judgment is granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). A court ruling on a summary judgment motion must construe the facts in the light most favorable to the non-moving party and draw all reasonable inferences in his favor. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986); *Williams v. Metropolitan Detention Center,* 418 F.Supp.2d 96, 100 (E.D.N.Y.2005). Defendants, the moving party in this action, bear the burden of demonstrating the absence of a genuine issue of material fact. *Baisch v. Gallina,* 346 F.3d 366, 371 (2d Cir.2003).

As Hargrove is proceeding *pro se,* his complaint must be reviewed carefully and liberally, and be interpreted to "raise the strongest argument it suggests," *Green v. United States,* 260 F.3d 78, 83 (2d Cir.2001), particularly when civil rights violations are alleged, *see, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004). Plaintiff's complaint does not specify the legal theories upon which it relies, but, in construing his complaint to raise its strongest arguments, it will be interpreted to raise claims under 42 U.S.C. § 1983. *See, e.g., Dufort v. Burgos,* No. 04-CV-4940, 2005 WL 2660384, at *2 (E.D.N.Y. Oct. 18, 2005) (liberally construing plaintiff's complaint, which failed to specify the legal theory or theories upon which it rested, as, *inter alia,* a claim under 42 U.S.C. § 1983); *Williams,* 418 F.Supp.2d at 100 (same).

**(2)**

**Prison Litigation Reform Act**

**a. Purpose of the Prison Litigation Reform Act**

The PLRA was intended to "reduce the quantity and improve the quality of prisoner suits." *Woodford v. Ngo,*

--- U.S. ----, 126 S.Ct. 2378, 2387 (2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 524 (2002)). It seeks to eliminate unwarranted interference with the administration of prisons by federal courts, and thus " 'affor[d] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case.' " *Woodford,* 126 S.Ct. at 2387 (quoting *Porter,* 534 U.S. at 525).*See also Booth v. Churner,* 532 U.S. 731, 739 (2001). Formal grievance procedures allow prison officials to reconsider their policies, implement the necessary corrections and discipline prison officials who fail to follow existing policy. *See Ruggiero v. County of Orange,* 467 F.3d 170, 177-78 (2d Cir.2006).

**b. The Exhaustion Requirement**

The PLRA's "invigorated" exhaustion provision, 42 U.S.C. § 1997e(a), provides the mechanism to reduce the quantity and improve the quality of prisoners' suits by requiring that prison officials have the opportunity to address prisoner complaints through internal processes before allowing a case to proceed in federal court. *Woodford,* 126 S.Ct. at 2382 (citing *Porter,* 534 U.S. at 524).Section 1997e(a) provides that:

**\*6** [n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other federal law, by a prisoner confined in any jail, or other correctional facility until such administrative remedies as are available are exhausted.

42 U.S.C. § 1997e(a).

The exhaustion requirement is a mandatory condition precedent to any suit challenging prison conditions, including suits brought under Section 1983. *Woodford,* 126 S.Ct. at 2383;*Ruggiero,* 467 F.3d at 174;*Williams,* 418 F.Supp.2d at 100-01. The exhaustion provision is applicable to suits seeking relief, such as money damages, that may not be available in prison administrative proceedings, as long as other forms of relief are obtainable through administrative channels. *Giano v. Goord,* 380 F.3d 670, 675 (2d Cir.2004); *see also Woodford,* 126 S.Ct. at 2382-83 ("[A] prisoner must now exhaust

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

administrative remedies even where the relief sought-monetary damages-cannot be granted by the administrative process.") (citing *Booth,* 532 U.S. at 734).

In June 2006, the Supreme Court held that the PLRA requires "proper exhaustion" before a case may proceed in federal court. *Woodford,* 126 S.Ct. at 2387. "Proper exhaustion" requires a prisoner to use " 'all steps that the agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits).' " *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2385 (emphasis in original)). Although the level of detail necessary to properly exhaust a prison's grievance process will vary from system to system, *Jones v. Bock,* 127 S.Ct. 910, 2007 WL 135890, at *12 (Jan. 22, 2007), "proper exhaustion" under the PLRA " 'demands compliance with [that] agency's deadlines and other critical procedural rules.' " *Ruggiero,* 467 F.3d at 176 (quoting *Woodford,* 126 S.Ct. at 2386). Thus, the PLRA's exhaustion requirement is not satisfied by "untimely or otherwise procedurally defective attempts to secure administrative remedies." *Ruggiero,* 467 F.3d at 176 (citing *Woodford,* 126 S.Ct. at 2382).

**(3)**

**Exhaustion Analysis: Hargrove did not Exhaust the Administrative Remedies Made Available by NCCF prior to Bringing Suit**

Section 1997e(a) of the PLRA applies to Hargrove's complaint; Hargrove was and continues to be confined in a correctional facility, *see Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004), and Hargrove's claim is about a "prison condition" within the meaning of the PLRA, *see Williams,* 418 F.Supp.2d at 101. *See also Sloane v. W. Mazzuca,* No. 04-CV-8266, 2006 WL 3096031, at *4 (S.D.N.Y. Oct. 31, 2006) (recognizing PLRA's application to complaint alleging retaliation by prison officials for plaintiff's refusal to consent to a PPD test). Accordingly, the merits of Hargrove's Section 1983 claims can only be addressed if it is first determined that Hargrove properly exhausted each claim under Section 1997e(a) of the PLRA before filing his complaint in federal court.

**\*7** Hargrove has submitted both forged [FN11] and authentic grievance forms in opposing defendants' motions for summary judgment. Excluding, for the moment, the forged documents, NCCF's records reflect that Hargrove did not submit his first grievance until after he filed the instant complaint. Williams Aff. at 1. Hargrove's first grievance complaining of unwanted PPD testing is dated November 19, 2004, Williams Aff. at 1, two to three months after Hargrove filed his complaint. Additionally, this first grievance, dated November 19, 2004, was submitted five months after the last PPD test was administered to him in June 2004. NHCC Defs.' 56.1 Statement ¶¶ 5,6. This five-month period far exceeds the five-day window provided by NCCF's IGP. Since Hargrove failed to comply with the IGP's deadlines, he did not properly exhaust the available administrative remedies. *Ruggiero,* 467 F.3d at 176 (" 'untimely or otherwise procedurally defective attempts to secure administrative remedies do not satisfy the PLRA's exhaustion requirement.' ") (quoting *Woodford,* 126 S.Ct. at 2382).

> FN11. Based on an examination of the documents themselves, as well as the uncontradicted testimony of the notaries performing services for prisoners at NCCF, *see generally* Klein Aff.; McDevitt Aff., and of the investigator in the Inmate Grievance Unit, *see generally* Williams Aff., it appears that many of the documents submitted by Hargrove are forgeries. However, in order to view the facts in the light most favorable to Hargrove, and so as to avoid making findings of fact in a summary judgment motion, for the purposes of the exhaustion analysis, all of the documents will be considered to be authentic. However, for purposes of the sanctions analysis, the documents will be explored and the consequences of Hargrove's misrepresentations will be addressed.

Furthermore, even if the falsified grievance forms Hargrove submitted in support of his claim are considered authentic, they are still untimely. The diagnostic TB tests (whether x-ray or PPD tests) were given to Hargrove on March 15, 2002, May 24, 2003 and in June of 2004, but the grievance forms Hargrove submitted complaining of unwanted PPD tests are dated April 19, 2002, April 28, 2002, April 20, 2003, April 28, 2003 and November 19,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

2004. None of these grievances were filed "within five days of the of the date of the act or occurrence giving rise to the grievance." Williams Aff. at 3. There is no evidence in the record suggesting that NCCF's IGP allows for a tolling of the five-day time limit in which to file a grievance.[FN12]

> FN12. Even if the submitted grievances had been filed within the proscribed time period, they only show that Hargrove's grievances reached an Inmate Grievance Coordinator, the first formal step of NCCF's three-step administrative grievance process; Hargrove never appealed to the Chief Administrative Officer. By failing to take the next available step in NCCF's IGP, Hargrove failed to satisfy the mandatory exhaustion requirement. *See, e.g., Williams, 418 F.Supp.2d at 101, 102* (dismissing *pro se* complaint where plaintiff could only show he exhausted two of the four-step process mandated by prison's administrative process).

While the letters to Reilly and sick call requests show that Hargrove attempted to bring his complaints about the PPD testing to the attention of the prison staff, *see, e.g.,* Aff. in Opp., Exs. A-D, NCCF's IGP requires use of formal grievance forms. Thus, writing complaint letters and submitting sick call requests did not properly exhaust NCCF's available administrative remedies. *See, e.g., Hernandez v. Coffey,* No. 99-CV-11615, 2006 WL 2109465, at *4 (S.D.N.Y. July 26, 2006) (holding letters did not satisfy plaintiff's exhaustion obligation); *Williams, 418 F.Supp.2d at 101* (holding that because plaintiff's efforts to convey his medical condition through letters and conversations with the warden and medical staff did "not include the required steps of the PLRA's administrative remedy process," plaintiff failed to exhaust); *Mills v. Garvin,* No. 99-CV-6032, 2001 U.S. Dist. LEXIS 3333, at *8 (S.D.N.Y. Mar. 2, 2001) ("letter writing is not the equivalent of an exhaustion of administrative remedies under the PLRA").

As Hargrove failed to properly exhaust his administrative remedies, this action is precluded by *42 U.S.C. § 1997e(a)* unless Hargrove can establish excuse for his failure to exhaust.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

**(4)**

**No Grounds to Excuse Plaintiff's Failure to Exhaust**

**\*8** Exhaustion is an affirmative defense that defendants have the duty to raise. *Jones,* 2007 WL 135890, at *8-11;*Sloane,* 2006 WL 3096031, at *4;*Williams,* 418 F.Supp.2d at 101. Once argued by the defendants, a plaintiff has an opportunity to show why the exhaustion requirement should be excused or why his failure to exhaust is justified. *See Ruggiero,* 467 F.3d at 175;*Collins v. Goord,* 438 F.Supp.2d 399, 411 (S.D.N.Y.2006) ("[T]he Second Circuit has cautioned that 'while the PLRA's exhaustion requirement is 'mandatory,' certain caveats apply.' ")(internal citations omitted). Thus, before concluding that a prisoner failed to exhaust available administrative remedies as required by *Section 1997e(a)* of the PLRA, the following three factors must be considered: (1) whether administrative remedies were actually available to the prisoner; (2) whether defendants have either waived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; and (3) whether special circumstances, such as a reasonable misunderstanding of the grievance procedures, exist justifying the prisoner's failure to comply with the exhaustion requirement. *Ruggiero,* 467 F.3d at 175 (citing *Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004)).[FN13]

> FN13. Courts in the Second Circuit have questioned what effect, if any, the Supreme Court's recent decision in *Woodford* requiring "proper exhaustion" may have on the three-step *Hemphill* inquiry. The Second Circuit has yet to address this issue. *See Ruggiero,* 467 F.3d at 175-76 (declining to "determine what effect *Woodford* has on our case law in this area ... because [plaintiff] could not have prevailed even under our pre-*Woodford* case law). To date, district courts have acknowledged the tension, but resolved to apply *Hemphill* to exhaustion claims until instructed otherwise by the Second Circuit. *See, e.g., Larkins v. Selsky,* 04-CV-5900, 2006 WL 3548959, at *9, n. 4 (S.D.N.Y. Dec. 6,

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

2006) (applying the current law of the Second Circuit to exhaustion claims); *Sloane,* 2006 WL 3096031, at *5 ("Until such time as the Court of Appeals considers the impact of *Woodford,* if any, on its prior rulings, this Court must follow the law of the Second Circuit. The Court will therefore apply the current law of this circuit to the exhaustion claims."); *Collins v. Goord,* 438 F.Supp.2d at 411 n. 13 (acknowledging that *Woodford* and *Hemphill* may be in tension, but deciding exhaustion claims under *Hemphill* inquiry); *Hernandez v. Coffey,* No. 99-CV11615, 2006 WL 2109465, at *3 (S.D.N.Y. July 26, 2006) (same). Here, Hargrove does not prevail under *Hemphill;* therefore, there is no occasion to address the potential effect *Woodford* may have had in his case.

### a. Whether administrative remedies were "available" to Hargrove

The first step in the *Hemphill* inquiry requires a court to determine whether administrative remedies were available to the prisoner. *Hemphill,* 380 F.3d at 686. The test for assessing availability is an "objective one: that is, would a similarly situated individual of ordinary firmness have deemed them available." *Id.* at 688 (internal quotation marks omitted). In making this determination, "courts should be careful to look at the applicable set of grievance procedures." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004). Exhaustion may be considered unavailable in situations where plaintiff is unaware of the grievance procedures or did not understand it, *Ruggiero,* 467 F.3d at 179, or where defendants' behavior prevents plaintiff from seeking administrative remedies,[FN14] *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004).

FN14. Case law does not clearly distinguish between situations in which defendants' behavior renders administrative remedies "unavailable" to the plaintiff and cases in which defendants are estopped from asserting non-exhaustion as an affirmative defense because of their behavior. As such, there will be some overlap in the analyses.

Here, Hargrove has not claimed that NCCF's administrative grievance procedure was unavailable to him. In fact, Hargrove demonstrated his access to and knowledge of NCCF's IGP by filing proper grievances on November 19, 2004 and on May 10, 2005. Hargrove did not dispute any part of Investigator Williams's affidavit detailing the IGP and its availability to inmates since 2001. Specifically, Hargrove did not dispute, upon entering the facility, that he received a copy of the inmate handbook outlining the IGP. He has not claimed that he is unfamiliar with or unaware of NCCF's IGP. Hargrove has not alleged that prison officials failed to advance his grievances [FN15] or that they threatened him or took any other action which effectively rendered the administrative process unavailable.

FN15. Although not specifically alleged, interpreting the evidence to "raise the strongest argument," Hargrove may be arguing that NCCF's IGP was not available to him because the Grievance Coordinator failed to respond to his grievances. In the single grievance regarding PPD tests that defendants concede is authentic, Hargrove writes, "[n]ow for the third time your office refused to answer my grievances so please look into this matter because the T.B. shot is [sic] effecting my health." 11/19/04 Grievance. This language implies that Hargrove filed grievances in the past and received no response from the Inmate Grievance Coordinator. Furthermore, Hargrove wrote on one of the submitted copies of the November 19, 2004 grievance that "[t]his is the only accepte[sic] that Plaintiff got back from all grievances and letters that the Plaintiff sent to Sheriff Riley and his medical staffs about his staff making [sic] take T.B. test for 3 year[s]." County Defs'. Not. of Motion, Ex. A, 11/19/2004 grievance.

First, it must be reiterated that filing of the initial grievances was untimely. However, even assuming *arguendo* that the original grievances had been timely filed, district courts in the Second Circuit have held that the "lack of a response from the [Inmate Grievance Review Committee] does not excuse an inmate's obligation to exhaust his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

remedies through available appeals." *Hernandez v. Coffey,* 2006 WL 2109465, at *3-5. *See also Hemphill,* 380 F.3d at 686 ("Threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system"); *Acosta v. Corr. Officer Dawkins,* No. 04-CV-6678, 2005 WL 1668627, at *3 (S.D.N.Y. July 14, 2005) (inmate required to appeal lack of response to exhaust administrative remedies); *Mendoza v. Goord,* No. 00-CV-0146, 2002 U.S. Dist. LEXIS 22573, at *6 (S.D.N.Y. Nov. 21, 2002) ("If, as a result of a negligent error by prison officials-or even their deliberate attempt to sabotage a prisoner's grievance-the prisoner [does not receive a response] on his complaint, he is not thereby forestalled from appealing"). Hargrove did not assert or offer evidence suggesting that he appealed the unresponsiveness or that those appeals were not advanced.

**\*9** Additionally, Hargrove's transfer from NCCF to Sing Sing Correctional Facility ("Sing Sing") in July 2005 did not excuse his previous failure to properly exhaust. *See, e.g., Sims v. Blot,* No. 00-CV-2524, 2003 WL 21738766, at *4 (S.D.N.Y. July 25, 2003) (determining that failure to exhaust administrative remedies is not excused by transfer to another facility); *Santiago v. Meinsen,* 89 F.Supp.2d 435, 440-41 (S.D.N.Y.2000) (determining that plaintiff should not be "rewarded" for failing to participate in grievance procedure before being transferred). Hargrove had ample opportunity to properly file his grievances and to appeal their results as required by NCCF's procedures while he was imprisoned at NCCF. The last PPD test Hargrove complains of was given in 2004; therefore, Hargrove had until June or July of 2004 to timely file his grievance in accordance with NCCF's IGP. Hargrove was not transferred to Sing Sing until July 2005. County Defs.' Mem. of Law at 2. Thus, Hargrove's transfer cannot excuse his previous failure to properly exhaust.

**b. Estoppel**

The second step of the inquiry asks whether defendants are estopped from raising exhaustion as a defense. Specifically, "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (internal citations omitted).

Here, Hargrove has not made any statements that would permit a finding that defendants should be estopped from raising the affirmative defense of exhaustion or that defendants waived the right to raise the defense. Defendants first raised the PLRA's exhaustion requirement as an affirmative defense in their respective answers. *See* County Defs.' Am. Answer at 3; NHCC Defs.' Answer at 1. County Defendants raised it again in their motion for summary judgment. *See* County Defs.' Mem of Law at 15-23. Thus, defendants are not estopped from raising the affirmative defense now. *See, e.g., Sloane,* 2006 WL 3096031, at *8 (exhaustion defense not waived where defendants first raised it in their motion to dismiss).

Additionally, defendants have not threatened Hargrove or engaged in other conduct preventing him from exhausting the available administrative remedies. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004) (holding defendants were estopped from asserting non-exhaustion because of prison officials' beatings, threats and other conduct inhibiting the inmate from filing proper grievances); *Feliciano v. Goord,* No. 97-CV-263, 1998 WL 436358, at *2 (S.D.N.Y. July 27, 1998) (holding defendants were estopped from asserting non-exhaustion where prison officials refused to provide inmate with grievance forms, assured him that the incidents would be investigated by staff as a prerequisite to filing a grievance, and provided prisoner with no information about results of investigation). Hargrove has not argued otherwise. *See Ruggiero,* 467 F.3d at 178 (holding defendants were not estopped from asserting a failure to exhaust defense where plaintiff pointed to no affirmative act by prison officials that would have prevented him from pursing administrative remedies); *Sloane,* 2006 WL 3096031, at *8 (finding no estoppel where plaintiff did not argue that defendants prevented him from pursuing the available administrative remedies); *Hernandez,* 2006 WL 2109465,

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

at *4 (finding no estoppel where plaintiff did not argue that any threats or intimidation prevented him from pursuing his appeals). Thus, for the same reasons that administrative remedies were not deemed unavailable to Hargrove, defendants are not estopped from raising a failure to exhaust defense.

### c. Special circumstances

*10 Even where administrative remedies are available and the defendants are not estopped from arguing exhaustion, the court must "consider whether 'special circumstances' have been plausibly alleged that justify 'the prisoner's failure to comply with administrative procedural requirements.' " *Hemphill,* 380 F.3d at 688 (quoting *Giano,* 380 F.3d at 676). For example, plaintiff's reasonable interpretation of regulations differing from prison official's interpretation has been held to constitute a "special circumstance." *Giano,* 380 F.3d at 676-77. No special circumstances have been alleged that would excuse Hargrove from availing himself of administrative remedies. *See* *Sloane,* 2006 WL 3096031, at *8; *Freeman v. Goord,* No. 02-CV-9033, 2004 U .S. Dist. LEXIS 23873, at * 9-10 (S.D.N.Y.2004) (granting motion to dismiss where "there is no evidence in the record ••• of any 'special circumstances' in this action.")

(5)

**Hargrove's Failure to Exhaust, in Addition to his Fraud on the Court, Warrants Dismissal with Prejudice**

Hargrove has not sufficiently rebutted the defendants' assertion of failure to exhaust, and a liberal reading of his submissions does not reveal any grounds to excuse that failure.

Because Hargrove filed a complaint in federal court before filing a grievance, permitting his unexhausted and unexcused claim to proceed would undercut one of the goals of the exhaustion doctrine by allowing NCCF to be haled into federal court without the "opportunity to correct

its own mistakes with respect to the programs it administers." *Woodford,* 126 S.Ct. at 2385. *See also* *Ruggiero,* 467 F.3d at 178 (citing *Porter,* 534 U.S. at 525). Thus, his complaint must be dismissed.

In general, dismissal without prejudice is appropriate where plaintiff has failed to exhaust but the time permitted for pursuing administrative remedies has not expired. *Berry v. Kerik,* 366 F.3d 85, 87 (2d Cir.2004). Dismissal with prejudice is appropriate where "administrative remedies have become unavailable after the prisoner had ample opportunity to use them and no special circumstances justified failure to exhaust." *Berry,* 366 F.3d at 88. Here, Hargrove's administrative remedies were available to him during his entire period of confinement at NCCF. He remained incarcerated in NCCF throughout the time period in which he alleges the PPD tests were given. He could have exhausted remedies for his grievances at any time. Therefore, Hargrove had ample opportunity to seek administrative remedies but failed to do so. Because there is no evidence in the record that administrative remedies are still available to Hargrove, as the five-day time period had run, and because Hargrove has alleged no special circumstances justifying his failure to exhaust, his complaint is accordingly dismissed with prejudice. *Berry,* 366 F.3d at 88 (upholding dismissal with prejudice where plaintiff had no justification for his failure to pursue administrative remedies while they were available.)

*11 Additionally, defendants' have moved for sanctions based on Hargrove's alleged submission of falsified evidence. If a party commits a fraud on the court, the court has the inherent power to do whatever is reasonably necessary to deter abuse of the judicial process. *Shangold v. The Walt Disney Co.,* No. 03-CV-9522, 2006 WL 71672, at *4 (S.D.N.Y. January 12, 2006) (citing *Chambers v. NASCO, Inc.,* 501 U.S. 32, 44 (1991)). Fraud upon the court has been defined as "fraud which seriously affects the integrity of the normal process of adjudication." *Gleason v. Jandrucko,* 860 F.2d 556, 559 (2d Cir.1988); *McMunn v. Mem'l Sloan-Kettering Cancer Center,* 191 F.Supp.2d 440, 445 (S.D.N.Y.2002). In order for a court to grant sanctions based upon fraud, it must be established by clear and convincing evidence that a party has "sentiently set in motion some unconscionable scheme calculated to interfere with the judicial system's ability impartially to adjudicate a matter by ... unfairly hampering

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)
(Cite as: 2007 WL 389003 (E.D.N.Y.))

the presentation of the opposing party's claim or defense." *McMunn*, 191 F.Supp.2d at 455 (quoting *Aoude v. Mobil Oil Corp.*, 892 F.2d 1115, 1119 (1st Cir.1989).

After carefully reviewing the allegedly fraudulent documents, it must be concluded that Hargrove consciously falsified these documents. *See, e.g., Shangold*, 2006 WL 71672, at *1, *3 (finding clear and convincing evidence of fraud where plaintiffs fabricated a timeline and plot outlines to advance their claims); *McMunn*, 191 F.Supp.2d at 446 (finding clear and convincing evidence of fraud where plaintiff edited audio tapes and represented that they were unedited during discovery). The notaries performing services for prisoners at NCCF testify that they never notarized many of the documents supplied by Hargrove. *See* Klein Aff.; McDevitt Aff. Furthermore, a visual examination of the documents themselves makes it clear that many of the documents submitted by Hargrove are forgeries.

In considering what sanction to impose, courts consider the following five factors: (i) whether the misconduct was the product of intentional bad faith; (ii) whether and to what extent the misconduct prejudiced the plaintiffs; (iii) whether there was a pattern of misbehavior rather than an isolated instance; (iv) whether and when the misconduct was corrected; and (v) whether further misconduct is likely to occur in the future. *Scholastic, Inc. v. Stouffer*, 221 F.Supp.2d 425, 444 (S.D.N.Y.2002) (citing *McMunn*, 191 F.Supp.2d at 461).

Here, Hargrove's deception was not an isolated instance; he fabricated the dates on many grievance forms, in addition to improperly duplicating notary stamps on complaint letters to make them look authentic. Klein Aff. at 2; McDevitt Aff. at 2; County Defs.' 56.1 Statement ¶¶ C3, D3. He submitted these forgeries to defendants during discovery and again as exhibits to his Affidavit in Opposition to Defendant's Motion for Summary Judgment. A severe sanction is warranted as Hargrove's forgeries were intentional, he never corrected them once their authenticity was challenged and he continues to insist on their veracity. Aff. in Opp. at 1-4. Given that there is clear and convincing evidence that Hargrove has continuously and consciously perpetrated a fraud on the court through his submission of fraudulent documents and sworn

affirmations of those documents' authenticity, dismissal with prejudice is especially appropriate. *See, e.g., Shangold*, 2006 WL 71672, at *5 (dismissing with prejudice where plaintiffs fabricated evidence to advance their claims); *Scholastic*, 221 F.Supp.2d at 439-444 (dismissing with prejudice where plaintiff produced seven pieces of falsified evidence); *McMunn*, 191 F.Supp.2d at 445 (dismissing with prejudice where plaintiff "lie[d] to the court and his adversary intentionally, repeatedly, and about issues that are central to the truth-finding process").

### Conclusion

**\*12** Because Hargrove did not satisfy the exhaustion requirement under the PLRA, defendants' motions for summary judgment are granted. Further, considering the fraud Hargrove perpetrated on the court, the claims are dismissed against all defendants with prejudice. The Clerk of the Court is directed to close the case.

SO ORDERED:

E.D.N.Y.,2007.
Hargrove v. Riley
Not Reported in F.Supp.2d, 2007 WL 389003 (E.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
William MINGUES, Plaintiff,
v.
C.O NELSON and C.O. Berlingame, Defendants.
**No. 96 CV 5396(GBD).**

Feb. 20, 2004.

**Background:** Inmate brought a § 1983 action asserting, inter alia, claims of excessive force during his wife's visit with him at the correctional facility.

**Holding:** On a defense motion to dismiss, the District Court, Daniels, J., held that the record established that the action was filed after the effective date of the Prison Litigation Reform Act (PLRA).
Motion granted.

West Headnotes

Civil Rights 78 ⟐ 1395(7)

78 Civil Rights
   78III Federal Remedies in General
     78k1392 Pleading
      78k1395 Particular Causes of Action
       78k1395(7) k. Prisons and Jails; Probation and Parole. Most Cited Cases
Record established that inmate's § 1983 action was filed after the effective date of the Prison Litigation Reform Act of 1996 (PLRA), such that the inmate's failure to exhaust his administrative remedies precluded relief; examination of the initial complaint itself, on its face, unequivocally demonstrated that the inmate's subsequent allegation in his amended complaint that he filed the complaint in April of

1996 was patently false; there was no explanation offered that could reasonably support and account for the existence of May dates on the complaint. 42 U.S.C.A. § 1983; Civil Rights of Institutionalized Persons Act, § 7(a), 42 U.S.C.A. § 1997e(a).

*MEMORANDUM DECISION AND ORDER*

DANIELS, J.

**\*1** This § 1983 action was originally commenced by the plaintiff, [FN1] a prisoner in New York State custody, and his wife claiming their civil rights were violated during the wife's visit with plaintiff at the correctional facility. Discovery in this matter has concluded. Previously, all claims asserted by plaintiff's wife were dismissed for failure to prosecute. Additionally, defendants' summary judgment motion was denied with respect to plaintiff's claims of excessive force,[FN2] and summary judgment was granted dismissing all of plaintiff's other claims. Defendants now seek to dismiss the remaining excessive force claims on the grounds they are barred by the Prisoner Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a), as plaintiff failed to exhaust his administrative remedies.

> FN1. Plaintiff and his wife were proceeding *pro se* when they filed the complaint and amended complaint. Thereafter, plaintiff obtained legal representation.

> FN2. In the amended complaint, plaintiff alleges he was beaten, kicked and punched. (Am.Compl. § 6). In his original complaint, he had also claimed that he was whipped." (Compl. at 7, 8). Plaintiff testified at his deposition that he was slapped once in the face, punched about four or five times in the lower back, and a correctional officer then laid on top of him. (Mingues Dep. at 78-81). The incident, which took approximately thirty to forty seconds, caused plaintiff to suffer from back pain for an unspecified period of time. (*Id.* at 81, 86).

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

Subdivision (a) of § 1997e provides, "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." This provision became effective on April 26, 1996. _Blisset v. Casey,_ 147 F.3d 218, 219 (2d Cir.1998). The PLRA's exhaustion requirement does not apply retroactively to actions pending when the Act was signed into law. _Scott v. Coughlin,_ 344 F.3d 282, 291 (2d Cir.2003).

There is no dispute that plaintiff did not avail himself of the existing and available prison grievance procedure. Plaintiff, however, argues he was not required to exhaust his administrative remedies because, as alleged in his amended complaint, "petitioners (sic) had already filed in April 10-12 of 1996," prior to the PLRA's April 26, 1996 enactment date.[FN3] (Am.Compl. § 2). In order to determine the date that the instant action was commenced, the date of the filing of the amended complaint relates back to the filing date of the original complaint. Fed.R.Civ.P. 15(c). The original complaint was signed and dated by plaintiff's wife on May 8, 1996; it was stamped received by the Pro Se Office on May 10, 1996; and plaintiff's signature is dated May 13, 1996.[FN4]

> FN3. The amended complaint reads as follows:
>
> That the original complaint filed under and pursuant to Title 42 section 1983 and 1985 was made and submitted before this court in April of 1996, before the application of the Prisoner Litigation Reform Act of 1996 was signed into law. The Act was signed into law April 26, 1996 and petitioners had already filed in April 10-12 of 1996. (Am.Compl. § 2).

> FN4. Plaintiff's wife application for _in forma pauperis_ relief was signed and dated May 8, 1996, and it is stamped as received by the Pro Se Office on May 10, 1996. Plaintiff's signature, on his initial application for appointment of counsel, is dated May 13, 1996, and it is stamped as

received by the Pro Se Office on May 10, 1996. Attached to plaintiff's application, is his signed Affirmation of Service, also dated May 13, 1996, wherein plaintiff declared under penalty of perjury that he served his application upon the Pro Se Office. Plaintiff alleges that "between April 17, 1996 until October 7, 1996," all visitation was suspended between him and his wife and that their "only form of communications was correspondence ." (Am.Compl. § 7).

The matter was referred to Magistrate Judge Pitman for a Report and Recommendation ("Report"). Although the magistrate judge found that the three earliest possible dates that the evidence demonstrates the complaint could have been filed, _i.e.,_ May 8th, 10th, and 13th of 1996, were all beyond the PLRA enactment date, he nevertheless recommended that the motion to dismiss be denied based on plaintiff's allegation in the amended complaint that he filed the original complaint April 10-12 of 1996, prior to the April 26, 1996 enactment date. The magistrate judge found that, "[i]n light of the express allegation in the Amended Complaint that plaintiff commenced the action before April 26, 1996 and the absence of a clear record to the contrary, the requirement that disputed factual issues be resolved in plaintiff's favor for purposes of this motion requires that the motion be denied." (Report at 12-13).

**\*2** Defendants object to the Report's conclusion that there is a material issue of fact regarding the date the action was filed. Plaintiff's attorney did not file any objections.[FN5] The Court must make a _de novo_ determination as to those portions of the Report to which there are objections. Fed.R.Civ.P. 72(b); 28 U.S.C. § 636(b)(1)(C). It is not required that the Court conduct a _de novo_ hearing on the matter. _United States v. Raddatz,_ 447 U.S. 667, 676, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980). Rather, it is sufficient that the Court "arrive at its own, independent conclusion" regarding those portions to which the objections were made. _Nelson v. Smith,_ 618 F.Supp. 1186, 1189-90 (S.D.N.Y.1985) (quoting _Hernandez v. Estelle,_ 711 F.2d 619, 620 (5th Cir.1983)). Accordingly, the Court, in the exercise of sound judicial discretion, must determine the extent, if any, it should rely upon the magistrate judge's proposed findings and recommendations. _Raddatz,_ 447 U.S. at 676. The Court may accept, reject or modify, in whole or in part, the findings and recommendations set forth within the Report. Fed.R.Civ.P. 72(b); 28 U.S.C. §

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

636(b)(1)(C). Where there are no objections, the Court may accept the Report provided there is no clear error on the face of the record. *Nelson v. Smith,* 618 F.Supp. at 1189; *see also Heisler v. Kralik,* 981 F.Supp. 830, 840 (S.D.N.Y.1997), *aff'd sub nom. Heisler v. Rockland County,* 164 F.3d 618 (2d Cir.1998).

FN5. Plaintiff himself filed objections which was not adopted by his counsel. Plaintiff objects to the magistrate judge's finding that an issue exists as to when plaintiff filed the complaint because plaintiff asserts he gave it to prison officials to be mailed in April. Additionally, plaintiff objects to the magistrate judge's suggestion that the defendants convert their motion to one for summary judgment asserting the same theory as set forth in the present motion. Since this Court finds that the instant motion is meritorious, the propriety of plaintiff personally submitting his own objections need not be address as those objections are moot.

Upon a *de novo* review, the Report's recommendation that the motion be denied is rejected by the Court. Section 1997e (a) requires that inmates exhaust all available administrative remedies prior to the commencement of a § 1983 action concerning prison conditions, and failure to do so warrants dismissal of the action. *Porter v. Nussel,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); *Scott,* 344 F.3d at 290. The exhaustion of one's administrative remedies, however, is not a jurisdictional requirement under the PLRA. *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003). A defendant may assert a non-exhaustion claim as an affirmative defense. *Jenkins v. Haubert,* 179 F.3d 19, 28-29 (2d Cir.1999). Since it is an affirmative defense, defendants bear the burden of proof in this regard. *See, McCoy v. Goord,* 255 F.Supp.2d 233, 248 (S.D.N.Y.2003); *Arnold v. Goetz,* 245 F.Supp.2d 527, 534-35 (S.D.N.Y.2003); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002). A motion to dismiss, pursuant to Fed.R.Civ.P. 12(b)(6), is an appropriate vehicle to be used by a defendant where the failure to exhaust is clear from the face of the complaint as well as any written instrument attached as an exhibit and any statements or documents incorporated by reference into the complaint. *See, Scott v. Gardner,* 287 F.Supp.2d 477, 485 (S.D.N.Y.2003) (citation omitted); *McCoy,* 255 F.Supp.2d at 249.

In the amended complaint, plaintiff alleges, in a conclusory manner, that he filed the original complaint before the effective date of the PLRA, sometime between April 10th and April 12th of 1996.FN6 On a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6), the court must accept all well-pleaded factual allegations in the complaint as true, and draw all reasonable inference in plaintiff's favor. *Resnick v. Swartz,* 303 F.3d 147, 150-51 (2d Cir.2002) (citation omitted); *Bolt Elec., Inc. v. City of New York,* 53 F.3d 465, 469 (2d Cir.1995). Dismissal is only warranted where it appears without doubt that plaintiff can prove no set of facts supporting his claims that would entitle him to relief. *Harris v. City of New York,* 186 F.3d 243, 247 (2d Cir.1999). The court's consideration is not limiting solely to the factual allegations set forth in the amended complaint. Rather, the court may also consider documents attached to the complaint as exhibits or incorporated in it by reference, matters of which judicial notice may be taken, or to documents either in plaintiff's possession or of which he has knowledge of and relied on in bringing the action. *Brass v. American Film Technologies, Inc.,* 987 F.2d 142, 150 (2d Cir.1993) (citation omitted). The court is not bound to accept as true a conclusory allegation where the pleadings are devoid of any specific facts or circumstances supporting such an assertion. *DeJesus v. Sears, Roebuck & Co., Inc.,* 87 F.3d 65, 70 (2d Cir.1996). Nor must the court "ignore any facts alleged in the complaint that undermine the plaintiff's claim." *Roots Partnership v. Lands' End, Inc.,* 965 F.2d 1411, 1416 (7th Cir.1992) (citation omitted).

FN6. In response to then Chief Judge Thomas P. Griesa's 1996 order dismissing this action, plaintiff filed an Application for Reconsideration, dated October 28, 1996, wherein he claims that "on April 12, 1996 this petitioner filed a 1983 civil suit ..." (Pl.'s Mot. for Recons. at 1).

*3 Plaintiff fails to allege any factual basis in support of his claim that he filed the initial complaint between April 10-12, 1996. The Court is not required to accept this statement as a well-pleaded factual allegation in light of the existing record which clearly demonstrates that such an allegation is not only factually unsupported by the clear evidence, but is factually impossible. Generally, an

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

amended complaint supersedes the original complaint, and renders it of no legal effect. *In re. Crysen/Montenay Energy Co.,* 226 F.3d 160, 162 (2d Cir.2000). In plaintiff's amended complaint, he states that he is submitting the amended complaint in support of his original complaint. Hence, the original complaint is incorporated by reference in the amended complaint, and may be considered by the Court. Even if the initial complaint was not so incorporated, given the circumstances of this case, the Court would nevertheless consider it as it relates to the original date of filing. An examination of the initial complaint itself, on its face, unequivocally demonstrates that plaintiff's subsequent allegation in his amended complaint that he filed the complaint between April 10th and 12th of 1996 is patently false.

The original complaint refers to plaintiff's prison disciplinary hearing arising out of the same incident forming the basis of the present lawsuit. Generally, the disciplinary charges against plaintiff were in connection with an alleged conspiracy by him and his wife to commit grand larceny against inmate Robert Cornell. That began on April 16, 1996, and concluded on April 19, 1996. (Defs.' Notice of Mot. for Summ. J. Ex. N, Transcript of Disciplinary Hr'g, conducted on April 16, 18-19, 1996). Specifically, in the original complaint, plaintiff refers to the testimony given by this fellow inmate.[FN7] (Compl. at 8). That inmate testified on April 19th. (Hr'g. Tr. at 53-54, 57). Thus, plaintiff's claim that he filed the complaint between April 10-12, 1996, is absolutely impossible as the initial complaint refers to events occurring after that time period. Merely because plaintiff boldly alleges in his amended complaint that he filed the original complaint between April 10th and 12th does not require this Court to turn a blind eye to plaintiff's prior pleadings demonstrating the absurdity of his claim.[FN8] *See, Silva Run Worlwide Ltd. v. Gaming Lottery Corp.,* 2001 WL 396521, *1 (S.D.N.Y. April 19, 2001) (citations omitted) (A court should not "accept allegations that are contradicted or undermined by other more specific allegations in the complaint or by written materials properly before the court.").

FN7. In the complaint, plaintiff alleges "that at his S.H.U. hearing petitioner called as a witness Robert Cornell who stated that this petitioner Mingues nor his wife (co-petitioner) Narvaez ever took any money from him. (Compl. at 8).

FN8. At his deposition, plaintiff testified that he filed the initial complaint "[a]pproximately around June of 1996." (Mingues Dep. at 37-38).

Lawsuits by inmates represented by counsel are commenced when the complaint is filed with the court. *See,* Fed.R.Civ.P. 3, 5(e). For *pro se* litigants, who are not imprisoned and have been granted *in forum pauperis* relief, their complaints are deemed filed when received by the Pro Se Office. *See,* *Toliver v. County of Sullivan,* 841 F.2d 41 (2d Cir.1998). The complaint of a *pro se* prisoner, however, is deemed filed when he or she gives the complaint to prisoner officials to be mailed. *Houston v. Lack,* 487 U.S. 266, 270, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993), *modified on other grounds,* 25 F.3d 81 (2d Cir.1994). The "prison mailbox" rule is designed to combat inmate litigants' dependence on the prison facility's mail system and their lack of counsel so as to assure the timely filing of their legal papers with the court. *Noble v. Kelly,* 246 F.3d 93, 97 (2d Cir.2001) (citations omitted). Given the difficulty in determining when a prisoner relinquishes control of the complaint to prison personnel, the date the plaintiff signed the original complaint is presumed to be the date plaintiff gave the complaint to prison officials to be mailed. *See e.g., Forster v. Bigger,* 2003 WL 22299326, *2 (S.D.N.Y. Oct.7, 2003); *Hosendove v. Myers,* 2003 WL 22216809, *2 (D.Conn. Sept.19, 2003); *Hayes v. N .Y.S. D.O.C. Officers,* 1998 WL 901730, *3 (S.D.N.Y. Dec.28, 1998); *Torres v. Irvin,* 33 F.Supp.2d 257, 270 (S.D.N.Y.1998) (cases cited therein).

**\*4** In response to the Report and Recommendation, plaintiff asserts that, in April, the original complaint "was placed in the facility mail box." (Pl.'s Objection to Report at 1). However, it is uncontested that plaintiff's wife signed the complaint on May 8th; it was received by the Pro Se Office on May 10 th; and plaintiff's signature is dated May 13th. There is no explanation offered that could reasonably support and account for the existence of these May dates on a complaint which plaintiff falsely claims to have deposited to be mailed during the period of April 10th and April 12th. Had plaintiff mailed the complaint directly to the court prior to April 26th, it would have been impossible for the plaintiff's wife to have signed the document two

Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)
(Cite as: 2004 WL 324898 (S.D.N.Y.))

days prior to the date that the Pro Se Office stamped it received on May 10th.[FN9] Moreover, absent evidence to the contrary, applying the mailbox rule would presume that plaintiff gave his complaint to prison officials on May 13, 1996, the date he signed it. *See, Johnson v. Coombe,* 156 F.Supp.2d 273, 277 (S.D.N.Y.2001) (quoting *Torres,* 33 F.Supp.2d at 270). Even if the Court gave plaintiff the benefit of the date plaintiff's wife signed the complaint, *i.e.,* the earliest date reflected on the filed complaint, it was still after the effective date of the PLRA. Hence, plaintiff is legally obligated to have pursued his prison grievance procedures prior to filing the instant action. The plaintiff has offered no explanation for the initial complaint's reference to events that occurred after the date he claims he filed it, the two May dates on which he and his former co-plaintiff wife signed the complaint, or the May date stamped received by the Pro Se Office. As the magistrate Judge observed:

> FN9. The benefit of the mailbox rule does not apply where the plaintiff delivers the complaint to someone outside the prison system to forward to the court. *Knickerbocker v. Artuz,* 271 F.3d 35, 37 (2d Cir.2001).

Apart from the allegation that certain events giving rise to the claims occurred on April 9, 1996, the Original Complaint contains no mention of dates in April, 1996. Mingues no where explains the contradiction between the signature dates on the Original Complaint and the allegations contained in Amended Complaint. (Report at 12).

New York state law provides a three tier grievance procedure applicable to plaintiff's claims of excessive force. *See,* N.Y. Correct. Law § 139 (McKinnney's 2003); N.Y. Comp.Codes R. & Regs. tit. 7, § 701.7 (2003); *Mendoz v. Goord,* 2002 WL 31654855 (S.D.N.Y. Nov.21, 2002); *Rodriguez v. Hahn,* 209 F.Supp.2d 344 (S.D.N.Y.2002). Plaintiff has not denied knowledge of the grievance procedure at his institution, nor claimed that anything or anyone caused him not to file a grievance and completely pursue it through the administrative process.[FN10] The magistrate judge's determination that the defendants' Rule 12(b) motion should be denied because of an "absence of a clear record" contrary to plaintiff's express allegation in the amended complaint that he

commenced the action before April 26, 1996 is erroneous. The Court could have *sua sponte* dismiss this action as the record is unmistakably clear that an appropriate administrative procedure was available to him, that he was required to exhaust his administrative remedies, and that he failed to do so as required by the PLRA. *See, Mojias v. Johnson,* 351 F.3d 606 (2003); *Snider v. Melindez,* 199 F.3d 108, 112-13 (2d Cir.1999). In this case, plaintiff has been afforded notice and given an opportunity to respond to the exhaustion issue and his failure remains clear.

> FN10. In the original complaint, plaintiff stated he did not file a grievance, pursuant to the state's prisoner grievance procedure, "because this matter can not be dealt with by interdepartmental grievances." (Compl. at 2-3). In plaintiff's attorney's memorandum in opposition to the motion to dismiss, counsel contends that plaintiff is not required to file a grievance because the state's prison system provides extremely limited administrative remedies and money damages, which plaintiff seeks, are not available.

**\*5** Accordingly, it is hereby

ORDERED that the Report and Recommendation is not adopted; and it is further

ORDERED that the defendants' motion to dismiss the complaint is granted.

S.D.N.Y.,2004.
Mingues v. Nelson
Not Reported in F.Supp.2d, 2004 WL 324898 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.



Slip Copy, 2014 WL 411569 (N.D.N.Y.)
**(Cite as: 2014 WL 411569 (N.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Michel TOLIVER, Plaintiff,
v.
Brian FISCHER, New York State Commissioner of
DOCCS; Joseph T. Smith, Superintendent of
Shawangunk Correctional Facility; W. Maly,
Deputy of Security, Shawangunk Correctional Fa-
cility; J. Stefinik, Correction Officer, Shawangunk
Correctional Facility; J. Gardner, Lieutenant Hear-
ing Officer, Shawangunk Correctional Facility;
Stone, Corrections Officer, Shawangunk Correc-
tional Facility; Lucien J. Leclaire, Deputy Commis-
sioner of DOCCS; Sgt. Aube, Sgt. In House Unit,
Shawangunk Correctional Facility; Gaye (John
Doe), Corrections Officer, Shawangunk Correction-
al Facility; Keys, Corrections Officer, Shawangunk
Correctional Facility; L. Pingott, Captain
(Security), Shawangunk Correctional Facility; D.
Degraff, Corrections Officer, Shawangunk Correc-
tional Facility; Sergeant Preston, Sergeant Correc-
tions, Shawangunk Correctional Facility; R. Cutler,
Corrections Officer, Shawangunk Correctional Fa-
cility; Budziszewski, Corrections Officer, Shawan-
gunk Correctional Facility; R. Kane, Corrections
Officer, Shawangunk Correctional Facility; C.O.
North; and J. Peterson, Defendants.

No. 9:12–CV–77 (MAD/ATB).
Feb. 3, 2014.

Michel Toliver, Romulus, NY, pro se.

Office of the New York, State Attorney General,
Cathy Y. Sheehan, AAG, of Counsel, Albany, NY,
for Defendants.

**ORDER**
MAE A. D'AGOSTINO, District Judge.
   **\*1** By his complaint in this action, Plaintiff as-
serts claims for the violation of his constitutional
rights arising out of his confinement at Shawan-
gunk Correctional Facility ("Shawangunk C.F.").
Plaintiff states that he was transferred to Shawan-
gunk C.F. in February of 2011, and assigned to a
housing unit which was not wheelchair accessible.
*See* Dkt. No. 1 at 15–17. Plaintiff was told that his
wheelchair had to be kept in a bin in a storage room
and retrieved from that location whenever Plaintiff
required it to move around the facility. *See id.* at
15–16. Plaintiff's repeated requests for inmate as-
sistance with storing and retrieving his wheelchair
were denied. *See id.* at 16–17. As alleged, Plaintiff
was injured on several occasions during this period
when he was attempting to store or retrieve his
wheelchair. *See id.* at 17–22. Throughout this peri-
od, Plaintiff filed numerous grievances regarding
the conditions of his confinement. In addition, as
many as nine misbehavior reports were issued to
Plaintiff. *See id.* at 22–24. Plaintiff claims that De-
fendants filed false misbehavior reports against him
in retaliation for his grievance activity, denied him
proper and adequate medical care, and discrimin-
ated against him on the basis of his disability and
sexual orientation. *See id.* at 8. Plaintiff seeks an
award of monetary damages, as well as declaratory
and injunctive relief. *See id.* at 13.

   On March 12, 2013, Defendants filed a motion
seeking dismissal pursuant to 28 U.S.C. § 1915 and
for sanctions pursuant to Rule 11 of the Federal
Rules of Civil Procedure. *See* Dkt. No. 104. In their
motion, Defendants ask the Court to revoke
Plaintiff's *in forma pauperis* status and condition-
ally dismiss the case because Plaintiff has previ-
ously filed seven federal actions or appeals that
were dismissed in such a manner that they should
be deemed strikes for purposes of the "three
strikes" provision of the Prison Litigation Reform
Act ("PLRA"). *See* Dkt. No. 104–10 at 4–7. Fur-
ther, Defendants argue that this action should be
dismissed because of Plaintiff's misrepresentations
in his complaint regarding his litigation history. *See
id.* at 8–10.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

On October 29, 2013, Magistrate Judge Baxter issued a Report–Recommendation in which he recommends that the Court deny Defendants' motion in its entirety. *See* Dkt. No. 120. Magistrate Judge Baxter first reviewed Plaintiff's lengthy litigation history and determined that, despite having filed more than thirty-five actions or appeals since 1992, only one of them qualifies as a "strike" for purposes of the PLRA. *See id.* at 4–8. Next, Magistrate Judge Baxter found that Defendants' Rule 11 motion is subject to denial because they failed to provide Plaintiff with the twenty-one day safe harbor period required by the Rule. *See id.* at 10. Finally, Magistrate Judge Baxter recommended that the Court deny the Rule 11 motion on the merits as well. *See id.* at 10–11. Specifically, the Report–Recommendation finds that Plaintiff has a far more extensive litigation history than the seven actions identified in the complaint. *See id.* at 11. Nevertheless, Magistrate Judge Baxter finds that although the standard form complaint "asks for a description of all prior lawsuits, and the court does not condone the omission, the court does not find plaintiff's failure to list all of his prior lawsuits so unreasonable as to require the imposition of sanctions." *See id.*

**\*2** Currently before the Court is Magistrate Judge Baxter's October 29, 2013 ReportRecommendation, to which neither party has objected.

When a party files specific objections to a magistrate judge's report-recommendation, the district court makes a "*de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1). However, when a party files "[g]eneral or conclusory objections or objections which merely recite the same arguments [that he presented] to the magistrate judge," the court reviews those recommendations for clear error. *O'Diah v. Mawhir,* No. 9:08–CV–322, 2011 WL 933846, \*1 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1).

A litigant's failure to file objections to a magistrate judge's report and recommendation, even when that litigant is proceeding *pro se,* waives any challenge to the report on appeal. *See Cephas v. Nash,* 328 F.3d 98, 107 (2d Cir.2003) (holding that, "[a]s a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point" (citation omitted)). A *pro se* litigant must be given notice of this rule; notice is sufficient if it informs the litigant that the failure to timely object will result in the waiver of further judicial review and cites pertinent statutory and civil rules authority. *See Frank v. Johnson,* 968 F.2d 298, 299 (2d Cir.1992); *Small v. Sec 'y of Health and Human Servs.,* 892 F.2d 15, 16 (2d Cir.1989) (holding that a *pro se* party's failure to object to a report and recommendation does not waive his right to appellate review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and former 6(e) of the Federal Rules of Civil Procedure).

Having carefully reviewed the October 29, 2013 Report–Recommendation, the parties' submissions and the applicable law, the Court finds that Magistrate Judge Baxter correctly determined that the Court should deny Defendants' motion in its entirety. Although Plaintiff does have an extensive litigation history, at the time he filed this lawsuit he had acquired only one strike for purposes of the PLRA. *See Toliver v. Dep't of Corrections,* No. 07–CV–3017, Dkt. No. 3 (S.D.N.Y.2007). The remaining cases Defendants cite do not qualify as strikes. Several of the cases, although filed as civil rights complaints, were treated as petitions for a writ of habeas corpus. *See* Dkt. No. 120 at 6. The Second Circuit has held that dismissal of such cases cannot constitute strikes for purposes of the PLRA. *See Jones v. Smith,* 720 F.3d 142, 147 (2d Cir.2013). Other cases cited were dismissed for

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 411569 (N.D.N.Y.)
**(Cite as: 2014 WL 411569 (N.D.N.Y.))**

Plaintiff's failure to submit a completed Prison Authorization Form and for Plaintiff's failure to comply with the filing fee requirements. *See* Dkt. No. 120 at 6–7 (citing cases). District courts in the Second Circuit have declined to find that a dismissal for failure to prosecute constitutes a strike for purposes of 28 U.S.C. § 1915(g). *See McNair v. Kelly,* No. 13 Civ. 728, 2013 WL 4574247, *1 (S.D.N.Y. Aug.22, 2013). Moreover, Magistrate Judge Baxter properly determined that a class action in which Plaintiff appears to have not given authorization for his name to appear should not be a frivolous action attributable to Plaintiff. *See* Dkt. No. 120 at 7–8.

**\*3** Finally, as to the motion for sanctions, Magistrate Judge Baxter correctly determined that Defendants failed to provide Plaintiff with the twenty-one day safe harbor period, which alone warrants denial of the motion. *See Fierro v. Gallucci,* 423 Fed. Appx. 17, 18–19 (2d Cir.2011) (finding that the district court "was required to deny plaintiffs' motion for sanctions for failure to comply with the 21–day 'safe harbor,' which requires Rule 11 motions to be served on the opposing party 21 days prior to their filing, in order to afford that party an opportunity to withdraw their allegedly sanctionable claims") (citations omitted).

After carefully considering Magistrate Judge Baxter's Report–Recommendation and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Baxter's October 29, 2013 Report–Recommendation is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion to dismiss (Dkt. No. 104) is **DENIED;** and the Court further

**ORDERS** that Defendants shall answer or otherwise respond to Plaintiff's amended complaint (Dkt. No. 27) within **TWENTY–ONE (21) DAYS** from the filing date of this Order; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

This matter has been referred for Report and Recommendation, pursuant to 28 U.S.C. § 636(b) and Local Rules N.D.N.Y. 72.3(c), by the Honorable Mae A. D'Agostino, United States District Judge.

Liberally construed, plaintiff's Amended Complaint ("Am.Compl.") (Dkt. No. 27) asserts claims against a number of defendants arising out of his confinement at Shawangunk Correctional Facility. ( *See generally* Am. Compl.). Plaintiff alleges that defendants filed false misbehavior reports against him in retaliation for his grievance activity, denied him adequate medical care, and discriminated against him on the basis of his disability and sexual orientation. Plaintiff seeks monetary damages as well as declaratory and injunctive relief.

Currently before the court is defendants' motion pursuant to 28 U.S.C. § 1915(g), seeking to revoke plaintiff's in forma pauperis status and conditionally dismiss the case and to dismiss the complaint as a sanction pursuant to Federal Rule of Civil Procedure 11 (" Rule 11 "). (Dkt. No. 104). Plaintiff filed a response (Dkt. No. 106) to which defendants replied (Dkt. No. 107). Plaintiff then filed three supplemental affidavits (Dkt. Nos.109–111) in opposition to the motion.

Defendants argue that plaintiff has previously filed seven federal actions or appeals that were dismissed under circumstances justifying dismissal of this action under the "three strikes" provision of the Prison Litigation Reform Act ("PLRA"). (Dkt. No. 104–10 at 4–7). Defendants further assert that the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

action should be dismissed based on plaintiff's mis-representations in his complaint regarding his litigation history. (Dkt. No. 104–10 at 8–10). Having concluded that plaintiff has not acquired three "strikes" under section 1915(g), this court recommends that defendants' motion to revoke plaintiff's in forma pauperis status and conditionally dismiss the case be denied. The court further concludes that dismissal under Rule 11 is not warranted.

## DISCUSSION

### I. Three Strikes

### A. Legal Standards

**\*4** The "three strikes" section of the PLRA prohibits the filing of an action in forma pauperis when the plaintiff has had federal actions or appeals dismissed on at least three prior occasions, either for failure to state a claim or for frivolousness. 28 U.S.C. § 1915(g). The purpose of section 1915(g) is to "stem the tide of egregiously meritless lawsuits" by "forcing the prisoner to go through the same thought process non-inmates go through before filing a suit, *i.e.* is filing this suit worth the costs?" *Tafari v. Hues,* 473 F.3d 440, 443 (2d Cir.2007) (citations omitted).

Section 1915(g) provides that:

[i]n no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding [in forma pauperis] if the prisoner has, on three or more occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

An action may be dismissed pursuant to section 1915(g) even if the court originally granted plaintiff in forma pauperis status. *See, e.g., Gamble v. Maynard* 9:06–CV–1543 (DNH/DEP), 2008 WL 150364, at *5 (N.D.N.Y. Jan. 14, 2008)

(conditionally dismissing complaint under section 1915(g) and finding that in forma pauperis status was improvidently granted); *Luevano v. Clinton,* 5:10–CV–754 (GTS/ATB), 2010 WL 3338704, at *3 (N.D.N.Y. July 1, 2010). An action is "frivolous" for purposes of the statute if it " 'lacks an arguable basis either in law or in fact.' " *Tafari,* 473 F.3d at 442 (citation omitted). In determining whether a dismissal satisfies the failure to state a claim prong of the statute, courts have drawn upon the provisions of Federal Rule of Civil Procedure 12(b)(6) for guidance, in light of the similarity in phrasing utilized in the two provisions. *Id.* The three strikes provision applies to cases that were dismissed for failure to state a claim or for frivolousness even prior to the 1996 enactment of section 1915(g). *Welch v. Galie,* 207 F.3d 130, 132 (2d Cir.2000).

A dismissal cannot count as a strike until after the opportunity to appeal has been exhausted or waived. *See, e.g., Partee v. Connolly,* 08 Civ. 4007, 2009 WL 1788375, at *2 (S.D.N.Y. June 23, 2009). If a district court dismisses an action on a ground specified in section 1915(g), and an appellate court simply affirms, together the decisions constitute a single strike. *Id.; Thompson v. Drug Enforcement Admin.,* 492 F.3d 428, 436–37 (D.C.Cir.2007). However, when a district court dismisses an action for any of the reasons set forth under the three strikes statute, and if the subsequent appeal is dismissed as frivolous, then the two decisions count as separate strikes. *Chavis v. Chappius,* 618 F.3d 162, 169 (2d Cir.2010) (noting that "sequential dismissals on strike grounds can provide separate strikes under § 1915(g)").

**\*5** If plaintiff has three strikes, section 1915(g) prevents plaintiff from filing a subsequent action in forma pauperis unless the plaintiff is under imminent danger of serious physical injury. 28 U.S.C. § 1915(g). This exception to section 1915(g) has been interpreted to apply only if the plaintiff faces imminent danger of serious physical injury "at the time the complaint is filed." *Malik v. McGinnis,*

293 F.3d 559, 562–63 (2d Cir.2002).

**B. Analysis**

Plaintiff is a frequent litigator. Based on the court's review of his litigation history on the Federal Judiciary's Public Access to Court Electronic Records ("PACER") Service, it appears that plaintiff has filed more than 35 actions or appeals since 1992. As Judge D'Agostino noted in her Decision and Order dated May 4, 2012, plaintiff had clearly acquired one strike for purposes of the PLRA before he filed the current action (on December 22, 2011). [FN1] (Dkt. No. 9 at 3). Plaintiff incurred this first strike on April 16, 2007, after filing a civil rights action in the Southern District of New York. *Toliver v. Dep't of Corrections, et al.,* 07–CV–3017, Dkt. No. 3 (S.D.N.Y.). According to the docket entries in that action, 07–CV–3017, [FN2] the district court dismissed this action *sua sponte,* because it failed "to state a claim on which relief may be granted." (*Id.* at Dkt. Entry No. 3).

> FN1. Defendants assert that the action was "commenced on January 17, 2012." (Dkt. No. 104–10 at 3). However, the complaint is dated December 22, 2011 (Dkt. No. 1 at 13), and, under the prisoner mailbox rule, the document is deemed filed on the date appearing on its face. *See Houston v. Lack,* 487 U.S. 266, 276, 108 S.Ct. 2379, 101 L.Ed.2d 245 (1988); *Dory v. Ryan,* 999 F.2d 679, 682 (2d Cir.1993).

> FN2. The district court's order is not available in the electronic PACER system. This court may rely on the docket entries to determine whether PLRA's three strikes limitation applies, so long as they indicate "with sufficient clarity" the grounds under which the prior suit was dismissed. *Harris v. City of New York,* 607 F.3d 18, 23 (2d Cir.2010).

Defendants assert that in addition to that dismissal, plaintiff has acquired six other strikes:

1. *Toliver v. McDonald, et al.,* 92–CV–5982 (S.D.N.Y.);

2. *Toliver v. Fountoulakis,* et al., 07–CV–2496 (S.D.N.Y.);

3. *Toliver v. Dep't of Corrections, et al.,* 07–CV–7672 (S.D.N.Y.);

4. *Toliver v. New York District Attorneys, et al.,* 10–CV–7711 (S.D.N.Y.);

5. *Toliver v. City of New York, et al.,* 10–CV–8375 (S.D.N.Y.); and

6. *Toliver v. New York State, et al.,* 11–CV–4330 (S.D.N.Y.).

(Dkt. No. 104–10 at 5). The court finds that at the time plaintiff filed this complaint, he had not accumulated three or more "strikes" under section 1915(g) and that his action is not subject to dismissal under that provision of the PLRA. [FN3]

> FN3. The court notes, however, that since the time he filed this action, plaintiff appears to have acquired at least three additional strikes. *See, e.g., Toliver v. City of New York, et al.,* 12–CV–0964 (S.D.N.Y.) (dismissed pursuant to 28 U.S.C. § 1915(e)(2) (B)(ii)); *Toliver v. City of New York, et al.,* 12–1855 (2d Cir.) (dismissed as lacking an arguable basis in law or fact); *Toliver v. New York City Dep't of Corrections, et al.,* 12–4992 (2d Cir.) (dismissed as lacking an arguable basis in law or fact).

*Toliver v. McDonald,* et al., 92–CV–5982 (S.D.N.Y.) and *Toliver v. New York State, et al.,* 11–CV–4330 (S.D.N.Y.) were both apparently filed by plaintiff as actions pursuant to 42 U.S.C. § 1983, however, the court considered each to be a petition for a writ of habeas corpus. *See* 92–CV–5982, Dkt. Entry No. 2 (dismissing the complaint "which was treated as a petition for a writ of habeas corpus relief"); 11–CV–4330, Dkt. No. 4 (ordering amendment and noting that plaintiff sought no monetary

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

damages, instead challenging his 2010 conviction), Dkt. No. 6 (dismissing the amended petition for a writ of habeas corpus as premature). The Second Circuit has held that dismissals of habeas petitions filed pursuant to sections 2254 or 2255 cannot constitute strikes for purposes of the PLRA. *Jones v. Smith,* 720 F.3d 142, 147 (2d Cir.2013) ("[D]ismissals of habeas petitions challenging the prisoner's conviction or the duration of his confinement should not be considered strikes for purposes of the PLRA."). Consequently, this court will not consider these dismissals "strikes" because they were considered by the Southern District of New York to be habeas petitions, not civil rights actions.

**\*6** Defendants also argue that the dismissal of *Toliver v. Fountoulakis, et al.,* 07–CV–2496 (S.D.N.Y.) constitutes a strike because the docket sheet states that the complaint was dismissed pursuant to section 1915(e)(2). (Dkt. No. 104–10 at 6). However, as plaintiff correctly observes (Dkt. No. 106 at 5), a review of the Order of Dismissal clarifies that the action was dismissed without prejudice because plaintiff failed to submit a completed Prison Authorization form. 07–CV–2496, Dkt. No. 3 at 2 (attached as Ex. A). Similarly, *Toliver v. Dep't of Corrections, et al.,* 07–CV–7672 (S.D.N.Y.) was dismissed for failure to comply with the filing fee requirements. 07–CV–7672, Dkt. No. 3 (dismissing the action following plaintiff's failure to submit an application to proceed in forma pauperis or pay the filing fee within thirty days of the court's compliance order) (attached as Ex. B). Neither was "dismissed on the grounds that it [was] frivolous, malicious, or fail[ed] to state a claim upon which relief may be granted." 28 U.S.C. § 1915(g). District courts in the Second Circuit have declined to find that a dismissal for failure to prosecute would be considered a strike for purposes of 28 U.S.C. § 1915(g). *See, e.g.,* *McNair v. Kelly,* No. 13 Civ. 728, 2013 WL 4574247, at \*1 (S.D.N.Y. Aug.22, 2013) (finding that dismissals for failure to prosecute and procedural failures did not constitute strikes); *Toliver v. Perri,* No. 10 Civ. 3165, 2011 WL 43461, at \*2–3 (S.D.N.Y. Jan. 6, 2011).

Defendants contend that plaintiff also acquired a strike when *Carrion, et al. v. City of New York, et al.,* 10–CV–8375 was dismissed. (Dkt. No. 104–10 at 7). In response, plaintiff asserts that he did not give authorization for his name to appear in this "class-action." (Dkt. No. 106 at 7). The court has reviewed the application to proceed in forma pauperis, the prisoner authorization form, and the complaint. 10–CV–8375, Dkt. Nos. 1, 2 (attached as Ex. C). There is no indication in any of these documents that plaintiff intended to be a part of that action. *See id.* The complaint identifies Toliver as a plaintiff, but is not signed by Toliver. *Id.* at Dkt. No. 2. Instead, all three documents are completed by Stephen Risi. *Id.* The factual allegations appear to be drafted by Risi and relate to Risi and Carrion, not Toliver. *Id.* Moreover, the Order of Dismissal notes that the action was brought by Risi on behalf of Carrion, and was not signed by Toliver or Carrion. *Id.,* Dkt. No. 3 (attached as Ex. D). Accordingly, the court finds that this action was not brought by plaintiff, and will not consider the dismissal a strike for purposes of section 1915(g).

*Toliver v. New York District Attorneys, et al.,* 10–CV–7711 (S .D.N.Y.) was dismissed as duplicative of another case filed by plaintiff. 10–CV–7711, Dkt. No. 3 (attached as Ex. E). In the Order of Dismissal, the Southern District of New York explained that "no useful purpose would be served by litigating this repeat filing," dismissed it as "duplicative," and directed the Clerk not to collect the filing fee. *Id.* The court also notes that plaintiff asserts that he "personally informed the court of [his] error after realizing [he] submitted this complaint twice accidentally." (Dkt. No. 111 at 8). The court doubts that under these circumstances this dismissal could be considered a strike for purposes of section 1915(g). However, the court does not need to decide this issue because even assuming, arguendo, that it could be considered a strike, it would only be plaintiff's second.

## II. Rule 11

### A. Legals Standards

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

**\*7** Under Rule 11, whenever a signed pleading or "other paper" is submitted to the court, the attorney or pro se litigant certifies, *inter alia,* that:

(1) it is not being presented for any improper purpose, such as to harass or to cause unnecessary delay ... [and]

(2) the factual contentions have evidentiary support ....

Fed.R.Civ.P. 11(b). In order to justify Rule 11 sanctions, it must appear that the lawyer or pro se litigant "sign[ed] a pleading, motion, or other paper for an improper purpose ... or [did] so without a belief, formed after reasonable inquiry, that the position espoused is factually supportable and is warranted by existing law ...." *Caisse Nationale de Credit Agricole–CNCA, N.Y. Branch v. Valcorp, Inc.,* 28 F.3d 259, 264 (2d Cir.1994).

To comply with Rule 11's procedural requirements, a party must make its motion for sanctions separate from other motions or requests, describe the specific conduct alleged to violate Rule 11(b), provide notice to opposing counsel, and serve the motion at least twenty-one days prior to filing the motion with the court. Fed.R.Civ.P. 11(c)(2); *see also, Langdon v. County of Columbia,* 321 F.Supp.2d 481, 484 (N.D.N.Y.2004); *Kron v. Moravia Central School Dist.,* No. 5:98–CV–1876, 2001 WL 536274, at \*3 (N.D.N.Y. May 3, 2001). The twenty-one day period between notice and filing is referred to as a "safe harbor" because the opposing party may avoid sanctions by withdrawing or correcting the offending material during this period.

The imposition of sanctions is a discretionary decision. *Margo v. Weiss,* 213 F.3d 55, 64 (2d Cir.2000). That discretion should be exercised with caution, and sanctions imposed only when it is patently clear that one has engaged in improper conduct. *Cerrone v. Cahill,* 95–CV–241, 2001 WL 1217186, at \*16 (N.D.N.Y. Sept.28, 2001). Whether conduct is sanctionable is subject to a test of ob-

jective unreasonableness. *Margo,* 213 F.3d at 64–65; *see also, Binghamton Masonic Temple, Inc. v. Bares* 168 F.R.D. 121, 126–27 (N.D.N.Y.1996).

A sanction imposed under Rule 11 must be "limited to what suffices to deter repetition of the conduct or comparable conduct by others similarly situated." Fed.R.Civ.P. 11(b)(4). The court must be mindful that the main thrust of Rule 11 sanctions is deterrence. *Margo,* 213 F.3d at 64–65; *Ehrich v. Binghamton City School District,* 210 F.R.D. 17 (N.D.N.Y.2002). A court has the discretion to dismiss an action with prejudice as a sanction pursuant to Rule 11, although this harsh sanction should be imposed only in extreme circumstances where the court is sure that lesser sanctions will be ineffective. *See, e.g., Safe–Strap Co., Inc. v. Koala Corp.,* 270 F.Supp.2d 407, 417–18 (S.D.N.Y.2003) (collecting cases).

**B. Analysis**

Here, defendants have combined the Rule 11 motion with their motion to revoke plaintiff's in forma pauperis status and conditionally dismiss the action. They do not appear to have provided plaintiff with the twenty-one day safe harbor period. Defendants' motion for sanctions is subject to denial on this procedural basis alone.

**\*8** Turning to the merits, defendants assert that the court should dismiss plaintiff's complaint based on his "material misrepresentations" regarding his litigation history. (Dkt. No. 104–10 at 8). Generally, information about a pro se litigant's previous cases is considered material because it allows the court to determine: (1) if the issues in the case have been previously litigated and decided; (2) if plaintiff has accumulated three strikes for purposes of 28 U.S.C. § 1915(g); (3) if plaintiff has a record of frivolous litigation sufficient to warrant a "bar order;" and (4) if plaintiff's litigation experience is so extraordinary that the court need not afford him the special solicitude normally afforded to *pro se* litigants. *Bell v. Lasacelli,* No. 08–CV–0287A, 2009 WL 1032857, at \*3 (W.D.N.Y.Apr.13, 2009) (citation omitted).[FN4]

FN4. Although defendants contend that the court granted plaintiff's in forma pauperis application based, at least in part, on plaintiff's misrepresentations (Dkt. No. 104–10 at 3), it is clear that the court undertook its own review and analysis of plaintiff's litigation history. (*See* Dkt. No. 9 at 3).

In his complaint and amended complaint, plaintiff admitted that he has filed lawsuits in the past, and identified seven that were filed in 2010 and 2011. (Compl. at 9, 14; Am. Compl., at 10, 15). As noted above, plaintiff has a far more extensive litigation history than the seven actions identified in his complaint. Although the form asks for a description of all prior lawsuits, and the court does not condone the omission, the court does not find plaintiff's failure to list all of his prior lawsuits so unreasonable as to require the imposition of sanctions.

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss pursuant to 28 U.S.C. § 1915(g) (Dkt. No. 104) be **DENIED,** and it is further

**RECOMMENDED,** that defendants' motion for sanctions pursuant to Federal Rule of Civil Procedure 11 (Dkt. No. 104) be **DENIED,** and it is further

**RECOMMENDED,** that if the District Court adopts this recommendation, the defendants be ordered to answer or otherwise respond to plaintiff's amended complaint (Dkt. No. 27) within twenty-one (21) days of the District Court's order.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2014.
Toliver v. Fischer
Slip Copy, 2014 WL 411569 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

2016 WL 3349316
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Michel Toliver, Plaintiff,

v.

J. Stefinik, Correction Officer, Shawangunk
Correctional Facility; J. Gardner, Lieutenant
Hearing Officer, Shawangunk Correctional
Facility; Stone, Corrections Officer, Shawangunk
Correctional Facility; Aube, Sgt. in House Unit,
Shawangunk Correctional Facility; Gaye (John
Doe), Corrections Officer, Shawangunk Correctional
Facility; Keys, Corrections Officer, Shawangunk
Correctional Facility; L. Pingott, Captain (Security),
Shawangunk Correctional Facility; D. Degraff,
Corrections Officer, Shawangunk Correctional
Facility; Sergeant Preston, Sergeant Corrections,
Shawangunk Correctional Facility; R. Cutler,
Corrections Officer, Shawangunk Correctional
Facility; Budziszewski, Corrections Officer,
Shawangunk Correctional Facility; R. Kane,
Corrections Officer, Shawangunk Correctional
Facility; C.O. North; J. Peterson, Defendants.

9:12-CV-00077
|
Signed 06/15/2016

**Attorneys and Law Firms**

MICHEL TOLIVER, 464 Hudson Street, #222, New
York, New York 10014, Plaintiff Pro Se.

OFFICE OF THE NEW YORK, STATE ATTORNEY
GENERAL, The Capitol, OF COUNSEL: CATHY Y.
SHEEHAN, AAG, Albany, New York 12224, Attorneys
for Defendants.

**MEMORANDUM-DECISION AND ORDER**

Mae A. D'Agostino, U.S. District Judge

**\*1** On January 17, 2012, Plaintiff commenced this civil
rights action, pursuant to 42 U.S.C. § 1983, alleging that
twenty employees of the New York State Department

of Corrections and Community Supervision ("DOCCS")
violated his constitutional rights during his confinement at
the Shawangunk Correctional Facility ("Shawangunk").
*See* Dkt. No. 1. By Decision and Order dated May
3, 2012, this Court dismissed, *sua sponte*, Defendants
Schneiderman, Bellamy, and Prack from the action
because the complaint did not state facts suggesting their
personal involvement in the alleged violations of Plaintiff's
constitutional rights. *See* Dkt. No. 9 at 8-10.

On June 28, 2012, Plaintiff filed an amended complaint
(Dkt. No. 27), which, by Decision and Order dated
December 6, 2012 (Dkt. No. 85), this Court accepted
for filing against seventeen of the original Defendants, as
well as Correction Officer ("C.O.") North, who was not
named in the original complaint. Liberally construed, the
surviving claims in Plaintiff's amended complaint include
(1) a First Amendment claim, based on Defendants'
alleged filing of false misbehavior reports against Plaintiff,
in retaliation for his pursuit of complaints, grievances,
appeals, and Article 78 actions; (2) an equal protection
claim based on alleged discrimination against Plaintiff
because of his race, disability, and/or sexual orientation;
(3) a conspiracy claim related to the retaliation and
discrimination claims; (4) a Fourteenth Amendment claim
alleging denial of procedural due process in connection
with various disciplinary proceedings; and (5) an Eighth
Amendment claim for failure to provide adequate medical
care. Dkt. No. 27 at 8-9; Dkt. No. 35. Plaintiff seeks both
monetary and injunctive relief. Dkt. No. 27 at 14.

Defendants filed a motion, pursuant to Fed. R. Civ.
P. 12(b)(6), seeking dismissal of Plaintiff's amended
complaint in its entirety, on behalf of all but one of
the remaining Defendants. [1] *See* Dkt. No. 134. Plaintiff
responded to the motion to dismiss, and defense counsel
chose not to file a reply. Dkt. No. 150. On November
17, 2014, Magistrate Judge Baxter issued a Report-
Recommendation recommending that the Court grant-
in-part and deny-in-part Defendants' motion to dismiss.
Dkt. No. 155. This Court adopted Magistrate Judge
Baxter's November 17, 2014 Report-Recommendation,
dismissing Plaintiff's conspiracy claim and all claims
against Defendants Fischer, Maly, and LeClaire.

This Court has previously found that, in litigating this
case, Plaintiff has made numerous

abusive and frivolous filings, which have included more than twenty motions, for preliminary injunctive relief, eight motions to amend the amended complaint, several requests for sanctions, repeated motions to compel discover seeking evidence which is clearly irrelevant to the matter at hand, numerous motions for reconsideration of the Court's denials of Plaintiff's frivolous motions, and countless appeals to this Court of Magistrate Judge Baxter's denials of his frivolous requests.

**\*2** *See* Dkt. No. 233. Since Defendants filed their summary judgment motion, Plaintiff has filed several additional motions to amend or supplement his amended complaint, which this Court denied as frivolous, vexatious, and in clear contravention of repeated notices to Plaintiff "that the Court will not permit [him] to amend the amended complaint in this now four-year old case." *See* Dkt. Nos. 244, 246. Plaintiff filed two Interlocutory Appeals both of which were dismissed by the Second Circuit. *See* Dkt. Nos. 252, 256.

On March 22, 2016, Magistrate Judge Andrew T. Baxter issued a Report-Recommendation recommending that Defendants' summary judgment motion be granted in full.[2] *See* Dkt. No. 249. Specifically, Magistrate Judge Baxter found that Plaintiff's retaliation, equal protection, and Eight Amendment medical indifference claims should be dismissed without prejudice for failure to exhaust all available administrative remedies. *See id.* Further, Magistrate Judge Baxter recommended dismissing Plaintiff's procedural due process claims with prejudice because Plaintiff's factual allegations failed to implicate a liberty interest that would warrant due process protection.

Currently before this Court is Magistrate Judge Baxter's Report-Recommendation, to which neither party has objected.

## I. DISCUSSION

### A. Standard

When a party files specific objections to a magistrate judge's report-recommendation, the district court "make[s] a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). However, when a party files "[g]eneral or conclusory objections, or objections which merely recite the same arguments [that he] presented to the magistrate judge," the court reviews those recommendations for clear error only. *O'Diah v. Mawhir*, No. 9:08-CV-322, 2011 WL 933846, \*2 (N.D.N.Y. Mar. 16, 2011) (citations and footnote omitted). After the appropriate review, "the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C).

A litigant's failure to file objections to a magistrate judge's report-recommendation, even when that litigant is proceeding pro se, waives any challenge to the report on appeal. *See Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (holding that, "[a]s a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point") (citation omitted). A pro se litigant must be given notice of this rule; notice is sufficient if it informs the litigant that the failure to timely object will result in the waiver of further judicial review and cites pertinent statutory and civil rules authority. *See Frank v. Johnson*, 968 F.2d 298, 299 (2d Cir. 1992); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (holding that a pro se party's failure to object to a report-recommendation does not waive his right to appellate review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and former 6(e) of the Federal Rules of Civil Procedure).

**\*3** In the present matter, Magistrate Judge Baxter provided Plaintiff adequate notice that he was required to file any objections to the Report-Recommendation, and specifically informed him that failure to object to any portion of the report would preclude his right to appellate review. *See* Dkt. No. 249 at 26. Specifically, Magistrate Judge Baxter informed Plaintiff that "**FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN**

**DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Secretary of Health and Human Services*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72." Dkt. No. 249 at 26.

Magistrate Judge Baxter clearly provided Plaintiff with sufficient notice of the consequences of failing to object to the Report-Recommendation. Although Plaintiff requested and was granted two extensions of time to file objections, no objections have been filed.

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and, based on the undisputed facts, judgment for the movant is warranted as a matter of law. *See Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(c)(e)).

In assessing the record to determine whether any such issues of material fact exist, the court is required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. *See Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. *See Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.'" *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that the court is obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because they lack a legal education. *Id.* at 295 (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). "However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment." *Kotler v. Fischer*, No. 9:09-CV-01443, 2012 WL 929823, *12 (N.D.N.Y. Mar. 19, 2012) (citations omitted). Specifically, "a *pro se* party's 'bald assertion,' completely unsupported by evidence is not sufficient to overcome a motion for summary judgment." *Lee v. Coughlin*, 902 F. Supp. 424, 429 (S.D.N.Y. 1995) (citing *Cary v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

**B. Exhaustion**

**\*4** The Prison Litigation Reform Act ("PLRA") states that "[n]o action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C. 1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1983; 42 U.S.C. § 1997e(a). This exhaustion requirement applies to all suits brought by inmates regarding aspects of prison life. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002). Inmates must exhaust all available administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Giano v. Goord*, 380 F.3d 670, 675 (2d Cir. 2004). The failure to exhaust is an affirmative defense that must be raised by the defendants and, as such, it is the defendants' burden to establish that the plaintiff failed to meet the exhaustion requirements. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004); *see, e.g., Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. *Woodford*, 548 U.S. at 90-103.

New York State has a three-step administrative review process. First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC") which reviews and investigates the formal complaint before issuing a written determination. *See* 7 N.Y.C.R.R. § 701.5(b). Second, an adverse decision by the IGRC may be appealed to the Superintendent of the Facility. *See id.* at § 701.5(c). Third, an adverse decision by the Superintendent may be appealed to Central Office Review Committee ("CORC"), which makes the final determination within the administrative review process. *See id.* at § 701.5(d). If all three of these levels of review are exhausted, then the prisoner may seek relief in federal court pursuant to § 1983. *See Bridgeforth v. DSP Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing *Porter*, 534 U.S. at 524); *Singh v. Goord*, 520 F. Supp. 2d 487, 495-96 (S.D.N.Y. 2007) (quoting *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004)). When a plaintiff presents a claim arising "directly out of a disciplinary or administrative segregation hearing ... (*e.g.*, a claim of denial of procedural due process), he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal." *Sweet v. Wende Corr. Facility*, 514 F. Supp. 2d 411, 413 (W.D.N.Y. 2007) (internal quotation and citations omitted); *see also Davis v. Barrett*, 576 F.3d 129, 131-32 (2d Cir. 2009).

To the extent a civil rights claim must be exhausted by the grievance process, completion of the three-tiered process, through and including a final decision by CORC, must be completed before an action asserting that claim may be initially filed. *See, e.g., Casey v. Brockley*, No. 9:13-CV-1271, 2015 WL 8008728, *5 (N.D.N.Y. Nov. 9, 2015) ("Receiving a decision from CORC *after* commencing litigation does not satisfy PLRA's requirement that administrative remedies be exhausted *before* filing suit, and any claim not exhausted prior to commencement of the suit must be dismissed without prejudice") (citing *Neal v. Goord*, 267 F.3d 116, 122-23 (2d Cir. 2001), *overruled on other grounds*, *Porter v. Nussle*, 534 U.S. 516 (2002)); *Rodriguez v. Rosner*, No. 12-CV-958, 2012 WL 7160117, *8 (N.D.N.Y. Dec. 5, 2012). "[A] post-exhaustion amendment of the complaint cannot cure an exhaustion defect existing at the time the action was commenced." *Guillory v. Haywood*, No. 9:13-CV-1564, 2015 WL 268933, *11 (N.D.N.Y. Jan. 21, 2015) (citing *Neal*, 267 F.3d at 122) (other citation omitted).

**\*5** When the Second Circuit decided *Giano*, it also decided four other related cases, further clarifying the law in the Second Circuit regarding the PLRA's exhaustion requirement, and carved out particular instances in which that requirement could be waived or excused. *See Hemphill*, 380 F.3d at 686; *Abney v. McGinnis*, 380 F.3d 663 (2d Cir. 2004); *Johnson v. Testman*, 380 F.3d 691 (2d Cir. 2004); *Ortiz v. McBride*, 380 F. 3d 649 (2d Cir. 2004). Based on these cases, the Second Circuit developed a "three part inquiry" to determine whether an inmate has fulfilled the PLRA exhaustion requirement: (1) whether the administrative remedies were available to the inmate; (2) whether the defendants' own actions inhibited exhaustion, estopping them from raising the defense of exhaustion; (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill*, 380 F.3d at 686). Although the Second Circuit has "questioned," without deciding, whether *Hemphill* remains good law after *Woodford*, it has applied the three-part inquiry to recent cases. *See, e.g., Heyliger v. Gebler*, 624 Fed. Appx. 780, 782-83 (2d Cir. 2015); *Davis v. State of New York*, 311 Fed. Appx. 397, 399 (2d Cir. 2009); *Snyder v. Whittier*, 428 Fed. Appx. 89, 91 (2d Cir. 2011).

In their answer to the amended complaint, Defendants properly asserted the affirmative defense that Plaintiff failed to exhaust his administrative remedies prior to bringing this federal civil rights action. *See* Dkt. No. 171 at 4. Plaintiff's argument that Defendants waived their right to assert an exhaustion defense by not raising it in their pre-answer motion to dismiss is without merit. *See* Dkt. No. 242-1 at 12; *Villante v. VanDyke*, 93 Fed. Appx. 307, 309 (2d Cir. 2004) (explaining that "[f]ederal Rule of Civil Procedure 8(c) requires only that an affirmative defense be included in a responsive pleading, such as an answer, not that it be the subject of a pretrial motion" and finding that the defendants, "having raised the exhaustion defense in their answer, did not waive the defense by failing to include it in their first motion for summary judgment"); *see also Belgrave v. Pena*, 254 Fed. Appx. 384, 387 (2d Cir. 2001) (permitting a defendant to amend its answer to state an exhaustion defense). As Magistrate Judge Baxter correctly found, Defendants did not waive the exhaustion defense by not asserting it in their initial motion to dismiss. *See* Dkt. Nos. 104, 171.

Defendants have submitted an affidavit from Michael Cunningham, the supervisor of the Inmate Grievance

Program ("IGP") at Shawangunk listing all of the grievances filed by Plaintiff between February 2011 (the date of Plaintiff's transfer to Shawangunk) and July 2012. *See* Dkt. No. 236-3 at 2. Additionally, Defendants submitted a certified copy of a CORC report showing Plaintiff's appeals to CORC of grievances filed between 2011 and 2015. [3] *See* Dkt. No. 236-8 at 3-5. This data indicates that Plaintiff filed five grievances at Shawangunk before he filed his initial complaint on January 17, 2012, and that although he fully exhausted two of those claims, they were not exhausted until February and March of 2011, after Plaintiff filed his initial complaint. *See* Dkt. No. 236-10 at 21.

In his response in opposition to Defendants' motion for summary judgment, Plaintiff claims, in conclusory terms, that he submitted many more grievances than Defendants acknowledged in their motion, which the IGRC refused to file, and that he filed additional appeals to CORC, which CORC refused to accept. *See* Dkt. No. 242-1 at 2-3. Plaintiff's amended complaint, although often vague and confusing, appears to allege that he "circulated" or filed "complaints" or grievances on the following dates: March 9, 22, 25, and 30. *See* Dkt. No. 27 at 11-12. Plaintiff attached a letter to his amended complaint sent by DOCCS Deputy Commissioner LeClaire dated April 26, 2011, in response to a complaint from Plaintiff, which reminds Plaintiff that "[a]llegations of misconduct by facility staff should be directed to facility officials through the established grievance mechanism or by writing to the Superintendent." *See* Dkt. No. 27 at 63. Thus, it appears as though Plaintiff may be referring to informal complaints that he failed to properly direct to the established grievance mechanism.

**\*6** Plaintiff has submitted a copy of one formal grievance, dated March 9, 2011, that does not appear to be reflected on Defendants' spreadsheet. In the amended complaint, however, Plaintiff merely alleges that he "circulated" this grievance to "the above named defendants," so it is unclear whether he properly submitted this grievance to IGRC. *See* Dkt. No. 27 at 11, 63; Dkt. No. 236 at 21; Dkt. No. 243-4 at 31. Further, Plaintiff has not submitted any documentation to suggest that he appealed a denial of the March 9, 2011 grievance. *See* Dkt. No. 27 at 11. Finally, whether Plaintiff properly submitted the March 9, 2011, grievance is unimportant as the substance of that grievance was covered, in much greater detail, in Plaintiff's March 10, 2011 grievance,

which was properly submitted to IGRC and appealed. *See* Dkt. No. 236 at 21.

As Magistrate Judge Baxter correctly found, Plaintiff's vague and conclusory allegations that he filed other grievances that were not accepted by the IGRC at Shawangunk do not, in light of the documentation that Defendants have provided about Plaintiff's grievance history, create a factual dispute material to the issue of whether Plaintiff exhausted his administrative remedies before he filed his initial complaint. *See Jeffreys v. City of new York*, 426 F.3d 549, 554 (2d Cir. 2005) (explaining that where a plaintiff, in response to a motion for summary judgment, provides only their "own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether the jury could reasonably find for the plaintiff, and thus whether there are any genuine issues of material fact, without making some assessment of the plaintiff's account") (quotation and internal citation omitted); *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case") (citations omitted).

Similarly, as Magistrate Judge Baxter correctly found, Plaintiff's claim that CORC sometimes refused to accept his appeals does not create a material issue of fact with respect to the exhaustion issue. Plaintiff has submitted two letters, received by him from CORC, dated July 20, 2011, [4] and June 12, 2012, returning papers to him and advising Plaintiff that appeals of grievances must be submitted through the IGRC at his facility, and not sent directly to CORC for review. *See* Dkt. No. 4-2 at 8-9; Dkt. No. 27 at 70. Only the July 20, 2011 letter is relevant to the exhaustion issue in this case because it pre-dates the filing of Plaintiff's initial complaint, whereas the June 12, 2012, letter was sent and received after the commencement of this action. *See* Dkt. No. 4-2 at 9. It is clear that the July 20, 2011 letter refers to Grievance No. 26770-11, which Plaintiff did ultimately appeal to exhaustion. *See* Dkt. No. 236-10 at 21. While CORC's return of Plaintiff's initial inquiry relating to Grievance No. 26770-11 may have delayed CORC's decision, it was Plaintiff's own mistake that would have caused that delay and would not estop Defendants from using the affirmative defense of exhaustion, nor is it a "special circumstance" under the *Hemphill* factors.

Plaintiff's primary argument as to why his failure to exhaust administrative remedies before filing this action should be excused, is that CORC far exceeded the time limits set by DOCCS regulations in denying his final appeal of Grievance No. 26770-11. *See* Dkt. No. 242-1 at 4-8. However, it is well-established law in the Second Circuit that a plaintiff must wait for a final decision from CORC before filing an action, even if CORC's decision is untimely under DOCCS internal rules and regulations. *See Casey*, 2015 WL 8008728, at *6 ("CORC's failure to act within the time frame set out in the regulations does not constitute a special circumstance justifying the failure to exhaust") (collecting cases); *Guillory*, 2015 WL 268933, at *12 ("although regulations require CORC to respond within thirty days, its failure to do so is not a 'special circumstance' which might defeat an exhaustion defense" (citation omitted)). The numerous grievances pursued by Plaintiff in 2011 and 2012, as well as the two appealed grievance decisions, clearly indicate that Plaintiff had access to, and took advantage of, the grievance process and was thus not inhibited from fully utilizing the grievance process. *See* Dkt. No. 236-10 at 21. Therefore, Plaintiff has failed to establish a material issue of fact with respect to the availability of the administrative grievance remedies that might justify Plaintiff's failure to exhaust the administrative grievance process before filing this action.

**\*7** As Magistrate Judge Baxter correctly found, Plaintiff's retaliation, equal protection, and Eighth Amendment medical claims must be dismissed without prejudice for failure to exhaust the administrative grievance process prior to filing this action. While requiring Plaintiff to initiate a new lawsuit now that at least two of his claims have been fully exhausted may seem judicially inefficient, if the resulting decision is favorable to the plaintiff "the federal court will have wasted its resources adjudicating claims that could have been resolved within the prison grievance system at the outset." *Neal*, 267 F.3d at 123. Moreover, "allowing prisoner suits to proceed, so long as the inmate eventually fulfills the exhaustion requirement, undermines Congress' directive to pursue administrative remedies prior to filing a complaint in federal court." *Id.*

### C. Due process claims

Defendant's have not argued that Plaintiff failed to fully appeal the disciplinary hearings challenged in the Amended Complaint. *See* Dkt. Nos. 27, 236. Accordingly, as Magistrate Judge Baxter correctly found, the due process claims cannot be dismissed based on failure to exhaust, and must be addressed on the merits. *See* Dkt. No. 249.

The Fourteenth Amendment to the Constitution provides that "[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV, § 1. "Although prison inmates necessarily have their liberty severely curtailed while incarcerated, they are nevertheless entitled to certain procedural protections when disciplinary actions subject them to further liberty deprivations such as loss of good-time credit or special confinement that imposes an atypical hardship." *Sira v. Morton*, 380 F.3d 57, 69 (2d Cir. 2004) (citations omitted). These procedural protections include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Id.* (citing *Wolff v. McDonnell*, 418 U.S. 539, 556 (1974)) (other citation omitted). Additionally, the hearing officer's findings must be supported by "some" "reliable evidence." *Id.* (citing *Superintendent v. Hill*, 472 U.S. 445, 455 (1985)) (other citation omitted).

To successfully state a claim under section 1983 for denial of due process, a plaintiff must establish both the existence of a protected liberty or property interest, and that he or she was deprived of that interest without being afforded sufficient process. *See Shakur v. Selsky*, 391 F.3d 106, 118 (2d Cir. 2004) (citing *Kentucky Dep't of Corrs. v. Thompson*, 490 U.S. 454, 460 (1989)); *Giano v. Selsky*, 238 F.3d 223, 225 (2d Cir. 2001). "Prison discipline implicates a liberty interest when it 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Ortiz*, 380 F.3d at 654 (quoting *Sandin v. Conner*, 515 U.S. 472, 484 (1995)). In *Sandin*, the Supreme Court held that although states may create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force, ... nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. 483-84 (internal citations omitted).

The Second Circuit has refused to set a bright line rule on when confinement becomes atypical. "In order to determine whether a liberty interest has been affected, district courts are required to examine the circumstances of a confinement ... and to identify with specificity the facts upon which [their] conclusions [are] based." *Wright v. Coughlin*, 132 F.3d 133, 137 (2d Cir. 1998) (citations omitted). While under certain circumstances confinement of less than 101 days could be shown to meet the atypicality standard under *Sandin*, the Second Circuit generally takes the position that confinement in a Special Housing Unit ("SHU"), without unusual conditions, for a period of up to 101 days will not constitute an atypical hardship, while confinement for a period of more than 305 days has been held to be atypical even if under "normal conditions." *Ortiz*, 380 F.3d at 654; *see Colon v. Howard*, 215 F.3d 227, 231, 232 n.5 (2d Cir. 2000). The "atypicality" inquiry under *Sandin* is normally a question of law. *Colon*, 215 F.3d at 230-31; *Sealey v. Giltner*, 197 F.3d 578, 585 (2d Cir. 1999).

**\*8** "Overlapping disciplinary penalties may, under some circumstances, have to be aggregated for purposes of determining whether a liberty interest was violated." *Reynoso v. Selsky*, 292 Fed. Appx. 120, 122 (2d Cir. 2008) (citation omitted). "Generally, it appears from Second Circuit decisions that separate SHU sentences constitute a 'sustained' period of confinement [that may be aggregated] when (1) they are contiguous *and* (2) they either (a) were imposed by the same disciplinary hearing officer or (b) were based on the same administrative rationale and are executed under the same conditions." *Taylor v. Artus*, No. 9:05-CV-271, 2007 WL 4555932, *8 (N.D.N.Y. Dec. 19, 2007) (collecting cases) (emphasis in original).

Although all relevant disciplinary proceedings involved Tier II hearings, for which the maximum possible confinement was 30 days of segregated housing or keeplock and would not, therefore, trigger due process protection individually, it is appropriate to aggregate two discrete periods in 2011 for due process analysis purposes. During these two discrete periods, Plaintiff served consecutive terms of confinement exceeding 30 days, and all of Plaintiff's disciplinary hearings at Shawangunk were conducted by the same individual, Defendant Gardner. [5] *See* Dkt. No. 236-10 at 17 (citing N.Y. Comp. Codes R. & Regs. Tit. 7 § 253.7(a)(1)(iii)). [6] When aggregated, these two distinct periods constitute a 59 day consecutive period of keeplock served between March 14 and May 11, 2011, and a 64 day consecutive period of keeplock served between October 14 and December 16, 2011. *See* Dkt. No. 236-9 at 7-8. However, as Magistrate Judge Baxter correctly found, Plaintiff's liberty interests were not implicated by the disciplinary proceedings challenged in the amended complain, even after aggregating the two consecutive periods of keeplock, given the absence of any allegations from Plaintiff about unusually harsh conditions of his keeplock.

Plaintiff's inmate history does not list two misbehavior reports filed by Defendant Budziszewski, which Defendants included with their motion. *See* Dkt. No. 236-6 at 69, 82-84. Plaintiff contends in his amended complaint that there were additional misbehavior reports filed against him in 2011 which are not reflected on the disciplinary history submitted by Defendants. *See* Dkt. No. 27 at 11, 24, 34-35, 48. Plaintiff, however, does not provide any specific allegations to suggest that he served punishment on disciplinary charges brought against him prior to the filing of his amended complaint on June 26, 2012 beyond that reflected in his disciplinary history or in the other disciplinary records submitted by Defendants or in

Plaintiff has not submitted any evidence establishing, or even made any allegations, that the conditions he experienced while serving keeplock sentences at Shawangunk were more harsh than typical keeplock conditions. Therefore, as Magistrate Judge Baxter correctly found, none of the periods of keeplock confinement he served would implicate a liberty interest warranting due process protection. *See, e.g., Holland v. Goord*, No. 05-CV-6295, 2006 WL 1983382, *7 (W.D.N.Y. July 13, 2006) (finding 77 days in keeplock during which the plaintiff was deprived of TV, phone, packages, and commissary, and was unable to attend Muslim services and classes, did not constitute a liberty interest); *Pilgrim v. Bruce*, No. 9:05-CV-198, 2008 WL 2003792, *15 (N.D.N.Y. May 7, 2008) (finding that a plaintiff's conclusory allegations, which notably failed to include claims that he was denied food, clothing, bedding, heat, running water, toiletries, or medicine during his 60 days in keeplock, fail to establish that he was subject to more severe conditions than in normal restrictive confinement); *Holmes v. Grant*, No. 03-CIV-3426, 2005 WL 2839123, *5 (S.D.N.Y. Oct. 25, 2005) (finding that sixty days in the SHU at Shawangunk is "insufficient to constitute a deprivation of a liberty interest").

**\*9** Based on the foregoing, the Court grants Defendants' motion for summary judgment as to Plaintiff's due process claims.

## II. CONCLUSION

After carefully considering Magistrate Judge Baxter's Report-Recommendation, the parties' submissions and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Baxter's March 22, 2016 Report-Recommendation is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendants' summary judgment motion is **GRANTED in full**; and the Court further

**ORDERS** that Plaintiff's retaliation, equal protection, and Eighth Amendment medical indifference claims are **DISMISSED** without prejudice; and the Court further

**ORDERS** that Plaintiff's procedural due process claims are **DISMISSED** with prejudice; and the Court further

**ORDERS** that the Clerk of the Court shall enter judgment in Defendants' favor and close this case; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum-Decision and Order on the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2016 WL 3349316

Footnotes

1     C.O. North, who, by then, was no longer an active DOCCS employee, had not been served with the amended complaint and was not then represented in this action. *See* Dkt. No. 91. C.O. North has since accepted service, and is currently represented by the Attorney General's Office, as are the other remaining thirteen Defendants.

2     Although Magistrate Judge Baxter's March 22, 2016, Report-Recommendation indicates that the Defendants' summary judgment motion should be granted in part, it is clear upon review that all remaining claims in Plaintiff's amended complaint must be dismissed on the grounds stated. Magistrate Judge Baxter found it unnecessary, as does this Court, to address multiple grounds on which to dismiss the same claims. Therefore, the Report-Recommendation actually recommends granting Defendants' summary judgment motion in full, terminating the instant action in its entirety.

3     The information from these two sources was collated in a spreadsheet summarizing Plaintiff's grievance filings and appeals, attached as Appendix A to Defendants' Memorandum of Law. *See* Dkt. No. 236-10 at 20-21.

4     Magistrate Judge Baxter's March 22, 2016, Report-Recommendation refers to this as the July 11, 2011 letter, which was the date on which Plaintiff received an adverse decision to his SHG-26770-11 Grievance; however, the actual letter from Karen Bellamy, Director of IGP, is dated July 20, 2011.

5     Plaintiff began serving more severe disciplinary sentences following disciplinary proceedings in July 2012, but that, and subsequent disciplinary hearings occurred after Plaintiff filed his amended complaint, and are not part of this action. *See* Dkt. No. 236-9 at 6-7.

6     The federal district courts in New York, applying *Sandin*, have consistently held that terms of special housing or "keeplock" of approximately 30 days, and the related loss of privileges, do not implicate a liberty interest protected by the due process clause, even in the absence of detailed factual development regarding the conditions of confinement. *See, e.g.*, *Brown v. Secore*, No. 9:08-CV-085, 2010 WL 980233, \*5 (N.D.N.Y. Mar. 15, 2010) (collecting cases).

**End of Document**                                      © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Not Reported in F.Supp.2d, 2002 WL 122921 (S.D.N.Y.)
(Cite as: 2002 WL 122921 (S.D.N.Y.))



**C**
Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Dennis FLANAGAN, Plaintiff,
v.
J. MALY, Captain at Downstate Corr. Fac., A. Sedlak, Sergeant at Downstate Corr. Fac., P. Artuz, Corr. Officer at Downstate Corr. Fac ., S. KIERNAN, Corr. Officer at Downstate Corr. Fac., J. Whalen, Corr. Officer at Downstate Corr. Fac., D. Alfonso, Corr. Officer at Downstate Corr. Fac., Individually and in their Official Capacity, Defendants.
**No. 99 CIV 12336 GEL.**

Jan. 29, 2002.

Dennis Flanagan, for Plaintiff Dennis Flanagan, pro se.

Eliot Spitzer, Attorney General of the State of New York (Melinda Chester-Spitzer, Assistant Attorney General of the State of New York,), for Defendants J. Maly, A. Sedlak, P. Artuz, S. Kiernan, J. Whalen, D. Alfonso, of counsel.

*OPINION AND ORDER*

LYNCH, J.

**\*1** Dennis Flanagan, a New York State prisoner, brings this action against a number of corrections officers at Downstate Correctional Facility, where he was formerly incarcerated, charging that they violated his constitutional rights. Specifically, he alleges that all the defendants except John Maly used excessive force against him in an altercation on June 4, 1999; that Maly, who conducted a disciplinary hearing on charges brought against Flanagan as a result of that incident, denied him due process of law; and that the defendants collectively denied him access to medical care and to the law library. Defendants move for dismissal of the complaint and/or summary judgment, on a variety of grounds. The motion is granted in substantial part as to all claims except the excessive force claim, as to which proceedings will be stayed pending the Supreme Court's decision in *Porter v. Nussle,* 122 S.Ct. 455 (2001).

The facts underlying plaintiff's claims will be addressed, to the extent necessary, in the discussion of the defendants' various arguments.

*DISCUSSION*

I. *Exhaustion of Administrative Remedies*

Defendants argue that the entire complaint should be dismissed for failure to exhaust available administrative remedies as required by 42 U.S.C. § 1997a(e), which provides:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available have been exhausted.

A. *Medical and Legal Needs*

Unquestionably, Flanagan's claims about inadequate access to medical care and legal materials are complaints about "prison conditions" within the meaning of this statute. *See, e.g., Santiago v. Meinsen,* 89 F.Supp.2d 435, 439-440 (S.D.N.Y.2000) (deliberate indifference to medical needs and access to courts are "prison conditions"); *Cruz v. Jordan,* 80 F.Supp.2d 109 (S.D.N.Y.1999) (deliberate indifference to medical needs are "prison conditions"); *Carter v. Kiernan,* 2000 WL 760303 (S.D.N .Y. June 12, 2000) (same). Equally unquestionably, Flanagan has failed to exhaust available administrative remedies with respect to those claims.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 122921 (S.D.N.Y.)
(Cite as: 2002 WL 122921 (S.D.N.Y.))

New York permits inmates to file internal grievances as to virtually any issue affecting their confinement. *See* N.Y. Corr. Law § 139 (authorizing inmate grievances); 7 N.Y.C.R.R. § 701.7 (establishing procedures for processing such grievances); *Petit v. Bender* 2000 U.S. Dist LEXIS 3536 at *6-8 (S.D.N.Y. March 22, 2000) (describing procedures); *Vasquez v. Artuz,* 1999 WL 440631 at *5 (S.D.N.Y. June 28, 1999) (same).

Prison records show no written grievances filed by Flanagan with respect to his medical or legal access. (Hughes Aff. Ex. BB at 4 ¶ 13.) Flanagan essentially concedes that he filed no such written grievance.[FN1] He does contend that he made an oral complaint to both the area supervisor, Sergeant Sedlak, (Pl.'s Br. at 3 ¶ 10), and a grievance supervisor, Skip Hughes -contentions which both officers deny (Sedlak Aff. Ex. G at 7 ¶ 26; Hughes Aff. Ex. BB at 4 ¶ 17).

> [FN1]. Flanagan states under oath that he submitted a "verbal grievance" to Sergeant Sedlak and "another verbal grievance" to supervisor Hughes who "ignored" his complaint. (Flanagan Aff. ¶¶ 3-4; Pl.'s Br. 1.) Although Flanagan's brief opposing summary judgment later states that "plaintiff did file a written grievance," the remainder of the same sentence suggests that he unintentionally omitted the word "not," as plaintiff proceeds to explain why an oral grievance should be considered the equivalent of a written grievance. (Pl.'s Br. 8.) Evaluating this in conjunction with Flanagan's affidavit, which nowhere states that he made a written complaint, it is clear that Flanagan is not claiming to have made a written report.

**\*2** But even if Flanagan made oral complaints or filed a written report of some kind, that would not satisfy the statutory requirement. To comply with 1997(e), a prisoner must "exhaust[ ]" his administrative remedies, meaning that he must pursue his challenge to the conditions in question through the highest level of administrative review prior to filing his suit. *Sonds v. St. Barnabas Hosp. Corr. Health Serve.,* 2001 U.S. Dist. LEXIS 7839 at *4 (S.D.N.Y. May 21, 2001); *Santiago,* 89 F.Supp.2d at 438, 438. The New York procedures provide for several levels of administrative review, beginning with

the filing of a written grievance, 7 N.Y.C.R.R. § 701.7(a)(1), and continuing through several levels of administrative appeal, 7 N.Y.C.R.R. § 701.7(a)(4), (b), and (c). The record demonstrates that Flanagan was fully aware of the availability of these grievance procedures. They are described in a booklet provided to all inmates on arrival, (Defs.' Br. 15), and Flanagan himself filed grievances over other issues.[FN2] Flanagan does not claim, let alone provide any evidence, that he pursued his grievance through these channels.[FN3]

> [FN2]. Prison records indicate that Flanagan filed a written grievance regarding the prison food served in the Downstate Correctional Facility. (Hughes Aff. Ex. BB at 4 ¶¶ 13, 17; Ex. CC.)

> [FN3]. As previously stated, Flanagan claims that he submitted only verbal grievances to complaint supervisor Hughes and defendant Sedlak, who reacted with hostility to the complaint and threatened plaintiff with violence if he continued to complain. (Pl.'s Br. at 1, 6, 8-9; Flanagan Aff. ¶ 3.) No doubt, under some circumstances, behavior by prison officials that prevented a prisoner from complying with § 1997a(e) would excuse compliance. But Flanagan alleges nothing approaching conduct that would present this issue. He evidently made no effort to file a written grievance, and verbal discouragement by individual officers does not prevent an inmate from filing a grievance.

Accordingly, Flanagan's claims of deliberate indifference to his medical needs and denial of access to the law library must be dismissed for failure to exhaust administrative remedies.

B. *Due Process*

Flanagan's due process claim, in contrast, cannot be so easily dismissed on exhaustion grounds. Flanagan argues that in conducting his disciplinary hearing, which resulted in a sentence of 24 months in Special Housing and various other administrative sanctions, Maly denied him due process by denying him the right to call a witness and to

Not Reported in F.Supp.2d, 2002 WL 122921 (S.D.N.Y.)
(Cite as: 2002 WL 122921 (S.D.N.Y.))

introduce certain medical records. Flanagan appealed this decision internally, to no avail. (Spitzer Decl. Ex. X.)

To require Flanagan to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of § 1997a(e), by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

Defendants essentially concede as much. Although their brief asserts that Flanagan's entire "action" should be dismissed for failure to exhaust (Defs.' Br. 13), the brief goes on to argue extensively for such dismissal of the medical and legal access claims (*id*. 14-16), and of the excessive force claim (*id*. 16-21), without directing any argument toward the exhaustion of the due process claim.[FN4]

> **FN4.** The exhaustion rule does require a plaintiff to have appealed his disciplinary case to the fullest extent provided by administrative regulations. *Sonds,* 2001 U.S. Dist. LEXIS 7830 at *4. It is not entirely clear on this record that Flanagan did. Given that (1) it is clear that Flanagan unsuccessfully pursued some appeal of the result of his hearing, (2) defendants have not pointed out any further levels of appeal available to him that he failed to utilize, and (3) the due process claim must be dismissed on the merits in any event, there is no need to pursue further clarification of the matter.

**\*3** For these reasons, the motion to dismiss the due process claim for failure to exhaust administrative remedies must be denied.[FN5]

> **FN5.** Flanagan's complaint, construed liberally as pro se pleadings must be, also appears to claim that certain defendants conspired to file false reports against him. (Compl.¶¶ 21-22.) Defendants do not address an exhaustion argument specifically to this claim. Arguably, the same logic set out above as to the due process claim would permit the conclusion that, by contesting the reports at his hearing and exhausting his appeals, Flanagan has exhausted his remedies as to this claim as well. Assuming without deciding that the exhaustion requirement has been met, this claim must nevertheless be dismissed for failure to state a claim, since a "prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest," *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986); *see also Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997), and there is no claim here that the false report constituted retaliation for exercise of a constitutional right, rather than simply a rationalization for the use of allegedly excessive force. *Cf. Franco v. Kelly* 854 F.2d 584, 588 (2d Cir.1988).

C. *Excessive Force*

Flanagan's excessive force claim also survives the defendants' exhaustion argument. The claim that individual officers assaulted an inmate on a particular occasion does not fit easily within the ordinary meaning of "[an] action ... with respect to prison conditions," and the Second Circuit has ruled that such a complaint is not subject to the exhaustion requirement. *Nussle v. Willette,* 224 F.3d 95 (2d Cir.2000).

Defendants structure much of their argument against the excessive force claim as an attack on the Second Circuit's decision in *Nussle,* recommending that this Court, in effect, overrule *Nussle* from below. Defendants' arguments that *Nussle* was wrongly decided are appropriately addressed only to higher authority - and have been. The Supreme Court has granted certiorari in *Nussle, Porter v.*

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 122921 (S.D.N.Y.)
(Cite as: 2002 WL 122921 (S.D.N.Y.))

*Nussle,* 122 S.Ct. 455 (2001).[FN6] While that Court's recent decision in *Booth v. Churner,* 121 S.Ct. 1819 (2001), suggests that the Court might reverse, until and unless it does, *Nussle* remains the law of this circuit, and requires denial of defendants' motion to dismiss the excessive force claim.

> FN6. Indeed, New York's Attorney General has himself presented his arguments for reversal of *Nussle* in an amicus brief in that case. *See* Brief of Amici Curiae New York, *et al., Porter v. Nussle* (No. 00-853), 122 S.Ct. 455 (2001).

II. *Summary Judgment*

Defendant Maly moves in the alternative for summary judgment on Flanagan's due process claim. That motion will be granted.

When adjudicating a motion for summary judgment, all ambiguities must be resolved in favor of the nonmoving party, although "the nonmoving party may not rely on conclusory allegations or unsubstantiated speculation." *Scotto v. Almenas,* 143 F.3d 105, 114 (2d Cir.1998). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996). Summary judgment is then appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits ... show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

To establish a genuine issue of material fact, the plaintiff " 'must produce specific facts indicating' that a genuine factual issue exists." *Scotto,* 143 F.3d at 114 (quoting *Wright v. Coughlin,* 132 F.3d 133, 137 (2d Cir.1998); *see also Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). "If the evidence [produced by the nonmoving party] is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249-50 (1986) (internal citations omitted). "The mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Pocchia v. NYNEX Corp.,* 81 F.3d 275, 277 (2d Cir.1996) (quoting *Liberty Lobby,* 477 U.S. at 252).

**\*4** It is settled that the "[p]rocedures established by the New York Department of Correctional Services governing disciplinary hearings comport with the due process procedural rights to which prison inmates are entitled." *Rodriguez v. Ghoslaw,* 2001 WL 755398 at \*9 (S.D.N.Y. July 5, 2001), citing *Walker v. Bates,* 23 F.3d 652, 656 (2d Cir.1994). Flanagan nevertheless claims that Maly deprived him of due process by evidentiary rulings made during the hearing.

The facts relating to these claims are essentially undisputed, and on those facts no denial of due process can be found. Flanagan offers no evidence to dispute Maly's testimony that the witness Flanagan sought to call, an inmate named Sanabria, refused to testify at the hearing. (Spitzer Decl. Ex. U at 24.) Indeed, upon learning that Sanabria would not appear at the hearing, Maly went to Sanabria's cell to inquire further, and Sanabria again refused.[FN7] (*Id.* at 25; Spitzer Decl. Ex. V at 19.) It is thus not true that Maly precluded a relevant witness from testifying.

> FN7. Sanabria told Maly he would not testify because he had been threatened by a corrections officer named Lee. There is, of course, no admissible evidence that this was so, Sanabria's statement being hearsay. But even if such a threat had occurred, nothing in the record casts doubt on Maly's testimony that he reassured Sanabria that his safety would be guaranteed if he testified, as three other inmates, including Flanagan, did. (Maly Aff. Ex. U at ¶¶ 25-26.)

As for the documentary evidence, Maly refused to admit photographs taken of Flanagan on the date of the incident, which Flanagan asserted would show that his hands were not bruised, arguably tending to show that he had not assaulted a corrections officer as charged. Maly ruled the photos irrelevant. The photographs were of limited

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 122921 (S.D.N.Y.)
(Cite as: 2002 WL 122921 (S.D.N.Y.))

probative value, and while the better course might have been to admit them, it can hardly be said that their exclusion was prejudicial error, let alone that it rises to the level of a denial of due process.

Maly heard testimony from Flanagan and two inmate witnesses, as well as from three corrections officers and the nurse who treated Flanagan and the officers after the fight. He also reviewed various medical records. The hearing provided Flanagan an opportunity to be heard "at a meaningful time and in a meaningful manner," *Mathews v. Eldridge,* 424 U.S. 319, 333 (1976), and thus comported with the requirements of due process. At a minimum, Maly is entitled to qualified immunity against Flanagan's claims, since his conduct of the hearing did not violate any "clearly established statutory or constitutional right," *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993); *see also Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989), as established by Supreme Court or Second Circuit precedent, *Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991).

Accordingly, Maly's motion for summary judgment must be granted.

III. *Stay of Proceedings*

Defendants do not seek summary judgment on the one remaining claim, for the alleged use of excessive force. Nor could they successfully do so, since the parties' conflicting testimony as to the events precipitating the use of force and the degree of force used presents classic questions of fact for jury resolution.[FN8] Accordingly, Flanagan's excessive force claim can proceed to trial.

FN8. The only one of defendants' remaining arguments that applies to this claim is their weakly-presented contention that the Court lacks jurisdiction under the Eleventh Amendment to the extent that they are sued in their official capacities. (Defs.' Br. at 39-40.) However, according Flanagan's complaint the liberal construction to which he is entitled, it is clear that he means to assert an ordinary claim that defendants as individuals violated his rights

under color of state law.

It would be imprudent, however, to schedule a trial at this time, in view of the pending Supreme Court decision in *Nussle.* Oral argument has already been heard, and a decision is likely within a few months. If the Supreme Court reverses and holds that exhaustion of administrative remedies is required in excessive force cases, Flanagan's one remaining claim will have to be dismissed, and any additional proceedings in this matter will have been wasted. If the Court affirms, in contrast, neither party will have been prejudiced by a brief delay. Therefore, proceedings in this case will be stayed pending the Supreme Court's decision.

*CONCLUSION*

**\*5** For the reasons set forth above, plaintiff's claim that defendants deprived him of access to medical care and to the courts are dismissed for failure to exhaust administrative remedies. Plaintiff's claim that defendants conspired to file false disciplinary reports is dismissed for failure to state a claim on which relief can be granted. Summary judgment for defendant Maly is granted on plaintiff's claim that he was denied due process of law at his disciplinary hearing; since this is the only claim against Maly, the case is terminated as to him.

The remaining defendants' motions to dismiss or for summary judgment with respect to plaintiff's claim of excessive force are denied, and further proceedings on that claim are stayed pending the Supreme Court's decision in *Porter v. Nussle.*

SO ORDERED:

S.D.N.Y.,2002.
Flanagan v. Maly
Not Reported in F.Supp.2d, 2002 WL 122921 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))



Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Maurice SAMUELS, Plaintiff,
v.
Donald SELSKY, Glenn Goord, Paul Cecilia, Javier
Iurrue, G. Schwartzman, Dennis Bliden, Jeffery McCoy,
and Christopher P. Artuz, Defendants.
**No. 01CIV.8235(AGS).**

Sept. 12, 2002.

OPINION & ORDER

SCHWARTZ, District J.

I. Introduction

*1 Maurice Samuels alleges that while incarcerated at the Green Haven Correctional Facility,[FN1] prison officials searched his cell and confiscated a number of documents which were deemed to be "subversive" and contraband. Samuels claims that the materials, including theological textbook excerpts, were of a Christian nature and were used in a course he taught in the prison through the New York Theological Seminary. Samuels' alleged possession of these documents led to a misbehavior report and a subsequent disciplinary hearing, for which Samuels was sentenced to 180 days in keeplock and 180 days' loss of packages, commissary privileges, and telephone use. Samuels also alleges that instead of being punished as per his disciplinary hearing, he was sentenced to a more severe punishment, 180 days in a special housing unit which entailed Samuels' being locked in his cell for twenty-three hours per day. On the basis of the allegedly unlawful sanctions to which he was subjected, Samuels has filed the instant action pursuant to 42 U.S.C. § 1983 alleging violations of, *inter alia,* his First Amendment and due process rights, and seeks equitable relief and damages.

Defendants have filed a motion to dismiss the action pursuant to FED. R. CIV. P. 12(b)(1) and (6), and argue that they enjoy qualified immunity barring this suit. For the reasons set forth below, defendants' motion is granted in part and denied in part.

FN1. Defendants repeatedly state that the events giving rise to this action arose while Samuels was incarcerated at the Great Meadow Correctional Facility. Samuels states that the events in question happened at the Green Haven Correctional Facility. Moreover, Samuels' evidence, including the Inmate Disciplinary Report (Exhibit H), the Disciplinary Hearing Record Sheet (Exhibit O), and the Superintendent Hearing Disposition Report (Exhibit P) all note the Green Haven Correctional Facility. In light of the above, the Court determines that defendants' position that the events occurred at Great Meadow is incorrect. The Green Haven Correctional Facility is located in Dutchess County in the Southern District, while Great Meadow is located in Washington County in the Northern District. Defendants make no argument regarding the Court's jurisdiction with respect to the location of the events in question.

II. Factual Background [FN2]

FN2. Unless otherwise indicated, the facts set forth below are gleaned from Samuels' submissions, because on a FED. R. CIV. P. 12(b)(1) or (6) motion, the adjudicating court must assume as true factual allegations made in the complaint. Defendants concede this fact. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint, at 4. It should also be noted that Samuels brings this action *pro se.* As such, it is sometimes difficult to understand fully his contentions. Accordingly, the Court reads the (sometimes confusing) factual allegations in the light most favorable to Samuels.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Maurice Samuels is currently an inmate at the Sullivan Correctional Facility. Since being incarcerated, Samuels has taken a keen interest in religion. He identifies himself as a member of the Five Percent Nation of Gods and Earths. [FN3] While confined at Sing Sing, he received a degree of Master of Professional Studies in Prison Ministry through the New York Theological Seminary ("NYTS"). *See* Complaint Pursuant to U.S.C.A. Section 1983 ("Complaint"), at 4; Exhibit ("Ex.") A. Upon completion of his studies with the NYTS, Samuels was transferred to the Green Haven Correctional Facility. [FN4] At Green Haven, Samuels was assigned a clerk's position in therapeutic "Reality and Pain Program." He subsequently redesigned the program, creating the "Reality and Pain Therapeutic Counseling Program." *See* Complaint, at 4. During this period he also served as a volunteer inmate instructor in the Black Studies program, and was later assigned as a clerk in Green Haven's Senior Counselor's Office, where he helped create a program for sex offenders. *See id.* at 4.

FN3. The website of the University of Chicago's Divinity School provides a good summary of the beliefs of the adherents of the Five Percent Nation of Gods and Earths, commonly known as the "Five Percenters." *See* Jonathan Moore, *The Five Percenters: Racist Prison Gang or Persecuted Religion?,* SIGHTINGS, May 21, 1999, *available at* http://divinity.uchicago.edu/sightings/archive_1999/sightings-052199.html. The name of the group stems from its belief that only five percent of people are aware of and teach the truth. The term "Gods" refers to black male members; "Earths" refer to black female members. The group was founded by Clarence 13X, who left the Nation of Islam in 1964. According to Moore, "[m]any of the theological accoutrements of Black Muslim belief remain: many read the Qur'an and Elijah Muhammad's writings (especially his "Message to the Black Man"), and they hold to the exclusive divinity of black men." *Id.* (The Moore article, not part of the record, is provided for background purposes only). Samuels has included two pages outlining the differences between the Nation of Gods and Earths and similar black Muslim groups-the Nation of Islam and the Temple of Islam. *See* Exhibit B.

FN4. *See supra* note 1.

The NYTS later began a certificate program in Christian Ministry in conjunction with Marist College at Green Haven. Samuels was invited to teach several courses for the program, including a course entitled "World Views and Values" and another entitled "Introduction to Theology and Methods." *See* Complaint, at 4; Ex. E, at 12. Samuels is listed on the "Faculty and Administration" page of the Certificate in Ministry Program brochure. *See* Ex. E, at 10. In designing his theology course, Samuels, in conjunction with Professor Mar Peter-Raoul (currently the Chair of the Department of Philosophy and Religious Studies at Marist College), prepared a syllabus which included the following:

**\*2** a. This is an introductory approach to contemporary Christian Theology, there will be a broad range of material provided for the student so that they [sic] may see the evolution of Christian Theology and Contemporary Theologies, active in the world today.

b. The course is divided into different sessions (1) What is Theology; (2) Philosophy & Theology; (3) Contemporary Theology; (4) Political and Liberation Theology; (5) Feminist/Womanist Theology; and (6) Black & Third World Theology.

c. This is done so that the student can examine the evolution of Christian Theology and Contemporary Theologies, and arrive at the next step in the process, i.e. explore the [sic] how to do theology.

d. This introduction to theology course will be taught from a [sic] interdisciplinary and non-traditional approach.

Complaint, at 5. This syllabus was approved by the appropriate authorities from NYTS, Marist College, and the Department of Corrections ("DOCS"). *See id.* at 5.

The central issue in this case involves a search of Samuels' cell. On September 15, 1999, another member of the Five Percent Nation of Gods and Earths who was involved in

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

the NYTS program was disciplined for allegedly possessing a pamphlet entitled "Awake" or "Awaken" which addressed topics such as racism in the criminal justice system and abuses of the Rockefeller drug laws. *See* Complaint, at 6. On October 19, 1999, the assistant inmate director for the NYTS certificate program was interrogated about the program and why some of its members were also members of the Five Percent Nation of Gods and Earths. At the time, Samuels was housed in the inmate honor block housing Unit and taught a pre-G.E.D. and adult basic education class in the morning and afternoon and taught his theology class in the evening. *See* Complaint, at 6. According to defendants, Sergeant Schwartzman, a member of the prison staff, received a report from a confidential informant that Samuels was a leader of a protest planned to occur around January 1, 2000 ("Y2K protest").[FN5] On October 20, 1999, Schwartzman ordered correction officers Williams and Kelly to search Samuels' cell. Samuels states that the confiscated materials included Marist College and NYTS course handouts for the certificate program, previously published material from the NYTS and Marist College, notes from newspaper articles, a manuscript Samuels had been working on since first attending the NYTS, and Kairos statements.[FN6] *See* Complaint, at 7. According to the Cell Search Report, contraband was found which consisted of a "folder of papers containing subversive material." Ex. G. On the same day, an Inmate Misbehavior Report was completed. *See* Ex. H. The rule violations are listed as 104.12 (action detrimental to the order of the facility) and 113.23 (contraband). *See id.* The narrative section of the Inmate Behavior Report states:

> FN5. While denying a link to the Y2K protest, Samuels provides some background on the matter. According to Samuels, DOCS created a program at Green Haven through the Corcraft Industry Division Program known as the Recreational Cell Building Project ("Project"). The Project initially used inmate volunteers to build Inmate Recreational Cells at recently constructed S-Facilities (special housing institutions). According to Samuels, because of poor working conditions, low wages, and other factors, inmates increasingly refused to volunteer for the Project and sought other work assignments. Samuels alleges that DOCS personnel then began using the disciplinary process to systematically force inmates to work

in the Project. *See* Complaint, at 3. Samuels also alleges that prison officials specifically targeted members of the NYTS and the Five Percent Nation of Gods and Earths for compelled work participation in the Project. *See id.* at 4. The planned Y2K protest, in which Samuels claims to have played no role, was intended to protest the program as well as prison conditions generally.

> FN6. The Kairos Statements (referred to by Samuels as "Karios Statements") are critiques of traditional church dogma. The most famous Kairos statement originated as a critique of alleged church complicity in the white *apartheid* regime in South Africa.

On the above date [10/20/99] and time while conducting a cell search on cell D-1-21 which houses inmate Samuels, Maurice 85A0184 the following contraband was found and recovered;

**\*3** (1) Folder of papers containing subversive material These papers speak about inmate [sic] uniting together to fight against oppsitions [sic] such as the N.Y. parole system and other dept. of correction [sic] programs.

This material is consistant [sic] with information recieved [sic] that inmate Samuels has been active in urging others to participate in a demonstration on or about Jan. 1, 2000, which led to his cell being searched.

Ex. H. The form is signed by G. Williams, a correction officer, and G. Schwartzman. The documents are not identified, nor is there an explanation of why they were considered "subversive." Samuels repeatedly asked prison authorities to identify the "subversive" documents without success. *See, e.g.,* Exhibits ("Exs.") J, K, M, N, V, 7, 9. Defendants have not furnished the confiscated papers for the Court, and make no representation as to what documents were found in Samuels' cell or why they are considered "subversive." Samuels states that the materials seized by the prison officials is not literature pertaining to the Five Percent Nation of Gods and Earths but Christian ministry materials he used in teaching his class and which had previously been approved by the NYTS and prison

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

authorities. *See* Complaint, at 5. Samuels also states that newspaper clippings and a manuscript he had been working on since 1986 were taken. *See* Affidavit [of Maurice Samuels] in Support of Opposition Motion ("Samuels Aff."), at ¶¶ 7-9.

Samuels was immediately placed in keeplock status pending a hearing on the misbehavior report. *See* Defendants' Memorandum of Law in Support of their Motion to Dismiss the Complaint ("Motion Brief"), at 3. Under DOCS rules, Samuels was entitled to an employee assistant to assist in his defense of the charges set forth in the misbehavior report.[FN7] An Assistant Selection Form was provided to Samuels, which instructed Samuels to select three people, one of whom would be assigned to him based on availability. *See* Ex. I. Samuels selected Hanna, Lawrence, and Schwartzman as his three choices. *See id.* Instead, Paul Cecilia was assigned to Samuels. *See* Motion Brief, at 3. Samuels alleges that instead of assisting him in the preparation of his case, Cecilia proceeded to interrogate Samuels, asking him if he was in contact with Green Party candidate (formerly "Grandpa Munster") Al Lewis, whether he had any letters from him, whether he had any letters from outside organizations involved in prison reform, whether he was involved in any planned Y2K protest, and what the "Kairos" document was. *See* Complaint, at 8. Samuels further alleges that Cecilia did not explain the charges contained in the misbehavior report and failed adequately to conduct an investigation on Samuels' behalf.[FN8] Cecilia signed an Assistant Form on October 25, 1999, at 12:53 pm, indicating that he had interviewed witnesses, assisted as requested, and reported back to Samuels. *See* Ex. J. However, on October 26, Green Haven officials requested a one-day extension to hold a disciplinary hearing on the basis that the "assistant is trying to speek [sic] to with witiness [sic]." Ex. L. The extension was granted by "Alternate User 999SHURXR for 999SHU." *See id.* The name of the grantor is not listed on the computer printout.

FN7. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1 (2002):(a) An inmate shall have the opportunity to pick an employee from an established list of persons who shall assist the inmate when a misbehavior report has been issued against the inmate if [...] (4) the inmate is confined pending a superintendent's hearing [...].

FN8. Samuels cites a number of failures on Cecilia's behalf: he failed to turn over documentary evidence relating to the charges against Samuels, he failed to provide a written record of the questions he was supposed to ask Samuels' witnesses, he failed to record the testimony of the witnesses interviewed on Samuels' behalf, he failed to explain exactly what material that was confiscated constituted contraband, and he failed to interview the confidential informant to determine his existence or credibility. *See* Complaint, at 9.

**\*4** The "Tier III" disciplinary hearing was held on October 27, 1999.[FN9] At the hearing, two inmates and Dr. George W. Webber testified on Samuels' behalf (Webber testified by telephone). Webber is the director of the Certificate Program and president emeritus of the NYTS. Sgt. Schwartzman testified against Samuels. *See* Ex. O. Samuels also submitted a written brief for the hearing. *See* Ex. M. Samuels was found guilty of "demonstration" and "contraband" on November 9, 1999. The hearing officer, Javier Irurre,[FN10] summarized his findings as follows:

FN9. Tier III hearings are held for "the most serious violations of institutional rules." *Walker v. Bates,* 23 F.3d 652, 654 (2d Cir.1994).

FN10. The name "Javier Irurre" appears on the Hearing Disposition form. *See* Ex. P. Samuels spells the name "Iurrue," *see* Complaint, at 9, while defendants in turn use two spellings for the name-"Iurre" and "Iurrue *See* Motion Brief, at 3. The Court uses the "Irurre" spelling found on the Hearing Disposition form, apparently in Javier Irurre's own handwriting, and on the Tier III assignment form signed by Superintendent Artuz. *See* Appendix 7.

Statement of Evidence Relied Upon: Papers & hand written papers retrieved from your cell show statements inciting revolt and prison unrest. Confidential tape shows similarity between statements made in papers you have written and others in your possession with statements found in written material belonging other [sic] inmates inciting the so called Y2K revolt.

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

Confidential tape and testimony at the hearing establish a link between the statements in papers found in your cell and phamphlets [sic] circulating among prison population urging to strike in Y2K.

Reason for Disposition: Inciting revolt can not be tolerated in a correctional setting.

Ex. P. Samuels was punished with 180 days of keeplock, 180 days of loss of packages, 180 days of loss of commissary privileges, and 180 days of loss of phone privileges. *See* Ex. P; Complaint, at 11. The hearing officer did not impose special housing unit placement. *See* Ex. P; Complaint, at 11. The Court has not been furnished with a transcript of the hearing or of the "confidential tape" referred to by Irurre.

Samuels alleges that his due process rights were violated at the misbehavior hearing. He alleges that he failed to receive a timely hearing, that he received inadequate assistance from the employee assistant assigned to him (Cecilia), and that Dr. Mar Peter-Raoul was not permitted to testify on Samuels' behalf. *See* Complaint, at 9, 11. Samuels also protests the fact that the misbehavior report never specifies exactly what Samuels did to constitute "demonstration." *See id.* at 11. No written record was apparently made stating the reasons Dr. Peter-Raoul was not permitted to testify. Dr. Peter-Raoul later wrote a lengthy letter addressed to defendants Bliden, McCoy, and Irurre in which she explained the nature of the Kairos documents and stated her desire to serve as a witness for Samuels. *See* Complaint, at 10.

On November 8, 1999 (one day before Irurre found Samuels guilty of demonstration and contraband), Samuels submitted a detailed written brief to First Deputy Superintendent Dennis Bliden and "Jeff Macoy" [sic] on November 8, 1999, requesting that his misbehavior report be dismissed. *See* Ex. N. While waiting for a response to his letter, Samuels was transferred to the Upstate Correctional Facility, a special housing unit facility, where he was housed for 180 days.[FN11] *See* Complaint, at 11; Motion Brief, at 4; Plaintiffs' [sic] Memorandum of Law in Opposition to Defendants' Motion ("Opposition Brief"),

at 27. Neither Samuels nor defendants provides an explanation as to why Samuels was transferred to the special housing unit facility. Jeff McKoy (listed in the caption as Jeffery McCoy) wrote to Samuels on November 12, 1999, advising him that he lacked the authority to overturn a Tier III disposition. *See* Ex. R. Bliden wrote to Samuels on November 18, 1999, stating that any appeal Samuels wished to file had to be directed to the Commissioner in Albany. He stated that "[u]ntil such time as we receive a decision from [Albany], I will not modify the disposition." Ex. U.

FN11. Placement in a special housing unit involves confinement for twenty-three hours per day. The inmates assigned to special housing units receive virtually no programming, no congregate activities, and very little natural light. Reading materials are severely restricted, as are visits. *See* Ex. 16, at 5-6 (THE NEW YORK STATE SENATE DEMOCRATIC TASK FORCE ON CRIMINAL JUSTICE REFORM, CRIMINAL JUSTICE REFORM: A TIME THAT'S COME (2001)).

**\*5** As per Deputy Superintendent Bliden's instructions, Samuels submitted a seventeen-page letter to Donald Selsky, the Director of the Inmate Disciplinary Program, in Albany. *See* Ex. V. In the course of his letter to Selsky, Samuels voices his procedurally and substantively-based arguments for dismissing his misbehavior adjudication. Selsky affirmed the November 9, 1999 hearing on January 6, 2000 on behalf of Glenn Goord, the Commissioner.[FN12] *See* Ex. 6. Samuels filed a request for a "time-cut" from the determination of the Superintendent on February 28, 2000. *See* Ex. 6. Prisoners' Legal Services of New York ("PLS") sent a letter to Selsky on March 2, 2000, asking him to reconsider his decision. On April 27, 2000, PLS sent a supplemental request for reconsideration, this time outlining in detail the legal bases for which Samuels' disciplinary charges should be withdrawn (by this point, Samuels had already served the imposed penalty; the letter asks Selsky to reverse the disciplinary hearing and expunge the disciplinary charges). *See* Ex. 9. Selsky did not alter his January 2000 decision. Samuels then appealed to the New York State Supreme Court, apparently by means of an Article 78 proceeding. The court, Canfield J., concluded that Samuels' appeal raised a substantial evidence question that could not be resolved by "reference

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

to the objections in point of law." Decision and Order dated October 13, 2000. The court then transferred the matter to the Appellate Division, Third Judicial Department pursuant to N.Y. C.P.L.R. 7804(g).[FN13] *See id.*

> FN12. Prisoners' Legal Services of New York cite the date as January 20, 2000. *See* Ex. 7; Samuels cites the date as January 20, 1999. *See* Ex. 6.

> FN13. No Appellate Division decision on the matter is in the record. However, defendants' argument on the exhaustion of remedies focuses on administrative remedies and not on this potential deficiency.

Samuels then filed the instant action pursuant to 42 U.S.C. § 1983 based on defendants' alleged violations of his due process, First Amendment, and other constitutional rights, seeking equitable relief as well as compensatory and punitive damages.[FN14] The defendants move to dismiss the complaint pursuant to FED. R. CIV. P. 12(b)(1) (lack of subject matter jurisdiction) and (6) (failure to state a claim upon which relief can be granted). For the reasons set forth below, defendants' motion is granted in part and denied in part.

> FN14. In his complaint, Samuels also alleged an Eighth Amendment violation stemming from his treatment during a trip to and from his brother's funeral. This claim was dismissed by order of Judge Mukasey dated September 4, 2001.

III. Legal Standard

A. *Pro Se* Complaints

The Second Circuit has repeatedly held that *pro se* complaints must be read more leniently than those prepared by lawyers. Recently, for example, the Second Circuit noted that a "*pro se* complaint should not be dismissed unless 'it appears beyond doubt that the plaintiff[ ] can prove no set of facts in support of [his]

claim[s] which would entitle [him] to relief." ' *Weixel v. Board of Educ. of the City of New York,* 287 F.3d 138, 145 (2d Cir.2002) (quoting *Conley v. Gibson,* 355 U.S. 41, 45-46 (1957)). Moreover, when considering a motion to dismiss a *pro se* complaint, "courts must construe [the complaint] broadly, and interpret [it] to raise the strongest arguments that [it] suggest[s]." *Weixel,* 287 F.3d at 146 (quoting *Cruz v. Gomez,* 202 F.3d 593, 597 (2d Cir.2000) (internal quotation marks omitted)). The Second Circuit has also emphasized that a liberal reading of a *pro se* complaint is especially important when the complaint alleges civil rights violations. *See Weixel,* 287 F.3d at 146; *Weinstein v. Albright,* 261 F.3d 127, 132 (2d Cir.2001). Consequently, Samuels' allegations must be read so as to "raise the strongest arguments that they suggest." *Weixel,* 287 F.3d at 146 (quoting *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (internal quotation marks omitted)).

B. Motions to Dismiss Pursuant to FED. R. CIV. P. 12(b)(1) & (6)

*6 Defendants move to dismiss the complaint pursuant to FED. R. CIV. P.12(b)(1) and (6). The standard of review for dismissal on either basis is identical. *See, e.g., Moore v. PaineWebber, Inc.,* 189 F .3d 165, 169 n. 3 (2d Cir.1999); *Jaghory v. New York State Dep't of Educ.,* 131 F.3d 326, 329 (2d Cir.1997). In either case, a court must assume as true factual allegations in the complaint and construe the complaint in the light most favorable to the plaintiff. *See, e.g., York v. Association of Bar of City of New York,* 286 F .3d 122, 125 (2d Cir.2002); *Shipping Fin. Servs. Corp. v. Drakos,* 140 F.3d 129, 131 (2d Cir.1998). While the question of subject matter jurisdiction goes to the power of the court to hear a case, the issue on a motion to dismiss is "not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *York,* 286 F.3d at 125 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236 (1974)).

IV. Legal Analysis

A. Exhaustion of Administrative Remedies

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

1. Legal Standards Governing Exhaustion of Administrative Remedies

Lawsuits by prisoners are governed by 42 U.S.C. § 1997e, which holds in part:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

Under this section, where a prisoner brings an action in a district court before exhausting all available administrative remedies, the action must be dismissed. A unanimous Supreme Court has recently interpreted the term "prison conditions" expansively, requiring an exhaustion of all available administrative remedies whether the inmate suit concerns a general prison condition (i.e., quality of food) or a discrete incident specific to one prisoner (i.e., excessive force). *See* *Porter v. Nussle,* 122 S.Ct. 983 (2002). The Court also held that the exhaustion requirement applies regardless of whether the administrative remedies are "plain," "speedy," or "effective," and also applies when the prisoner "seeks relief not available in grievance proceedings" such as monetary damages. *Id.* at 988.

As a preliminary matter, defendants concede that Samuels has exhausted all administrative remedies concerning his due process violations. *See* Defendants' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Their Motion to Dismiss ("Reply Brief"), at 9. Defendants' concession is apparently based on DOCS Directive No. 4040, which holds that:

[T]he individual decisions or dispositions of the following are not grievable: [...] Media Review, disciplinary proceedings, inmate property claims (of any amount) and records review (Freedom of Information Requests, expunction). However, the policies, rules, and procedures of any of these programs or procedures may be the subject of a grievance.

**\*7** As noted above, Samuels unsuccessfully appealed his case within the prison facility and later to defendant Selsky in Albany, who denied it and denied reconsideration thereof.

Defendants argue, however, that "if a claim is incidental to a disciplinary determination [...] the fact that the disciplinary charge itself has been appealed does not excuse the failure to file a grievance." Reply Brief, at 9. Defendants thus seek to sever the alleged due process violations (for which Samuels has exhausted all administrative remedies) from several closely related claims-Samuels' claims protesting the confiscation of his papers, his transfer to the special housing unit, and DOCS policy regarding the Five Percent Nation of Gods and Earths (for which defendants argue Samuels has failed to exhaust all administrative remedies). *See* Reply Brief, at 9.

2. Confiscation of Documents

Defendants allege that the confiscation of the religious material is a matter separate from the underlying disciplinary hearing. While Samuels directly appealed his disciplinary adjudication, he concedes that he did not bring any complaint to the inmate grievance program. *See* Complaint, at 1. Defendants argue that Samuels' claim alleging the confiscation of religious material must therefore be dismissed because he failed to exhaust administrative remedies. *See* Reply Brief, at 9-10. Defendants represent that confiscation of religious documents from a cell is a grievable matter. The Court notes, however, that in similar cases inmates have been told that such confiscations are not grievable. *See, e.g., Allah v. Annucci,* 97 Civ. 607, 1999 U.S. Dist. LEXIS 7171, at \*2-\*3 (W.D.N.Y. Mar. 25, 1999) (plaintiff filed an inmate grievance protesting confiscation of religious material and was told such a seizure was not grievable).

As a preliminary matter, there is considerable confusion regarding exactly which documents were confiscated. Samuels has sought these documents numerous times; defendants have not made the documents available to him or to the Court. Initially, defendants stated that "Plaintiff specifically alleges in his compliant that the defendants confiscated a pamphlet called 'Awake'." Motion Brief, at

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

8. Later, defendants state that it is "unclear from plaintiff's complaint and response whether the pamphlet 'Awake' was confiscated from him or another." Yet since defendants conducted the search and confiscation of the materials from Samuels' cell, they should know whether "Awake" was confiscated from Samuels' cell. Nonetheless, they claim ignorance. Samuels himself makes his position clear: "material taken from Plaintiff [sic] cell [...] was not [...] Awake." Complaint, at 2. In a later brief, he writes "Complainant NEVER POSSESSED a pamphlet entitled 'Awake.'" Opposition Brief, at 3 (emphasis in original).

In any event, it is clear that certain religiously-oriented documents were confiscated from Samuels' cell. Samuels seeks, *inter alia*, punitive and compensatory damages he claims to have suffered through defendants' alleged violation of his rights, including his First Amendment rights. *See* Complaint, at 13. Defendants argue that Samuels "never appealed any grievance relating to the confiscation of religious material" to the Inmate Grievance Program, citing an affidavit of Thomas G. Eagen ("Eagen Aff."), the Director of DOCS's Inmate Grievance Program, dated March 13, 2002. While this may be true, Samuels did protest the confiscation of documents in his direct appeal to Bliden and McKoy and later to Selsky. *See* Exs. N, V, 9. These appeals were denied.

**\*8** As noted, it is factually unclear whether seizures of religious materials may be grieved through the Inmate Grievance Program. However, even if such seizures are grievable, Samuels' alleged failure to exhaust all administrative remedies as required by 42 U.S .C. § 1997e(a) goes only to the narrow issue of the confiscation *qua* confiscation-the damage Samuels suffered from the loss of his property (such as the property value of the books). The main confiscation issue put forward by Samuels is not the confiscation in and of itself, but the confiscation insofar as it was the basis for the misbehavior adjudication.[FN15] This issue was already effectively grieved by Samuels through his direct appeal of his misbehavior determination, which *per se* implicated the confiscation of documents. Defendants argue nonetheless that any confiscation that took place is separate from the disciplinary hearing and thus must be separately grieved. The Court does not agree.

FN15. The real damage suffered by Samuels

was, *inter alia,* his 180 days in keeplock (and later a special housing unit).

Disputes stemming from a disciplinary hearing are properly appealed directly and not through the Inmate Grievance Program. To the extent that the confiscation issue is a constituent element of the misbehavior adjudication, Samuels need not file an administrative grievance because he already sought review of the matter on his direct appeal. The recent case of *Flanagan v. Maly, 99 Civ. 12336(GEL), 2002 WL 122921 (S.D.N.Y. Jan. 29, 2002),* is instructive. In *Flanagan,* the plaintiff brought two separate claims-one stemming from inadequate access to medical and legal resources, and one stemming from an alleged due process violation in a disciplinary hearing. The court found that the plaintiff had not exhausted all administrative remedies with regard to medical and legal access because he failed to utilize the Inmate Grievance Program. With regard to the disciplinary hearing, however, the court held that utilization of the grievance procedures was unnecessary because the plaintiff had already appealed the issues directly:

To require [plaintiff] to file an administrative grievance in these circumstances would be absurd, and Congress cannot have intended such a requirement. When an inmate challenges the procedure at a disciplinary hearing that resulted in punishment, he exhausts his administrative remedies by presenting his objections in the administrative appeals process, not by filing a separate grievance instead of or in addition to his ordinary appeal. Pursuit of the appellate process that the state provides fulfills all the purposes of the exhaustion requirement of [ § 1997e(a) ][FN16], by giving the state an opportunity to correct any errors and avoiding premature federal litigation. Once the alleged deprivation of rights has been approved at the highest level of the state correctional department to which an appeal is authorized, resort to additional internal grievance mechanisms would be pointless.

FN16. The district court mistakenly cites the provision as " § 1997a(e)," a nonexistent section.

*Flanagan,* 2002 WL 122921, at *2. While the issue referred to in *Flanagan* was a due process defect in the disciplinary hearing (not at issue here because defendants

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

concede that Samuels exhausted all available administrative remedies), the underlying point, that issues directly tied to the disciplinary hearing which have been directly appealed need not be appealed again collaterally through the Inmate Grievance Program, is applicable to the confiscation issue. Moreover, the confiscation in the instant case is part and parcel of the misbehavior adjudication-unlike the medical claim made in *Flanagan* which was divorced from the due process claim.

**\*9** Defendants rely on a single case in support of their contention that the confiscation issue and the disciplinary hearing issue are wholly separate, *Cherry v. Selsky,* 99 Civ. 4636(HB), 2000 U.S. Dist. LEXIS 9451 (S.D.N.Y. July 7, 2000). It is not completely clear which section of the opinion defendants are citing, because no pinpoint citation is given. In *Cherry,* Judge Baer held that the filing of a false misbehavior report by a corrections officer is a grievable matter. *See id.* at *21. However, *Cherry* is readily distinguishable from the instant case because in *Cherry,* the plaintiff had "not brought a claim with respect to the due process afforded him at his disciplinary hearing [...]." *Id.* at *15. In contrast, Samuels makes this claim. As a consequence, the due process violations, including the allegedly wrongful confiscation (to the extent it led to the misbehavior adjudication) may be appealed directly.

Consequently, while Samuels has not exhausted his administrative remedies with regard to the injuries he suffered from the confiscation *alone,* he has exhausted his administrative remedies with regard to the injuries he suffered from the confiscation inasmuch as the confiscation of the religious materials serves as the basis for the disciplinary hearing.[FN17]

> [FN17.](#) The confiscation of Samuels' documents is not an ancillary issue unrelated to the disciplinary hearing (as was Samuels' Eighth Amendment argument, *see supra* note 14). Instead, the allegedly improper confiscation of materials is part and parcel of the disciplinary proceeding. The primary harm suffered by Samuels of the confiscation was not the value of the documents seized (which is never mentioned by Samuels) but the fact that the confiscation of allegedly harmless materials led to his confinement in keeplock and later in a special

housing unit for 180 days.

### 3. Special Housing Unit Confinement

Defendants similarly argue that Samuels' claim of retaliatory confinement in a special housing unit is barred because he failed to exhaust all available administrative remedies.[FN18] It is not entirely clear whether Samuels is making an argument based on retaliation. On one hand, he states that "Plaintiff [sic] claim is not on issue of retaliation." Samuels Aff., at ¶ 4. Elsewhere, he argues that "Plaintiff should not need to fear imposition of [special housing unit] confinement because they [sic] have engaged in prison litigation and/or prison reform activity [...]." Opposition Brief, at 25. As noted above, after being sentenced, Samuels was apparently transferred to a special housing unit for 180 days, which involves confinement for twenty-three hours per day.

> [FN18.](#) There are two separate retaliation issues at play in this action. The first, discussed here, is Samuels' claim of retaliatory confinement in a special housing unit. The second, discussed below, is Samuels' claim that the misbehavior adjudication itself was a form of retaliation for the NYTS's opposition to the Cell Building Project. *See supra* note 5.

Defendants represent to the Court that confinement to a special housing unit is ordinarily grievable. *See* Reply Brief, at 11. Samuels failed to bring this grievance to the Inmate Grievance Program. However, Samuels argues, and defendants do not contest, that Samuels was transferred to the special housing unit as punishment for his misbehavior adjudication, even though he was sentenced to 180 days of keeplock. Consequently, his appeal of his misbehavior adjudication necessarily implicates his sentence-not only his *de jure* punishment of 180 days of keeplock, 180 days' loss of telephone, package, and commissary privileges, but also his *de facto* punishment of 180 days of special housing unit confinement. *See* [*Flanagan,*](#) 2002 WL 122921, at *2. The transfer to a special housing unit potentially implicates due process concerns. *See, e.g.,* [*Tookes v. Artuz,*](#) 00 Civ. 4969, [2002 WL 1484391, at *3 (S.D.N.Y. July 11, 2002)](#) (noting that in the Second Circuit, confinement in a special

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

housing unit for more than 101 days generally implicates a liberty interest protected by the Due Process Clause).

4. DOCS Policy Regarding the Five Percent Nation of Gods & Earths

**\*10** Samuels makes an oblique reference to the fact that DOCS has treated members of the Five Percent Nation of Gods and Earths unfairly and partially. *See* Opposition Brief, at 3. To the extent that Samuels has a claim regarding DOCS's treatment of members of the Five Percent Nation, it is not directly tied to his disciplinary hearing and has not been grieved through the Inmate Grievance Program. Moreover, he has not taken issue with DOCS policies regarding the Five Percent Nation in his appeal. Consequently, this issue is dismissed with prejudice.

5. Dismissal of Action

Defendants argue that because Samuels seeks to assert certain unexhausted claims, "the entire action should be dismissed," irrespective of the fact that some claims are (as defendants concede) exhausted. Reply Brief, at 11. Defendants point to no binding precedent in support of this contention. The only New York case cited by defendants is *Radcliffe v. McGinns,* 00 Civ. 4966 (LMM), 2001 U.S. Dist. LEXIS 15528 (S.D.N.Y. Sept. 27, 2001). However, *Radcliffe* does not support defendants assertion that dismissal of some unexhausted claims mandates the dismissal of all claims, because in that case the claims were unexhausted as to *all* defendants. On that basis, the *Radcliffe* court dismissed all claims without prejudice. This Court thus does not find that dismissal of the exhausted claims is warranted.

B. Due Process

1. Samuels Pleads a Valid Due Process Claim

Defendants argue that Samuels does not plead a valid due process claim, claiming that Samuels does not identify a liberty interest, protected by the Due Process Clause, of

which he was deprived. *See* Motion Brief, at 9. Defendants state that "[other] then [sic] allege that he was sentenced to keeplock and transferred to Upstate, plaintiff does not allege any facts that distinguishes [sic] the disciplinary sentence from general prison population conditions." [FN19] *Id.* at 9. Defendants cite *Walker v. Goord,* 98 Civ. 5217(DC), 2000 U.S. Dist. LEXIS 3501, at \*22 (S.D.N.Y. Mar. 22, 2000) for the proposition that a complaint that merely alleges that a plaintiff was housed in a special housing unit does not state a due process claim. *See* Motion Brief, at 10. In fact, *Walker* 's ruling is not so sweeping. In *Walker,* the court held that to establish a liberty interest, a prisoner "must establish that the restraint imposed creates an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' ' *Walker,* at \*21 (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). The court also reiterated the Second Circuit's holding that there is no "bright-line rule regarding the length or type of sanction" necessary. *Walker,* at \*21 (citation omitted). The prisoner must also establish that the state has granted its inmates a protected liberty interest in remaining free from that confinement or restraint. *Id.* at \*21.

FN19. As noted *supra,* Samuels was also sentenced to 180 days' loss of packages, telephone, and commissary privileges.

**\*11** Samuels is able to meet this burden. The deprivation of liberty Samuels suffered was onerous. He was moved from the inmate honor block housing unit to keeplock and then to a special housing unit. *See supra* note 11. Moreover, unlike the plaintiff in *Walker,* Samuels identifies the length of time he was punished (180 days). *See Walker,* at \*22. In light of these facts, and given the length of his confinement, Samuels has met the *Sandin* test cited above. *See Tookes v. Artuz,* 00 Civ. 4969, 2002 WL 1484391, at \*3 (S.D.N.Y. July 11, 2002). Additionally, the requirement of an appealable hearing, with certain procedural safeguards, *see infra,* indicates that the state has granted inmates a protected liberty interest in remaining free from keeplock and special housing unit placement.

Due process requirements for a prison disciplinary hearing are "in many respects less demanding than those for criminal prosecutions." *Espinal v. Goord,* 180 F.Supp.2d

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

532, 537 (S.D.N.Y.2002) (quoting *Edwards v. Balisok,* 520 U.S. 641, 647 (1997)). At the same time, "[p]rison walls do not form a barrier separating prison inmates from the protections of the Constitution." *Duamutef v. Hollins,* 297 F.3d 108, 112 (2d Cir.2002) (citation omitted). With respect to Tier III hearings such as the one at issue here, the Fourteenth Amendment requires that:

(1) the inmate receive at least twenty-four hours written notice of the disciplinary charges against him;

(2) the inmate be permitted to call witnesses and present evidence "when permitting him to do so would not be unduly hazardous to institutional safety or correctional goals";

(3) the inmate be judged by a fair and impartial hearing officer;

(4) the disciplinary conviction be supported by some evidence; and

(5) the inmate be provided with a written statement of fact findings that support the disposition as well as the reasons for the disciplinary action taken.

*Espinal,* 180 F.Supp.2d at 538 (citing *Wolff v. McDonnell,* 418 U.S. 539, 563-69 (1974)) (internal citations omitted)).

**2. Whether Samuels Received the Process Due Him**

Defendants concede that Samuels was entitled to the aforementioned rights under *Wolff. See* Reply Brief, at 13. They argue, however, that Samuels received all the procedural safeguards due him. Before analyzing defendants points in detail, the Court notes the paucity of the record before it. While Samuels has provided nearly fifty exhibits, defendants have provided only a two-page affidavit by Inmate Grievance Program Director Thomas G. Eagen dated March 13, 2002, attached to which is a nine-line computer printout of what purports to be Samuels' grievance file. Defendants have failed to submit, *inter alia,* a transcript of the disciplinary hearing, a transcript or audio recording of the confidential witness statements, a written basis for the rejection of Samuels' witnesses, or a copy of the documents that were supposedly seized from Samuels' cell. While the Court is cognizant of the fact that the instant motion is not one for summary judgment, without these and other documents, it is difficult for this Court fully to evaluate the merits of the parties' arguments. More troubling is the fact that this is apparently not the first time an inmate has been sentenced to a special housing unit on the basis of evidence which has not been preserved for judicial review. Indeed, in *Cherry v. Selsky,* 99 Civ. 4636, 2000 U.S. Dist. LEXIS 9451, at *9-*12 (S.D.N.Y. July 7, 2000), a case cited by defendants, the court noted that on more than one occasion, Selsky was forced to reverse his previous decision denying an inmate's appeal because the "record of [the disciplinary] hearing was incomplete and the 'confidential tape' was 'unavailable for judicial review.' " *Id.* at *9 (citation omitted). On the occasion cited by the *Cherry* court, the inmate's record was expunged, but only after the plaintiff had served 125 days in a special housing unit. *See id.* at *9.

**a. Witnesses**

**\*12** Samuels argues that his due process rights were violated because he was not permitted to call Dr. Peter-Raoul as a witness at his disciplinary hearing. *See* Complaint, at 9; Ex. V, at 2. Defendants state, without explanation, that "it is clear that the proffered testimony would have been irrelevant and redundant." Motion Brief, at 13. The Court agrees with defendants that the right of an inmate to call witnesses in his defense is not limitless. Nevertheless, prison authorities' failure to allow an inmate to call a witness may be grounds for reversal, where the authorities fail to justify their actions. *See Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). In this case, Dr. Peter-Raoul was apparently the author of some or all of the "subversive" materials and had close ties to the theological seminary program at the prison. According to Samuels, she also "assisted plaintiff with his course syllabus and provided much of the material utilized" therein. Complaint, at 9. She was therefore in a unique position to explain the appropriateness and relevance of the materials allegedly possessed by Samuels, who had in fact argued that the materials in question were issued to

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

him through the NYTS program with the authorization of prison officials. *See, e.g.,* Complaint, at 5, Ex. V, at 2. The misbehavior hearing record sheet states that, "if any witness is denied [the opportunity to testify,] form 2176 explaining the reason for that determination must be given to the inmate and included as part of the record." Ex. O. No such form was filled out, and nowhere in the record do defendants explain or justify their exclusion of Dr. Peter-Raoul. *See* Ex. Q. Due process rights may be violated where prison authorities fail "without rational explanation" to obtain a witness requested by an inmate during a disciplinary hearing. *Ayers v. Ryan,* 152 F.3d 77, 81 (2d Cir.1998). Defendants' failure to justify their exclusion of Dr. Peter-Raoul potentially gives rise to a due process violation. [FN20] Dismissal is therefore inappropriate.

> FN20. Samuels also appears to allege that Cecilia, his employee assistant, was not permitted to testify on Samuels' behalf, and that Schwartzman testified outside Samuels' presence. *See* Ex. V, at 4; Plaintiffs' Supplemental Memorandum of Law and Reply Memorandum of Law in Further Support of Plaintiffs' Motion to Stay Complaint, at 8.

b. Confidential Informant

Samuels also protests the fact that he was not furnished with statements of the confidential informant, and argues that the record is insufficient to permit an assessment of the reliability of the informant's testimony. The Second Circuit has noted that "even if due process does require a hearing officer to conduct an independent assessment of the informant's credibility, that 'would not entail more than some examination of indicia relevant to credibility rather than wholesale reliance upon a third party's evaluation of that credibility." ' *Espinal v. Goord,* 180 F.Supp.2d 532, 540 (S.D.N.Y.2002) (quoting *Russell v. Scully,* 15 F.3d 219, 223 (2d Cir.1993)). In the instant case, the lack of a full record does not permit the Court to determine whether Irurre, the presiding officer at the Tier III hearing, made the required "examination of indicia relevant to the credibility of the confidential informant[ ], whether by an independent assessment or otherwise." *Espinal,* 180 F.Supp.2d at 540. Consequently, dismissal is inappropriate, because it is uncertain whether Samuels' punishment was supported by constitutionally sufficient

evidence.

c. Assistance Provided by the Employee Assistant

**\*13** Samuels claims that his employee assistant, Cecilia, violated his due process rights by, *inter alia,* failing to explain the charges against Samuels, failing to provide Samuels with documentary evidence relating to the charges in the misbehavior report, failing to make a written record of the questions he asked the interviewees, failing to record the testimony of the witnesses he allegedly interviewed for Samuels, failing to interview the confidential informant on Samuels' behalf, and failing to interview one of the three witnesses requested by Samuels. *See* Complaint, at 9; Opposition Brief, at 22. Samuels also complains that his employee assistant did not assist in his defense but instead interrogated him about his alleged links to prison reform activists. *See* Ex. V, at 5-6.

Defendants concede that inmates have a limited right to assistance in misbehavior proceedings. *See Silva v. Casey,* 992 F .2d 20, 22 (2d Cir.1993) (per curiam). While defendants are correct in asserting that inmates do not have the right to appointed or retained counsel at a misbehavior hearing, *see Wolff v. McDonnell,* 418 U.S. 539, 570 (1974), they do have a right to assistance in "certain circumstances [in which they] will be unable to 'marshal evidence and present a defense' [...]." *Silva,* 992 F.2d at 22. Such situations include where the inmate is confined pending a superintendent's hearing. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.1(a)(4). The Green Haven Notice of Assistance form given to Samuels specifically states that an "inmate shall have the opportunity to pick an employee from established lists of persons who shall assist the inmate when a Misbehavior Report has been issued against the inmate if [...] [t]he inmate is keeplocked or confined to a special housing unit and is unable to prepare his defense." Ex. J. In the instant case, Samuels was entitled to an employee assistant because he was keeplocked immediately after the search of his cell and was unable to prepare his defense.

As noted, Samuels makes broad assertions as to the deficiency of his employee assistant. *See* Ex. V, at 3-8. Based on Samuels' factual assertions, it is possible that employee assistant Cecilia failed to provide even the

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

"limited" assistance to which Samuels is entitled.[FN21] Such a failure potentially implicates Samuels' due process rights. *See* *Ayers v. Ryan,* 152 F.3d 77, 80-81 (2d Cir.1998). Because the instant motion requires that the Court accept Samuels' allegations as true, dismissal is inappropriate.

> FN21. By statute, the "assistant's role is to speak with the inmate charged, to explain the charges to the inmate, interview witnesses and to report the results of his efforts to the inmate. He may assist the inmate in obtaining documentary evidence or written statements which may be necessary. The assistant may be required by the hearing officer to be present at the disciplinary or superintendent's hearing." N.Y. Comp.Codes R. & Regs. tit. 7, § 251-4.2. While failure to adhere to regulations does not itself give rise to a claim under 42 U.S.C. § 1983, it may constitute evidence of a constitutional deprivation. *See, e.g., Duckett v. Ward,* 458 F.Supp. 624, 627 (S.D.N.Y.1978).

**d. Actions of the Hearing Officer**

With respect to the hearing officer, Irurre, Samuels makes a variety of claims, including the fact that Irurre prohibited Samuels from calling various witnesses and that he was partial. The Court has not been furnished with a copy of the hearing transcript. Because Samuels' claims potentially implicate constitutional rights, and because any holding on this issue requires that the Court make factual determinations, dismissal is inappropriate.

**e. Timeliness of the Hearing**

**\*14** Samuels claims that his due process rights were violated because his misbehavior hearing was held eight days after Samuels was confined following the search of his cell. Where an inmate is confined pending a disciplinary hearing (as was the case here), the hearing must be held within seven days of the confinement unless a later date is authorized by the commissioner or his designee. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 251-5.1(a). In this case, Samuels' rights were not violated.

The search took place on October 20, 1999, and the hearing occurred on October 27, 1999. Under § 251-5.1, the date of the incident is generally excluded. *See, e.g., Harris v. Goord,* 702 N.Y.S.2d 676 (N.Y.App. Div.3d Dep't 2000) (holding that the fourteen-day period in § 251-5.1(b), which runs from the date of the writing of a misbehavior report, is calculated by excluding the day the report is written). Thus, Samuels' hearing was held within seven days of his detention. Moreover, as Samuels admits, prison officials sought and received permission to begin the hearing on October 27, 1999, as per the requirements of § 251-5.1(a). *See* Ex. L. For these reasons, Samuels' claim with regard to the timeliness of his hearing is dismissed.

**f. Notice**

Defendants reject Samuels' argument that he received inadequate notice of the charges against him. It is unclear from the record what notice Samuels received, either before or during the disciplinary hearing. While the Court is cognizant of the fact that inmates are entitled to fewer due process rights than other citizens, it is possible to read Samuels' allegations as presenting a valid due process claim. The Court notes, for instance, that inmate rule 104.12 provides that "[i]nmates shall not lead, organize, participate, or urge other inmates to participate in work-stoppages, sit-ins, lock-ins, or other actions which may be detrimental to the order of the facility." N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2(B)(5)(iii). The Appellate Division has held that possession of threatening materials alone does not violate the rule because the inmate must actually lead, organize, participate, or urge other inmates to participate, and not merely intend to do so. *See, e.g., Abdur-Raheem v. Goord,* 665 N.Y.S.2d 152, 153 (N.Y.App. Div. 4th Dep't 1997). While Samuels may have possessed the documents, it is unclear whether he received any notice of how he allegedly led, organized, or participated in (or urged others to participate in) a prohibited activity. Because the determination hinges on a factual determination, dismissal is inappropriate.

**C. Retaliation**

Samuels alleges that his misbehavior adjudication was based on the prison authorities' perception that members

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

of the NYTS were behind the planned Y2K protest. *See* Complaint, at 3-6. Samuels alleges that the materials seized were not subversive and were of a Christian nature. Defendants move to dismiss the retaliation argument, arguing that the prison authorities' decision is entitled to deference. While this may be true, such deference is inappropriate on a motion to dismiss, particularly given the paucity of the record. Without, for example, a transcript of the hearing, a transcript of the testimony of the confidential informant, or a copy of the allegedly subversive documents, the Court cannot blindly defer to the prison authorities. Consequently, dismissal is inappropriate. Defendants also argue that "even if it was improper to discipline plaintiff for possession of contraband, the evidence of plaintiff's involvement in the unauthorized demonstration provided a valid non-retaliatory basis for the disciplinary sanction and transfer." Reply Brief, at 19. This argument is incorrect for two reasons. First, the argument ignores the fact that the contraband documents and testimony of the confidential informant provide the basis for the prison authorities' finding that Samuels was involved in the demonstration. None of these documents is in the record before the Court; thus deference is inappropriate. Second, this argument ignores the fact that Samuels' punishment was ultimately based on the fact that he had violated two rules. His prison file reflects a guilty adjudication on two counts; also, had Samuels been disciplined for violating only one rule, his penalty would likely have been less.

D. Personal Involvement

**\*15** Defendants correctly note that liability of supervisory officials under 42 U.S.C. § 1983 may not be premised on the doctrine of *respondeat superior. See, e.g., Poe v. Leonard,* 282 F.3d 123, 140 (2d Cir.2002); *Emblen v. Port Auth. of New York/New Jersey,* 00 Civ. 8877(AGS), 2002 WL 498634, at \*10 (S.D.N.Y., Mar. 29, 2002). Consequently, a defendant's personal involvement in the alleged constitutional violation is required. *See, e.g., Monell v. New York City Dep't of Soc. Servs.,* 436 U.S. 658, 690-95 (1978). Such personal involvement may be proven in a number of ways:

(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed

to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). The Court examines the alleged personal involvement of each defendant in turn.

1. Donald Selsky

Defendants concede Donald Selsky, Director, Special Housing/Inmate Disciplinary Program, was personally involved in the alleged due process violations cited by Samuels. The Court notes that Selsky, acting "on behalf of the commissioner," reviewed and affirmed Samuels' superintendent's hearing and denied Samuels' appeal. Ex. 6, V.

2. Glenn Goord

Defendants argue that Glenn Goord, DOCS Commissioner, has no personal involvement in this case, and that the only link to him in this action is a newspaper article. *See* Reply Brief, at 20-21. This is incorrect, however, since the denial of Samuels' appeal was written by Selsky on behalf of Goord. As noted, defendants concede Selsky's involvement. Goord had a duty to supervise his subordinate who purportedly acted in his name.[FN22] Without further evidence, the Court cannot say as a matter of law that Goord was not personally involved, since personal involvement can include gross negligence "in supervising subordinates who committed the wrongful acts." *Colon,* 58 F.3d at 873.

FN22. Whereas the doctrine of *respondeat superior* involves the legal assignment of liability to a supervisor for the acts of a subordinate, the instant case involves a subordinate who claims to be (and legally is) acting in the name of his

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

supervisor.

3. Paul Cecilia

Defendants concede Paul Cecilia's personal involvement.

4. Javier Irurre

Defendants concede Javier Irurre's personal involvement.

5. Sergeant Schwartzman

Defendants concede Sergeant Schwartzman's personal involvement.

6. Dennis Bliden

Defendants allege that Samuels never argues that Bliden had the ability to remedy the alleged constitutional violation. However, Bliden wrote to Samuels in response to his appeal of the misbehavior adjudication, stating, "You may appeal this hearing to the Commissioner in Albany. Until such time as we receive a decision from this office, *I will not modify the disposition.*" Ex. U (emphasis added). Significantly, Bliden did not state that he *could* not modify the disposition but stated that he *would* not. This provides at least *prima facie* evidence that Bliden had the authority to overturn the disposition. While further facts may reveal this to be untrue, at this stage dismissal is inappropriate.

7. Jeffery McKoy

**\*16** Samuels fails to provide any support for McKoy's personal involvement in this action. Indeed, in responding to one of Samuels' appeals, McKoy wrote that "I do not have the authority to overturn Tier 3 dispositions." Ex. R. McKoy does not appear to have been complicit in any alleged deprivation of Samuels' rights, and, in contrast to Bliden, he plainly lacked the authority to overturn the

misbehavior adjudication. Consequently McKoy was not personally involved in the matter and all claims against him are dismissed.

8. Christopher P. Artuz

Christopher P. Artuz is Green Haven's Superintendent. Samuels states that his involvement stems from his failure to respond to a note sent to him. Although the note to Artuz does not appear to be in the record before the Court, it is referenced in a note from Bliden to Samuels. *See* Ex. T ("This is in response to your memo of November 12, 1999 to Superintendent Artuz"). Samuels also alleges that Artuz failed to respond when contacted by Dr. Peter-Raoul and Dr. Webber, who sought to intervene on Samuels' behalf. *See* Opposition Brief, at 27. While it is not clear that Artuz was personally involved, the question of Artuz's involvement in this matter is a factual question. In such cases, dismissal should be denied. As the Second Circuit noted in *Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986), "even if [the prison superintendent] did not actively affirm the conviction on administrative appeal, we cannot say, on this record, that as Superintendent [of the prison] he was not directly responsible for the conduct of prison disciplinary hearings [...]."

E. Qualified Immunity

Defendants move to dismiss this action based on the qualified immunity of defendants. As defendants correctly point out, government employees are generally immune from liability for civil damages "when their conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known." ' *Duamutef v. Hollins,* 297 F.3d 108, 111 (2d Cir.2002) (citation omitted). As a preliminary matter, it should be noted that qualified immunity is only a defense to claims for money damages and are not a defense for equitable relief or injunctions. *See, e.g., Charles W. v. Maul,* 214 F.3d 350, 360 (2d Cir.2000). To the extent that Samuels seeks equitable relief, defendants' potential claims of qualified immunity are no bar.

The Court is unable to determine at this time whether the remaining defendants are entitled to qualified immunity in

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)
(Cite as: 2002 WL 31040370 (S.D.N.Y.))

this case. The reason is that without having basic documentary evidence, including a transcript of the disciplinary hearing, a transcript of the testimony of the confidential informant, and the documents allegedly seized from Samuels' cell, the Court cannot determine whether these defendants violated Samuels' clearly established constitutional or statutory rights. Because it is a fact-intensive question, it cannot be disposed of at this stage.

V. Conclusion

**\*17** For the reasons set forth above, defendants' motion to dismiss the complaint pursuant to Fed.R.Civ.P. 12(b)(1) and (6) is DENIED with respect to defendants Selsky, Goord, Cecilia, Irurre, Schwartzman, Bliden, and Artuz. Defendants' motion is GRANTED with respect to Jeffery McKoy, and with respect to the issue of DOCS policy regarding the Five Percent Nation of Gods and Earths and with regard to the timeliness of Samuels' misbehavior hearing.

SO ORDERED.

S.D.N.Y.,2002.
Samuels v. Selsky
Not Reported in F.Supp.2d, 2002 WL 31040370 (S.D.N.Y.)

END OF DOCUMENT

© 2010 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

**H**

Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Mark LABOUNTY, Plaintiff,
v.
Philip COOMBE, Jr., Wayne Strack, and Donald
Selsky, Defendants.
No. 95 CIV 2617(DLC).

Dec. 26, 2001.
Mark LaBounty, Pro Se, Marcy Correctional Facility,
Marcy, for Plaintiff.

Michael J. Keane, Assistant Attorney General, Office of
the Attorney General of the State of New York, New
York, for Defendants.

OPINION AND ORDER

COTE, District J.

**\*1** On April 17, 1995, Mark LaBounty ("LaBounty"),
who is presently incarcerated at Marcy Correctional
Facility, brought this action *pro se* pursuant to 42 U.S.C.
§ 1983 ("Section 1983"), alleging that the defendants
violated his constitutional rights while he was an inmate at
Fishkill Correctional Facility ("Fishkill"). On November
25, 1996, the Court granted in part the defendants' motion
to dismiss. On February 5, 2001, the Court of Appeals for
the Second Circuit vacated in part the November 25, 1996
decision, and remanded LaBounty's procedural due
process claim for further development.FN1 This claim stems
from LaBounty's wrongful confinement in "SHU" for 30
days, a claim that this Court had dismissed for failure to
identify a violation of a liberty interest. After discovery,
defendants now move for summary judgment. For the
reasons set forth below, the motion is denied.

> FN1. The claims brought by the plaintiff that
> survived summary judgment were tried before a
> jury on October 4, 1998. On October 6, 1998,
> the jury returned a verdict for LaBounty on his
> claim that Nurse Millie Rivera had been

deliberately indifferent to his serious medical
needs and awarded him $1 in nominal damages.
The Second Circuit denied the appeals from the
trial and the summary judgment opinion, but
reversed the dismissal of the due process claim at
issue here. *LaBounty v. Kinkhabwala,* No.
99-0329, 2001 WL 99819 (2d Cir. Feb. 5, 2001).

BACKGROUND

LaBounty's allegations against the defendants are
fully described in the Court's November 25, 1996 Opinion,
familiarity with which is presumed. *LaBounty v.
Coombe, et al.,* No. 95 Civ. 2616, 1996 WL 684168
(S.D.N.Y. Nov. 25, 1996). Here, the Court only describes
those facts necessary for the purposes of this motion.FN2

> FN2. To the extent that the plaintiff reiterates in
> his opposition claims that have been previously
> dismissed or makes new claims unrelated to the
> issues which have been remanded, those claims
> are not properly before this Court and the Court
> does not consider them here.

By Order dated February 13, 2001, the Court
described the issues remanded by the Court of Appeals for
further development as follows:

1. The plaintiff's procedural due process claim that the
disciplinary hearing held on January 23 and 27, 1995
was delayed, that witnesses at that hearing were
examined outside his presence, and that Vuturo
prejudged the merits of the hearing.

2. Whether plaintiff's due process rights were violated
while he was in SHU during the period beginning on
January 27, 1995, by

(a) a denial of medication for his ear infection;

(b) the prescription of Flexeril for a back condition;

(c) Nurse Rivera substituting his back pain medication
with an unknown drug which caused him dizziness and

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

head and stomach aches;

(d) a denial of paper and pencils;

(e) a denial of out-of-cell exercise;

(f) a denial of access to library books;

(g) not being permitted to mail letters in the evening; and

(h) the censorship or destruction of his mail, legal documents, and personal papers.

3. Whether, under *Sandin v. Conner,* 515 U.S. 472 (1995) and its progeny, the plaintiff has a liberty interest sufficient to bring the due process claims described in items 1 and 2.

The parties were ordered to inform the Court if they had any other understanding of the Court of Appeals' Order of remand.

By letter dated February 27, 2001, the defendants agreed that the February 13, 2001 Order correctly described the remanded issues. By letter dated February 17, 2001, the plaintiff also agreed with the description of the issues, but indicated a wish to add three additional issues. By Order dated February 28, 2001, the Court found that the issues remanded for further development were those described in the February 13, 2001 Order.

**\*2** The following facts are undisputed or as shown by the plaintiff unless otherwise noted. On January 12, 1995, LaBounty went to the clinic at Fishkill to renew his prescriptions for hypertension medication, and to complain of an ear infection. On that day, Nurse Ronald Waller issued an "Inmate Misbehavior Report" against him, which included the charge of refusing a direct order. Also on that day, Robert L. Macomber issued a "Inmate Misbehavior Report" against LaBounty, which included the charge of possessing outdated medications in his cell.

*Tier III Hearing*

On January 23 and 27, 1995, hearing officer Joseph

Vuturo ("Vuturo") conducted a "Tier III" disciplinary hearing to address the charges against plaintiff. [FN3] On January 27, Vuturo found LaBounty guilty of violating a direct order and possessing outdated medications. Vuturo sentenced LaBounty to 90 days of segregated confinement in the Special Housing Unit ("SHU"), of which 60 days were suspended. LaBounty served 30 days in SHU, beginning on January 27, 1995.

> FN3. Tier III hearings are held for " 'the most serious violations of institutional rules." ' *Colon v. Howard,* 215 F.2d 227, 230 n. 1 (2d Cir.2000) (citation omitted).

On January 27, 1995, LaBounty appealed his conviction to the Commissioner of the Department of Correctional Services ("DOCS"). On March 22, 1995, the DOCS Director of the Special Housing / Inmate Disciplinary Program, defendant Donald Selsky ("Selsky"), reversed LaBounty's conviction on the charge of possessing outdated medication because the "[m]isbehavior report fail[ed] to support [the] charge." On February 6, 1996, Selsky "administratively reversed" plaintiff's conviction on the only remaining charge-disobeying a direct order-"due to off-the-record communication used as evidence in hearing." Selsky directed that any records containing references to the January 27, 1995 hearing be expunged.

*SHU Conditions*

The SHU regulations provide that, while in SHU, inmates are confined to their cells for 23 hours a day, and are permitted to leave their cells for recreation, visits to the medical department, legal visits, guidance or counselor interviews, and for showers two times per week. SHU may be imposed for disciplinary and non-disciplinary, or administrative, reasons. Between January 1, 1991 and December 31, 1996, 162,601 of the 215,701 inmates in the New York correction system received "confinement sanctions." 106,265 inmates were penalized by "keeplock" confinement. In 1993, 4.2% of the inmates in DOCS' confinement were sentenced to SHU, and in 1994, 4.8% were sentenced to SHU.

*Plaintiff's Experience in SHU*

While in SHU, LaBounty was deprived of all of the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

pain medication which had been prescribed for "constant severe pain related to his spinal condition," [FN4] as well as medication for an ear infection. LaBounty complained to defendant Nurse Rivera and to other medical staff that he was not receiving his pain medication and that he was suffering from an ear infection, but he received no response from them. On February 13, 1995, LaBounty was prescribed "Flexeril" by a physician's assistant, but LaBounty claims the medicine was merely prescribed as a "pretext" and that it did not help his severe pain or his ear infection. LaBounty was in "constant severe pain for the duration of his 30-days in SHU." LaBounty was not treated for his ear infection until he was released from SHU and given a CAT Scan. The CAT Scan revealed that the ear infection had become "Mastoiditis." As a result of the untreated ear infection, LaBounty lost the hearing in his right ear.

> FN4. Plaintiff asserts that his spinal condition was, at all relevant times, well-documented and diagnosed.

**\*3** While he was in SHU, LaBounty was prescribed one refill of his hypertension medication. A nurse gave the refill to officers, but the officers refused to give plaintiff his medication. After LaBounty repeatedly threw his bed against the cell door, the SHU evening supervisor came to his cell and later ordered the SHU officer to give LaBounty his medication.

While he was in SHU, LaBounty was deprived of any "out-of-the-cell exercise," which he requested each day. He was given only two showers during his 30 days in SHU, and each shower was only one to two minutes long. He requested a pen from the SHU officer in order to write his appeal to the Commissioner, and the officer refused. Plaintiff later received a pen from the "porter." [FN5] Plaintiff requested other writing materials from the officers, but they did not give him any. LaBounty received all of his writing materials from the porter and other inmates when they were let out for exercise. Before he was released from SHU, the officers opened LaBounty's "property bags" and "removed legal material relevant to this case and other pending cases." LaBounty was refused books and newspapers while he was in SHU despite requesting them.

> FN5. A porter is an inmate who is also serving a sentence in SHU.

## DISCUSSION

Summary judgment may not be granted unless the submissions of the parties, taken together, "show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Fed.R.Civ.P. The substantive law governing the case will identify those issues that are material, and "only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1987). The moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination the Court must view all facts in the light most favorable to the nonmoving party. *See Azrielli v. Cohen Law Offices,* 21 F.3d 512, 517 (2d Cir.1994). When the moving party has asserted facts showing that the nonmovant's claims cannot be sustained, the opposing party must "set forth specific facts showing that there is a genuine issue for trial," and cannot rest on the "mere allegations or denials" of his pleadings. Rule 56(e), Fed.R.Civ.P. *See also Goenaga v. March of Dimes Birth Defects Found.,* 51 F.3d 14, 18 (2d Cir.1995). In deciding whether to grant summary judgment, this Court must, therefore, determine (1) whether a genuine factual dispute exists based on the evidence in the record, and (2) whether the facts in dispute are material based on the substantive law at issue.

Where, as here, a party is proceeding *pro se,* this Court has an obligation to "read [the pro se party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). Nonetheless, a *pro se* party's "bald assertion," completely unsupported by evidence, is insufficient to overcome a motion for summary judgment. *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

### A. *Protected Liberty Interest*

**\*4** A claim for procedural due process violations requires a determination of "(1) whether the plaintiff had a protected liberty interest in not being confined and, if so,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

(2) whether the deprivation of that liberty interest occurred without due process of law." *Tellier v. Fields*,-F.3d-, 2001 WL 457767, at *7 (2d Cir. Nov. 1, 2000) (errata filed Apr. 26, 2001) (citation omitted). After the Supreme Court's decision in *Sandin v. Connor,* 515 U.S. 472 (1995), a determination that there is a liberty interest also requires a two-part analysis. *Tellier,*-F.3d-, 2001 WL 457767, at *7. " 'As a result of *Sandin,* a prisoner has a liberty interest only if the deprivation is atypical and significant and the state has created the liberty interest by statute or regulation." ' *Id.* (citation omitted).

*Atypical and Significant Hardship*

The defendants argue that LaBounty does not have a protected liberty interest because his confinement in SHU was not atypical or significant. To determine whether the conditions of a particular confinement impose an "atypical and significant hardship" one must undertake a factual analysis. *Id.* "The circumstances that the court must examine include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions....' " *Sims v. Artuz,* 230 F.3d 14, 22 (2d Cir.2000) (citation omitted). It is clear that "[c]onfinement in SHU may impose hardships that are atypical or significantly different from the burdens of ordinary prison confinement." *Id.* " 'The content of the *Sandin* standard of 'atypical and significant hardship' is an issue of law, but if the facts concerning the conditions or the duration of confinement are reasonably in dispute, the jury (where one is claimed) must resolve those disputes and then apply the law of atypicality, as instructed by the Court." ' *Colon v. Howard,* 215 F.3d 227, 230 (2d Cir.2000) (citation omitted).

Material issues of fact exist as to whether LaBounty's confinement in SHU was "atypical" as compared to the conditions of other inmates in both administrative confinement and in the general population. As noted above, LaBounty asserts that while he was in SHU, he was denied medication and medical treatment, writing materials, books, and exercise.[FN6] If proven true, these conditions would appear to be atypical when compared to the conditions of confinement not only of inmates in administrative confinement and in the general population, but also of other inmates in punitive segregation. *See* N.Y. Comp.Codes R. & Regs. tit. 7, § 304.1 *et seq.; Colon,* 215 F.3d at 230 (stating that "normal conditions of SHU confinement in New York" include one hour of exercise per day, two showers a week, and a limited number of books). LaBounty further asserts that the conditions in SHU caused him significant hardship in a number of ways, including severe physical pain and the loss of hearing.

> FN6. Although not included in the list of issues from the February 13, 2001 Order, LaBounty also presents evidence that he was allowed only two showers in one month.

**\*5** The defendants rely on the length of LaBounty's sentence of confinement for their argument that his punishment was not atypical and significant. While it has been found in at least one other case that as much as 101 days in SHU did not run afoul of *Sandin, Sims,* 230 F.3d at 23, there is no litmus test based on the length of confinement alone-as the remand here demonstrates. *See also Colon,* 215 F.3d at 232 n. 5. Even a relatively brief term in segregated confinement may violate the law. *Taylor v. Rodriguez,* 238 F.3d 188, 196 (2d Cir.2001).

The defendants have also submitted evidence regarding the percentage of inmates in disciplinary confinement. These statistics do not address the specific conditions experienced by LaBounty during his confinement in SHU. *See Welch v. Bartlett,* 196 F.3d 389, 393-94 (2d Cir.1999) (vacating summary judgment where plaintiff alleged that SHU hygiene conditions were far inferior to those in general population). "[M]erely calculating the percentage of prisoners sentenced to SHU confinement" says nothing about the qualitative experience of prisoners in confinement and the relative degree to which they are deprived of the care and facilities at issue here. *Kalwasinski v. Morse,* 201 F.3d 103, 107 (2d Cir.1999).

The defendants make several additional arguments which can swiftly be rejected. They argue that only those deprivations experienced by LaBounty that independently constitute a constitutional violation-such as deliberate indifference to his serious medical needs in violation of the Eighth Amendment or an interference with his ability to pursue litigation in violation of the First Amendment-should be considered in judging whether LaBounty suffered atypical and significant hardships.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

There is no authority within either *Sandin* or its progeny in this Circuit for such a heightened showing. The defendants also argue that the issue of whether LaBounty suffered atypical and significant hardships should be tested not by his personal experience in SHU but by what the prison regulations prescribe as the standard for treatment of SHU prisoners. They contend, for instance, that what is relevant is that SHU prisoners are supposed to receive one hour per day of out of cell exercise and either two or three showers a week (depending on the level of prison) and not that LaBounty contends he received no opportunity to exercise and two brief showers in one month. The individualized inquiry required by the law is of the actual experience of the inmate, not what the experience should have been. *Sims,* 230 F.3d at 22-23. Finally, the defendants contend that they are entitled to summary judgment because while LaBounty's description of his deprivations is sufficient to create issues of fact regarding his own experience, he has not presented evidence that inmates in general population or in administrative confinement were not subjected routinely to those same deprivations. LaBounty has, until this point in the litigation, proceeded *pro se.* He was entitled to rely on the prison's regulations, well established law, and the basic standards of decency, to make the point that the deprivations of medical care, exercise, showers, books, and writing material that he alleges he experienced for one month cannot be the general experience of inmates incarcerated in New York state.

*Liberty Interest Created by State Law*

**\*6** The defendants argue that New York State has not granted inmates a protected liberty interest in remaining free from disciplinary confinement. In *Hewitt v. Helms,* 459 U.S. 460, 471-72 (1983), the Supreme Court held that a state-created "liberty interest arises when state statutes or regulations require, in 'language of an unmistakably mandatory character,' that a prisoner not suffer a particular deprivation absent specified predicates." *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999). *Sandin* did not replace *Hewitt'*s description of the process that creates a cognizable "liberty interest." *Tellier,*-F.3d-, 2001 WL 457767, at \*7; *Sealey v. Giltner,* 197 F.3d 578, 585 (2d Cir.1999); *Welch,* 196 F.3d at 394 n. 4. Where a regulation requires "in language of an unmistakably

mandatory character, that a prisoner not suffer a particular deprivation absent specified predicates," *Tellier,*-F.3d-, 2001 WL 457767, at \*8 (citation omitted), then the regulation creates a protectable liberty interest.

New York regulates the process through which SHU disciplinary confinement may be imposed. Regulations allow such confinement only upon "[d]isposition of superintendent's Tier III hearing for a designated period of time as specified by the hearing officer." N.Y. Comp.Codes R. & Regs. tit. 7, § 301.2 (McKinney 1999). The regulations further explain the manner in which the Tier III hearings must be conducted.

Upon receipt of a misbehavior report from the review officer, the hearing officer *shall* commence the superintendent's hearing as follows:

(a) The misbehavior report *shall* be served on the inmate at least 24 hours before the superintendent's hearing. If the inmate is confined and requests an assistant, the hearing *may not* start until 24 hours after the assistant's initial meeting with the inmate.

(b) The inmate *shall* be present at the hearing unless he refuses to attend, or is excluded for reason of institutional safety or correctional goals. The entire hearing *must* be electronically recorded.

(c) The inmate when present may reply orally to the charge and/or evidence and *shall* be allowed to submit relevant documentary evidence or written statements on his behalf.

N.Y. Comp.Codes R. & Regs. tit. 7, § 254.6 (McKinney 2000) (emphasis supplied). The regulations provide that "where the hearing officer affirms the charges on the basis of the evidence, the hearing officer may impose ... confinement to a cell or room continuously or to a special housing unit continuously or on certain days during certain hours for a specified period." *Id.* § 254.7.

It has long been recognized that New York's regulations authorizing restrictive confinement in SHU "provide sufficient limitation on the discretion of prison officials to create a liberty interest." *Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984). *See also Sealey,* 197 F.3d at

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

585 (construing New York regulation regarding administrative confinement in SHU). New York has therefore created a liberty interest protected by the Due Process Clause.

B. *Qualified Immunity*

**\*7** The defendants contend that they are entitled to qualified immunity. Qualified immunity protects a state actor sued in his individual capacity from a suit for damages. *Johnson v. Newburgh Enlarged Sch. Dist.,* 239 F.3d 246, 250 (2d Cir.2001). A state actor is qualifiedly immune if either "(a) the defendant's action did not violate clearly established law, or (b) it was objectively reasonable for the defendant to believe that his action did not violate such law." *Id.* (citation omitted).

LaBounty claims that he was deprived of his procedural due process rights during the 1995 disciplinary hearing because he was denied, among other things, the right to call witnesses and to introduce documentary evidence.[FN7] The law was clearly established in January 1995 that inmates have the right to call witnesses and submit documentary evidence at disciplinary hearings.[FN8] *Wolff v.. McDonnell,* 418 U.S. 539, 566 (1974); *Walker v. Bates,* 23 F.3d 652, 656 (2d Cir.1994). Since the contours of LaBounty's due process rights were well defined by both Supreme Court and Second Circuit precedent by the time Vuturo conducted LaBounty's disciplinary hearing in January 1995, the defendants have not demonstrated that they are entitled to qualified immunity as a matter of summary judgment.

> FN7. The parties agreed in February 2001 that the procedural irregularities at issue here were the delay in the hearing, the examination of witnesses outside of LaBounty's presence, and a prejudgment of the merits by a hearing officer. The defendants do not object to LaBounty's emphasis in this motion on the interference with his right to offer evidence.

> FN8. The defendants characterize the pertinent inquiry as whether the law was clearly established in January 1995, that inmates have a liberty interest in remaining free from SHU confinement. Defendants argue that the Second

Circuit law since *Sandin* has been "ambiguous at best." The extent to which *Sandin* may have unsettled the law on this issue is irrelevant since *Sandin* was handed down after LaBounty's hearing. The law was "clearly established" as of January 1995, that inmates have a liberty interest in remaining free from segregated confinement such as SHU. *See, e.g., Walker v. Bates,* 23 F.3d 652, 655-56 (2d Cir.1994); *Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984).

C. *Personal Involvement*

Defendants contend that they are not liable for the alleged due process violations because none of the remaining defendants was personally involved in the January 1995 disciplinary hearing. The defendants argue that hearing officer Vuturo is the only proper defendant and that no action may proceed against him because he was never served in this case. As LaBounty will be appointed counsel in this case, counsel for all parties will be able to explore this issue further.[FN9]

> FN9. The defendants argue that LaBounty failed to exhaust his administrative remedies by not filing grievances regarding the conditions in SHU. Because the defendants raised this argument for the first time in their reply brief and it has not been developed, it will not be considered. *See Strom v. Goldman, Sachs & Co.,* 202 F.3d 138, 142 (2d Cir.1999) (holding that it would not consider arguments raised in a reply brief because "[w]e repeatedly have said that we will not consider contentions first advanced at such a late stage").

D. *Appointment of Counsel*

Plaintiff has submitted an application requesting counsel. In determining whether to grant a request for counsel, the Court must consider
the merits of plaintiff's case, the plaintiff's ability to pay for private counsel, his efforts to obtain a lawyer, the availability of counsel, and the plaintiff's ability to gather the facts and deal with the issues if unassisted by counsel.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)

(Cite as: 2001 WL 1658245 (S.D.N.Y.))

*Cooper v. A. Sargenti Co., Inc.,* 877 F.2d 170, 172 (2d Cir.1989). As a threshold matter, plaintiff must demonstrate that his claim has substance or a likelihood of success in order for the Court to grant plaintiff's request for counsel. *See Hodge v. Police Officers,* 802 F.2d 58, 61 (2d Cir.1986). Based on the Court's familiarity with this case and the legal issues presented, LaBounty's claim has substance and LaBounty has shown a need for representation. Accordingly, plaintiff's request for counsel is granted.

CONCLUSION

For the reasons stated, defendants' motion for summary judgment is denied. Plaintiff's request for counsel is granted. The Pro Se Office of this Court shall seek Pro Bono counsel for this plaintiff.
**8** SO ORDERED:

S.D.N.Y.,2001.

LaBounty v. Coombe
Not Reported in F.Supp.2d, 2001 WL 1658245 (S.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Ramon ALVAREZ, Plaintiff,
v.
Thomas A. COUGHLIN, III, Commissioner NYS
DOCS; William Brunet, Seargent; SGT. Davis; SGT.
Emery; J. Baker, C.O.; W. Smith, C.O.; M. Hamilton,
C.O.; Mushen, C.O.; Supt. Barkley; Nurse L. Lipscum;
Thomas Farns, C.O.; Walter Lincoln, C.O., Defendants.
No. 94–CV–985(LEK)(DRH).

Feb. 6, 2001.
*MEMORANDUM–DECISION AND ORDER*

KAHN, J.

   **\*1** Presently before the Court are Plaintiff's motions
for relief from judgment and for recusal of the
undersigned. For the reasons set forth below, Plaintiff's
motions are denied.

## I. BACKGROUND

   Plaintiff, an inmate in the custody of the New York
State Department of Correctional Services ("DOCS"),
commenced the present 42 U.S.C. § 1983 action alleging
violations of his Constitutional Rights on August 5, 1994.
On July 18, 1993, while Plaintiff was incarcerated at
Riverview Correctional Facility, defendant Baker alleges
that she witnessed Plaintiff exposing himself to her in the
recreation yard. Plaintiff was then taken from the yard to
the infirmary by defendants Baker, Smith, and Hamilton.
In his Amended Complaint, Defendant alleges, in relevant
part, that he was repeatedly assaulted by defendants
Davis, Smith, Mushen, and Hamilton while defendants
Liscum, Baker, and Emery stood by and watched in
violation of his Eighth Amendment rights. Plaintiff then
alleges that he was escorted to the prison's special housing
unit ("S.H.U.") and received further physical mistreatment
from defendants Emery, Mushen, Hamilton, Smith, Farns,
and Lincoln.

   Plaintiff also alleges that his due process rights under

the Fourteenth Amendment were violated by the
disciplinary proceeding resulting from the incident, which
was conducted by defendant Brunet. Finally, Plaintiff
alleges that defendant Barkley participated in the violation
of these rights by failing to address Plaintiff's grievances
and by designating a biased hearing officer, defendant
Brunet, to preside over Plaintiff's Tier III hearing.

   On June 14, 1999, defendants Brunet, Baker and
Barkley ("Defendants") filed a motion for summary
judgment pursuant to Fed.R.Civ.P. 56. Plaintiff filed an
affirmation in opposition to Defendants' motion on June
23, 1999 and a letter response on July 6, 1999. By an
Order dated October 25, 1999, this Court granted
Defendants' motion for summary judgment and dismissed
Plaintiff's case against them in its entirety.[FN1] Plaintiff's
current motions for relief from judgment and recusal were
filed on November 12, 1999 and March 23, 1999,
respectively.

   > FN1. Also still pending before the Court is a
   > motion for summary judgment filed by Plaintiff
   > September 1, 1998. The motion was originally
   > dismissed by the Court's Order adopting the
   > Report–Recommendation of United States
   > Magistrate Judge David R. Homer, which held
   > that the motion was untimely and, in the
   > alternative, that it failed on the merits. Then, by
   > an Order dated June 1, 1999, the Court vacated
   > its previous order and held that Plaintiff's motion
   > would be addressed on the merits, along with
   > Defendants' motion for summary judgment.
   > However, Judge Homer's
   > Report–Recommendation did address the merits
   > of Plaintiff's motion. The Court has undertaken a
   > de novo review of the record and has determined
   > that Plaintiff's motion should be dismissed for the
   > reasons discussed in the
   > Report–Recommendation.

## II. ANALYSIS

### A. Relief from Judgment

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

Plaintiff's motion, although termed a "motion for relief from judgment," is brought pursuant to Local Rule 7.1(g). Accordingly, it will be treated by the Court as a motion for reconsideration.

Motions for reconsideration proceed in the Northern District of New York under Local Rule 7.1(g), unless otherwise governed by Fed.R.Civ.P. 60. The "clearly erroneous" standard of review applies to motions for reconsideration. The moving party must "point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995).

Generally, the prevailing rule in the Northern District "recognizes only three possible grounds upon which motions for reconsideration may be granted; they are (1) an intervening change in controlling law, (2) the availability of new evidence not previously available, or (3) the need to correct a clear error of law or prevent manifest injustice." *In re C–TC 9th Ave. P'ship,* 182 B.R. 1, 3 (N.D.N.Y.1995). Defendant does not argue that there has been an intervening change in controlling law or the availability of new evidence. Therefore, the basis for this motion must be that the Court made a clear error of law or needs to correct a manifest injustice. Although this Court enjoys broad discretion when making a determination to reconsider on this ground, *Von Ritter v. Heald,* 876 F.Supp. 18, 19 (N.D.N.Y.1995), it will not disregard the law of the prior case unless "the Court has a 'clear conviction of error' with respect to a point of law on which its previous decision was predicated." *Fogel v. Chestnutt,* 668 F.2d 100, 109 (2d Cir.1981).

*1. Discovery Matters*

**\*2** Plaintiff, in part, objected to Defendants' motion for summary judgment on the ground that Defendants have yet to comply with several orders by this Court compelling production. Ordinarily, Defendants' failure to comply with discovery orders would make a motion for summary judgment premature. However, in this case, the outstanding items sought by Plaintiff do not relate to the claims against the three defendants who have brought the present action.

Plaintiff points to two orders compelling Defendants to comply with his discovery requests. The first, signed on June 26, 1997, orders Defendants to provide Plaintiff with: (1) the names, identification numbers, and cell locations of all inmates that were confined in the Special Housing Unit the evening of the event; (2) copies of any witness refusal forms; (3) copies of Plaintiff's medical records from July 18, 1993 to September 27, 1993; (4) copies of medical refusal forms indicating that Plaintiff refused his medication on the day of the incident; (5) copies of any reports prepared by prison staff regarding Plaintiff's refusal to take his medication between July 18, 1993 and September 27, 1993; and (6) copies of psychiatric reports regarding Plaintiff dated July 18, 1993 to September 27, 1993. The second order, signed on January 29, 1998, requires Defendants to provide Plaintiff with clearer copies of photographs taken of Plaintiff on the day of the incident.

To the extent any of these items exist, they are not relevant to the summary judgment motion before the Court. Accordingly, the Court is free to address the summary judgment motion of these three defendants. However, if Defendants still have not produced the complained of documents and photographs, Plaintiff is free to file another motion to compel or a motion for sanctions.

*2. Defendant Baker*

In their motion for summary judgment, Defendants argue that Plaintiff's claims against defendant Baker are conclusory and insufficient because they do not contain specific allegations of fact indicating a deprivation of rights. *See Barr v. Abrams,* 912 F.2d 52, 56 (2d Cir.1986). Plaintiff's Amended Complaint makes mention of defendant Baker only once. Plaintiff's first cause of action alleges that:

[t]he willful acts and omissions of defendant J. Baker constituted gross deprivation of the plaintiff's Civil Rights when J. Baker subject[ed] or caused plaintiff to be subjected to cruel and unusual punishment and failed to intervene to secure the plaintiff's health and safety.

However, Plaintiff's statement of facts does not allege that defendant Baker was present at the time of the beating

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

or that Baker had any knowledge whatsoever of the beating.

In fact, Plaintiff's statement of facts does not mention defendant Baker at all. The statement of facts does, on the other hand, describe with specificity the involvement of a number of prison staff members, including defendant Liscum who allegedly observed the assault without taking any action to intervene, suggesting that Baker was not present at the time of the beating. Accordingly, Plaintiff's claims against defendant Baker do not contain any specific allegations of fact regarding her alleged failure to intervene and this Court was not in error when it dismissed them.

### 3. *Defendant Barkley*

**\*3** Defendants argue that Plaintiff has not alleged sufficient personal involvement on the part of defendant Barkley. In order to maintain a Section 1983 action, a plaintiff must allege direct personal involvement by the defendant in the alleged constitutional deprivation. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Wright v. Smith,* 21 F.3d 496, 501 (1994). Liability may not be based on respondeat superior or vicarious liability. *See Al– Jundi v. Estate of Rockefeller,* 885 F.2d 1060, 1065 (2d Cir.1989). Supervisors may be held liable for personal involvement when they: (1) are directly involved in the alleged events; (2) fail to rectify a constitutional violation after being notified of the situation; (3) create or allow to continue a policy of unconstitutional practices; or (4) commit gross negligence in supervising the individuals responsible for the constitutional violations. *See Wright,* 21 F.3d at 501.

Here, Plaintiff's complaint baldly alleges that defendant Barkley failed to address Plaintiff's grievance complaint and appointed a biased hearing officer to conduct Plaintiff's disciplinary hearing. Plaintiff does not make any specific factual allegations regarding defendant Barkley's involvement in his case. Plaintiff's statement of facts fails to allege facts establishing that Barkley ever reviewed his grievance. Indeed, Plaintiff's own exhibit reveals that Harlan W. Jarvis, Jr., Acting Superintendent, rather than defendant Barkley, reviewed Plaintiff's

grievance. Moreover, an exhibit introduced by Defendants, and not contradicted by Plaintiff, shows that Mr. Jarvis also appointed the hearing officer for Plaintiff's disciplinary hearing.

"It is not enough to allege that officials failed to carry out the duties of their office without defining these duties or how each individual failed to meet them." *Thomas v. Coombe,* No. 95 Civ. 10342, 1998 WL 391143, at \*5– \*6 (S.D.N.Y. July 13, 1998) (citing *Beaman v. Coombe,* No. 96 Civ. 3622, 1997 WL 538833, at \*3 (S.D.N.Y. Aug. 29, 1997), *aff'd in relevant part* No. 97–2683, 1998 WL 382751, at \*\*1 (2d Cir. May 13, 1998)). Because Plaintiff's claim against defendant Barkley fails to allege with sufficient specificity his personal involvement in the alleged constitutional violations, it was properly dismissed by the Court.

### 4. *Defendant Brunet*

Plaintiff alleges that defendant Brunet violated his Due Process rights under the Fourteenth Amendment in the conduct of his disciplinary hearing. Defendants argue that (1) Plaintiff's claim is barred by the Supreme Court decision in *Sandin v. Conner,* 515 U.S. 472 (1995), because Plaintiff has not alleged that he had a protected liberty interest; (2) Plaintiff was nevertheless accorded all of the process due under *Wolff v. McDowell,* 418 U.S. 539 (1974); and (3) defendant Brunet is protected by qualified immunity in any event.[FN2] In order to establish a due process violation, a defendant must "prove that the state has created a protected liberty interest and that the process due was denied." *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)).

> FN2. Defendants also argue in their brief that Plaintiff's claim is barred by the Supreme Court decisions in *Heck v. Humphrey,* 512 U.S. 477 (1994), and *Edwards v. Balisok,* 520 U.S. 641 (1997). Following the filing of Defendants' brief, however, the Second Circuit held that a Section 1983 suit "challenging the validity of a disciplinary or administrative sanction that does not affect the overall length of the prisoner's confinement is not barred by *Heck* and *Edwards." Jenkins v. Haubert,* 179 F.3d 19, 27

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

(2d Cir.1999). Because Plaintiff's complaint challenges the conditions of, as opposed to the fact or duration of his confinement, the *Heck* and *Edwards* decisions are not applicable.

a. *Protected liberty interest*

**\*4** In *Sandin,* the Supreme Court considered whether prisoners have a protected liberty interest entitling them to due process in disciplinary proceedings and held that such interests "will be generally limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prisoner life." *Sandin,* 515 U.S. at 483–84. Following the *Sandin* decision, the Second Circuit held that, in order for a liberty interest to be protectable, a plaintiff "must establish both that the confinement or restraint creates an 'atypical and significant hardship' under *Sandin,* and that the state has granted inmates, by regulation or statute, a protected liberty interest in remaining free from that confinement or restraint." *Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996).

 i. Atypical and significant hardship

The Second Circuit has repeatedly held that, in determining whether a liberty interest has been affected, a district court is required to undertake extensive fact-finding regarding both the length and conditions of confinement and make specific findings in support of its conclusions. *See, e.g., Brooks v. DiFasi,* 112 F.3d 46, 48–49 (2d Cir.1997); *Miller v. Selsky,* 111 F.3d 7, 9 (2d Cir.1997); *Sealey v. Giltner,* 116 F.3d 47, 51–52 (2d Cir.1997); *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998). The Second Circuit makes clear that it is not enough to look at the length of time a prisoner has been confined to SHU in determining whether he has a liberty interest. *Brooks,* 112 F.3d at 49. Instead, courts must also make a factual finding as to the conditions of the prisoner's confinement in SHU relative to the conditions of the general prison population. *Id.* (citing *Miller,* 111 F.3d at 8–9).

However, in *Hynes v. Squillance,* 143 F.3d 653 (2d Cir.1998), the Second Circuit held that, "in cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, the district court need not provide such detailed explanation

of its reasoning." *Id.* at 658. There, the plaintiff offered no evidence in support of his argument that his 21–day confinement was atypical or significant to contradict the defendants' submission showing that the conditions of confinement were typical. *See id.* The ruling was explicitly limited, however, to cases involving shorter periods of segregated confinement. *See id.* The Court held that the decisions in *Miller, Brooks,* and *Wright* all required specific factual findings because they "involved relatively long periods of confinement." *Id.; see also Spaight v. Cichon,* No. 98–2537, 1998 WL 852553, at *2 (2d Cir. Dec 8, 1998) (holding that a 39–day confinement was not so short as to be subject to dismissal under *Hynes* without further analysis); *Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000) (advising district courts to develop a detailed factual record for cases involving segregated confinement of between 101 and 305 days in lenght). The plaintiff in *Miller,* for example, was subject to disciplinary segregation for 125 days. *See Miller,* 11 F.3d at 7.

**\*5** In this case, Plaintiff was subject to 120 days in disciplinary segregation, much closer to the period of confinement in *Miller* than that in *Hynes.* Accordingly, the Court may not rely on the length of Plaintiff's confinement alone and must undertake a detailed factual finding regarding the conditions of Plaintiff's confinement as compared to other forms of segregated confinement and to the general population of inmates.

To establish that Plaintiff's confinement was not atypical and significant, Defendants put forth the affidavit of Mr. Donald Selsky, Director of the Special Housing/Inmate Disciplinary Program. However, Selsky's affidavit discusses the special housing program on a statewide basis in comparison to general population policies statewide, but acknowledges that conditions differ from facility to facility. The affidavit also includes a variety of statistics regarding SHU confinement establish, including the fact that 19,983 of the 215,701 inmates (9.26%) in the prison system between 1991 and 1996 were penalized with SHU confinement and that 17,302 of those received terms up to one year (85.17%). It does not, however, provide any evidence regarding the specific conditions of Plaintiff's confinement.

This leaves the Court with insufficient evidence with

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

which to compare Plaintiff's conditions of confinement to other forms of segregated confinement and to the general population. If such a generalized showing by the government regarding the typicality of segregated confinement was satisfactory, then there would be no need for the specific factual findings required in each case by the Second Circuit.

Indeed, in *Welch v. Bartlett,* 196 F.3d 389 (2d Cir.1994), the Second Circuit held that a district court's reliance on the percentage of the prison population receiving punitive terms of segregated confinement and the percentage of that group receiving terms similar in length to that of the plaintiff was inappropriate. *See id.* at 394. The Court held that

> [t]he theory of *Sandin* is that, notwithstanding a mandatory entitlement, a deprivation is not of sufficient gravity to support a claim of violation of the Due Process Clause if similar deprivations are typically endured by other prisoners, not as a penalty for misbehavior, but simply as the result of ordinary prison administration.

> *Id.*

A comparison between the duration of a plaintiff's SHU confinement and the SHU terms received by other inmates who were convicted of misbehavior "does not tell whether [the plaintiff's] deprivation was more serious than typically endured by prisoners as an ordinary incident of prison life." *Id.* Likewise, the court held that punitive terms in SHU

> are not a 'normal incident' for a prisoner whose wrongdoing must be established according to due process standards if the consequence of an adverse finding is confinement in atypical conditions of severe hardship. How many prisoners receive such terms as punishment for misbehavior does not measure how likely a prisoner is to suffer comparable deprivation in the ordinary administration of the prison.

**\*6** *Id.* Moreover, the Court expressed doubt that, even if such a statistic was held to be relevant, the fact that 10% of prisoner were subject to terms in SHU made such

confinement typical. *See id.* at 394 n.2.

As the record before the Court is not sufficient to determine whether Plaintiff's confinement was an atypical and significant hardship, summary judgment at this time is inappropriate.

### ii. State created liberty interest

Defendants also argue the second prong of the *Frazier* test, requiring Plaintiff to establish the existence of a state-created liberty interest in remaining free from segregated confinement, has not been satisfied. Defendants contend that no New York law grants prisoners the right to be free from segregated confinement. Defendants argue that previous Second Circuit precedent establishing the existence of such a state-created interest, *see, e.g., Sher v. Coughlin,* 739 F.2d 77, 81 (2d Cir.1984), does not survive the Supreme Court's decision in *Sandin*. However, *Sandin* does not effect the validity of these decisions. *See Ramirez v. McGinnis,* 75 F.Supp.2d 147, 153 (S.D.N.Y.1999) (holding that *Sandin* "simply limits due process protection to hardships that are also 'atypical and significant' ") (citing *Gonzalez v. Coughlin,* 969 F.Supp. 256, 257 (S.D.N.Y.1997); *Wright v. Miller,* 973 F.Supp. 390, 395 (S.D.N.Y.1997); *Lee v. Coughlin,* 26 F.Supp.2d 615, 632–33 (S.D.N.Y.1998)). Accordingly, New York State regulations do create a protected liberty interest in remaining free from disciplinary segregation.

### b. *Process Due*

Defendants next urge the Court to find that, even if Plaintiff was entitled to due process protections, he was afforded the necessary procedural protections at his hearing. In a conclusory fashion, Defendants argue that Plaintiff "received advance notice of the charges, called witnesses at the hearing, and testified on his own behalf."

When charged with a disciplinary infraction that could lead to loss of good-time credits or to confinement in SHU, a prisoner is entitled to "at least the minimum requirements of procedural due process appropriate for the circumstances." *Wolff v. McDonnell,* 418 U.S. 539, 558 (1974); *see Benitez v. Wolff,* 985 F.2d 662, 665 (2d Cir.1993) (citing *McCann v. Coughlin,* 698 F.2d 112, 121 (2d Cir.1983)). This requires, among things, that the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

prisoner be given advance notice of the charges against him and a meaningful opportunity to marshall and present evidence in his defense, which includes the right to "call witnesses and present evidence in his defense when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals." *Wolff,* 418 U.S. at 563, 566.

Plaintiff specifically argues that defendant Brunet denied him due process by, among other things, disregarding his complaints regarding the confiscation of his trial materials and refusing to allow him to present an eye witness who would testify that Plaintiff was beaten by several of the defendants. The requirement that a prisoner be given advance notice of the charges against him is "no mere formality." *Benitez,* 985 F.2d at 665. Such "notice must be 'written ... in order to inform [the inmate] of the charges and to enable him to marshall the facts and prepare a defense.' " *Id.* (quoting *Wolff,* 418 U.S. at 564). Moreover, the prisoner must be given the notice no less than 24 hours before the hearing and be permitted to retain the notice for at least 24 hours. *See Benitez,* 985 F.2d at 665–66.

**\*7** Here, Plaintiff alleges that his litigation papers were all confiscated from him by the guards in the SHU and that, when he complained of these actions to defendant Brunet, his concerns were ignored. Confiscation of a prisoner's papers made in preparation for a hearing, particularly the notice of charges, significantly hampers the prisoner's ability to prepare his defense. Defendants do not address Plaintiff's allegation in their papers. Accordingly, summary judgment is not appropriate on this ground.

A prisoner is also given the right to call and present witnesses in his defense at a disciplinary hearing. *See Ponte v. Real,* 471 U.S. 491, 495 (1985) (citing *Wolff,* 418 U.S. at 566)). This right is not absolute, however, as prison officials must be allowed "discretion to keep the hearing within reasonable limits and to refuse to call witnesses that may create a risk of reprisal or undermine authority." *Wolff,* 418 U.S. at 566; *see also Ponte,* 471 U.S. at 496 (suggesting that prison officials may also deny a witness request on grounds of irrelevance or lack of necessity). However, "a hearing official has a duty to

articulate an explanation for the decision to exclude a witness." *Rivera v. Coughlin,* No. 92 Civ. 3404, 1994 WL 263417, at \*6 (S.D.N.Y. June 13, 1994).

In this case, Plaintiff alleges that he requested the presence of an eye-witness to the events in question but that defendant Brunet did not allow it. The transcript to the hearing reveals that Brunet informed Plaintiff that he could not contact the witness because he could not contact the witness and the hearing had to be finished that day.

Defendants have not argued, much less established, that these were reasonable limits placed on the hearing by Brunet. Moreover, Defendants have not presented any evidence or argued that allowing the witness' testimony would have been "unduly hazardous to institutional safety" or create a "risk of reprisal or undermine authority." Defendants do not even argue the validity or importance of those reasons set forth by defendant Brunet at the hearing. Finally, it is clear that the proposed evidence in this case was not irrelevant or unnecessary. Accordingly, genuine issues of material fact exist which prevent a finding of summary judgment at this time.

c. *Qualified Immunity*

Finally, relying solely on their prior arguments, Defendants contend that defendant Brunet is protected by qualified immunity. The doctrine of qualified immunity protects a Section 1983 defendant from liability for damages if his "conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982). Defendants are further protected from liability where the rights are clearly established if it was objectively reasonable to believe that their actions did not violate those rights. *See Anderson v. Creighton,* 483 U.S. 635, 638 (1987).

**\*8** The officials do not have such immunity, however, where the "contours of the right" were "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 640. In determining whether a particular right was clearly established at the time of the alleged violation, courts should consider:

(1) whether the right in question was defined with

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

"reasonable specificity;" (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991).

In this case, Plaintiff's right to notice and to present witnesses were clearly established and well defined at the time of the hearing, July 22, 1993. Although, prior to 1993, it was not entirely clear whether a prisoner was entitled to keep his notice for at least 24 hours, *Benitez* clarified that this was so on February 3, 1993. Therefore, it was not objectively reasonable for defendant Brunet to leave unanswered Plaintiff's complaint that his litigation papers were confiscated.

Also, the right to present witnesses at a disciplinary hearing and the limitations on that right were well defined prior to the time of the hearing. Whether the rationale offered by defendant Brunet for excluding the witness, the difficulty in locating the witness and the need to complete the hearing that day, are sufficient justification to support his qualified immunity defense are material issues of fact which cannot be resolved on a motion for summary judgment. *See Rivera,* 1994 WL 263417, at *6. Accordingly, summary judgment may not be granted on this ground.

In light of these holdings, it is evident that this Court made a clear error of law and that reconsideration is appropriate as to Plaintiff's claims against defendant Brunet.

B. Recusal

Plaintiff's motion for recusal is based on 28 U.S.C. § 455(a), which states that "[a]ny justice, judge, or magistrate of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." *Id.* Importantly, it does not matter whether the judge is in fact subjectively impartial, only whether the objective facts create the appearance of impartiality. *United States v. Bayless,* 201 F.3d 116, 126 (2d Cir.2000);

*Hughes v. City of Albany,* No. 98–2665, 1999 WL 709290, at **2 (2d Cir. July 1, 1999). "The ultimate inquiry is whether 'a reasonable person, knowing all the facts, would conclude that the trial judge's impartiality could reasonably be questioned." ' *Hughes v. City of Albany,* 33 F.Supp.2d 152, 153 (N.D.N.Y.1999) (quoting *United States v. Lovaglia,* 954 F.2d 811, 815 (2d Cir.1992)); *see Bayless,* 201 F.3d at 126.

In this case, Plaintiff's claim is based on the congregation of a number of the Court's rulings and the overall handling of his case. The Supreme Court has held, however, that "judicial rulings alone almost never constitute a valid basis for a bias or partiality motion." *Liteky v. United States,* 510 U.S. 540, 555 (1994); *see Hughes,* 1999 WL 709290, at **2. Indeed, the Second Circuit has held that "opinions formed by a judge on the basis of facts introduced or events occurring in the course of judicial proceedings do not constitute a basis for recusal unless they indicate that the judge has a 'deep-seated favoritism or antagonism that would make fair judgment impossible.' " *United States v. Diaz,* 176 F.3d 52, 112 (2d Cir.1999) (quoting *Liteky,* 510 U.S. at 555). Plaintiff has put forth nothing, and a review of the record reveals nothing, which would suggest to an objective observer that the Court has a deep-seated favoritism for Defendants or any antagonism against Plaintiff. Therefore, his motion is denied.

III. CONCLUSION

*9 ORDERED that Plaintiff's motion to vacate is GRANTED in part and DENIED in part consistent with the terms of this opinion;

ORDERED that Plaintiff's claim against defendant Brunet be REINSTATED and the judgment dismissing the case in defendant Brunet's favor be VACATED;

ORDERED that Plaintiff's motion for recusal is DENIED; and it is further

ORDERED that the clerk serve a copy of this order on all parties by regular mail.

IT IS SO ORDERED.

N.D.N.Y.,2001.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)

(Cite as: 2001 WL 118598 (N.D.N.Y.))

Alvarez v. Coughlin
Not Reported in F.Supp.2d, 2001 WL 118598 (N.D.N.Y.)
END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 3911414 (W.D.N.Y.)
**(Cite as: 2010 WL 3911414 (W.D.N.Y.))**



Only the Westlaw citation is currently available.

**This decision was reviewed by West editorial staff and not assigned editorial enhancements.**

United States District Court,
W.D. New York.
Jeffrey ALLRED, Plaintiff,
v.
Captain KNOWLES, Hearing Officer Sgt. Noto,
Defendants.

No. 06–CV–0456Sr.
Oct. 5, 2010.

Jeffrey Allred, Queensvillage, NY, pro se.

Kim S. Murphy, NYS Attorney General's Office, Buffalo, NY, for Defendants.

### DECISION AND ORDER

H. KENNETH SCHROEDER, JR., United States Magistrate Judge.

**\*1** Pursuant to 28 U.S.C. § 636(c), the parties have consented to the assignment of this case to the undersigned to conduct all proceedings in this case, including entry of final judgment. Dkt. # 14.

Plaintiff, Jeffrey Allred, filed this *pro se* action seeking relief pursuant to 42 U.S.C. § 1983. Dkt. # 1. Plaintiff alleges that while an inmate at the Gowanda Correctional Facility ("Gowanda") his rights pursuant to the First, Eighth, and Fourteenth Amendments to the United States Constitution were violated. *Id.* Currently before the Court is defendants' motion for summary judgment. Dkt. # 18. For the following reasons, defendants' motion for summary judgment is granted and the plaintiff's complaint is dismissed in all respects.

### BACKGROUND

Plaintiff filed this action on July 11, 2006, against defendants, Michael Knowles and Louis

Noto, pursuant to 42 U.S.C. § 1983, seeking monetary damages. *Id.* The action arises from a misbehavior report issued on or about July 27, 2003 by defendant Noto against plaintiff and the resulting Tier III disciplinary hearing conducted by defendant Knowles. *Id.* Specifically, the complaint alleges the issuance of a false misbehavior report, retaliation and violation of plaintiff's due process rights. *Id.*

At the time of the events alleged in the complaint, plaintiff was an inmate in the care and custody of the New York State Department of Correctional Services ("DOCS") housed at Gowanda. Dkt. # 1, p. 2; Dkt. # 20, p. 1. Defendant Knowles was a Captain at Gowanda and his duties included, from time to time, conducting inmate disciplinary hearings. Dkt. # 1, pp. 3–4; Dkt. # 21, pp. 1–2. Sergeant Noto was a DOCS Sergeant on plaintiff's housing unit at Gowanda. Dkt. # 1, p. 4; Dkt. # 22, pp. 1–2.

On July 22, 2003, at approximately 8:30 p.m., Correctional Officer Millich discovered several marijuana cigarettes during a search of inmate Meja's cell. Dkt. # 22, p. 3. Consequently, defendant Noto initiated an investigation into the matter. Dkt. # 1, p. 8; Dkt. # 22, p. 3. Defendant Noto maintained that Meja told him that he had purchased the marijuana cigarettes from plaintiff. Dkt. # 22, p. 3. Based on Meja's identification of plaintiff and information allegedly received from confidential informant(s)—who identified plaintiff as a drug dealer and indicated that the sale in question occurred between 7:00 and 8:00 p.m. on July 22, 2003 in the prison yard—defendant Noto issued a misbehavior report charging plaintiff with violating Inmate Rule 113.25. Dkt. # 1, pp. 22 and 25; Dkt. # 22, p. 3. Inmate Rule 113.25 provides that "an inmate shall make, possess, sell or exchange any narcotic, narcotic paraphernalia, controlled substance or marijuana. An inmate shall not conspire with any person to introduce such items into the facility." Dkt. # 22, p. 2; *see also* 7 NYCRR § 270.2(14)(xv).

On July 28, 2003, a Tier III disciplinary hearing was conducted before defendant Knowles. Dkt. # 1, p. 23; Dkt. # 21, p. 2. At the hearing, plaintiff testified in his own defense that he was at a Nation of Islam ("NOI")/Black studies program during the period of the alleged drug sale in the prison yard. Dkt. # 1, p. 24; Dkt. # 21, p .6. Plaintiff called two other inmates, Ford and Williams, as alibi witnesses. Dkt. # 1, p. 29; Dkt. # 21, p. 7. Ford and Williams attended the NOI/Black studies program with plaintiff, but could not verify the time plaintiff left. Dkt. # 21, pp. 7 and 16. The sign-out sheet for the NOI/Black studies class did not indicate the time plaintiff left, although it indicated that both Ford and Williams left at 7:00 p.m. Plaintiff did not sign back into his housing unit until 8:10 p.m. and no one was able to verify his whereabouts after 7:00 p.m. Dkt. # 21, p. 17. Defendant Knowles interviewed the confidential informant(s) outside the presence of plaintiff and found them to be credible witnesses. Dkt. # 21, pp. 7–8. The confidential informant(s) identified plaintiff as a drug dealer and indicated that the sale of the drugs to Meja occurred between 7:00–8:00 p.m. in the prison yard. *Id.* Meja also testified at the hearing, and recanted his initial identification of plaintiff as the person who sold him drugs. Dkt. # 1, p. 26; Dkt. # 21, p. 11. When asked by defendant Knowles why he initially told defendant Noto that plaintiff was the individual who sold him drugs, Meja answered that he did so because he wanted defendant Noto to "leave [him] alone." Dkt. # 24, Ex. D, p 5. In response, defendant Knowles asked Meja to confirm, by answering in either the affirmative or the negative, if he initially identified plaintiff as the individual who sold him drugs, to which Meja answered in the affirmative. *Id.*

**\*2** On August 3, 2003, at the close of the disciplinary hearing, defendant Knowles entered a guilty finding against plaintiff. Dkt. # 24, Ex. C. Based on the Hearing Disposition Report completed by defendant Knowles, he based his guilt determination on the following evidence: defendant Noto's misbehavior report and his testimony that Meja initially identified plaintiff as the individual who sold Meja drugs in the yard; and the testimony of the confidential informant(s). *Id.* Defendant Knowles imposed a penalty of 12 months of confinement in special housing unit ("SHU") and a loss of privileges between the period August 22, 2003 and August 22, 2004.

### *DISCUSSION AND ANALYSIS*
### Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). "In reaching this determination, the court must assess whether there are any material factual issues to be tried while resolving ambiguities and drawing reasonable inferences against the moving party, and must give extra latitude to a pro se plaintiff." *Thomas v. Irvin,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (internal citations omitted).

A fact is "material" only if it has some effect on the outcome of the suit. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see Catanzaro v. Weiden,* 140 F.3d 91, 93 (2d Cir.1998). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248; *see Bryant v. Maffucci,* 923 F.2d 979 (2d Cir.1991), *cert. denied,* 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

Once the moving party has met its burden of "demonstrating the absence of a genuine issue of material fact, the nonmoving party must come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely upon a 'metaphysical doubt' concerning the facts, or on the basis of conjecture or surmise." *Bryant,* 923 F.2d at 982. A party seeking to defeat a motion for summary judgment must do more than make broad factual allegations and invoke the ap-

propriate statute. The non-moving party must also show, by affidavits or as otherwise provided in Rule 56 of the Federal Rules of Civil Procedure, that there are specific factual issues that can only be resolved at trial. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995).

Pursuant to Fed.R.Civ.P. 56(e), affidavits in support of or in opposition to a motion for summary judgment "shall be made on personal knowledge, shall set forth such facts as would be admissible in evidence, and shall show affirmatively that the affiant is competent to testify to the matters stated therein." Thus, affidavits "must be admissible themselves or must contain evidence that will be presented in an admissible form at trial." *Santos v. Murdock,* 243 F.3d 681, 683 (2d Cir.2001), *citing Celotex Corp. v. Catrett,* 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *see also H. Sand & Co. v. Airtemp Corp.,* 934 F.2d 450, 454–55 (2d Cir.1991) (hearsay testimony that would not be admissible if testified to at trial may not properly be set forth in an affidavit).

**Due Process Claim**

**\*3** Plaintiff alleges that defendants deprived him of his constitutional right to procedural due process. Dkt. # 1, p. 42. This allegation appears to be based on the following: (1) that he was not afforded all of the procedural safeguards set forth in *Wolff v. McDonnell*[FN1] during the Tier III disciplinary hearing; and (2) that defendant Knowles was not an impartial hearing officer.

> FN1. 418 U.S. 539, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1975).

To prevail on a procedural due process claim under § 1983, a plaintiff must show that he possessed a protected property or liberty interest and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000) (liberty interest); *Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998).

"A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995). In assessing whether the discipline imposed rises to this level, the Court of Appeals for the Second Circuit has directed the district courts to consider both the conditions of confinement and their duration, "since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." *Id.,* quoting *Sealey v. Giltner,* 197 F.3d 578, 586 (2d Cir.1999). In light of this standard, the Court of Appeals has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights" and has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer,* 364 F.3d at 64–65.

Notwithstanding the foregoing, courts in this Circuit "generally require that the duration of confinement be at least 100 days" to be categorized as constituting an "atypical and significant hardship." *Palmer v. Goss,* No. 02 Civ 5804(HB), 2003 U.S. Dist. LEXIS 18103, 2003 WL 22327110 (S.D.N.Y. Oct. 10, 2003), *aff'd, Palmer,* 364 F.3d 60; *Sims v. Artuz,* 230 F.3d 14, 24 (2d Cir.2003) (vacating dismissal of, *inter alia,* procedural due process claims, stating, during little more than a 4 1/2 month period, Sims was sentenced to SHU for a total of nearly 3 1/2 years); *Durran v. Selsky,* 251 F.Supp.2d 1208, 1214 (W.D.N.Y.2003) (quoting *Tookes v. Artuz,* No. 00CIV4969, 2002 U.S. Dist. LEXIS 12540, 2002 WL 1484391 (S.D.N.Y. July 11, 2002)) ("[c]ourts in this Circuit routinely hold that an inmate's confinement in special housing for 101 days

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

or less, absent additional egregious circumstances, does not implicate a liberty interest."); *Colon v. Howard,* 215 F.3d 227, 232 (2d Cir.2000) (instructing district courts to develop detailed factual records "in cases challenging SHU confinements of durations within the range bracketed by 101 days and 305 days"). Here, following the Tier III disciplinary hearing, defendant Knowles imposed a penalty of 12 months of confinement in SHU and a loss of privileges between the period August 22, 2003 and August 22, 2004. Thus, there can be no dispute that plaintiff has demonstrated a protected liberty interest. The issue that remains and that which will be addressed below, is whether plaintiff was deprived of that protected liberty interest without due process. Defendants maintain that was not. Dkt. # 21, p. 2; Dkt. # 22, p. 7.

**\*4** In *Wolff,* the Supreme Court enumerated certain procedural safeguards that must be afforded to an inmate during the course of a prison disciplinary proceeding in order to ensure that the minimum requirements of procedural due process are satisfied. *Wolff,* 418 U.S. at 563–66. Specifically, the Supreme Court identified the following procedures: advance written notice of the claimed violation or charges; the opportunity for an inmate to call witnesses and present documentary evidence in his/her defense, provided that such a process would not jeopardize institutional safety; and a written statement by the fact finder of the evidence relied upon and the reasons for the disciplinary action taken. *Id* . Additionally, the findings must be supported by some evidence in the record. *Walpole v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985).

Here, contrary to plaintiff's contention, he was afforded all of the procedural safeguards set forth in *Wolff.* Dkt. # 24, p 4–5. Plaintiff was provided with a copy of defendant Noto's misbehavior report before the hearing, giving him advance notice of the charge against him.[FN2] Dkt. # 1, p. 22; Dkt. # 21, p. 5. Plaintiff had the opportunity to call witnesses and present evidence. Dkt. # 1, pp. 26, 29; Dkt. #

21, pp. 6, 8. Plaintiff was also provided with a written statement of the guilty finding and the evidence relied on for the disposition. Dkt. # 21, p. 12. The guilty disposition was supported by evidence in the form of defendant Noto's notes; defendant Noto's misbehavior report and testimony; and the testimony of the confidential informant(s), particularly because plaintiff's alibi was uncorroborated. *Id.* at pp. 10–11. Thus, plaintiff's claim that he was deprived of procedural due process fails as a matter of law.

> **FN2.** Plaintiff concedes this fact. However, he suggests that he was deprived of his due process rights under the standard set forth in *Wolff* because defendant Knowles found him guilty of drug possession, rather than sale of a narcotic substance, which he was charged with in the misbehavior report. Dkt. # 24, p 5. However, inmate Rule 113.25, which plaintiff was charged with in the misbehavior report and found guilty of at the close of the Tier III hearing, encompasses possession **and** sale of a narcotic. Dkt. # 21, pp. 5 and 19.

**Impartial Hearing Officer**

Plaintiff contends, in particular, that his due process rights were violated because defendant Knowles was not an impartial hearing officer. *See* Dkt. # 1, p. 6–8. Plaintiff points to the following to support his allegation: (1) that defendant Knowles was involved in both the Tier III hearing and in the investigation into plaintiff's drug sale; (2) that defendant Knowles instructed Meja to respond affirmatively at the hearing that plaintiff had sold Meja drugs although Meja testified at the hearing that he did not know plaintiff; and (3) that defendant Knowles rejected his alibi and confused the time of the drug sale at issue. Dkt. # 1, pp. 28, 39; Dkt. # 24, p. 6.

Indeed, as plaintiff correctly contends, "[a]n inmate subject to a disciplinary hearing is entitled to an impartial hearing officer." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996); *see Wolff,* 418 U.S. at

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

570–71; *Russell v. Selsky,* 35 F.3d 55, 59 (2d Cir.1994). An impartial hearing officer "is one who, inter alia, does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990); *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989) ("it would be improper for prison officials to decide the disposition of a case before it was heard").

**\*5** It is well recognized, however, "that prison disciplinary hearing officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen,* 100 F.3d at 259; *see Francis,* 891 F.2d at 46 ("Because of the special characteristics of the prison environment, it is permissible for the impartiality of such officials to be encumbered by various conflicts of interest that, in other contexts, would be adjudged of sufficient magnitude to violate due process."). For example, "[t]he degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Allen,* 100 F.3d at 259; *see Francis,* 891 F.2d at 46. A hearing officer may satisfy the standard of impartiality if there is *"some evidence* in the record" to support the findings of the hearing. *Superintendent v. Hill,* 472 U.S. 445, 455, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) (emphasis added).

In this case, there is ample evidence to support defendant Knowles' guilty finding: defendant Noto's misbehavior report and his testimony that Meja originally identified plaintiff as the individual who sold him drugs; and the testimony of the confidential informant(s), which was considered outside the presence of plaintiff. Dkt. # 21, pp. 8–9.

Notably, plaintiff's only defense at the Tier III hearing was that he had been at an NOI/Black studies program at the time of the drug sale, which took place allegedly between 7:00–8:00 p.m. Dkt. # 21, p. 7. However, inmates Ford and Williams could not verify plaintiff's alibi defense. *Id.* Because plaintiff did not sign back into his cell area until 8:10 p.m., defendant Knowles determined that there was ample time for plaintiff to sell the drugs in the

yard during the period of his unexplained absence. Dkt. # 21, pp. 7, 16–18.

Plaintiff further contends that defendant Knowles violated his constitutional right to due process by failing to adhere to the state guidelines for conducting prison disciplinary hearings (set forth in Title 7 of the NYCRR §§ 253.1(b), 254.1 FN3) because, he alleges, that defendant Knowles conducted the Tier III hearing and was also involved in the investigation of plaintiff's drug sale. Dkt. # 24, p 6.

> FN3. 7 NYCRR § 253.1 gives superintendents the discretion to designate DOCS employees to conduct disciplinary hearings. Pursuant to § 253.1(b), "[n]o person who has participated in any investigation of the acts shall be a hearing officer at a hearing relating to those acts, nor shall any person who has prepared or caused to be prepared the misbehavior report on which a hearing is held, act as the hearing officer on that charge." Section § 254.1 of 7 NYCRR precludes a person who was a witness to or who investigated an incident that is the subject of a disciplinary proceeding from acting as a hearing officer relating to that incident.

This argument fails because violations of state law that do not deprive the plaintiff of a right "secured by the Constitution and laws" are insufficient to support a claim under § 1983. *See Baker v. McCollan,* 443 U.S. 137, 139–40, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979); *Shakur v. Selsky,* 391 F.3d 106, 119 (2d Cir.2004); *Blouin v. Spitzer,* 356 F.3d 348, 362 (2d Cir.2004). State procedural protections do not give rise to substantive federal rights. *See Olim v. Wakinekona,* 461 U.S. 238, 249–50, 103 S.Ct. 1741, 75 L.Ed.2d 813 (1983); *Holcomb v. Lykens,* 337 F.3d 217, 224 (2d Cir.2003) ("[S]tate statutes do not create federally protected due process entitlements to specific state-mandated procedures."). Moreover, "[s]tate procedures designed to protect substantive liberty interests entitled to pro-

tection under the federal constitution do not themselves give rise to additional substantive liberty interests." *Blouin,* 356 F.3d at 363. It is "federal law, not state regulations, [that] determines the procedures necessary to protect that liberty interest ." *Id.* (citing *Watson v. City of New York,* 92 F.3d 31, 38 (2d Cir.1996)). Therefore, "the only relevant inquiry was whether the constitutional [procedures] were met, not whether state procedures were followed." *Shakur,* 391 F.3d at 119 (citing *Holcomb,* 337 F.3d at 224). As set forth above, plaintiff's constitutional rights were not violated during the Tier III hearing. Plaintiff's exclusive reliance on defendants' alleged violations of 7 NYCRR §§ 253.1(b) and 254.1 is insufficient to support his claim under § 1983. *See Shakur,* 391 F.3d at 119; *Holcomb,* 337 F.3d at 224; *Ramsey v. Goord,* 661 F.Supp.2d 370, 391–92 (W.D.N.Y.2009).

**\*6** Accordingly, since plaintiff received all of the process he was due in the course of the Tier III disciplinary hearing, defendants' motion for summary judgment on plaintiff's due process claim is granted.

**Retaliation Claim**

Plaintiff alleges that, in retaliation for attending a Nation of Islam ("NOI")/Black Studies course and/or for his affiliation therewith, defendant Noto filed a false misbehavior report and gave false testimony and that defendant Knowles found him guilty. Dkt. # 1, p. 43.

"In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for 'adverse action' taken against him by defendants." *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). Third, the plaintiff must establish a causal connection between the protected speech and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes v. Walker,*

239 F.3d 489, 491 (2d Cir.2001), overruled on other grounds, *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)).

The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), superseded by 2003 U.S.App. LEXIS 13030, 2003 WL 360053 (2d Cir. Feb. 10, 2003)) (omission in the original). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennett,* 343 F.3d at 137 (citing *Dawes,* 239 F.3d at 491). Accordingly, plaintiff must set forth nonconclusory allegations. *Id.* Finally, even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.*

A prison inmate has no constitutionally-guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986). However, if a defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights are implicated even if the plaintiff did receive full procedural due process. *Franco v. Kelly,* 854 F.2d 584, 588–89 (2d Cir.1988). Any adverse action taken by defendant in retaliation for the exercise of a constitutional right, even if not unconstitutional in itself, states a viable constitutional claim. *Id.*

**\*7** Here, even assuming plaintiff's affiliation

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

with the NOI/Black studies program was constitutionally protected conduct, he cannot show that his affiliation therewith was a substantial motivating factor for the filing of the misbehavior report and the subsequent finding of guilt concerning the report. Defendant Knowles declares that he "did not even recall plaintiff prior to the hearing he conducted," and had no involvement whatsoever in any NOI activities. Dkt. # 21, p. 22. Similarly, defendant Noto declares that he had no knowledge of plaintiff's participation in the NOI/Black Studies program, and, up until the time of the instant litigation, "did not know that plaintiff attended such a course or was a member of the NOI." Dkt. # 22, p. 6. To this extent, plaintiff cannot demonstrate that his affiliation with the NOI/Black studies program was a motivating factor in defendants' actions. Since plaintiff cannot establish any plausible connection between NOI/Black studies participation and the misbehavior report and the guilty finding, his retaliation claim fails as a matter of law.

Assuming, *arguendo,* that plaintiff could show that the disciplinary actions were motivated by retaliatory animus (an assumption that has no basis in the record before this Court), plaintiff's retaliation claims would fail because defendants can easily show that they would have taken the same disciplinary actions even in the absence of the protected conduct. *See Davidson v. Chestnut,* 193 F.3d at 149 ("At the summary judgment stage, if the undisputed facts demonstrate that the challenged action clearly would have been taken on a valid basis alone, defendants should prevail."). The record shows that there was sufficient evidence, based on defendant Noto's investigation, to have charged plaintiff with a drug sale. Further, there was ample evidence at the Tier III disciplinary hearing for defendant Knowles to find plaintiff guilty of the drug sale charge. This is so particularly in the context of prison administration where courts must be cautious to recognize that prison officials have broad administrative and discretionary authority over the institutions they manage. *Lowrance v. Achtyl,* 20 F.3d 529, 535 (2d Cir.1994).

Accordingly, defendants' motion for summary judgment on plaintiff's claim of retaliation is granted.

### CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted. Dkt. # 18. The Clerk of the Court is directed to enter judgment in favor of the defendants.

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

**\*8 SO ORDERED.**

W.D.N.Y.,2010.
Allred v. Knowles
Not Reported in F.Supp.2d, 2010 WL 3911414 (W.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

2012 WL 4033731
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Demore FULMORE, Plaintiff,
v.
Eugene RAIMO; John Smith; and
Jeremy Saunders, Defendants.

No. 9:10–CV–1096 (GTS/DRH).
|
Sept. 12, 2012.

**Attorneys and Law Firms**

Stoll, Glickman & Bellina, Cynthia H. Conti–Cook, Esq.,
Leo Glickman, Esq., of Counsel, Brooklyn, NY, for
Plaintiff.

Hon. Eric T. Schneiderman, Attorney General for
the State of New York, Cathy Y. Sheehan, Esq.,
Assistant Attorney General, of Counsel, Albany, NY, for
Defendants.

***MEMORANDUM–DECISION and ORDER***

GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this prisoner civil rights
action filed by Demore Fulmore ("Plaintiff") against
New York State Corrections Officers Eugene Raimo,
John Smith, and Jeremy Saunders ("Defendants"), is
Defendants' motion for partial summary judgment. (Dkt.
No. 16.) For the reasons set forth below, Defendants'
motion is granted.

**I. RELEVANT BACKGROUND**

**A. Plaintiff's Claims**
Generally, liberally construed, Plaintiff's Complaint
asserts the following three claims against Defendants
arising from events occurring on and after July 3,
2009, at Great Meadow Correctional Facility: (1) a
claim that they violated his Eighth Amendment right
to be free from cruel and unusual punishment by
using excessive force against him; (2) a claim that they
violated his Fourteenth Amendment right to due process

by issuing a false misbehavior report against him and
"submitt[ing] false statements at [his] prison disciplinary
proceeding"; and (3) a claim that they conspired to
violate both his Eighth Amendment and Fourteenth
Amendment rights in violation of 42 U.S.C. § 1983. (*See
generally* Dkt. No.1 [Plf.'s Compl.].) Familiarity with the
factual allegations supporting these claims in Plaintiff's
Complaint is assumed in this Memorandum–Decision and
Order, which is intended primarily for review by the
parties.

**B. Defendants' Motion**
On September 6, 2011, Defendants moved for partial
summary judgment to dismiss Plaintiff's due process
and conspiracy claims. (Dkt. No. 16.) Generally, in
support of their motion for partial summary judgment,
Defendants argue as follows: (1) Plaintiff has failed
to state a due process claim, because a prison inmate
has no constitutional right to be free from being
false accused in a misbehavior report; (2) based on
Plaintiff's factual allegations, and/or the admissible
record evidence, Defendants are protected from liability
on Plaintiff's conspiracy claim by the intracorporate
conspiracy doctrine; and (3) based on the admissible
record evidence, Defendants are shielded from liability on
Plaintiff's due process claims by the doctrine of qualified
immunity. (*See generally* Dkt. No. 16, Attach. 3 [Defs.'
Memo. of Law].)

Generally, in response to Defendants' motion, Plaintiff
argues as follows: (1) rather than asserting a Fourteenth
Amendment due process claim against Defendants arising
from the false statements use to initiate and conduct
Plaintiff's disciplinary hearing, Plaintiff is asserting a First
Amendment retaliation claim against them, based on
his allegation that the disciplinary charges were issued
against him as a result of his being "in the company of
inmates perceived to be homosexuals"; (2) in any event,
"[t]he substantive due process clause of the Fourteenth
Amendment protects a person's right to be homosexual
and engage in homosexual conduct" in prison; (3) the
intracorporate conspiracy doctrine is not available to
Defendants because they took the actions in question
to pursue their personal objective wholly separate and
apart from the objectives of the correctional facility. (*See
generally* Dkt. No. 18 [Plf.'s Opp'n Memo. of Law].)

**\*2** Generally, in reply to Plaintiff's response, Defendants
argue as follows: (1) Plaintiff's Complaint fails to assert

a claim for retaliation under the First Amendment, or even allege facts plausibly suggesting that Defendants perceived him to be homosexual (or even that he is homosexual); and (2) Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants took the actions in question to pursue personal objective wholly separate and apart from the objectives of the correctional facility. (*See generally* Dkt. No. 21 [Defs.' Reply Ltr. Brief].)

## C. Undisputed Material Facts

The following material facts appeared undisputed based on the admissible record evidence before the Court. On July 3, 2009, at approximately 10:40 a.m., Plaintiff was returning to his housing area from the law library at Great Meadow Correctional Facility. At that time, Defendant Raimo, aided by Defendants Saunders and Smith, used physical force against Plaintiff. Following the use of physical force against Plaintiff, Defendant Raimo filed a misbehavior report against Plaintiff, charging him with (1) assault, (2) engaging in violent conduct, (3) disobeying a direct order, (4) engaging in an unauthorized exchange of property, and (5) violating the institution's pat-frisk procedure.

More specifically, the misbehavior report described the incident as follows:

> On the above time and date I observed Inmate Fulmore passing property to another inmate at the end of C–1 Company. I called Inmate Fulmore to C–Company desk and gave him a direct order to place his hands on the wall under [the] C–1 stairwell. Inmate Fulmore placed his hands on the wall, and abruptly threw his right elbow rearward striking me in the right side of my face. Body holds and force was [sic] used to control Inmate Fulmore.

(Dkt. No. 20, at 38 [attaching Ex. G to Glickman Decl.].) Defendant Saunders signed off on the misbehavior report as a witness.

As a result of the misbehavior report, Plaintiff was subjected to an administrative disciplinary hearing conducted by Hearing Officer Andrew Harvey on July 20, 2009. Relying on the misbehavior report (as well as other evidence), Hearing Officer Harvey found Plaintiff guilty of all of the five above-described charges, except the charge of disobeying a direct order. The other evidence relied on by Hearing Officer Harvey consisted of the following: (1) the unusual incident report; (2) two use-of-force reports; (3) three memoranda exchanged between Defendants Raimo, Sauders, Smith and/or Sergeant Kline, describing the incident and subsequent use of force; (4) the testimony of inmate Nelson (DIN 07–B–2407); (5) the testimony of Corrections Officer John Rosati; and (6) the refusal testify of three of Plaintiff's inmate witnesses based on the fact that they saw nothing. Based on all of this evidence, Hearing Officer Harvey charged Plaintiff with eight months confinement in the facility's Special Housing Unit, as well as loss of packages, commissary and phone.

**\*3** Familiarity with the remaining undisputed material facts of this action, as well as the disputed material facts is assumed in this Decision and Order, which (again) is intended primarily for review by the parties.

## II. RELEVANT LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the legal standard governing motions for summary judgment, the Court will not recite that well-known legal standard in this Decision and Order, but will direct the reader to the Court's decision in *Pitts v. Onondaga County Sheriff's Dep't,* 04–CV–0828, 2009 WL 3165551, at \*2–3 (N.D.N.Y. Sept. 29, 2009) (Suddaby, J.), which accurately recites that legal standard.

It is well accepted that, on a defendant's motion for summary judgment, the plaintiff's claim may be dismissed for failure to state a claim. *Schwartz v. Compagnie General Transatlantique,* 405 F.2d 270, 273–74 (2d Cir.1968) ("Where appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment."); *Katz v. Molic,* 128 F.R.D. 35, 37–38 (S .D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). In *Bell*

*Atlantic Corp. v. Twombly,* the Supreme Court clarified that pleading standard under Fed.R.Civ.P. 8(a) turns on the *plausibility* of an actionable claim, rather than turn on the *conceivability* of an actionable claim. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 556–70 (2007). As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). "Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 556 U.S. at 678.

## B. Legal Standards Governing Plaintiff's Claims

Because the parties to this action have demonstrated, in their memoranda of law, an accurate understanding of the relevant points of law contained in the legal standards governing Plaintiff's claims in this action, the Court will not recite, in their entirety, those legal standards in this Decision and Order, which (again) is intended primarily for review by the parties. (*See generally* Dkt. No. 16, Attach. 3 [Defs.' Memo. of Law]; Dkt. No. 18 [Plf.'s Opp'n Memo. of Law]; Dkt. No. 21 [Defs.' Reply Ltr. Brief.] )

## III. ANALYSIS

### A. Whether Plaintiff's Claim for Denial of Due Process Should Be Dismissed

After carefully considering the matter, the Court agrees with Defendants that Plaintiff's due process claim should be dismissed for the reasons stated by Defendants in their memoranda of law. (Dkt. No. 16, Attach.3.) The Court would add only three points.

**\*4** First, Plaintiff never responds to Defendants' argument that, without more, the merely filing a false misbehavior report against an inmate does not give rise to a claim under 42 U.S.C. § 1983. As a result, Defendants' burden with regard to it is lightened such that, in order to succeed on it, they need only show their entitlement to the relief requested with regard to it, which has appropriately been characterized as a "modest" burden. *Dottolo v. Byrne Dairy, Inc.,* 08–CV–0390, 2010 WL 2560551, at \*7, n. 13 (N.D .N.Y. June 22, 2010) (collecting authorities). The Court finds that Defendants have met that modest burden. In any event, the Court notes that the Court would accept this argument even if it subjected it to

the more rigorous scrutiny appropriate for a contested motion.

Second, just as an inmate possesses no due process right to be free from being issued a false misbehavior report, an inmate possesses no due process right to be free from having that false misbehavior report relied on by a hearing officer at a disciplinary hearing. *See Freeman v. Rideout,* 808 F.2d 949, 952–53 (2d Cir.1986) (holding that an inmate who was found guilty by a prison disciplinary committee based on a false report did not have an actionable due process claim because the inmate was granted a hearing and the opportunity to rebut the false charges against him); *accord, Richardson v. Ray,* No. 12–CV–6399, 2012 WL 3105224, at \*1 (4th Cir. Aug. 1, 2012); *see also Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997); *Velez v. Burge,* No. 11–CV–2897, 2012 WL 1889402, at \*1 (2d Cir. May 25, 2012). In any event, here, any such use of the report was immaterial, given (1) the independence of the hearing officer (against whom no claim has been asserted in this action), and (2) the other evidence relied on by him.

Third, the Court rejects Plaintiff's attempt (during his opposition to Defendants' motion for partial summary judgment) to transform what was obviously pled as a *procedural* due process claim (arising from his disciplinary hearing) into a *substantive* due process claim (arising from adverse action taken allegedly against him due to his status as a homosexual), for the same reasons that the Court rejects Plaintiff's attempt to assert a late-blossoming retaliation claim in this action. *See, infra,* Part III.C. of this Decision and Order.

For these reasons, Defendants' motion for partial summary judgment dismissing Plaintiff's due process claim is granted.

### B. Whether Plaintiff's Claim for Conspiracy Should Be Dismissed

After carefully considering the matter, the Court agrees with Defendants that Plaintiff's conspiracy claim should be dismissed for the reasons stated by Defendants in their memoranda of law. (Dkt. No. 16, Attach.3.) The Court would add only the following point.

"[T]he 'intracorporate conspiracy doctrine' ... essentially bars conspiracy claims against employees of entities such as DOCS (when those employees are alleged to

have conspired solely with each other) unless, pursuant to the doctrine's 'scope of employment' exception, the employees were pursuing personal interests wholly separate and apart from the entity by whom they were employed." *Cusamano v. Sobek,* 604 F.Supp.2d 416, 469–70 (N.D.N.Y.2009) (Suddaby, J., adopting Report–Recommendation of Lowe, M.J.) (collecting cases). Here, no factual allegations exist plausibly suggesting that Defendants were pursuing any personal interests apart from the interests of the prison. Even if such factual allegations did exist, no admissible record evidence exists establishing that Defendants were pursuing any personal interests apart from the interests of the prison. It is imperative that correctional officers work together to maintain order in the prison and to ensure their own safety as well as the safety of the inmates.

**\*5** For these reasons, Defendants' motion for partial summary judgment dismissing Plaintiff's claim for conspiracy is granted.

## C. Whether Plaintiff's Claim for Retaliation Should Be Considered

After carefully considering the matter, the Court agrees with Defendants that the Court should not consider this claim, for the reasons stated by Defendants in their reply letter brief. The Court would add only two points.

First, while the Court sometimes liberally construes a non-movant's response to a motion as effectively amending the allegations contained in the non-movant's complaint, it does so only when (1) the non-movant is pro se, (2) the response is in opposition to a motion to dismiss, and (3) the response is consistent with the allegations contained in the non-movant's complaint. Here, none of these three conditions is present. Plaintiff is, and was when he filed his Complaint, represented by able counsel. Moreover, Plaintiff's late-blossoming claim is asserted in an opposition to a motion for partial summary judgment (not a motion to dismiss), which if permitted would drastically change the landscape of Plaintiff's claims at a late stage of the litigation. Finally, Plaintiff's detailed Complaint, which is otherwise quite detailed, is conspicuously absent of any fact plausibly suggesting that Defendants perceived him to be homosexual (or even that he is homosexual). The Court finds it particularly noteworthy that the words "retaliation," "First Amendment," "homosexual," "July 2," "evening

meal," or "mess hall" do not appear anywhere in Plaintiff's Complaint. (*See generally* Dkt. No. 1.)

Simply stated, permitting Plaintiff to effectively amend his Complaint through his opposition to Defendants' motion for partial summary judgment would be, under the circumstances, unduly prejudicial to Defendants, a gross waste of judicial resources, and a violation of both Fed.R.Civ.P. 15(a) and the Court's Pretrial Scheduling Order (page 2 of which set the deadline for the amendment of pleadings as March 15, 2011). (Dkt. No. 12, at 2.) *See also Brown v. Raimondo,* 06–CV–0773, 2009 WL 799970, at \*2, n. 2 (N.D.N.Y. March 25, 2009) (Report–Recommendation of Treece, M.J., adopted by Suddaby, J.) ("The Court notes that opposition papers [on summary judgment motions] are not the proper vehicle to instill new causes of action or add new defendants."), *aff'd,* 373 F. App'x 93 (2d Cir.2010).[1] If Plaintiff's counsel wanted to assert this claim, he should have filed a motion to amend Plaintiff's Complaint.

Second, even if the Court were to consider this claim, the Court would find it futile. "To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was 'protected'; (2) the defendants took 'adverse action' against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a 'substantial or motivating factor' in the defendants' decision to take action against the plaintiff." *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); Gill, 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ).

**\*6** For the sake of brevity, the Court will not linger on the fact that the Court has found no authority for the point of law that simply being homosexual, or socializing with homosexuals, in a maximum-security single-gender prison (such as Great Meadow Correctional Facility) is "protected activity" or "protected speech" for purposes of a First Amendment claim.[2] More important is the fact that Plaintiff alleges facts plausibly suggesting that the relevant adverse action allegedly taken against him (through the initiation of disciplinary charges) resulted in a disciplinary conviction (which does not appear to

have been subsequently reversed or vacated). (*See, e.g.,* Dkt. No. 1, at ¶¶ 17, 24.) As a result, the conclusion that the misbehavior report was actually caused by the misbehavior charged therein (rather than by any protected activity or speech in which Plaintiff engaged) appears inescapable.

For these reasons, the Court will not consider Plaintiff's retaliation claim.

**ACCORDINGLY,** it is

**ORDERED** that Defendants' motion for partial summary judgment (Dkt. No. 16) is *GRANTED;* and it is further

**ORDERED** that Plaintiff's due process and conspiracy claims are *DISMISSED;* and it is further

**ORDERED** that counsel are directed to appear on NOVEMBER 2, 2012 at 1:30 p.m. in chambers for a pretrial conference, at which counsel are directed to appear with settlement authority, and in the event that the case does not settle, trial will be scheduled at that time. Plaintiff is further directed to forward a written settlement demand to defendants no later than October 12, 2012, and the parties are directed to engage in meaningful settlement negotiations prior to the 11/2/12 conference.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 4033731

Footnotes

1   *See also Smith v. Greene,* 06–CV–0505, 2011 WL 1097863, at *3, n. 5 (N.D.N.Y. Feb. 1, 2011) (Baxter, M.J.) ("[P]laintiff should not be allowed to assert any new claims at this stage of the case, particularly through his response to a summary judgment motion ."), *adopted by,* 2011 WL 1097862 (N.D.N.Y. March 22, 2011) (Suddaby, J.); *Jackson v. Onondaga Cnty,* 549 F.Supp.2d 204, 219–20 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation of Lowe, M.J.) (finding that pro se civil rights plaintiff's complaint should not be effectively amended by his new allegations presented in his response to defendants' motion for summary judgment); *Shaheen v. McIntyre,* 05–CV–0173, 2007 WL 3274835, at *1, 9 (N.D.N.Y. Nov. 5, 2007) (McAvoy, J., adopting Report–Recommendation of Lowe, M.J.) (finding that pro se civil rights plaintiff's complaint should not be effectively amended by his new allegations presented in his response to defendants' motion for summary judgment); *Harvey v. New York City Police Dep't,* 93–CV–7563, 1997 WL 292112, at *2 n. 2 (S.D.N.Y. June 3, 1997) ("To the extent plaintiff attempts to assert new claims in his opposition papers to defendants' motion, entitled 'Notice of Motions in Response and Opposing Defendant'(s) Summary Judgment Motions,' the Court finds that 'it is inappropriate to raise new claims for the first time in submissions in opposition to summary judgment' and accordingly disregards such claims.") (citing *Bonnie & Co. Fashions, Inc. v. Bankers Trust Co.,* 170 F.R.D. 111, 119 [S.D.N.Y.1997] ).

2   On the contrary, federal courts appear to routinely uphold as constitutional prison regulations that reasonably limit inmates' First Amendment right to sexual expression. *See, e.g., Giano v. Senkowski,* 54 F.3d 1050, 1052–53 (2d Cir.1995); *Ramirez v. Pugh,* 379 F.3d 122, 128 (3d Cir.2004); *Hodgson v. Fabian,* 378 F. App'x 592, 594 (8th Cir.2010); *Rogers v. Martin,* 85 F. App'x 577, 579 (6th Cir.2003); *Rogers v. Morris,* 34 F. App'x 481, 482 (7th Cir.2002). Indeed, the Court notes that in New York there exists a disciplinary rule against sexual relations between prisoners. *N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2* (Rules Series 101 Sex Offenses).

2015 WL 10568892
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Edward R.L. Alexander, Plaintiff,

v.

Brian Fischer, et al., Defendants.

9:14-CV-548 (GLS/ATB)
|
Signed 12/21/2015

**Attorneys and Law Firms**

EDWARD R.L. ALEXANDER, Plaintiff, pro se.

MICHAEL G. McCARTIN, Ass't Att'y Gen., for the
Defendants.

### REPORT-RECOMMENDATION

ANDREW T. BAXTER, U.S. MAGISTRATE JUDGE

**\*1** This matter has been referred to me for Report and
Recommendation, pursuant to 28 U.S.C. § 636(b) and
Local Rules N.D.N.Y. 72.3(c) by the Honorable Gary L.
Sharpe, United States District Judge.

In this civil rights action, plaintiff alleges various
violations of his federal constitutional rights that occurred
between December 2012 and September 2013 while
confined by the New York Department of Corrections
and Community Supervision ("DOCCS") at Clinton
Correctional Facility ("Clinton"). (Compl., Dkt. No.
1). Specifically, plaintiff raises (1) due process claims
arising from three separate disciplinary hearings (Compl.
at 6–11); (2) First Amendment retaliation claims after
his successful challenge of those hearings at the
administrative and state level (Compl. at 6–7, 9–11); and
(3) Eighth Amendment claims that Clinton correctional
officers used excessive force during a cell inspection and
improperly deprived him of food. (Compl. at 8–9, 12–14).

Presently before the court is the defendants' motion for
summary judgment pursuant to Fed.R.Civ.P. 56. (Dkt.
No. 30). Plaintiff has opposed the motion. (Dkt. No.

42). Defendants' reply only raised a procedural defect in
plaintiff's statement of material facts. (Dkt. No. 45).

For the reasons set forth below, this court recommends
that defendants' summary judgment motion be granted,
and that all of plaintiff's claims be dismissed.

### DISCUSSION

**I. Summary Judgment**

Summary judgment is appropriate where there exists
no genuine issue of material fact and, based on the
undisputed facts, the moving party is entitled to judgment
as a matter of law. Fed.R.Civ.P. 56; Salahuddin v. Goord,
467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over
["material"] facts that might affect the outcome of the suit
under the governing law will properly preclude the entry of
summary judgment." Anderson v. Liberty Lobby, 477 U.S.
242, 248 (1986). It must be apparent that no rational finder
of fact could find in favor of the non-moving party for a
court to grant a motion for summary judgment. Gallo v.
Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir.
1994).

The moving party has the burden to show the absence of
disputed material facts by informing the court of portions
of pleadings, depositions, and affidavits which support the
motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).
If the moving party satisfies its burden, the nonmoving
party must move forward with specific facts showing that
there is a genuine issue for trial. Salahuddin v. Goord,
467 F.3d at 273. In that context, the nonmoving party
must do more than "simply show that there is some
metaphysical doubt as to the material facts." Matsushita
Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475
U.S. 574, 586 (1986). However, in determining whether
there is a genuine issue of material fact, a court must
resolve all ambiguities, and draw all inferences, against the
movant. See United States v. Diebold, Inc., 369 U.S. 654,
655 (1962); Salahuddin, 467 F.3d at 272.

**\*2** To be sufficient to create a "factual issue," in the
context of a summary judgment motion, an allegation
in an affidavit or verified complaint must not be
conclusory or overly general. Smith v. Woods, 9:03–
CV–480 (DNH/GHL), 2006 WL 1133247, at \*3 & n.10
(N.D.N.Y. Apr. 24, 2006). Even where a complaint
or affidavit contains specific assertions, the allegations

"may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " *Id.,* 2006 WL 1133247, at *3 & n.11 (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 554–55 (2d Cir. 2005) ("While it is undoubtedly the duty of district courts not to weigh the credibility of the parties at the summary judgment stage, in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff,' ... and thus whether there are any "genuine" issues of material fact, without making some assessment of the plaintiff's account.")).

## II. Compliance with Local Rule (L.R.) 7.1

As required under L.R. 7.1, defendants have filed a Statement of Material Facts. (Dkt. No. 30–27) Although plaintiff has responded to the Statement of Material Facts filed by Defendants (Dkt. No. 42–1), his response, with limited exception, does not follow the mandate of L.R. 7.1(a)(3). Under this rule, the opposing party's response to the movant's statement of material facts "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises." Instead, plaintiff has submitted a counter-statement of material facts that does not correspond to the defendants' statement.

Where, as in this case, a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the local rule provides that facts in the movant's statement will be accepted as true (1) to the extent they are supported by evidence in the record, and (2) the nonmovant, if proceeding pro se, has specifically advised of the possible consequences of failing to respond to the motion. *See Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir. 1996). However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record

even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.,* 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to plaintiff's pro se status and his attempt, albeit inadequate, to respond to defendants' statement of material facts, the court has opted to review the entire summary judgment record.

## III. Due Process—Disciplinary Hearings and Appeals

Plaintiff claims that his due process rights were violated during three separate disciplinary hearings that were all conducted by defendant Captain David Lucia, resulting in confinement in the Clinton Special Housing Unit ("SHU"), and in one case, the imposition of a restricted diet. As set forth herein, the record evidence supports the conclusion that plaintiff was afforded due process in each of the three disciplinary hearings. Accordingly, this court recommends that defendants' motion for summary judgment as to plaintiff's due process claims against defendant Lucia be granted. Summary judgment on these claims should also be granted with respect to defendants Thomas LaValley and Albert Prack, because their only involvement was to review plaintiff's appeals of the results of the disciplinary hearings that this court has found comported with due process.

## A. Legal Standards

**\*3** In order to begin a due process analysis, the court first determines whether plaintiff had a protected liberty interest in remaining free from the confinement that he challenges and then determines whether the defendants deprived plaintiff of that liberty interest without due process. *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir. 2001); *Bedoya v. Coughlin,* 91 F.3d 349, 351 (2d Cir. 1996). In *Sandin v. Conner,* the Supreme Court held that although state may still create liberty interests protected by due process, "these interests will be generally limited to freedom from restraint which, while not exceeding the sentence in such an unexpected manner as to give rise to protection by the Due Process Clause of its own force ..., nonetheless imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 483–84.

The Second Circuit has explicitly avoided a bright line rule that a certain period of confinement in a segregated housing unit automatically gives rise to due process protection. *See Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.

2000); *Colon v. Howard,* 215 F.3d 227, 234 (2d Cir. 2000). Instead, cases in this circuit have created guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed. *Palmer v. Richards,* 364 F.3d 60, 64–66 (2d Cir. 2004). A confinement longer than an intermediate one, and under "normal SHU conditions" is "a sufficient departure from the ordinary incidents of prison life to require procedural due process protections under *Sandin*." *Colon,* 215 F.3d at 231 (finding that a prisoner's liberty interest was infringed by 305–day confinement). Shorter confinements under normal SHU conditions may not implicate a prisoner's liberty interest.

The due process protections afforded inmates facing disciplinary hearings that affect a liberty interest include advance written notice of the charges, a fair and impartial hearing officer, a hearing that affords the inmate the opportunity to call witnesses and present documentary evidence, and a written statement of the evidence upon which the hearing officer relied in making his determination. *Sira v. Morton,* 380 F.3d 57, 69 (2d Cir. 2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. 539, 563–67 (1974)). The hearing officer's findings must be supported by "some reliable evidence." *Id.* (*citing, inter alia, Superintendent v. Hill,* 472 U.S. 445, 455 (1985)).

## B. Application

### 1. December 2012 Disciplinary Hearing

On November 24, 2012, plaintiff declined a correctional officer's request to submit a urine sample for analysis, and received a misbehavior report charging him with refusing a direct order in violation of DOCCS Rule 160.10, and with violating the rule governing urinalysis testing, DOCCS Rule 180.14. (Lucia Decl., Ex. A, Misbehavior Report dated November 24, 2012, Dkt. No. 30–8 at 4– 5). Defendant Lucia conducted a Tier III disciplinary hearing with respect to these charges on December 4, 2012 and December 10, 2012. (Lucia Decl., Ex. B, Hearing Transcript, Dkt. No. 30–9).

At the hearing, plaintiff denied that he had been provided employee assistance in preparation for the hearing, despite documentation that such assistance was provided. (Lucia Decl., Ex. A at 6–7; Lucia Decl., Ex. B at 2). Plaintiff pled not guilty to both charges, and testified that Correctional Officer ("CO") Burgess, who was not named as a

defendant, asked him "if he wanted to give urinalysis and I said no." (Lucia Decl., Ex. B at 4). Plaintiff insisted that he was not actually ordered to submit a urine sample, but was merely given the option to do so. (*Id.*).

CO Burgess testified at the hearing that he gave plaintiff a direct order to submit a urine sample and that plaintiff refused. (Lucia Decl., Ex. B at 7). This testimony was consistent with CO Burgess's misbehavior report, that described a direct order and quoted plaintiff as saying "I'm not going to do this." (Lucia Decl., Ex. A at 4). A second witness, Sergeant McLean, testified that he had requested that plaintiff's urine be tested upon review of a confidential tip. (Lucia Decl., Ex. B at 11). McLean did not hear the initial interaction between plaintiff and CO Burgess, but testified that he also asked plaintiff whether he would comply with the urinalysis request, and plaintiff responded that "he had never complied with one before, he wasn't gonna comply with this one." (Lucia Decl., Ex. B at 9).

**\*4** Prior to the hearing, plaintiff requested that Terrill Jewell, an inmate who was in the area when CO Burgess made the urinalysis request, be called to testify. (Lucia Decl., Ex. A, Assistant Form, at 8 & Ex. B at 4–5). Defendant Lucia asked plaintiff about the substance of the proposed testimony, but plaintiff said that he did not know because "I'm not psychic." (Lucia Decl., Ex. B at 4). Defendant Lucia concluded that the proposed inmate testimony was irrelevant and denied plaintiff's request. (*Id.* at 45). Despite this denial, Lucia investigated Jewell's potential testimony during an adjournment in the hearing, and found that the proposed witness was not in the cell when plaintiff was ordered to submit a urine sample. (*Id.* at 5). Defendant Lucia again concluded that Jewell's testimony would have no relevance to the issue of whether plaintiff refused an order to submit a urine sample, and advised plaintiff of the rationale for his decision. (*Id.*).

At the conclusion of the hearing, Lucia found plaintiff guilty of both charges and imposed a penalty of two months in SHU, and three months loss of recreation, packages, commissary, phone and visitation privileges. (Lucia Decl. ¶ 9; Ex. A at 1–2 & Ex. B at 14). Plaintiff submitted administrative appeals to defendant LaValley and defendant Fischer, which were denied. (Pl.'s Decl. ¶ 11–12, Dkt. No. 42–1). Plaintiff filed an Article 78 petition in New York State Supreme Court challenging the determination. (Compl. at 17). On September 11, 2013,

prior to a judicial determination on plaintiff's petition, DOCCS reversed the hearing decision and expunged it from plaintiff's record. (Compl. at 20; Pl.'s Decl., Ex. A, Administrative Reversal, Dkt. No. 42–2). The memo accompanying the DOCCS determination notes that "per conversation with the [New York State] attorney general's office, witness issue was not properly addressed." (*Id.*).

Plaintiff's two month SHU sentence falls within the "short range" of disciplinary confinement. *See Tafari v. McCarthy,* 714 F.Supp.2d 317, 375 (N.D.N.Y.2010) (finding 30, 60 and 90 day SHU sentences within the short range of disciplinary sentences). Therefore, plaintiff's confinement in SHU implicates a liberty interest only if "the conditions were more severe than the normal SHU conditions." [1] *Palmer,* 364 F.3d at 64. "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " *Id.* (quoting *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir. 1998)). The loss of visitation and related privileges, the only other deprivations identified by plaintiff, do not rise to the level of an "atypical and significant hardship," so as to create a liberty interest protected by procedural due process. *Borcsok v. Early,* 299 Fed. Appx. 76, 78 (2d Cir. 2008). Thus, because plaintiff had no liberty interest, no due process violation could flow from the facts set forth in his complaint.

In any event, even assuming that plaintiff had a liberty interest, a review of the record demonstrates that plaintiff received adequate due process, and that plaintiff's arguments to the contrary are meritless. Plaintiff's due process challenge to the December 2012 hearing centers on the allegation that he was "totally denied" his right to call witnesses when defendant Lucia refused to have inmate Jewell testify at the hearing. (Compl.¶ 3).

Although due process includes a right to call witnesses, this right is not unfettered. *Alicea v. Howell,* 387 F.Supp.2d 227, 234 (W.D.N.Y.2005) (citing *Ponte v. Real,* 471 U.S. 491, 495 (1985)). This right may be limited for security reasons, to keep a hearing within reasonable limits, or on the basis of irrelevance or lack of necessity. *Id.* (citing, *inter alia, Kingsley v. Bureau of Prisons,* 937 F.2d 26, 30 (2d Cir.1991) (a hearing officer does not violate due

process by excluding irrelevant or unnecessary testimony or evidence)). An inmate's due process right to witnesses is only violated when a prison hearing officer refuses to interview witnesses without assigning a reason "logically related to preventing undue hazards to 'institutional safety or correctional goals.' " *Ponte,* 471 U.S. at 497.

**\*5** At the December 2012 hearing, defendant Lucia questioned plaintiff about the purpose for Jewell's testimony, and plaintiff either did not know or refused to answer. (Lucia Decl., Ex. B at 4–5). It was not unreasonable for defendant Lucia to ask plaintiff to justify his request for a particular witness, and the hearing officer could have denied the request based upon plaintiff's refusal to explain the reason for calling the witness. However, the record shows that Lucia followed up and determined that Jewell was not in the cell at the time that plaintiff was ordered to produce a urine sample. (Lucia Decl., Ex. A, Witness Interview Notice, at 9). In light of these findings, Lucia made a written determination that Jewell's proposed testimony had "no relevance in regards to inmate Alexander's refusal to follow staff directions." (*Id.*). This exclusion of testimony deemed irrelevant or unnecessary does not violate due process. *Kawalinski v. Morse,* 201 F.3d 103, 109 (2d Cir. 1999) (citing *Kingsley v. Bureau of Prisons,* 937 F.2d at 30); *Chavis v. vonHagn,* No. 02–CV–119, 2009 WL 236060, at *62 (W.D.N.Y. Jan. 30, 2009).

### 2. February 2013 Disciplinary Hearing

On the morning of February 1, 2013, plaintiff received two misbehavior reports charging him with refusing a direct order or frisk in violation of DOCCS rule 106.10, refusing a search or frisk in violation of DOCCS Rule 115.10, creating a disturbance in violation of DOCCS Rule 104.13, and Interference with an Employee in violation of DOCCS Rule 107.10. (Lucia Decl., Ex. C, Misbehavior Report dated February 1, 2013, Dkt. No. 30–10 at 4). These charges stemmed from a verbal confrontation during a pat frisk and search outside plaintiff's SHU cell, during which plaintiff turned his head toward the correctional officers conducting the frisk, and the officers used force to bring plaintiff to the ground and restrain him. (*Id.*). Upon inspection of a list of names found in plaintiff's sock during the search, plaintiff was also charged with gang activity in violation of DOCCS Rule 105.13. (Lee Decl., Ex. B, Misbehavior Report dated February 1, 2013,

Dkt. No. 30–16 at 16). Defendant Lucia conducted a Tier III disciplinary hearing with respect to all charges on February 12, 2013. (Lucia Decl., Ex. D, Hearing Transcript, Dkt. No. 30–11). Plaintiff pled not guilty to all charges. (Lucia Decl., Ex. D at 3).

Lucia reviewed the evidence related to the gang charge first. K. Norcross, a counselor at Clinton, generally described his experience and training in monitoring gang activity at DOCCS facilities, and testified that he reviewed the paper found in plaintiff's sock. (Lucia Decl., Ex. D at 10–16). According to Norcross, the two-sided sheet taken from plaintiff contained a list of names and nicknames, with various descriptors including "Gangsters," "Black Diamonds," and "Black Roses." (Lucia Decl., Ex. C at 9–10). After comparing the list with a DOCCS database of gang affiliations, Norcross concluded that the sheet included names and aliases of Blood gang members, broken down by various sects. (Lucia Dec, Ex. C at 11 & Ex. D at 1011). Norcross testified that plaintiff was affiliated with the Bloods, and had previous gang-related disciplinary violations in his record. (Lucia Decl., Ex. D at 11).

Sergeant Orzech, CO Lee and CO Christon separately testified about the search that resulted in discovery of the contraband list, including the officers' orders to the plaintiff, plaintiff's behavior during the search, and the use of force. (Lucia Decl., Ex. D at 19–24, 30–31). CO Christon testified that during the standard pat and frisk, a piece of paper was found in plaintiff's left sock. (Id. at 19–20). Sergeant Orzech testified that plaintiff put his left foot on the ground and engaged in a verbal confrontation with the officers while his sock was being removed. (Id. at 21). Officer Lee, who wrote the first misbehavior report regarding the incident, testified that plaintiff was given several direct orders to face the wall, to stop pushing off from the wall with his hands, and to stop turning his head toward the officers. (Id. at 30). Lee admitted that the specifics of the orders were not included in his misbehavior report. (Id.).

 **\*6** Following this testimony, Defendant Lucia reviewed the surveillance video of the February 1, 2013 incident several times with plaintiff. [2] (Lucia Decl., Ex. D at 31-39). Plaintiff offered his description of the events in the video, and disputed the testimony of each witness regarding the incident. (Id.) Plaintiff argued that there was no proof that he had engaged in any gang activity, or that he had failed

to comply with any orders while the frisk was taking place. (Id. at 39–41).

At the conclusion of the hearing, Lucia found plaintiff guilty of gang activity, creating a disturbance, and interference with an employee. (Lucia Decl., Ex. D, at 41). He found plaintiff not guilty of two charges: refusing a search or frisk, and refusing a direct order. (Id.). Lucia stated that he based his determination on the testimony of Sergeant Orzech, CO Lee, CO Christon, K. Norcross and plaintiff, as well as the video evidence. He imposed a penalty of six months in SHU with loss of recreation, packages, commissary and phone privileges. (Id.) Plaintiff submitted an administrative appeal. On April 29, 2013, DOCCS modified the determination, finding that the misbehavior report did not substantiate the charges of Interfering with an Employee and Creating a Disturbance. (Pl. Decl., Ex. B, Prack Memo, Dkt. No. 42–2 at 7). The modification did not address the gang charge or alter plaintiff's sentence.

Since the disciplinary hearing resulted in a six month sentence to SHU, plaintiff is considered to have a liberty interest subject to due process protection. *Sandin, 515 U.S. at 484.* Beyond plaintiff's common refrain of a retaliatory motive on the part of defendant Lucia (addressed in Section V, *infra* ), he argues that defendant Lucia's February 2013 determination violated his right to due process because it was inconsistent with the video evidence. Plaintiff also argues that the invalidity of Lucia's decision is demonstrated by the fact that it was modified upon administrative appeal. Neither of these arguments supports a due process claim.

Plaintiff's argument that defendant Lucia violated due process by misinterpreting the video evidence does not raise a valid constitutional question. The constitutional standard for sufficiency of evidence in a prison disciplinary hearing is whether there is "some" or "a modicum" of evidence to support the hearing officer's determination. *Sira v. Morton,* 380 F.3d 57, 76 (2d Cir. 2004) (citing *Superintendent v. Hill,* 472 U.S.445, 454 (1985)). In this case, defendant Lucia heard testimony from a DOCCS employee with experience in monitoring gang affiliations, who concluded that the list found in plaintiff's socks contained the names, aliases, and sect of various members of the Blood gang. He also heard testimony from three correctional officers who were directly involved in the incident. In addition to examining

the list found in plaintiff's sock that included several references to "Gangsters," defendant Lucia also reviewed surveillance video and allowed plaintiff an opportunity to explain his version of the events depicted therein. (Lucia Decl., Ex. D at 31–39). As the hearing officer, defendant Lucia was authorized to make an independent assessment of the evidence, including witness testimony. *See Lewis v. Johnson,* No. 9:08–CV–482 (TJM/ATB), 2010 WL 3785771, at *11 n.25 (N.D.N.Y. Aug. 5, 2010) (Baxter, M.J.) ("the Second Circuit has required that a hearing examiner make an independent assessment of the credibility of certain sources of evidence at a prison disciplinary hearing"), *Rep.-Rec. adopted,* 2010 WL 3762016, at *1 (N.D.N.Y. Sept. 20, 2010) (McAvoy, J.). By doing so, Lucia's determination at the February 2013 hearing was supported by "some" evidence, and therefore satisfied due process.

**\*7** The subsequent modification of defendant Lucia's determination during the administrative appeals process or in anticipation of state court litigation does not impact the due process analysis. The outcome of an administrative appeal or a state court proceeding does not, by itself, resolve the question of whether a constitutional violation occurred. *Walker v. Bates,* 23 F.3d 652, 657 (2d Cir. 1994); *Bunting v. Nagy,* 452 F.Supp.2d 447, 453–54 (S.D.N.Y.2006); *Bogle v. Murphy,* No. 98–CV–6473, 2003 WL 22384792, at *5–6 (W.D.N.Y. Sept. 9, 2003); *see also Young v. County of Fulton,* 160 F.3d 899, 902 (2d Cir. 1998); *Madera v. Goord,* 103 F.Supp.3d 536, 541 (N.D.N.Y.2000) (violation of state regulations, by itself, does not give rise to a constitutional claim). The New York state law standard for sufficiency of evidence is whether the hearing officer's determination is supported by "substantial evidence." *Foster v. Coughlin,* 76 N.Y.2d 964 (1990). This stricter standard is not applicable to federal due process claims. *See Sira v. Morton,* 380 F.3d 57, 76 n.9 (2d Cir. 2004).

### 3. August—September 2013 Disciplinary Hearing

On August 20, 2013, plaintiff received a misbehavior report from CO LaFountain. (Lucia Decl., Ex. F, Misbehavior Report dated August 20, 2013, Dkt. No. 30–13 at 4). In the report, LaFountain stated that he was conducting rounds when plaintiff asked him a question regarding a package. When plaintiff disagreed with LaFountain's response, plaintiff "became verbally

aggressive and started making threats toward staff, specifically DSS Brown." (*Id.*) Plaintiff was charged with creating a disturbance in violation of DOCCS Rule 104.13, Interference with an Employee in violation of Rule 107.10, Harassment in violation of DOCCS Rule 107.11, and Threats in violation of DOCCS Rule 102.10. (*Id.*)

Defendant Lucia held a disciplinary hearing on September 3, 2013. [3] After consideration of the evidence, including audio and video of the incident, Lucia found plaintiff guilty of all charges and placed plaintiff on a restricted diet [4] for seven days, beginning on September 5, 2013. (Lucia Decl., Ex. F, Dkt. No. 30–13 at 1). Lucia wrote that the purpose for this penalty was "[t]o impress upon this inmate that this type of behavior will not be tolerated. Previous dispositions have failed to dissuade this inmate from similar conduct. Inmate SHU/KL confinement exceeds his maximum release date." (Lucia Decl., Ex. F at 2). The disposition also noted that facility medical staff had cleared plaintiff for a restricted diet. (*Id.*)

Plaintiff's due process claim with regard to this hearing fails because the resulting sentence, a seven day restricted diet, did not create an atypical and significant hardship sufficient to implicate due process rights. *See Adams v. Rock,* No. 9:12–CV–1400 (GLS/ATB), 2015 WL 1312738, at *5–6, (N.D.N.Y., Dec. 9, 2014); *see also Smith v. Burge,* 2006 WL 2805242, at *1, 12–14 & n.88 (dismissing substantive and procedural due process claims relating to a pre-hearing imposition of a restricted diet for seven days) (*citing, inter alia, McEachin v. McGuinnis,* 357 F.3d at 199, 200, 201).

Even if a liberty interest were involved, summary judgment for defendants would still be appropriate. Plaintiff's only due process claims related to the August–September 2013 hearing are that imposition of a restricted diet was an inappropriate penalty under DOCCS policy, and that defendant Lucia did not allow plaintiff to call three eyewitnesses at the hearing.

**\*8** Defendants have not countered plaintiff's allegation that his placement on a restricted diet violated DOCCS' regulations, but a violation of state regulation or policy, by itself, does not give rise to liability under § 1983. *Young,* 160 F.3d at 902; *Madera,* 103 F.Supp.3d at 541. Likewise, where the hearing officer found that audio and videotape of the incident "clearly indicated" that the violations occurred, his decision not to call alleged

inmate eyewitnesses who were in the general area at the time would not amount to a constitutional violation. *See, e.g., Kawalinski v. Morse,* 201 F.3d at 109 (exclusion of testimony deemed unnecessary does not violate due process).

Plaintiff alleges that the entire August–September 2013 disciplinary hearing was prompted by a false misbehavior report from defendant LaFountain. This conclusory allegation does not alter the analysis above. A prison inmate has no constitutionally guaranteed immunity from being falsely or wrongly accused of conduct which may result in the deprivation of a protected liberty interest, as long as the prisoner is provided with procedural due process. [5] *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir. 1986).

**IV. Eighth Amendment Claims**

**A. Legal Standards**

**1. Conditions of Confinement**

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Estelle v. Gamble,* 429 U.S. 97, 104 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir. 2000). The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir. 1994). To establish an Eighth Amendment claim based on unsafe or medically inappropriate living conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer,* 511 U.S. at 834.

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir. 1994). Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a constitutional violation. *Hathaway,* 37 F.3d at 66 (quoting *Wilson v. Seiter,* 501 U.S. at 298). "Because society does not

expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim." *Blyden v. Mancusi,* 186 F.3d 252, 263 (2d Cir. 1999) (citing *Hudson v. McMillan,* 503 U.S. 1, 9 (1992)) (only those deprivations denying "the minimal civilized measures of life's necessities" are sufficiently serious to form the basis of an Eighth Amendment violation) (internal quotations and citations omitted).

The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin v. Goord,* 467 F.3d 263, 280 (2d Cir. 2006) (citing *Wilson v. Seiter,* 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer,* 511 U.S. at 835. In order for a prison official to act with deliberate indifference, he must know of and disregard an excessive risk to an inmate's health or safety. *Hathaway,* 37 F.3d at 66. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id.*

**2. Excessive Force**

**\*9** Inmates enjoy Eighth Amendment protection against the use of excessive force, and may recover damages under 42 U.S.C. § 1983 for a violation of those rights. *Hudson v. McMillian,* 503 U.S. 1, 9–10 (1992). To sustain a claim of excessive force, a plaintiff must still establish the objective and subjective elements of an Eighth Amendment claim. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir. 1999).

In order to satisfy the objective element of the constitutional standard for excessive force, a defendant's conduct must be " 'inconsistent with the contemporary standards of decency.' " *Whitley v. Albers,* 475 U.S. 312, 327 (1986) (citation omitted); *Hudson,* 503 U.S. at 9. The malicious use of force to cause harm constitutes a per se Eighth Amendment violation, regardless of the seriousness of the injuries. *Blyden,* 186 F.3d at 263 (citing *Hudson,* 503 U.S. at 9). "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or

shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7). In determining whether defendants acted in a malicious or wanton manner, the Second Circuit has identified five factors to consider: the extent of the injury and the mental state of the defendant; the need for the application of force; the correlation between that need and the amount of force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response. ' *Scott v. Coughlin,* 344 F.3d 282, 291 (2d Cir. 2003).

### B. Application

#### 1. Conditions of Confinement—Denial of Food

While plaintiff objects to his placement on a restricted diet in September 2013 as a violation of due process and DOCCS policy, that penalty does not raise an Eighth Amendment issue under the circumstances, where the diet was approved by medical staff. Courts in this circuit routinely have dismissed Eighth Amendment claims based on dietary restrictions imposed for disciplinary reasons, finding that the inmates failed to establish sufficiently "serious" deprivations. *See, e.g., McEachin v. McGuinnis,* 357 F.3d 197, 199–200 (2d Cir. 2004) (affirming district court's dismissal of Eighth Amendment claim alleging, *inter alia,* that inmate was placed on a restricted diet consisting of "loaf" for seven days pending a disciplinary hearing); *Smith v. Burge,* No. 9:03–CV–955 (LEK/GHL), 2006 WL 2805242, at *1, 11 & n.78 (N.D.N.Y. Sept. 28, 2006) ("[a]t most, Plaintiff was deprived of food that tasted good for a period of seven days") (collecting cases); *Willey v. Kirkpatrick,* No. 07–CV–6484, 2013 WL 434188, at *10 (W.D.N.Y. Feb. 4, 2013).

**\*10** Here, however, plaintiff alleges a far more onerous punishment. Plaintiff claims that while he was formally sentenced to a seven day restricted diet, defendant

LaFountain and other unnamed correctional officers denied him all meals of any kind for seven days, at the direction of defendant Lucia and with the knowledge and approval of defendants LaValley and Brown. [6] Plaintiff further alleges that defendant Lucia ordered sandbags to be placed in front of his cell door to prevent him from "fishing" for food shared by other inmates. [7] "Under certain circumstances a substantial deprivation of food may well be recognized as being of constitutional dimension." *Robles v. Coughlin,* 725 F.2d 12, 15–16 (2d Cir. 1983) (citations omitted); *Moss v. Ward,* 450 F.Supp. 591, 596–97 (W.D.N.Y.1978) (disciplinary penalty that denied inmate all food for four days violated the Eighth Amendment). Defendants counter that if plaintiff did not eat for the seven days that he was on a restricted diet, it was because he did not like the food offered and declared a hunger strike. (Lucia Decl. ¶ 25; Ryan Decl., Dkt. No. 30–22, ¶¶ 8–9). Regardless of plaintiff's motivation, this court recommends that summary judgment be granted for defendants because plaintiff "has failed to come forward with anything of evidentiary value establishing that he was in fact deprived of food, not by his own actions but rather those of prison officials." *Cruz v. Church,* No. 9:05–CV–1067 (GTS/DEP), 2008 WL 4891165, at *12 (N.D.N.Y. Nov. 10, 2008)

As a general rule, at the summary judgment stage, courts must not weigh evidence or assess the credibility of witnesses. *Scott v. Coughlin,* 344 F.3d 282, 29091 (2d Cir. 2003). However, in the "rare circumstances where plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether the jury could reasonably find for plaintiff, and thus whether there are any genuine issues of material fact, without making some assessment of the plaintiff's account." *Jeffreys,* 426 F.3d at 554; *see also Barr v. Abrams,* 810 F.2d 358, 363 (2d Cir. 1987) (conclusory allegations are insufficient to state a claim for relief under section 1983); *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir. 1983) ("mere conclusory allegations or denials are insufficient to withstand a motion for summary judgment once the moving party has set forth a documentary case").

In this case, it is not simply plaintiff's word against the officers'. Defendants have produced the SHU logs that document that plaintiff was provided the "loaf" between September 5, 2013 and September 11, 2013 and refused it. (Beudette Decl., Dkt. No. 30–21, Ex. A.). On September

5, the first day of the restricted diet, the log shows that plaintiff refused his meals at 7:20 a.m., 11:25 a.m. and 4:00 p.m. (Beudette Decl., Ex. A at 5). On September 6, 2013, the log shows plaintiff refusing his meals at 11:17 a.m and 4:00 p.m. (*Id.* at 8–9). On September 7, 2015, the SHU log shows plaintiff refusing his meals at 7:35 a.m., 11:25 a.m., and 4 p.m (*Id.* at 10–12). The 4 p.m. entry on September 7 notes that this was the ninth consecutive meal that plaintiff had refused, and that supervisors had been notified. (*Id.* at 12).

**\*11** On September 8, 2013, the SHU logs shows that plaintiff refused his meal at 7:30 a.m and 4:50 p.m., and also refused to have medical staff take his vital signs and weight that morning. (*Id.* at 13). On September 9, 2013, the SHU logs document plaintiff refusing meals at 7:32 a.m., 10:55 a.m., and 4:47 p.m. (*Id.* at 16). The September 10, 2013 SHU logs show plaintiff refusing meals at 7:13 a.m., 10:50 a.m., and 4 p.m. (*Id.* at 20–21, 23). The September 11, 2013 SHU log, only a portion of which was provided, shows that plaintiff refused his meal at 7:50 a.m. (*Id.* at 24). SHU logs from September 12 –14, when plaintiff was off the restricted diet, do not mention any refusal by plaintiff. (Id. at 25–31).

SHU logs, that "would not likely reflect the wrongful denial of meals to an inmate by a corrections officer," do not, standing alone, establish as a matter of law that plaintiff was provided food. *Moncrieffe v. Witbeck,* No. 97–CV–952, 2000 WL 949457, at \*6 (N.D.N.Y. June 29, 2000). However, defendants have also provided medical records that demonstrate that the facility was regularly monitoring plaintiff's physical and mental condition, ensuring that he was drinking fluids, and making sure that he was compliant with his medication. (Ryan Decl., Ex. A., Dkt. No. 30–23). Plaintiff regularly refused the medical treatment offered, including taking his weight and vital signs. (*Id.* at 1–2, 4). Defendants have also submitted a declaration by Kathleen Ryan, a registered nurse who examined plaintiff on September 7, 2015, when plaintiff was allegedly being denied food. According to Ryan, plaintiff informed her that he was refusing to eat due to an alleged "inability to eat the 'loaf' ", and she noted these remarks in her status report. (Ryan Decl. ¶ 5, Ex. A at 1). Plaintiff's medical records also reference a hunger strike. (Ryan Decl. Ex. A at 2, 4–5). Medical records that contradict plaintiff's allegations may be relied on for summary judgment. *See Brown v. White,* 9:08– CV–200, 2010 WL 985184, at \*8 (N.D.N.Y. Mar. 15, 2010) (plaintiff's conclusory suggestion that defendant nurse completely refused to provide any medical attention on a particular date is insufficient to create a dispute of fact in the face of the sworn declaration and supporting documentary evidence in the record); *Benitez v. Pecenco,* 92 Civ. 7670, 1995 WL 444352 at n.5, (S.D.N.Y. July 27, 1995) (conclusory claim that plaintiff was never issued medication was directly contradicted by medical records and was insufficient to create a factual dispute on that issue).

Defendants also point to plaintiff's deposition in this litigation, during which he testified that he had previously refused several meals while on the restricted diet in April 2013. (McCartin Decl., Ex. A at 72, 75–6). Plaintiff testified during the deposition that he did not like to eat the "loaf," which typically contained carrots, because "I am allergic to them. I won't eat them. It makes me throw up."[8] (*Id.*). Defendants also provided test results showing that medical staff had tested plaintiff for food allergies prior to his placement on the restricted diet and found none. (Lucia Decl., Ex. F at 5). Because plaintiff has not provided any evidence to support his claim that he was deprived food for seven days, and defendants have offered several sources of documentary evidence that plaintiff was provided nutritionally sufficient, if unappetizing, food during the same time period, summary judgment should be granted for defendants Lucia, LaValley, Brown and LaFountain on this Eighth Amendment claim.

**\*12** Plaintiff's claim that defendant Lucia ordered sandbags placed in front of his cell to prevent him from fishing for food from other inmates does not change this analysis.[9] Plaintiff conceded at his deposition that the surreptitious exchange of food between inmates was a violation of DOCCS rules. (McCartin Decl. Ex. A at 87–90). Therefore, the installation of the sandbags served a legitimate penological purpose. Aside from preventing the exchange of food among inmates, plaintiff does not allege that the sandbags interfered with air circulation or created any other condition different from the standard SHU cell. Therefore, there is no credible Eighth Amendment argument to be made. *See Demaio v. Mann,* 877 F.Supp. 89, 93 (N.D.N.Y.1995) (installation of plexiglass shield around cell door to prevent spitting or throwing food at staff did not violate Eighth Amendment); *Ruffin v. Taylor,* 166 F.Supp.2d 999, 1007–08 (D.Dela.2001) (temporary installation of chain and padlock on cell door to prevent

inmate from tampering with lock did not give rise to constitutional claim).

### 2. Excessive Force

Plaintiff's complaint states that on February 1, 2013, he was removed from his SHU cell by several officers, was handcuffed behind his back [10], and told to face the wall. (Compl.¶ 24). Plaintiff further claims that defendant Lee grabbed plaintiff from behind, with one hand on his neck and the other holding the handcuffs, and slammed plaintiff to the floor. (Compl.¶ 25). Plaintiff claims that the right side of his face was slammed into the floor, causing the inside of his mouth to bleed and one of his upper right tooth to become loose. (Compl.¶ 26). As described by plaintiff, defendant Lee then used his knee to kick plaintiff's lower back while plaintiff was on the floor. (Compl.¶ 26). Defendant Lee and other correctional officers then placed plaintiff in leg chains and escorted him to the holding pen. (Compl.¶ 28).

During his deposition, plaintiff testified that he did not receive any direct orders when he was removed from the cell, and "All I did was I turned my head to the sergeant, and turned back around.... I was facing the wall. I didn't move or anything, and I was thrown to the floor." (McCartin Decl., Ex. A at 32). Plaintiff testified that after his face struck the floor, defendant Lee kneed him twice in the mid-back and held his head down while the other officers applied leg shackles. (Id. at 33). Plaintiff testified that he attempted to bring his face up from the floor, and defendant Lee pushed it back down. (Id. at 36). He denied that defendant Lee or any other correctional officer told him to stay still on the ground and not to try and lift his face off the floor. (Id.). Plaintiff testified that the incident took "maybe two or three minutes." (Id. at 35). Plaintiff testified that he suffered back pain that radiated to his right knee since the incident, and that one of his upper right teeth was loose and caused some pain when he chewed. (Id. at 37). He had seen a dentist since the incident but did not receive or request any treatment for the damaged tooth. (Id. at 37–38).

Defendant Lee submitted a memo dated February 1, 2013, describing his use of force against plaintiff. (Lee Decl., Ex. A, Memo, Dkt. No. 30–15). Lee stated that during a pat-frisk at approximately 9:30 a.m. on February 1, 2013, he took control of plaintiff's waist chain with his

left hand. (Id.). As described by Lee, plaintiff became agitated, attempted to turn his head toward staff, and did not comply with several direct orders to face the wall. Defendant Lee said that he placed his right hand on the back of plaintiff's head in an attempt to gain compliance, and plaintiff began pushing off the wall. Defendant Lee stated that "while maintaining control of [plaintiff's] waistchain with my left hand a body hold of his right shoulder with my right hand, I forced Inmate Alexander to the floor. Leg restraints were applied by other staff." (Id.). Defendant LaFountain and C.O. McMillian, who were involved in the pat-frisk, [11] submitted contemporaneous reports matching defendant Lee's description. (Lee Decl., Ex. B, Use of Force Reports, Dkt. No. 30–16, at 5, 9–12).

**\*13** Defendant Lee also submitted a declaration in support of summary judgment, expanding on the description contained in his original report. (Lee Decl., Dkt. No. 3014). Lee stated that he came over to assist fellow officers who were frisking plaintiff and removing his socks to look for contraband. (Lee Decl. ¶ 9). Lee testified that at the time that he arrived, plaintiff was not complying with the frisk. (Id. at ¶ 11). After plaintiff refused several orders to face the wall and began pushing himself away from the wall, defendant Lee told plaintiff that if he kept pushing himself off the wall, defendant Lee would take him to the ground. (Id.). When plaintiff again pushed himself off the wall, according to Lee, "I used force to swiftly place plaintiff on the floor." (Id. at ¶ 12).

Defendants have submitted a surveillance video of the incident that supports defendant Lee's version of events. [12] (Lucia Decl., Ex. E, Dkt No. 30–12). The video is approximately six minutes long and documents the removal of plaintiff from his cell, the pat-frisk, the arrival of defendant Lee, the use of force, and the movement of plaintiff to a holding cell. (Id.) The video depicts two correctional officers approaching plaintiff's cell and handcuffing him in the front through a slot in the door. (Id. at 0:13). Plaintiff was then removed from the cell and stood with his arms extended in front of him, against the wall. (Id. at 0:23). After an initial pat-down, a third officer arrived to assist. (Id. at 0:43). Plaintiff was directed to press up against the wall and one officer had him lift each foot in order to check his foot, sock, and pant leg. (Id. at 0:52). When plaintiff began to lower his left foot, he was ordered to pick his foot back up. (Id. at 1:07). Plaintiff turned his head to the officers, and was directed to face the wall. (Id. at 1:11). After plaintiff's left sock

was inspected, one officer remarked, "He's got something in there." (*Id.* at 1:20). Several officers ordered plaintiff against the wall, and pushed his him closer to the wall. (*Id.* at 1:25). When plaintiff began to push himself further away from the wall, an officer instructed him, "Don't push back," and asked plaintiff several times if he could hear him. (*Id.* at 1:32). At this time, defendant Lee arrived. [13] (*Id.* at 1:36). The officers advised plaintiff that they were going to take his sock off to inspect what was hidden inside it. (*Id.* at 1:49). Several officers, including defendant Lee, then pressed plaintiff against the wall. (*Id.* at 2:03). One officer warned plaintiff "That we can do this the easy way or we are going to have to put you on the ground to do it." (*Id.* at 2:17). Defendant Lee, who had his left hand on plaintiff's neck, told plaintiff that he did not have to turn his head toward the officers, and to face the wall. (*Id.* at 2:24). Another officer advised plaintiff "don't play games," and plaintiff's verbal response is inaudible on the video. (*Id.* at 2:48). An officer removed plaintiff's left sock and took a folded sheet of paper from the sock. (*Id.* at 3:04). Plaintiff turned his head to the left, and an officer advised him again to face the wall. (*Id.* at 3:28). An officer put plaintiff's left sock back on his foot, and plaintiff turned his head to the right. (*Id.* at 3:50). Several officers repeated the order to face the wall. (*Id.* at 4:00). Defendant Lee said that plaintiff was pushing against him. (*Id.* at 4:05). Plaintiff's verbal response is inaudible on the video. (*Id.* at 4:06). Defendant Lee told plaintiff that this was his last chance or he was going on the floor. (*Id.* at 4:12). Defendant Lee told plaintiff twice more to stop pushing backwards, and then pulled plaintiff down to the floor face first. (*Id.* at 4:17). Once on the floor, defendant Lee told plaintiff, "That's enough" and to stop resisting. (*Id.* at 4:24). While the officers were putting plaintiff's slippers or shoes back on, defendant Lee told plaintiff to stop trying to get up. (*Id.* at 4:45). On the video, defendant Lee's left hand and left knee appear to be pressed against plaintiff's back while the other officers shackled plaintiff's legs. (*Id.* at 4:50–5:35). When the leg shackles were in place, the other officers lifted plaintiff to his feet and escorted him down the hallway. (*Id.* at 5:42). The video shows that the period between plaintiff being taken to the ground to being escorted away took approximately one and a half minutes.

**\*14** The video corroborates defendant Lee's statement that plaintiff was directed several times to face the wall, and turned several times toward the officers. Defendant Lee also ordered plaintiff several times to stop pushing

off the wall. When plaintiff was pulled facedown to the floor, defendant Lee had a knee on his back but did not appear to use his knee to kick plaintiff twice, as alleged in the complaint. Once the leg shackles were applied, plaintiff was lifted to his feet and escorted down the hallway without further incident.

Plaintiff has not submitted any evidence to counter defendants' video or to show that he suffered more than a *de minimis* injury from the use of force. Although the lack of injury is not fatal to an excessive force claim, the extent and nature of an injury, if any, " 'is probative of the amount and type of force actually used ... and that in turn is likely to reflect on the reasonableness of that force[.]' " *Cunningham v. McCluskey,* No. 05 Civ. 10169, 2011 WL 2791336, at \*7 (S.D.N.Y. June 22, 2011) (quoting *Yang Feng Zhao v. City of New York,* 656 F.Supp.2d 375, 390 (S.D.N.Y.2009); *Washington v. Parr,* 561 F.Supp.2d 394, 407 (S.D.N.Y.2008) (finding de minimus injury to be probative of de minumus force)), *Rep.-Rec. adopted,* 2011 WL 3478312 (S.D.N.Y. Aug. 8, 2011).

In his complaint, plaintiff alleges that he suffered a cut to his mouth and a loose tooth. (Compl.¶ 26). During his deposition, plaintiff stated that one of his teeth on the right side was "a little loose" and when "I chew on it, it kind of bothers me." (McCartin Decl., Ex. A at 37). He also reported that he has required medication for back pain since the incident. (*Id.* at 39–4). Defendants have filed the declaration of Susan Devlin–Varin, a registered nurse, who examined plaintiff shortly after the use of force and concluded that plaintiff had no observable injuries. (Devlin–Varin Decl., Ex. A & B, Dkt. Nos. 30–25, 30–26). Photographs taken of plaintiff immediately after the use of force do not show any obvious cuts, bruises or other injuries on his body. (LaBonte Decl., Exs. A & B, Dkt. Nos. 30–18, 30–19). In her declaration, Devlin–Varin noted that plaintiff did not have any blood on his face or in and around his mouth during her evaluation. (Devlin–Varin Decl., Dkt. No. 30–24 at ¶ 5). During the examination, plaintiff initially reported that he did not have any injuries. (Devlin–Varin Decl. ¶ 4). Devlin–Varin concluded that plaintiff's subsequent statement during the examination, that his back, neck, and shoulder hurt, seemed sarcastic. (*Id.*).

Based on the video evidence, no reasonable finder of fact would credit plaintiff's claim that he was following all of the officers' orders when he was suddenly

slammed to the floor and repeatedly kneed in the back. Likewise, plaintiff's claim that he suffered significant mouth and back injuries is inconsistent with plaintiff's own description of his injuries, contemporaneous photographs, and the assessment of nurse Devlin–Varin. While there is no dispute that defendant Lee used force against plaintiff, this court concludes that it amounted to a *de minimis* and reasonable use of force. This finding is consistent with that of other courts applying *Hudson. See Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir. 1997) (holding an inmate's claims that he was "bumped, grabbed, elbowed, and pushed" by prison officials insufficient to state Eighth Amendment claim); *Bermudez v. Waugh,* No. 09:11–CV–947 (MAD/DEP), 2013 WL 654401 at *5 (finding that tackling of inmate that caused minor bruising constituted *de minimis* force); *James v. Phillips,* No. 05 Civ. 1539, 2008 WL 1700125 at *4-*5 (S.D.N.Y.2008) (finding de minimis use of force when prison guard shoved inmate into cell door, causing swelling of the inmate's chin). Therefore, this court recommends that defendant Lee be granted summary judgment on the excessive force claim.

## V. Retaliation

### A. Applicable Law

**\*15** In order to establish a claim of retaliation for the exercise of a First Amendment right, plaintiff must show that he engaged in constitutionally protected speech or conduct, and that the protected activity was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir. 2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir. 2002)); *see also Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir. 1997). The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (citation omitted). This objective test applies whether or not the plaintiff was himself subjectively deterred from exercising his rights. *Id.* Participation in the grievance process by an inmate is clearly protected conduct in the context of a retaliation claim. *Roseboro v. Gillespie,* 791 F.Supp.2d 353, 367 & n. 21 (S.D.N.Y.2011) (collecting cases).

To establish retaliation, the plaintiff must also demonstrate a causal connection between the protected speech or conduct and the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir. 2004). Although a " 'plaintiff can establish a causal connection that suggests retaliation by showing that protected activity was close in time to the adverse action [,]" "[s]uch circumstantial evidence of retaliation, ... without more, is insufficient to survive summary judgment." *Roseboro v. Gillespie,* 791 F.Supp.2d at 370 (citations omitted).

Even if plaintiff makes the appropriate showing of retaliation, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* at 371. "Regardless of the presence of retaliatory motive, ... a defendant may be entitled to summary judgment if he can show ... that even without the improper motivation the alleged retaliatory action would have occurred." *Scott v. Coughlin,* 344 F.3d 282, 287–88 (2d Cir. 2003) (citing *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977)).

The court must keep in mind that claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." Accordingly, plaintiff must set forth non-conclusory allegations to sustain a retaliation claim. *Bennett,* 343 F.3d at 137. Even where a complaint or affidavit contains specific assertions, the allegations "may still be deemed conclusory if [they are] (1) 'largely unsubstantiated by any other direct evidence' and (2) 'so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint.' " *Smith v. Woods,* 9:03–CV–480 (DNH/GHL), 2006 WL 1133247, at *3 & n.11 (N.D.N.Y. Apr. 24, 2006) (quoting *Jeffreys v. City of New York,* 426 F.3d 549, 554–55 (2d Cir. 2005)). To be sufficient to create a "factual issue," in the context of a summary judgment motion, an allegation in an affidavit or verified complaint "must, among other things, be based 'on personal knowledge.' " *Id.,* 2006 WL 1133247, at *3 & n.7 (collecting cases); Fed.R.Civ.P. 56(c)(4).

### B. Application

Plaintiff claims that defendant Lucia, who was the hearing officer for all three of the disciplinary hearings at issue in this case, made his determinations based on bias or animus toward plaintiff. (Compl.¶¶ 9, 42, 47–49). Plaintiff also alleges that defendant Lucia threatened physical violence at the close of the December 2012 hearing,

"telling plaintiff that he is going to have his officers jump and beat up the plaintiff if the plaintiff keep on complaining about defendant D. Lucia wrongdoing against that plaintiff." (Compl.¶ 7). Plaintiff further alleges that many of the unconstitutional actions alleged in his complaint, including the excessive use of force, the denial of food, and the false misbehavior report, were retaliatory actions taken by other Clinton employees at the direction of defendant Lucia. (Compl.¶¶ 23, 27, 52, 63). During his deposition, plaintiff also alleged that defendant Brown had ordered retaliation against plaintiff for filing grievances against DOCCS staff.[14] (McCartin Dec, Ex. A at 78–79, 90).

**\*16** All of plaintiff's retaliation claims are based upon his own conclusory allegations, and are not supported by the record. He offers no support for a retaliatory motive on the part of defendant Lucia, suggesting at various points that Lucia was upset that plaintiff objected at the hearings and successfully appealed some or all of the determinations (Compl.¶¶ 4–7), that the hearing officer wanted to prevent plaintiff from receiving visitors at Christmas (Compl.¶ 9), and that Lucia was angry about an unsuccessful grievance that plaintiff had filed against him. (McCartin Decl., Ex. A at 113). Even if the court accepts that plaintiff's complaints and objections to conditions at the facility, including defendant Lucia's handling of the disciplinary hearings, were protected exercises of the First Amendment,[15] plaintiff fails to show that there was a causal nexus between such exercise and the alleged retaliatory actions.

Plaintiff's own subjective belief that defendant Lucia was biased is insufficient to create a genuine issue of material fact. *Francis v. Coughlin,* 891 F.2d 43, 47 (2d Cir. 1989); *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437–38 (W.D.N.Y.2010). It is well settled that "prison disciplinary officers are not held to the same standard of neutrality as adjudicators in other contexts." *Allen v. Cuomo,* 100 F.3d at 259. "The degree of impartiality required of prison officials does not rise to the level of that required of judges generally." *Id.* The record evidence, as described above, supports the conclusion that plaintiff's due process rights were satisfied in the three disciplinary hearings described in the complaint, and that each of the guilty verdicts was supported by some evidence, including witness testimony and video or audio recordings.

Plaintiff claims that other retaliatory actions, including the use of force by defendant Lee, the issuance of a false misbehavior report by defendant LaFountain, and deprivation of food by LaFountain and other unnamed Clinton correctional officers and employees, were all carried out at the direction of defendant Lucia. He also alleges that defendant Brown participated in or encouraged these retaliatory actions in response to grievances that plaintiff filed against various DOCCS employees. Without more, courts have regularly dismissed claims that a defendant has retaliated for complaints against a third party. *See, e.g., Hare v. Hayden,* 09 Civ. 3135, 2011 WL 1453789, at \*4 (S.D.N.Y. Apr. 14, 2011) ("As a general matter, it is difficult to establish one defendant's retaliation for complaints against another defendant.") (citing *Wright v. Goord,* 554 F.3d 255, 274 (2d Cir. 2009) (dismissing retaliation claim against a corrections officer when only alleged basis for retaliation was complaint about an incident involving another corrections officer)); *Roseboro v. Gillespie,* 791 F.Supp.2d at 369 (plaintiff has failed to provide any basis to believe that a corrections counselor would retaliate for a grievance that she was not personally named in).

The only evidence that plaintiff offers to support his retaliation theory is an allegedly overhead conversation between correctional officers during which defendant Lee "gloated" about how defendant Lucia instructed him to assault plaintiff. (McCartin Decl., Ex. A at 116). These unsupported allegations, particularly in light of the use of force video that contradicts plaintiff's Eighth Amendment claims and the disciplinary hearing records that show that there was at least "some evidence" to support the disciplinary measures imposed by defendant, are insufficient for any reasonable jury to "undertake the suspension of disbelief necessary to credit the allegations made in the complaint." *Jeffreys,* 426 F.3d at 554–55. Therefore, this court recommends that summary judgment be granted as to the retaliation claims against defendants Lucia, Brown, LaFountain, and Lee.

## VI. Personal Involvement/Respondeat Superior

### A. Legal Standards

**\*17** Personal involvement is a prerequisite to the assessment of damages in a section 1983 case, and respondeat superior is an inappropriate theory of liability. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir. 2003). In *Williams v. Smith,* 781 F.2d 319, 32324 (2d Cir. 1986),

the Second Circuit detailed the various ways in which a defendant can be personally involved in a constitutional deprivation, and thus be subject to individual liability.

A supervisory official is personally involved if that official directly participated in the infraction. *Id.* The defendant may have been personally involved if, after learning of a violation through a report or appeal, he or she failed to remedy the wrong. *Id.* Personal involvement may also exist if the official created a policy or custom under which unconstitutional practices occurred or allowed such a policy or custom to continue. *Id.* Finally, a supervisory official may be personally involved if he or she were grossly negligent in managing subordinates who caused the unlawful condition or event. *Id. See also Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir. 2007) (citing *Colon v. Coughlin,* (58 F.3d 865, 873) (2d Cir. 1995)), *rev'd on other grounds, Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009).

Some courts have discussed whether all of the *Colon* factors are still viable after *Ashcroft. See Conklin v. County of Suffolk,* 859 F.Supp.2d 415, 439 (E.D.N.Y.2012) (discussing cases). However, the court in *Conklin* ultimately determined that it was unclear whether *Colon* had been overruled or limited, and continued to apply the factors outlined in *Colon. Id.* In making this determination, the court in *Conklin* stated that "it remains the case that 'there is no controversy that allegations that do not satisfy any of the *Colon* prongs are insufficient to state a claim against a defendant-supervisor.' " *Id.* (quoting *Aguilar v. Immigration Customs Enforcement Div. of the U.S. Dep't of Homeland Sec.,* 811 F.Supp.2d 803, 815 (S.D.N.Y.2011)). *See also Jones v. Smith,* No. 09–CV–1058, 2015 WL 5750136, at *8 n.6 (N.D.N.Y. Sept. 30, 2015) (discussing the use of the *Colon* factors absent definitive guidance from the Second Circuit). This court finds that even if the *Colon* factors are considered, and are all still viable, plaintiff has not alleged the requisite personal involvement of defendants Brian Fischer in any of the constitutional claims.

### B. Application

Plaintiff has stated that he named defendant Fischer due to his position as DOCCS Commissioner, because Fischer ruled or had subordinates rule on plaintiff's various administrative appeals. (McCartin Decl., Ex. A at 47). The personal involvement of a supervisory official cannot be established if his only involvement is to refer an inmate's complaint to the appropriate staff for investigation. [16] *Harnett v. Barr,* 538 F.Supp.2d 511, 524 (N.D.N.Y. 2008); *Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir. 1997) (a supervisor's referral of a prisoner's letter of complaint to a subordinate for review, and a later response to the prisoner to advise him of the subordinate's decision did not demonstrate the requisite personal involvement on the part of the supervisory prison official). Thus, plaintiff cannot establish personal involvement based upon Fischer's referral of plaintiff's various appeals for administrative review, and summary judgment should be granted for defendant Fischer.

**\*18 WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendants' motion for summary judgment (Dkt. No. 30) be **GRANTED**, and the complaint be **DISMISSED IN ITS ENTIRETY**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.,* 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

### All Citations

Slip Copy, 2015 WL 10568892

---

Footnotes

1    "Normal" SHU conditions include being kept in solitary confinement for 23 hours per day, provided one hour of exercise in the prison yard per day, and permitted two showers per week. *Ortiz v. McBride,* 380 F.3d 649, 655 (2d Cir. 2004).

2    A full description of the video's contents is set forth in the Excessive Force analysis in Section IV(B)(1), *infra.*

3    Neither party has submitted the transcript of this hearing.

4    As described by plaintiff in his deposition, the restricted diet is a loaf of bread, typically containing carrots, that is served with a portion of raw cabbage. (McCartin Decl., Ex.A, Deposition Transcript, Dkt. No. 30–3 at 55, 76).

5    If a defendant initiated disciplinary proceedings against plaintiff in retaliation for his exercise of a constitutionally protected right, substantive due process rights may be implicated even if the plaintiff did receive full procedural due process. *Franco v. Kelly*, 854 F.2d 584, 58890 (2d Cir. 1988). As explained in Section V, *infra*, defendant LaFountain should also be granted summary judgment as to the substantive due process issues raised by plaintiff's retaliation claim.

6    Plaintiff alleges that he wrote to both defendant LaValley and defendant Brown to tell them that he was wrongfully placed on a restricted diet and that he was being denied all meals. (Compl.¶ 59). Plaintiff also states that defendants LaValley and Brown responded in person and in writing "that no wrong doing was done and that plaintiff was rightfully placed on a restricted diet." (Compl.¶ 60). Plaintiff furthers states that LaValley observed the sandbags in front of plaintiff's cell, and explained their purpose. Therefore, this court concludes that plaintiff has adequately alleged personal involvement of these supervisory officials as to these claims. *Williams v. Smith*, 781 F.2d 319, 323–24 (2d Cir. 1986). A more detailed discussion of the case law addressing personal involvement is set out in Section VI, *infra*.

7    As described by plaintiff in his deposition, "fishing" is the use of a line, typically made of string or a torn bed sheet, attached to paper or some other weight so that it can be pushed underneath a cell door to trade food, magazines or contraband material between cells. (McCartin Decl., Ex. A at 66–67).

8    Defendants also point to a portion of plaintiff's deposition in which plaintiff was asked whether he was provided a carrot-free loaf in September 2013, and whether he ate it. Plaintiff responded "yes" to both questions, without elaboration. (McCartin Decl., Ex. A at 79). Defendants contend that this undermines plaintiff's claim that he was denied food. This court has not relied on these curt responses in its recommendation to grant summary judgment for defendants because the responses are inconsistent with the majority of plaintiff's testimony during the same deposition. (*Id.* at 65–66, 82–84, 91). *See Palazzo v. Corio*, 232 F.3d 38, 43–44 (2d Cir. 2000) (factual question may still exist where issue was not "thoroughly or clearly" explored in deposition and party may be able to amplify or explain in subsequent sworn testimony).

9    Plaintiff filed a declaration with the court that his personal property includes copies of surveillance video that show the sandbags being placed in front of his cell. Because defendants do not dispute that Lucia ordered the sandbags to be placed there, these videos would not change this court's decision.

10   During his deposition, plaintiff testified that he was handcuffed in the front and had a chain that extended around his waist. Based on the video provided by defendants, plaintiff was actually handcuffed with his hands in front of him, and a chain around his waist.

11   Plaintiff does not accuse defendant LaFountain of excessive force. C.O. McMillian has not been named as a defendant in this proceeding.

12   The court may rely on the video of the relevant events in concluding that no reasonable fact finder could credit the plaintiff's inconsistent claims about the incident. *See, e.g., Kalfus v. New York and Presbyterian Hosp.*, 476 F. App'x 877, 880–81 (2d Cir. 2012) (the video demonstrated that plaintiff resisted arrest by refusing to stand up or be handcuffed, and that the patrolmen used only reasonable force to overcome his resistance; no reasonable fact finder could conclude that defendants applied excessive force); *Green v. Morse*, 00–CV–6533, 2009 WL 1401642, at *27 (W.D.N.Y. May 18, 2009) (this court may rely on the video evidence clearly showing that some use of force was necessary to grant summary judgment and dismiss plaintiff's excessive force claim) (citations omitted).

13   Defendant Lee is not identified by name in the video, but this officer's actions generally correspond to both plaintiff's and defendants' description of Lee's use of force.

14   Defendants have submitted evidence that plaintiff has filed 86 grievances in the DOCCS system between 2000 and 2014.

15   There is support for the proposition that an inmate's verbal complaints might serve as the basis for a section 1983 retaliation claim. *McMillian v. County of Onondaga*, No. 9:13–CV–1124 (TJM/ATB), 2015 WL 1403459, at *11 (N.D.N.Y. March 26, 2015) (collecting cases).

16   In fact, it is clear there is no constitutional right to an investigation by government officials at all. *Nieves v. Gonzalez*, 05–CV–00017, 2006 WL 758615 at *4 (W.D.N.Y. March 2, 2006) (collecting cases). *See also Smart v. Goord*, 441 F.Supp.2d 631, 642–643 (S.D.N.Y.2006) (the failure of a supervisory official to investigate a letter of protest written by an inmate is not sufficient to show personal involvement); *Greenwaldt v. Coughlin*, No. 93 Civ. 6551(LAP), 1995 WL 232736, at *4 (S.D.N.Y. Apr. 19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations.")

WESTLAW   © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 1261124
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Edward R.L. Alexander, Plaintiff,

v.

Brian Fischer et al., Defendants.

9:14-cv-548(GLS/ATB)
|
Signed 03/30/2016

**Attorneys and Law Firms**

FOR THE PLAINTIFF: Edward R.L. Alexander, Pro se Plaintiff, 99-A-4752, Attica Correctional Facility, Box 149, Attica, New York 14011.

FOR THE DEFENDANTS: HON. ERIC T. SCHNEIDERMAN, New York State Attorney General, Litigation Bureau, The Capitol, OF COUNSEL: MICHAEL G. MCCARTIN, Assistant Attorney General, Albany, New York 12224.

## ORDER

Gary L. Sharpe, Senior District Judge

 **\*1** The above-captioned matter comes to this court following a Report-Recommendation by Magistrate Judge Andrew T. Baxter, duly filed on December 21, 2015. (Dkt. No. 47.) Following fourteen days from the service thereof, the Clerk has sent the file, including any and all objections filed by the parties herein.

The plaintiff timely filed general objections to the report-recommendation on January 29, 2016, (Dkt. No. 50); *see Almonte v. N.Y. State Div. of Parole*, No. Civ. 904CV484, 2006 WL 149049, at *4 (N.D.N.Y. Jan. 18, 2006), and the court having reviewed the Report-Recommendation for clear error, it is hereby

**ORDERED** that the Report-Recommendation, (Dkt. No. 47) is **ADOPTED** in its entirety; and it is further

**ORDERED** that defendants' motion for summary judgment (Dkt. No. 30) is **GRANTED**; and it is further

**ORDERED** that the complaint (Dkt. No. 1) is **DISMISSED**; and it is further

**ORDERED** that the Clerk close this case; and it is further

**ORDERED** that the Clerk provide a copy of this Order to the parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2016 WL 1261124

**End of Document** © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 1340799
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Injah TAFARI, Petitioner,

v.

David A. ROCK, Superintendent, Respondent.

No. 10–CV–0729 (MAT).
|
April 18, 2012.

**Attorneys and Law Firms**

Injah Tafari, Malone, NY, pro se.

**DECISION AND ORDER**

MICHAEL A. TELESCA, District Judge.

**I. Background**

**\*1** Injah Tafari ("Tafari"), an inmate at Upstate
Correctional Facility, filed a pleading in the Northern
District of New York captioned "Petition for a Writ
of Habeas Corpus", seeking to "reverse and expunge
determinations from four (4) Tier II disciplinary hearings,
and one (1) Tier III Superintendent's hearing held at Five
Points Correctional Facility on (a) 2/22/07; (b) 4/11/07;
(c) 4/19/07; (d) 6/28/07; and (e) 8/29/07, that the New
York State Court of Appeals affirmed on September
3rd, 2009 [1] from an Order of the Appellate Division,
Third Department." The petition was transferred to this
Court on September 9, 2010. On January 5, 2012, the
Court (Skretny, D.J.) issued an order denying Tafari's
application to proceed *in forma pauperis* and directing
him to show cause why the petition should not be re-
characterized as a civil action under 42 U.S.C. § 1983. *See*
Dkt. # 8. Tafari filed a response, stating in conclusory
terms that his pleading in fact was properly characterized
as a habeas petition, and again seeking leave to proceed as
a poor person. *See* Dkt. # 9.

**II. Recharacterization of the Petition**

When a litigant makes a constitutional challenge to a
determination which affects the overall length of his
confinement, the "sole federal remedy is a writ of habeas

corpus." *Preiser v. Rodriguez,* 411 U.S. 475, 500, 93 S.Ct.
1827, 36 L.Ed.2d 439 (1973). Where a prisoner seeks to
challenge the constitutionality of a disciplinary proceeding
resulting only in the imposition of sanctions that do
not affect the overall length of his confinement, such a
challenge is properly brought under 42 U.S.C. § 1983.
*Id.* at 499 (§ 1983 action "is a proper remedy for a state
prisoner who is making a constitutional challenge to the
conditions of his prison life, but not to the fact or length of
his custody"); *see also, e.g., Jenkins v. Haubert,* 179 F.3d
19, 24 (2d Cir.1999).

With one exception, all of the sanctions that Tafari seeks
to have expunged would be proper subjects of a complaint
filed pursuant to 42 U.S.C. § 1983. With regard to the
last of the challenged disciplinary determinations, Tafari
alleges that among the sanctions he received was a four-
month recommended loss of good time credits, which
can be a proper subject of a petition for habeas corpus
under 28 U.S.C. § 2254. *Edwards v. Balisok,* 520 U.S. 641,
646, 117 S.Ct. 1584, 137 L.Ed.2d 906 (1997). However,
as the Court (Skretny, D.J.) previously found, the loss of
four months of good time will not affect the length of
Tafari's confinement because he is serving a sentence with
a maximum life-term. Prisoners serving such sentences are
not eligible to receive good-time credits. *See* N.Y. Corr.
Law § 803(1)(a) ("Every [inmate] ... except a person serving
a sentence with a maximum term of life imprisonment,
may receive time allowance against the term or maximum
term of his ... sentence imposed by the court."). Therefore,
inasmuch as Tafair is serving a maximum life-term, the
deprivation of any good time credits he sustained as the
result of the July 2007 disciplinary hearing does not affect
the length of his confinement because he is not eligible for
a good-time reduction of his sentence. *See, e.g., Bressette
v. Travis,* 240 A.D.2d 828, 828, 659 N.Y.S.2d 818 (3d
Dept.1997). The Court accordingly dismissed as frivolous
Tafari's challenge to the component of his disciplinary
sentence involving a loss of good time credits. Dkt. # 8 at
5. Thus, the only remaining sanctions challenged by Tafari
pertain solely to the conditions of his confinement (i.e.,
loss of headphones privileges, keeplock, SHU).

**\*2** Tafari, in his response to the Court's order to show
cause why his petition should not be recharacterized
as a § 1983 complaint, states, without elaboration or
explanation, that he "is challenging the validity, and/or
length of his confinement, and 'not' the conditions of his
confinement." Dkt. # 9 at 2. This conclusory assertion is

plainly insufficient to establish that his pleading is actually a petition for a writ of habeas corpus. Accordingly, Tafari's petition is recharacterized as an action arising under 42 U .S.C. § 1983.

## III. *In Forma Pauperis* Application

As amended by the Prison Litigation Reform Act of 1995 ("PLRA"), 28 U.S.C. § 1915 allows indigent prisoners to enter into a structured payment plan with regard to the filing fees. *See* 28 U.S.C. § 1915(b). Section 1915(g) denies this option to "frequent filers", like Tafari, who have repeatedly instituted lawsuits that have been dismissed as frivolous, malicious, or lacking an arguable basis in law or fact. *See* 28 U.S.C. § 1915(g). Tafari has had at least four federal actions or appeals dismissed for these reasons prior to instituting the present case. *See Tafari v. Aidala,* No. 1:00–CV–405 (W.D.N.Y. Sept. 28, 2001) (dismissing complaint with prejudice for failure to state claim, and certifying that any appeal would not be taken in good faith); *Tafari v. Aidala,* No. 01–0279 (2d Cir. Apr. 5, 2002) (dismissing appeal from *Tafari v. Aidala,* 1:00–CV–0405 (W.D.N.Y. Sept. 28, 2001, as frivolous); *Tafari v. France,* No. 06–1876 (2d Cir. Nov. 2, 2006) (dismissing appeal from *Tafari v. France,* 1:01–CV–0011 (W.D.N.Y. Mar. 10, 2006, as frivolous); *Tafari v. Stein,* 09–0710–pr(L), 09–2288–pr (Con.) (2d Cir. Nov. 13, 2009) (dismissing appeal from *Tafari v. Stein,* 1:01–CV–0841 (W.D.N.Y. Feb. 12, 2009), as lacking an arguable basis in law or fact).

Pursuant to 28 U.S.C. § 1915(g), Tafari's application for *in forma pauperis* status must be denied unless he can demonstrate that he is in "imminent danger". Tafari has not made such an allegation, and indeed his pleadings contain no suggestion that this is the case. The Court finds that Tafari, An experienced *pro se* litigator who is well aware of the "three strikes" rule, brought this proceeding as a 28 U.S.C. § 2254 petition in an attempt to make an "end run" around the rule and obtain poor person status. His application to proceed *in forma pauperis* is therefore denied.

## IV. Dismissal Pursuant to Fed. R. Civ. P 8(a)

Federal Rule of Civil Procedure 8 ("Rule 8") requires a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. Proc. 8(a)(2). "The key to Rule 8(a)'s requirements is whether adequate notice is given." *Wynder v. McMahon,* 360 F.3d 73, 79 (2d Cir.2004) (citation omitted). Notice is satisfactory when

it "enable[s] [the adverse party] to answer and prepare for trial." *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988); *accord, e.g., Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) (stating that adequate notice is "that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so that it may be assigned the proper form of trial"). To satisfy Rule 8, a complaint must "contain sufficient factual matter, accepted as true, to 'state a claim that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)). As the Supreme Court has explained, a "complaint [does not] suffice if it tenders 'naked assertion[s] devoid of 'further factual enhancement.' " *Iqbal,* 556 U.S. at 678 (internal quotations omitted; second alteration in original). To determine whether a claim is "plausible," a court must "draw on its judicial experience and common sense." *Id.* at 679.

**\*3** Although courts must give *pro se* pleadings a liberal construction, "the basic requirements of Rule 8 apply to self-represented and counseled plaintiffs alike." *Wynder,* 360 F.3d at 79, n. 11 (citation omitted). Thus, if a *pro se* complaint does not comply with the requirements of Rule 8, a court may dismiss the complaint "on its own initiative or in response to a motion by the defendant." *Salahuddin,* 861 F.2d at 42. Dismissal for non-compliance Rule 8 is appropriate when the complaint is "so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Id.* (citation omitted); *see also Iwachiw v. New York State Dep't of Motor Vehicles,* 396 F.3d 525, 527–28 (2d Cir.2005) (affirming dismissal of a *pro se* complaint because unintelligible).

When the district court elects to dismiss the complaint, "it normally grants leave to file an amended pleading that conforms to the requirements of Rule 8." *Salahuddin,* 861 F.2d at 42 (citations omitted). The Second Circuit has observed that "[t]he district court has discretion whether or not to grant leave to amend, and its decision is not subject to review on appeal except for abuse of discretion ...." *Id.* (quotation omitted; footnote omitted in *Salahuddin* ). In exercising this discretion, the district court should bear in mind that under Rule 15(a), leave to amend " 'shall be freely given when justice so requires.' " *Id.* (quoting Fed.R.Civ.P. 15(a); citations omitted). Nevertheless, the Second Circuit

has recognized, the district court has the authority to "dismiss a prolix complaint without leave to amend in extraordinary circumstances, such as where leave to amend has previously been given and the successive pleadings remain prolix and unintelligible, or where the substance of the claim pleaded is frivolous on its face." *Salahudin,* 861 F.2d at 42 (internal and other citations omitted).

Tafari is an longstanding and prolific litigant, having filed dozens of lawsuits in both state and federal court. Notwithstanding his experience with the rules of pleading, he has failed to set forth any plausible claims in his complaint, which is "so confused, ambiguous, vague, or otherwise unintelligible that its true substance, if any, is well disguised." *Salahuddin,* 861 F.2d at 42. The present case is thus one where dismissal without granting leave to amend is appropriate.

### V. Analysis of the Complaint

In his complaint, Tafari discusses five different disciplinary incidents, although his accompanying memorandum of law only appears to address two of those incidents-namely, the two in which he claims he was denied the right to call witnesses and to obtain evidence (i.e., a videotape of an unspecified subject). As discussed below, none of Tafari's allegations sets forth a colorable constitutional claim on which relief may be granted.

### A. The February 2, 2007 Report of Harassment

**\*4** Tafari states that on February 2, 2007, Corrections Officer ("CO") Canfield filed a report against him for harassment, and the penalty imposed as a result was 30 days keeplock, loss of commissary and phone privileges, and 60 days confinement in the Special Housing Unit ("SHU"). Tafari states that the hearing process resulted in violations of "9 N.Y.C.R.R. § 7695(vi)(B)" which he claims provides that an inmate "shall not receive a misbehavior report based solely upon an alleged false statement made by the grievant".

In New York's code of administrative regulations ("N.Y. Comp.Code R. & Regs." or "N.Y.C.R.R."), there is no such section as the one quoted by Tafari. The most similarly numbered section is 9 N .Y.C.R.R. § 7695, which requires nondiscrimninatory treatment in relation to the regulation and management of state correctional facilities. It is entirely irrelevant to Tafari's situation.

Next, Tafari states that "7 N.Y.C.R.R. § 251–3.1(a)(b)(c)" was violated because the misbehavior report was not issued in a timely manner. Complaint ("Compl."), ¶ 3 (Dkt.# 7). Although this is an actual section, Tafari has not established that it was violated. N.Y.C.R.R. § 251–3.1(a) requires that incidents of inmate misbehavior must be in writing. N.Y.C.R.R. § 251–3.1(b) specifies who must make the report. N.Y.C.R.R. § 251–3.1(c) states what the report must contain. None of the sections specifies a time-period within which the report must be filed. Moreover, even if Tafari had demonstrated non-compliance with one of these sections, he has not established a deprivation of rights guaranteed to him under the federal constitution. *See Kern v. City of Rochester,* 93 F.3d 38, 43 (2d Cir.1996) (To state a cognizable claim under 42 U.S.C. § 1983, "a plaintiff must allege a violation of rights secured by the Constitution or laws of the United States, and that such violation was committed by a person acting under color of state law."), *cert. denied,* 520 U.S. 1155, 117 S.Ct. 1335, 137 L.Ed.2d 494 (1997).

### B. The April 6, 2010 Report of Harassment

Tafari alleges that Nurse Tremlett filed a report against him on April 6, 2010, for harassment, and that the penalty imposed was 30 days loss of headphones. Compl., ¶ 5 (Dkt.# 7). Tafari states that on appeal he argued that "the charge did not substantiate the statement made by petitioner." *Id.,* ¶ 6. However, he provides no elaboration on what this statement means, or how his constitutional rights allegedly were violated.

"A complaint is frivolous when it is vague and incomprehensible or when it is supported by baseless factual allegations describing fantastic or delusional scenarios." *Bloom v. Unites States Gov't,* No. 02 Civ. 2352, 2003 WL 22327163, at \*8 (S.D.N.Y. Oct. 10, 2003). The allegations in support of this claim by Tafari are incomprehensible and so vague as to make it impossible for the defendant to frame a response. The claim involving Nurse Tremlett accordingly cannot provide a basis for relief, and it is dismissed. *See Biviano v. Richard,* No. 11–cv–1674, 2011 WL 1579925, at \*4 (E.D.N.Y. Apr.26, 2011) ("The vague, disjointed, and incomprehensible nature of the instant complaint ... supports this Court's decision to dismiss with prejudice."); *Middleton v. United States,* No. CV 10–6057(JFB)(ETB), 2011 WL 7164452, at \*3 (E.D.N.Y. June 28, 2011) (similar).

## C. The April 16, 2007 Report for Misbehavior

**\*5** The third incident described in Tafari's complaint is that on April 16, 2007, CO Murphy filed a misbehavior report against him for something he describes as "unauthorized exchange and other inmate's criminal information". A penalty of 30–days loss of headphones was imposed. Compl., ¶ 7 (Dkt.# 7). On appeal, Tafari argued that he was "denied the right of a witness ("video tape") pursuant to 7 N .Y.C.R.R. § 253.5(a)(b)(c)". *Id.,* ¶ 8. Tafari has provided no other information regarding this claim, such as whether he was subjected to a Tier I, II, or III disciplinary hearing, or the potential punishment he faced. Loss of headphone privileges clearly is not an atypical and significant hardship on a prison inmate's life sufficient to create a protectible due process liberty interest. *See, e.g., Husbands v. McClellan,* 990 F.Supp.2d 214, 217 (W.D .N.Y.1998) (holding that temporary loss of various privileges (telephone, package, commissary, and recreation privileges) did "not represent the type of deprivation which could reasonably be viewed as imposing an atypical and significant hardship on an inmate") (citing, *inter alia, Frazier v. Coughlin,* 81 F.3d 313, 317 (2d Cir.1996)).

However, the Supreme Court's precedents in this area counsel that "the determination of whether a liberty interest has been sufficiently alleged should focus upon the potential penalties that an inmate faces at a disciplinary hearing, rather than on the ultimate penalty imposed, to determine the necessary due process protection." *Rivera v. Coughlin,* No. 92 Civ. 3404(DLC), 1996 WL 22342, at \*6, n. 6 (S.D.N.Y. Jan.22, 1996) (citing *Superintendent, Mass. Corr. Inst. at Walpole v. Hill,* 472 U.S. 445, 454, 105 S.Ct. 2768, 86 L.Ed.2d 356 (1985) (stating that "[w]here a prison disciplinary hearing may result in the loss of good time credits," an inmate "must receive" the procedural protections outlined in *Wolff v. McDonnell,* 418 U.S. i.e.,); *Wolff,* 418 U.S. at 563–64 (requiring Nebraska prison officials to give inmates notice of pending charges prior to a hearing that would determine whether good time credits would be revoked). Thus, Tafari's complaint lacks a sufficient basis for determining whether he had a cognizable due process liberty interest at stake, such as the loss of good time credits. [2] Even assuming that Tafari had a due process liberty interest, and that he was denied "the right of a witness ('video tape')", he does not have a meritorious claim.

The Second Circuit has held that prison disciplinary hearings are subject to a harmless error analysis. *See Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991) ("If a person may be convicted and obliged to serve a substantial prison sentence notwithstanding a constitutional error determined to be harmless, surely the conditions of confinement of a sentenced prisoner may be made temporarily more severe as discipline for a prison rules infraction despite a harmless error in adjudicating the violation.") (internal citations omitted). "Courts may find harmless error where a prisoner fails to show that the error negatively affected the outcome of the proceeding, or that it impaired the prisoner's ability to prepare a defense." *Marino v. Humphrey,* No. 05 Civ. 6571(SAS) 2006 WL 2786182, at \*5 & n. 94 (S.D.N.Y. Sept.27, 2006) (citing *Grossman v. Bruce,* 477 F.3d 801, 805 (10th Cir.2006) ("[A] prisoner cannot maintain a due process claim for failure to permit witness testimony if he fails to show that the testimony would have affected the outcome of his case.") (citation omitted); *Louis v. Ricks,* No. 01 Civ. 9368, 2002 WL 31051633, at \*52–53 (S.D.N.Y. Sept.13, 2002); *Zamakshari v. Dvoskin,* 899 F.Supp. 1097, 1111 (S.D.N.Y.1995)).

**\*6** Tafari's pleadings contain no hint as to the contents of the videotape or how the tape would have been relevant and material to his defense against the disciplinary charges. Having failed to show how, if at all, the hearing result would have been different had he been given access to those documents, he has failed to establish how he was prejudiced by the alleged denial of the videotape. *See, e.g., Clark v. Dannheim,* 590 F.Supp.2d 426, 429–31 (W.D.N.Y.2008) (dismissing state prisoner's due process claim based on hearing officer's denial of requests to review certain medical records, and to call a prison sergeant as a witness, where plaintiff failed to demonstrate that he was prejudiced by those refusals); *Eleby v. Selsky,* 682 F.Supp.2d 289, 292 (W.D.N.Y.2010) (similar).

## D. The June 25, 2007 Report for Creating a Disturbance

The fourth incident described in Tafari's complaint refers to a misbehavior report filed on June 25, 2007, by Nurse Bannister against Tafari for "creating disturbance and interference." Compl., ¶ 9 (Dkt.# 7). The penalty imposed was a 15–day loss of headphones. *Id.* Tafari argued on appeal that he was "denied inmate witnesses". *Id.,* ¶ 10.

Tafari has provided no information regarding the substance of the purported testimony of the unidentified

inmate witnesses, and thus he cannot demonstrate how he was prejudiced by the alleged denial of their testimony at his hearing. *See, e.g., Eleby v. Selsky,* 682 F.Supp.2d at 292 ("Plaintiff further contends that his rights were violated because he was denied certain documents that he had requested concerning the testing device. Again, plaintiff has failed to show that he was prejudiced by the denial of those documents, in other words, that the hearing result would have been different had he been given access to those documents.").

### E. The July 24, 2007 Report for Harassment, Refusing a Direct Order and Making Threats

The fifth and final incident set forth in Tafari's complaint concerns a July 24, 2007 misbehavior report filed by CO Canfield against Tafari for harassment, refusing a direct order, and making threats. The penalty imposed was four months confinement in SHU, with loss of commissary, package, and phone privileges; and four months recommended loss of good time. *See* Compl., ¶¶ 11, 12 (Dkt.# 7).

Again, Tafari provides no useful information concerning his claim. He asserts in a conclusory fashion that CO Canfield "filed the report in retaliation to grievances Petitioner filed against her," and complains that "the video tape proved [his] innocents [sic]", that he was "denied right to call employee witnesses ("Sgt. Ingles and CO. Canfield")", and that "the hearing was untimely as the third extension was requested and granted after the extention [sic] had expired." Compl., ¶ 12 (Dkt.# 7).

As an initial matter, the conclusory allegation that a misbehavior report was filed in retaliation to previous grievances he filed is entirely insufficient to state a claim upon which relief may be granted.

**\*7** In addition, Tafari has not demonstrated a meritorious constitutional claim insofar as he alleges

that he was denied the right to call employee witnesses since he has failed to show how he was prejudiced, if at all, by the alleged lack of their testimony. Indeed, it appears that he does not know whether they would have provided helpful or even relevant testimony. *See* Petitioner's Memorandum of Law attached to Petition o(Dkt.# 7) at 2 ("Inasmuch as the video tape witnesses, employee witnesses, as well as inmate witnesses, they all *may have provided* testimony that was material, the their absence substantially prejudiced petitioner's ability to present his defense ....") (emphasis supplied). A prisoner cannot demonstrate prejudice and thus non-harmless error based upon pure speculation. *See, e.g., United States v. Harrington,* 354 F.3d 178, 184 (2d Cir.2004) ("[W]hether an error was in fact harmless because it did not prejudice the defendant must be resolved on the basis of the record, not on the basis of speculative assumptions ...."); *Lou v. Mantello,* No. 98–CV–5542 (JG), 2001 WL 1152817, at \*10 (E.D.N.Y. Sept.25, 2001) ("Habeas claims based on complaints of uncalled witnesses are not favored, because the presentation of testimonial evidence is a matter of trial strategy and because allegations of what a witness would have testified [to] are largely speculative.") (interior quotation and citation omitted).

### VI. Conclusion

For the foregoing reasons, the complaint (Dkt.# 7) is dismissed in its entirety with prejudice for failure to state a claim. The Court hereby certifies that any appeal from this Decision and Order would not be taken in good faith. *See* 28 U.S.C. § 1915(a). The Clerk of the Court is directed to enter judgment dismissing the action.

### IT IS SO ORDERED.

### All Citations

Not Reported in F.Supp.2d, 2012 WL 1340799

---

Footnotes

1   Tafari failed to provide any citations to the relevant state court appellate decisions affirming the outcomes of the disciplinary proceedings that he challenges, and the Court was unable to locate a copy of this alleged order in its search of Westlaw. It is impossible to determine which of the many dozens of decisions reported on Westlaw in Tafari's lawsuits pertain to the five disciplinary hearings mentioned above, as the appellate courts generally do not reference the dates of the hearings in their orders.

2   Given that the punishment was a mere loss of headphones privileges, the Court suspects that Tafari was not subjected to a Tier III or Superintendent's Hearing, which can result in both a loss of good time credits and a virtually unlimited

solitary confinement sentence. *See* N.Y. Comp.Codes R. & Regs., tit. 7 § 254.7(a)(iii) and (vi). A Tier II or Disciplinary Hearing can result in no more than 30 days confinement in SHU and may not impose a loss of good time credits. A Tier I or Violation Hearing, which is reserved for the least serious infractions, can only be punished by loss of privileges-such as the loss of headphones privileges here. *See* 7 N.Y.C.R.R. §§ 252, 253, 254 & 270.3(a)(1)-(3).

**End of Document**

© 2016 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Declined to Follow by Samuels v. Fischer, S.D.N.Y., March 2, 2016

2014 WL 4627120
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Leonard HINTON, Plaintiff,

v.

A. PRACK, et al., Defendants.

No. 9:12–CV–1844 (LEK/RFT).
|
Signed Sept. 10, 2014.
|
Filed Sept. 11, 2014.

**Attorneys and Law Firms**

Leonard Hinton, Malone, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State of New York, Joshua E. Mcmahon, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendants.

*MEMORANDUM–DECISION and ORDER*

LAWRENCE KAHN, District Judge.

## I. INTRODUCTION

 **\*1**  This *pro se* action under 42 U.S.C. § 1983 comes before the Court following a Report–Recommendation filed on August 14, 2014, by United States Magistrate Judge Randolph F. Treece, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(d). Dkt. No. 59 ("Report–Recommendation"). Judge Treece recommends that all of Plaintiff Leonard Hinton's ("Plaintiff") claims be dismissed, except that he be awarded nominal damages for violation of his due process rights by Defendant Uhler. Report–Rec. at 31–32. Plaintiff timely filed Objections. Dkt. Nos. 62 ("Objections"); 63 ("Addendum"). For the following reasons, the Report–Recommendation is adopted in its entirety.

## II. STANDARD OF REVIEW

When a party makes a timely objection to a Report–Recommendation, it is the duty of the Court to "make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b). Where, however, an objecting "party makes only conclusory or general objections, or simply reiterates his original arguments, the Court reviews the Report and Recommendation only for clear error." *Farid v. Bouey,* 554 F.Supp.2d 301, 307 (N.D.N.Y.2008) (quoting *McAllan v. Von Essen,* 517 F.Supp.2d 672, 679 (S.D.N.Y.2007)) (citations omitted); *see also Brown v. Peters,* No. 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept. 22, 1997). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b).

## III. DISCUSSION

### A. First Disciplinary Hearing

Plaintiff argues that the evidence presented at his first disciplinary hearing was not "reliable evidence" sufficient to support the hearing officer's determination that Plaintiff was guilty of the alleged conduct. Objs. at 1. Specifically, Plaintiff argues that the evidence was insufficient because there was no independent credibility assessment of, or written statements by, the confidential informant or alleged victim to corroborate Sergeant Gower's testimony. *Id.* at 1–2.

Plaintiff already raised this argument in great detail in his Motion for summary judgment, *see* Dkt. No. 39 at 19–22, and Judge Treece explicitly addressed it in the Report–Recommendation, Report–Rec. at 12–15. Because Plaintiff's argument is "a mere reiteration of an argument made to the magistrate judge," *Dove v. Smith,* No. 13–CV–1411, 2014 WL 1340061, at *1 (N.D.N.Y. Apr. 3, 2014) (Kahn, J.) the Court reviews Plaintiff's objection only for clear error, *see Chylinski v. Bank of Am., N.A.,* 434 F. App'x 47, 48 (2d Cir.2011)). The Court finds that Judge Treece committed no clear error in determining that Sergeant Gower's testimony was sufficiently corroborated by his written report and other evidence in the record. *See* Report–Rec. at 12–15; *see also Kotler v. Daby,* No. 10–CV–0136, 2013 WL 1294282, at *10 (N.D.N.Y. Mar. 28, 2013) (finding guard's testimony and written report constituted "reliable evidence" under the "some evidence" standard, and that an independent assessment of the witnesses' credibility was not required).

**B. Second Disciplinary Hearing**

**\*2** Plaintiff argues that his due process rights were violated at his second disciplinary hearing because Defendant Haug, who conducted the disciplinary hearing, failed to interview or make available four of Plaintiff's requested witnesses. Objs. at 2. Specifically, Plaintiff asserts that he was prejudiced by his inability to question Captain Scarafile ("Scarafile") and Deputy Superintendent Kinderman ("Kinderman") because they "ascertained the facts of th[e] incident, and would have testified [sic] those facts." *Id.* Moreover, corrections officer Ruggerio ("Ruggerio") and inmate Burton ("Burton") both had relevant, first-hand knowledge of the circumstances of the alleged fight. *See id.; see also* Addendum at 2.

To establish a procedural due process claim in connection with a prison disciplinary hearing, an inmate must show that he was prejudiced by the alleged procedural errors, in the sense that the errors affected the outcome of the hearing. *See Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991). In his Objections, Plaintiff states that "[c]learly there is relevance of every witness that Plaintiff requested to testify on his behalf." Objs. at 2. However, Plaintiff fails to advance any specific arguments as to *how* these witnesses' testimonies would have affected the outcome of his disciplinary hearing.

Indeed, as Judge Treece points out, Kinderman and Scarafile were merely supervisors who were informed of the incident after it had already transpired. Report–Rec. at 19. Thus, they did not have first-hand knowledge of the events, and there is no indication that they would have testified favorably to Plaintiff. *See id.* Moreover, Ruggerio did not arrive until after the incident occurred, and his misbehavior report was virtually identical to that of Officer Betti, who testified at the hearing. *Id.* Thus, there is no indication that Ruggerio's testimony would have affected the outcome of the hearing. Finally, although Burton presumably could have offered relevant testimony, as he was the alleged victim of Plaintiff's attack, Plaintiff has not demonstrated how Burton's testimony would have affected the outcome of his hearing. To the contrary, as indicated in Sergeant Betti's Fight Investigation Report, Burton stated that Plaintiff began yelling at him for no reason and Plaintiff then hit him in the head with a frying pan. Report–Rec. at 20. Thus, Plaintiff's arguments that these witnesses' testimonies would have affected the

outcome of his hearing are entirely speculative, and do not warrant finding a constitutional violation. *See* Report–Rec. at 2; *see also Grossman v. Bruce,* 447 F.3d 801, 805 (10th Cir.2006) ("[A] prisoner cannot maintain a due process claim for failure to permit witness testimony if he fails to show that the testimony would have affected the outcome of his case.").

**C. Third Disciplinary Hearing**

Plaintiff next argues that he has established an actual injury in connection with his third disciplinary hearing because he was confined in the Special Housing Unit ("SHU") "as a result of the constitutional violations." Objs. at 2. Plaintiff is correct that his constitutional rights were violated by Defendants' failure to timely provide Plaintiff with a copy of the disciplinary hearing determination. *See* Report–Rec. at 25–26. However, the copy of the hearing determination was merely the means by which to inform Plaintiff of the penalty to be imposed. Thus, Defendants' failure to provide Plaintiff with a copy of the hearing decision did not affect the actual determination, because the determination had already been made. In other words, Defendants' failure to provide Plaintiff with the hearing decision did not *cause* him to be confined in SHU—the penalty had already been imposed and was entirely independent of the failure to serve Plaintiff with a written confirmation of the penalty. *See McCann v. Coughlin,* 698 F.2d 112, 126 (2d Cir.1983) (noting that failure to provide a copy of a hearing determination occurs after the decision has been rendered). Therefore, Plaintiff has failed to show actual injury in relation to his third disciplinary hearing.

**D. Qualified Immunity**

**\*3** Plaintiff's final objection is that Defendants are not entitled to qualified immunity. Objs. at 3. However, Judge Treece did not find that any Defendants were entitled to qualified immunity. Therefore, Plaintiff's argument is irrelevant.

**IV. CONCLUSION**

Accordingly, it is hereby:

**ORDERED,** that the Report–Recommendation (Dkt. No. 59) is **APPROVED and ADOPTED in its entirety;** and it is further

**ORDERED,** that Plaintiffs' Motion (Dkt. No. 39) for summary judgment is **GRANTED in part and DENIED in part** consistent with the Report–Recommendation (Dkt. No. 59); and it is further

**ORDERED,** that Defendant's Cross–Motion (Dkt. No. 42) for summary judgment is **GRANTED in part and DENIED in part** consistent with the Report–Recommendation (Dkt. No. 59); and it is further

**ORDERED,** that Plaintiff be awarded nominal damages in the amount of one dollar ($1.00); and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Memorandum–Decision and Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

LEONARD HINTON, Plaintiff,
-v-

**A. PRACK,** *Commissioner's Designee,* **D. VENETTOZZI,** *Commissioner's Designee,* **S. BULLIS,** *Hearing Officer,* **D. HAUG,** *Hearing Officer,* **D. ROCK,** *Superintendent; Upstate Correctional Facility,* **UHLER,** *Deputy Superintendent of Security; Upstate Correctional Facility,* Defendants.

### *REPORT–RECOMMENDATION and ORDER*

RANDOLPH F. TREECE, United States Magistrate Judge.

*Pro se* Plaintiff Leonard Hinton brings this action, pursuant to 42 U.S.C. § 1983, alleging that Defendants violated his right to due process at three separate disciplinary hearings. *See* Dkt. No. 1, Compl. Plaintiff has moved for summary judgment. Dkt. No. 39. Defendants oppose that Motion, and Cross–Move for Summary Judgment. Dkt. No. 42. Plaintiff opposes Defendants' Cross–Motion. Dkt. Nos. 44, Pl.'s Opp'n, & 45, Pl.'s Supp. Opp'n. For the reasons that follow, we recommend that Plaintiff's Motion for Summary Judgment be **DENIED,** Defendants' Cross–Motion for Summary Judgment be **GRANTED,** and that this action be **DISMISSED.**

## I. STANDARD OF REVIEW

Pursuant to FED. R. CIV. P. 56(a), summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." The moving party bears the burden to demonstrate through "pleadings, depositions, answers to interrogatories, and admissions on file, together with [ ] affidavits, if any," that there is no genuine issue of material fact. *F.D.I. C. v. Giammettei,* 34 F.3d 51, 54 (2d Cir.1994) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986)). "When a party has moved for summary judgment on the basis of asserted facts supported as required by [Federal Rule of Civil Procedure 56(e) ] and has, in accordance with local court rules, served a concise statement of the material facts as to which it contends there exist no genuine issues to be tried, those facts will be deemed admitted unless properly controverted by the nonmoving party." *Glazer v. Formica Corp.,* 964 F.2d 149, 154 (2d Cir.1992).

**\*4** To defeat a motion for summary judgment, the non-movant must set out specific facts showing that there is a genuine issue for trial, and cannot rest merely on allegations or denials of the facts submitted by the movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) ("Conclusory allegations or denials are ordinarily not sufficient to defeat a motion for summary judgment when the moving party has set out a documentary case."); *Rexnord Holdings, Inc. v. Bidermann,* 21 F.3d 522, 525–26 (2d Cir.1994). To that end, sworn statements are "more than mere conclusory allegations subject to disregard ... they are specific and detailed allegations of fact, made under penalty of perjury, and should be treated as evidence in deciding a summary judgment motion" and the credibility of such statements is better left to a trier of fact. *Scott v. Coughlin,* 344 F.3d at 289 (citing *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983) and *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995)).

When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.,* 164 F.3d 736, 742 (2d Cir.1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of

material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship,* 22 F.3d 1219, 1224 (2d Cir.1994). Furthermore, where a party is proceeding *pro se,* the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994), *accord, Soto v. Walker,* 44 F.3d 169, 173 (2d Cir.1995). Nonetheless, mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment. *See Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991).

When considering cross-motions for summary judgment, a court "must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Hotel Employees & Rest. Employees Union, Local 100 of N.Y. v. City of N.Y. Dep't of Parks & Recreation,* 311 F.3d 534, 543 (2d Cir.2002) (quoting *Heublein, Inc. v. United States,* 996 F.2d 1455, 1461 (2d Cir.1993)). "[N]either side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it ... [and] a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States,* 996 F.2d at 1461.

## II. DISCUSSION

### A. Due Process

 **\*5** Plaintiff alleges that Defendants violated his right to due process at three separate disciplinary hearings. *See generally* Compl.

The Due Process Clause of the Fourteenth Amendment protects against restraints or conditions of confinement that "exceed[ ] the sentence in ... an unexpected manner[.]" *Sandin v. Conner,* 515 U.S. 472, 484 (1995). To state a due process claim under § 1983, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460 (1989)). Inmates' liberty interests are derived from two sources: (1) the Due Process Clause of the Fourteenth Amendment; and (2) state statute or regulations. *Id.* With regard to liberty

interests arising directly under the Due Process Clause, the Supreme Court has "narrowly circumscribed its scope to protect no more than the 'most basic liberty interests in prisoners [,]' " *Arce v. Walker,* 139 F.3d at 333 (quoting *Hewitt v. Helms,* 459 U.S. 460, 467 (1983)), and limited to freedom from restraint that "exceed[ ] the sentence in ... an unexpected manner[,]" *Sandin v. Conner,* 515 U.S. 472, 478 (1995).

Turning to liberty interests created by the state, the Supreme Court states that such liberty interests shall be limited solely to those deprivations which subject a prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. at 484; *see also Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001) (citing *Sandin* ); *Welch v. Bartlett,* 196 F.3d 389, 392 (2d Cir.1999).

Factors relevant to an analysis of what constitutes an atypical and significant hardship include "(1) the effect of the confinement on the length of prison incarceration, (2) the extent to which the conditions of segregation differ from other routine prison conditions, and (3) the duration of the disciplinary segregation compared to discretionary confinement." *Spaight v. Cinchon,* 1998 WL 167297, at \*5 (N.D.N.Y. Apr. 3, 1998) (citing *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)); *see also Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (stating that in assessing what constitutes an atypical and significant hardship, "[b]oth the conditions [of confinement] and their duration must be considered, since especially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical" (citation omitted)). Though the length of the confinement is one guiding factor in a *Sandin* analysis, the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the *Sandin* standard. *Jenkins v. Haubert,* 179 F.3d 19, 28 (2d Cir.1999) (citations omitted). Nevertheless, the Court of Appeals has stated that "[w]here the plaintiff was confined for an intermediate duration—between 101 and 305 days—development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required." *Palmer v. Richards,* 364 F.3d at 64–65 (quoting *Colon v. Howard,* 215, F.3d 227, 232 (2d Cir.2000)); *see also Hanrahan v. Doling,* 331 F.3d 93, 97–98 (2d Cir.2003) ("[W]here the actual period of disciplinary confinement is insignificant or the restrictions imposed relatively minor, such confinement

may not implicate a constitutionally protected liberty interest."); *Edmonson v. Coughlin,* 1996 WL 622626, at *4–5 (W.D.N.Y. Oct. 4, 1996) (citing cases for the proposition that courts within the Second Circuit tend to rule, as a matter of law, that "disciplinary keeplock or SHU confinement to 60 days or less in New York prisons is not an atypical or significant hardship in relation to the ordinary incidents of prison life"); *Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (noting that segregative sentences of 125–288 days are "relatively long" and therefore necessitate "specific articulation of ... factual findings before the district court could properly term the confinement atypical or insignificant"). Accordingly, the court must "make a fact-intensive inquiry" that would examine the actual conditions of confinement within SHU. *Palmer v. Richards,* 364 F .3d at 65 (citations omitted); *see also Wright v. Coughlin,* 132 F .3d at 137; *Brooks v. DiFasi,* 112 F.3d 46, 49 (2d Cir.1997). If the conditions of confinement are undisputed, a court may decide the *Sandin* issue as a matter of law. *Palmer v. Richards,* 364 F.3d at 65. If, however, normal conditions of SHU exist, but the period of confinement is longer than the intermediate duration, then it would constitute a significant departure from ordinary prison life requiring the protection of procedural due process under *Sandin. Id.*

**\*6** Once a prisoner makes a threshold showing of atypical and significant confinement, the court should determine whether that prisoner, prior to his confinement, was afforded the minimum requirements of due process. *Wolff v. McDonnell,* 418 U.S. 539, 556 (1974). A prisoner placed in disciplinary segregation must be provided (1) advanced written notice of the charges against them at least twenty-four hours prior to the hearing; (2) the opportunity to appear at the hearing, to call witnesses, and to present rebuttal evidence; and (3) written statement as to the evidence relied upon and the reasons for the disciplinary action. *Id.* at 564–66; *see also Freeman v. Rideout,* 808 F.2d 949, 953 (2d Cir.1986); *Taylor v. Rodriguez,* 238 F.3d 188, 192 (2d Cir.2001) (quoting *Hewitt v. Helms,* 459 U.S. at 476).

With these principles in tow, we discuss the process that was provided at each of the disciplinary hearings at issue *seriatim.*

### 1. Liberty Interest

Defendants concede that, in the aggregate, the amount of time Plaintiff spent in the solitary housing unit ("SHU"), as a result of the three disciplinary hearings at issue, was sufficient to implicate a protected liberty interest. [1] Dkt. No. 42–7, Defs.' Mem. of Law, at p. 11; *see also* Dkt. No. 42–4, Steven Bullis Decl., dated Dec. 26, 2013, at Ex. A, Disciplinary Hr'g Tr. (hereinafter "1st Hr'g Tr."), dated Oct. 13–18, 2010, at p. 1; Dkt. No. 42–5, Donald Haug Decl., dated Dec. 24, 2013, at Ex. A, Disciplinary Hr'g Report, dated Sept. 7–13, 2010; [2] Dkt. No. 42–6, Donald Uhler Decl., dated Dec. 27, 2013, at Ex. A, Disciplinary Hr'g Tr. (hereinafter "3rd Hr'g Tr."), dated February 2–3, 2011, at p. 1. Accordingly, we need only determine whether Plaintiff was deprived of any of the minimum requirements of due process during any of the disciplinary hearings at issue. [3]

### 2. First Disciplinary Hearing

The following facts are undisputed.

On July 25, 2010, Sgt. Gower [4] issued a misbehavior report charging Plaintiff with extortion, soliciting a sexual act, and making a third party call. Defendant Bullis found Plaintiff guilty of all three violations, and sentenced him to six months in the SHU as well as six months loss of packages, commissary, phone, and good time credits. Dkt. No. 39–3, App. to Pl.'s Mot. for Summ. J. (hereinafter "Pl.'s App."), Sec. 1, at Ex. A, Misbehavior Rep., dated July 25, 2010 (hereinafter "1st Misbehavior Rep."); 1st Hr'g Tr. at p. 1. Plaintiff appealed the decision; but his appeal was denied by Defendant Prack, the Director of the Special Housing/ Inmate Disciplinary Program, on December 20, 2010. *See* Pl.'s App., Sec. 1, at Ex. E, Appeal Form, dated Oct. 18, 2010; & F, Appeal Dec., dated Dec. 20, 2010. Subsequently, Plaintiff challenged the disciplinary determination, in State Court, pursuant to N.Y. C.P.L.R. § 7803 ("Article 78"). *Id.* at Ex. G, Pl.'s Art. 78 Pet., dated Dec. 29, 2010. The New York State Appellate Division, Fourth Department, denied Plaintiff's petition, and unanimously upheld Defendant Bullis's disciplinary determination. *Id.* at Ex. I, Dec., dated Nov. 9, 2012.

**\*7** Plaintiff now argues that he is entitled to summary judgment as to his claims against Defendants Bullis and Prack for violations of his right to due process

in conjunction with this hearing, because Defendants lacked any credible evidence to support the decision or its subsequent affirmation. *See, e.g.,* Dkt. No. 44–1, Pl.'s Opp'n at p. 2. [5] Defendants argue that they are entitled to summary judgement as to this claim because Plaintiff was provided all of the process that was due. Dkt. No. 42–7, Defs.' Mem. of Law, at pp. 13–16.

### a. Notice

It is undisputed that Plaintiff was served with a copy of the misbehavior report on October 6, 2010. Pl.'s App., Sec. I, Ex. D, Hr'g Disposition. Accordingly, Plaintiff received notice, as required, more than twenty-four hours prior to his hearing. *See Sira v. Morton,* 380 F.3d 57, 70 (2d Cir.2004) (citing, *inter alia, Wolff v. McDonnell,* 418 U.S. at 564 for the proposition that "[d]ue process requires that prison officials give an accused inmate written notice of the charges against him twenty-four hours prior to conducting a disciplinary hearing"). Moreover, the misbehavior report noted, *inter alia:* "[b]ased on an investigation [Sgt. Gower] conducted it has been determined that inmate Hinton ... was attempting to solicit sexual acts and was attempting to extort money from a family member of inmate Veach .... Inmate Hinton also gave inmate Veach two packs of tobacco without authorization of any staff." 1st Misbehavior Rep. Such notice was adequate to inform Plaintiff of the nature of the offenses for which he was charged. *See Sira v. Morton,* 380 F.3d at 70 (quoting *Taylor v. Rodriguez,* 238 F.3d at 193, for the proposition that "due process requires more than a conclusory charge; an inmate must receive notice of at least some specific facts underlying the accusation such that he can prepare a defense to those charges and not be made to explain away vague charges set out in a misbehavior report.") (internal quotation marks omitted). [6]

### b. Opportunity to be Heard

The record clearly establishes that Plaintiff was present at the hearing, able to question witnesses, and present rebuttal evidence. *See generally* 1st Hr'g Tr. This remains true notwithstanding the fact that four of the witnesses Plaintiff called refused to testify. *See id.* at p. 10. Crucially, "it is well settled that [a]n inmate does not

possess a constitutional right to confront or cross-examine witnesses in prison disciplinary hearings." *Fernandez v. Callens,* 2010 WL 4320362, at *11 (W.D.N.Y. Oct. 29, 2010) (citing *Wolff v. McDonnell,* 418 U.S. at 567–68; *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999); & *Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993)). The fact that these witnesses refused to testify on Plaintiff's behalf does not alter the fact that he was given the opportunity to call witnesses. *See Creech v. Schoellkoph,* 688 F.Supp.2d 205, 213 (W.D.N.Y.2010) (finding no due process violation where two witnesses called by inmate refused to testify); *see also Edmonson v. Coughlin,* 1996 WL 622626, at *8 (W.D.N.Y. Oct. 4, 1996) (citing *Wolff v. McDonnell,* 418 U.S. at 568–69 for the proposition that "*Wolff* specifically recognized the discretion of prison officials to decline to call as witnesses fellow inmates who do not wish to testify, or witnesses who know nothing of the underlying events"); *Jamison v. Fischer,* 2013 WL 5231457, at *3 (S.D.N.Y. July 11, 2013) (citing cases for the proposition that "if a requested witness refuses to testify at a disciplinary hearing, the hearing officer is not constitutionally required to compel the witness to testify."). Moreover, in such situations, all that is required of the hearing officer is that he provide the inmate with notice of the fact that witnesses are being withheld and explain the reasons why. *See* N.Y. COMP.CODES R. & REGS. tit. 7, § 254.5(a) ("If permission to call a witness is denied, the hearing officer shall give the inmate a written statement stating the reasons for the denial, including the specific threat to institutional safety or correctional goals presented."). Here, Defendant Bullis explained at the hearing that:

> **\*8** Mr. Hinton, on your assistant form you requested four potential witnesses. It is written down that they all refused to testify and in the file there are four refusal forms, one by inmate Maida ... refuses to testify he does not want to be involved. Inmate King ... states he does not want to be involved with any of this, he doesn't want to get involved with any of this don't call me again as stated on the form. The next is from inmate Woods ... stating he does not want to be involved as he stated on the form. The next is for inmate Veach ... stating he does not want to be involved he claimed he does not

know anything about this incident on 7/28/2010.

1st Hr'g Tr. at p. 10.

Thus, we can find no evidence of any constitutional deficiency in Plaintiff's opportunity to appear, call witnesses, or present rebuttal evidence at the first disciplinary hearing. *See Wolff v. McDonnell,* 418 U.S. at 564–66.

### c. Written Decision

It is clear from the record that at 11:15 a.m., on October 8, 2010, Plaintiff received a written statement as to the evidence relied upon and the reasons for the disciplinary action that was taken. Pl.'s App., Sec. I, Ex. D, Hr'g Disposition Form.

Therefore, under *Wolf v. McDonnell,* Plaintiff received all of the process due to him. 418 U.S. at 564–66.

### d. Remaining Arguments

Plaintiff also argues that there was no credible evidence to support Defendant Bullis's disciplinary determination. While an inmate is *not* entitled to a hearing officer with the same level of impartiality required by judges; it is true that he is entitled to a hearing untainted by arbitrary or pre-determined findings of guilt. *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989). Nonetheless, a hearing officer's limited impartiality requirements are satisfied where the record contains "some evidence" to support the officer's findings. *Superintendent v. Hill,* 472 U.S. 445, 455 (1985). "Ascertaining whether this standard is satisfied does not require examination of the entire record, independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, the relevant question is whether there is any evidence in the record that could support the conclusion reached." *Id.,* 472 U.S. at 455–56 (citations omitted). That being said, only " 'reliable' evidence can constitute 'some evidence.' " *Sira v. Morton,* 380 F.3d at 76 (citing *Luna v. Pico,* 356 F.3d at 488).

Here, Defendant Bullis's determination was supported by ample reliable evidence, chiefly, the testimony and

misbehavior report of Sgt. Gower. *See* Pl.'s App., Sec. I at Ex. C.

As noted above, the misbehavior report stated, *inter alia:* "[b]ased on an investigation [Sgt. Gower] conducted it has been determined that inmate Hinton ... was attempting to solicit sexual acts and was attempting to extort money from a family member of inmate Veach .... Inmate Hinton also gave inmate Veach two packs of tobacco without authorization of any staff." 1st Misbehavior Rep. At the hearing, Sgt. Gower explained, in sum and substance, that on the morning of July 25, 2010, an unidentified inmate told him that Plaintiff had attempted to solicit sex from inmate Veach. As a result, Sgt. Gower conducted an investigation during which he interviewed Inmate Veach, who reported that "approximately 2 weeks before that he got two packs of tobacco from [Plaintiff] he was unable to pay him so [Plaintiff] had requested he perform sexual acts for approximately ten days to pay him for the tobacco." 1st Hr'g Tr. at p. 6. Veach also informed Sgt. Gower that Plaintiff had attempted to pull him into a toilet stall but stopped when Inmate Moody walked into the bathroom area. Gower verified with Inmate Moody that he saw Veach and Hinton in the bathroom at the same time; however, Moody did not see Hinton pulling Veach into the stall. Gower ordered that Veach be examined by medical, and no evidence of sexual misconduct was found. Gower also testified that Veach informed him that Plaintiff and Inmate McGee had set up a three-way call in an attempt to extort fifteen dollars from Inmate Veach's sister for the tobacco. Gower reported that he verified this with inmate McGee who admitted to helping to orchestrate the three-way call. *Id.* at pp. 6–8.

**\*9** Standing alone, the unidentified inmate's claims that Plaintiff solicited sex from Inmate Veach would be insufficient to satisfy the "some evidence" standard applicable to prison disciplinary hearings. *See Dawkins v. Gonyea,* 646 F.Supp.2d 594, 611 (S.D.N .Y.2009) (citing *Sira v. Morton,* 380 F.3d at 78, for the proposition that "if any confidential informant's testimony was based solely on hearsay, a greater inquiry into the reliability of this hearsay information is required."); *Howard v. Wilkerson,* 768 F.Supp. 1002, 1007 (S.D.N.Y.1991) (citing *Vasquez v. Coughlin,* 726 F.Supp. 466, 471 (S.D.N.Y.1989), for the proposition that "[s]ince *[Superintendent v.] Hill,* [472 U.S. 445 (1985) ] it has been held that hearsay evidence does not constitute 'some evidence' "). However, here, Defendant Bullis's determination was supported

by Gower's misbehavior report. More importantly, Gower testified at the hearing that prior to issuing the misbehavior report he independently corroborated the statements made to him by the unidentified inmate and the victim. Gower's investigation, report, and testimony were all valid bases from which Defendant Bullis could conclude that the information was reliable. *See Sira v. Morton,* 380 F.3d at 78 ("Where the original declarant's identity is unknown or not disclosed, the hearing officer may nevertheless consider such factors as the specificity of the information, the circumstances under which it was disclosed, and the degree to which it is corroborated by other evidence."). Since Defendant Bullis found Gower's testimony to be reliable, Bullis Decl. at ¶ 17, we need not conduct an independent assessment of Gower's credibility. *Kotler v. Daby,* 2013 WL 1294282, at * 10 (N.D.N.Y. Mar. 28, 2013) (finding guard's testimony and written report constituted some evidence, and that an independent assessment of the charging officer's credibility is neither required nor encouraged); *Thomas v. Connolly,* 2012 WL 3776698, at *23 (S.D.N.Y. Apr. 10, 2012) (finding that disciplinary determination supported by the investigating officer's report was sufficient to satisfy the some evidence requirement). Thus, we conclude that no reasonable juror could conclude that Plaintiff's disciplinary conviction was not based on some reliable evidence. [7]

Furthermore, Plaintiff's argument that Inmate Veach's statements to Sgt. Gower during his investigation are unreliable in light of the fact that Inmate Veach subsequently refused to testify at Plaintiff's hearing—reportedly, on the grounds that he knew nothing about the alleged incident—are also unavailing. *See* Pl.'s Mem. of Law at pp. 17–20; Pl.'s App., Sec. I, Ex. C, Inmate Refusal Form, dated Oct. 8, 2010; *see also Louis v. Ricks,* 2002 WL 31051633, at *13 (S.D.N.Y. Sept. 13, 2002) (surveying cases for the proposition that no due process violation occurred where the hearing assistant relied on testimony from the alleged victim which the victim later recanted). [8]

**\*10** Accordingly, having determined that Plaintiff received all of the process that was due to him with regard to his first disciplinary hearing, we recommend that Plaintiff's Motion for Summary Judgment be **DENIED** as to this claim, that Defendants' Cross–Motion for Summary Judgment be **GRANTED,** and that this claim be **DISMISSED.**

*e. Defendant Prack*

Plaintiff alleges that Defendant Prack was liable in his supervisory capacity for Defendant Bullis's alleged due process violation because he knew of but failed to remedy the violation when he affirmed Defendant Bullis's disciplinary determination. Pl.'s Mem. of Law at p. 25. An individual cannot be held liable for damages under § 1983 merely because he holds a position of authority, but he can be held liable if he was personally involved in the alleged deprivation.

> The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citations omitted).

However, having failed to find any evidence of an underlying constitutional violation, we recommend that Plaintiff's Motion for Summary Judgment be **DENIED** as to Plaintiff's claim against Defendant Prack arising out of his affirmation of Defendant Bullis's disciplinary determination. *See Elek v. Inc. Vill. of Monroe,* 815 F.Supp.2d 801, 808 (S.D.N.Y.2011) (collecting cases for the proposition that "because Plaintiff has not established any underlying constitutional violation, she cannot state a claim for § 1983 supervisor liability"). Furthermore, we also recommend that Defendants' Motion be **GRANTED**

with respect to the same, and that this claim be **DISMISSED.**

### 3. Second Disciplinary Hearing

The following facts are undisputed.

On August 11, 2010, Plaintiff was charged with violent conduct, assault on an inmate, and fighting by Sergeant Betti, and violent conduct, creating a disturbance, and fighting by Corrections Officer Ruggerio. [9] According to Sergeant Betti's report "inmate Hinton admitted to [her] that he had a verbal argument with inmate Burton over some missing food items. He said the argument ended with him picking up a frying pan and hitting inmate Burton once over the head with it." Haug Decl., Ex. A, Betti Misbehavior Rep., dated Aug. 11, 2010. According to Officer Ruggerio, on August 11, he heard a crashing noise in the room near the kitchen, and upon responding "observed inmate Hinton lying on his left side ... near his overturned wheelchair.... [He] also observed Inmate Burton standing over Hinton with a clinched fist. There was also a medium sized stainless steel frying pan lying near [Hinton's wheelchair]." *Id.,* Ex. A, Ruggerrio Misbehavior Rep., dated Aug. 11, 2010.

**\*11** Defendant Haug conducted a disciplinary hearing between September 7 and 13, 2010, and found Plaintiff guilty of all six violations. Decl., Ex. A, Hr'g Disposition, dated Sept. 13, 2010. On November 12, 2010, Defendant D. Venettozzi, the Acting Director of the Special Housing/ Inmate Disciplinary Program, affirmed the disciplinary determination. *Id.* at Ex. C, Appeal Dec., dated Nov. 12, 2010. However, as a result of an Article 78 proceeding brought by Petitioner before the Fourth Department, the determination was overturned and vacated because "the hearing officer's effective denial of petitioner's request to call C.O. Ruggerio, Inmate Burton, Captain Scarafile and Deputy Superintendent Kinderman [10] as witnesses, without [ ] stated good faith reasons, constituted a clear constitutional violation[.]" *Id.* at Ex. C, Dec. & J., dated May 27, 2011. As a result, Plaintiff's September 13 disciplinary decision was administratively reversed on August 4, 2011. *Id.* at Ex. B, App. Dec., dated Aug. 4, 2011.

In his Motion, Plaintiff claims he is entitled to summary judgment as to his due process claims against Defendant

Haug because he was improperly denied the right to call witnesses on his behalf, and against Defendant Venettozzi for affirming Defendant Haug's disciplinary determination. *See* Pl.'s Opp'n at p. 5. Defendants argue that they are entitled to summary judgment on this claim because Plaintiff received all of the process that was due at his second disciplinary hearing. Defs.' Mem. of Law at pp. 17–19.

### a. Notice

It is uncontested that Plaintiff received a copy of the misbehavior reports at issue on August 12, 2010. Haug Decl. at ¶ 9 & Ex. A, Tier III Data Sheet, dated Aug. 22, 2010. Furthermore, each report contained a detailed factual account of the basis of the charges, the names of those involved, and the date of the relevant events. *Id.* at Ex A, Misbehavior Reports, dated Aug. 11, 2010. Accordingly, Plaintiff clearly received constitutionally sufficient notice.

### b. Opportunity to be Heard

According to the Fourth Department, the "denial of petitioner's request to call C.O. Ruggerio, Inmate Burton, Captain Scarafile and Deputy Superintendent Kinderman as witnesses, without a stated good faith reason[ ], constituted a clear constitutional violation." *Id.* at Ex. B, Dec. & J. at p. 5. As a result of the Fourth Department's decision, Plaintiff's disciplinary determination was subsequently administratively overturned. However, neither of these facts is dispositive for purposes of the instant action. *Gutierrez v. Coughlin,* 841 F.2d 484, 486 (2d Cir.1988) (citing cases for the proposition that collateral estoppel does not preclude defendants from re-litigating due process violations decided in an Article 78 proceeding in a subsequent 1983 case because, *inter alia,* "appellees could not have been held personally liable in such a proceeding, they did not have the same incentive to litigate that state court action as they did the federal § 1983 action[,]" and "the defenses of absolute or qualified immunity, or lack of personal involvement, were not available to appellees"); *see also LaTorres v. Selsky,* 2011 WL 7629515, *6 n. 10 (N.D.N.Y. Aug. 1, 2011) (citing *Gutierrez v. Coughlin* ).

**\*12** Moreover, Plaintiff's claim is subject to review for harmless error. *Sims v. Artuz,* 103 F. App'x 434, 436 (2d Cir.2004) (upholding magistrate's determination applying harmless error to defendant's undisputed failure to provide a reason for refusing to call witnesses during a disciplinary hearing); *Clark v. Dannheim,* 590 F.Supp.2d 426, 431 (W.D.N.Y.2008) (same); *Colantuono v. Hockeborn,* 801 F.Supp.2d 110, 115 (W.D.N.Y.2011) (citing *Clark v. Dannheim,* 590 F.Supp.2d 426, (W.D.N.Y.2008), for the proposition that "dismissing state prisoner's due process claim based on the hearing officer's denial of plaintiff's requests to review certain medical records, and to call DOCS sergeant as a witness, where plaintiff failed to demonstrate that he was prejudiced as a result"); *cf. Powell v. Coughlin,* 953 F.2d 744, 751 (2nd Cir.1991) ("it is entirely inappropriate to overturn the outcome of a prison disciplinary proceeding because of a procedural error without making the normal appellate assessment as to whether the error was harmless or prejudicial").

Here, notwithstanding the fact that a denial of the right to call witnesses without an explanation is a violation of New York's prison disciplinary regulations, N.Y. COMP.CODES R. & REGS. tit. 7, § 254.5(a), Defendant Haug's decision to deny, without reason, Plaintiff's request to call as witnesses Deputy Superintendent Geoghegan, Captain Scarafile, and Officer Rugerio did not rise to the level of a due process violation because Plaintiff failed to allege, in any fashion, how he was prejudiced. Indeed, it is undisputed that Deputy Superintendent Geoghegan and Captain Scarafile had no personal knowledge of the event; their only involvement was that they were informed about the alleged fight after the fact. Haug Aff. at ¶ 18 & Ex. A, Unusual Incident Report, dated Aug. 19, 2010, at p. 2. Similarly, Officer Ruggerio's misbehavior report confirms that he arrived on scene after the event, and the details of his report are nearly identical to those provided by Officer Betti, who testified at the hearing. *Id.* at ¶¶ 10 & 16–17, & Ex. A, Misbehavior Reports. Accordingly, their testimony was at best cumulative, and quite possibly irrelevant. *See Hamilton v. Fischer,* 2013 WL 3784153, at \*10 (W.D.N.Y. July 18, 2013) (dismissing due process claims based on a hearing officer's failure to call witness who were not present for the incident at issue because the error was harmless).

Likewise, the record in this case compels us to reach a similar conclusion with regard to the fourth witness,

Inmate Burton, although by a slightly different route. With respect to his decision to deny Plaintiff's request to call Inmate Burton, Defendant Haug avers that "I have no recollection of who that inmate was or why his testimony would have had any bearing on whether or not Plaintiff Hinton hit another inmate with a frying pan. Had I believed that this inmate had information that was pertinent to Plaintiff Hinton's defense, I would have requested his testimony." *Id.* at ¶ 19. It cannot seriously be argued that Inmate Burton, the inmate Plaintiff allegedly hit over the head with the frying pan, did not have any relevant information with regard to the incident at issue.

**\*13** However, nothing in Plaintiff's papers [11] nor the many documents submitted by Defendants indicates that had Inmate Burton been called his testimony would have altered the course of the hearing. Rather, based on the record before us, we can only conclude the opposite. In the Fight Investigation Rep., dated August 11, 2010, Sergeant Betti reported that "Burton stated [that] Hinton approached him in the day room and was yelling at him for no reason. Hinton hit him with a pan in the head." Haug Decl., Ex. A. Crucially, Burton's statement was relied upon by Defendant Haug. *Id.,* Ex. A, Hr'g Disposition Report, dated Sep. 13, 2010, at p. 2.

Given the lack of any indication in the record that Inmate Burton would have testified favorably, as well as his own admissions to Sergeant Betti that he struck Inmate Burton with the pan, Plaintiff has failed to establish that he was prejudiced by Defendant Haug's refusal to call Inmate Burton as a witness. *See Clark v. Dannheim,* 590 F.Supp.2d at 430–31 (concluding, after examining the record, that failure to call a witness who had clearly relevant information was non-prejudicial because "there [wa]s no indication or reason to believe that his testimony would have been helpful to plaintiff"); *see also Sims v. Artuz,* 103 F. App'x at 436 (upholding magistrate's determination that exclusion of witnesses from disciplinary hearing was harmless error where plaintiff "ha [d] not shown that he was prejudiced in any way"); *Tafari v. Rock,* 2012 WL 1340799 (W.D.N.Y. Apr. 18, 2012) ("A prisoner cannot demonstrate prejudice and thus non-harmless error based upon pure speculation.").

*c. Written Decision*

It is undisputed that Plaintiff received a copy of the notice of decision including the evidence that was relied upon, as well as an explanation of the reasons for the punishment assigned. *Id.* at Ex. A, Hr'g Disposition Form, dated Sep. 13, 2010, at p. 2.

Accordingly, we recommend that Plaintiff's Motion be **DENIED** as to his due process claim against Defendant Haug arising out of the second disciplinary hearing, that Defendants' CrossMotion be **GRANTED** with respect to the same, and that this claim be **DISMISSED.**

### d. Defendent Venettozzi

Having established the absence of any underlying constitutional violation, Plaintiff cannot maintain a cause of action against Defendant Venettozzi based on supervisory liability for affirming Defendant Haug's disciplinary determination. *See Elek v. Inc. Vill. of Monroe,* 815 F.Supp.2d at 808.

Accordingly, we recommend that Plaintiff's Motion for Summary Judgment be **DENIED** with respect to his claim against Defendant Venetozzi for affirming Defendant Haug's disciplinary determination, that Defendants' Cross–Motion for Summary Judgment be **GRANTED** as to the same, and that this claim be **DISMISSED.**

### 4. Third Disciplinary Hearing

The following facts are undisputed.

On January 19, 2011, Plaintiff was charged with two counts of possessing unauthorized medication and smuggling. 3rd Hr'g Tr. at p. 1. On February 2–3, 2011, Defendant Uhler conducted a Tier III disciplinary hearing, from which Plaintiff was excluded. *See generally id.* Plaintiff was convicted of all three offenses and sentenced to thirty-six months in SHU as well as thirty-six months loss of packages, commissary, phone, and good time credits. *Id.* at p. 1. On February 3, 2011, Plaintiff appealed Defendant Uhler's disciplinary determination. Compl. at p. 6. On March 29, 2011, Defendant Venettozzi modified Plaintiff's punishment to eighteen months SHU and corresponding loss of privileges. Uhler Decl., Ex. B, Appeal Dec., dated Mar. 29, 2011. On June 21, 2011, Defendant D. Rock, Superintendent of

Upstate Correctional facility, refused Plaintiff's request for discretionary review of his disciplinary determination. *Id.* at Ex. C, Lt., dated June 21, 2011.

**\*14** On June 30, 2011, Plaintiff filed an Article 78 petition challenging the disciplinary determination. On December 2, 2012, the Honorable S. Peter Feldstein, Acting Supreme Court Justice in Franklin County, New York, determined that "the hearing officer did not err in conducting the Tier III Superintendent's Hearing in the absence of petitioner." Pl.'s App. at Sec. III, Ex. A, at p. 4. However, Judge Feldstein found that Plaintiff "must prevail" as to his argument that "he did not receive a copy of the written hearing disposition sheet, including the statement of evidence relied upon by the hearing officer, and the statement of reason(s) for the disposition imposed." *Id.* at pp. 5–6. Judge Feldstein further noted that prison officials should "process any additional administrative appeal from the results and disposition of the Tier III Superintendent's Hearing concluded February 3, 2011 that petitioner files within 30 days service" of his decision. *Id.* at p. 6.

Plaintiff contends that he is entitled to summary judgment against Defendant Uhler because he held the third disciplinary hearing in Plaintiff's absence and because he failed to provide Plaintiff with written notice of the disciplinary determination and the evidence on which it was based. Pl.'s Mem. of Law at pp. 25–27. Plaintiff further claims that Defendants Venettozzi, Prack, and Rock were personally involved in depriving him of his due process right because they affirmed Defendant Uhler's determination. Pl's Opp'n at ¶ 53. Defendants argue that they are entitled to summary judgment on this claim because Plaintiff received all of the process that was due at the subsequent disciplinary hearing. Defs.' Mem. of Law at pp. 20–24.

### a. Notice

Plaintiff concedes that he "receive[d] advance notice of the charges, by service of the misbehavior report." Dkt. No. 39–2, Pl.'s Mem. of Law, at ¶ 34.

### b. Opportunity to be Heard

Originally, Plaintiff contended that Defendant Uhler violated his right to due process by unlawfully excluding him from attending the third disciplinary hearing. Pl.'s Mem. of Law at pp. 25–27. However, Plaintiff has since conceded that he is barred from re-litigating this issue in the instant matter by the doctrine of collateral estoppel. [12]

A review of Judge Feldstein's decision reveals that he indeed already considered the issue of whether "the Tier III Superintendent's Hearing was unlawfully conducted in his absence" in Plaintiff's Article 78 action. Pl.'s App. at Sec. III, Ex. A, at p. 3. Judge Feldstein noted that, "an inmate has a fundamental right to be present at a Superintendent's Hearing unless he or she refused to attend, or is excluded for reasons of institutional safety or correctional goals." *Id.* (internal quotations, alterations, and citations omitted). After considering the evidence before him, including a transcript of the hearing conducted in Plaintiff's absence—containing on-the-record testimony from multiple prison officials stating, in sum and substance, that they made every effort to bring Plaintiff to his disciplinary hearing but Plaintiff refused to comply with prison handcuffing procedures—Judge Feldstein concluded that "the hearing officer did not err in conducting the Tier III Superintendent's Hearing in the absence of petitioner." *Id.* at pp. 3–6.

**\*15** Crucially, and in keeping with the standard applied by Judge Feldstein, it is well established federal precedent that an inmate's refusal to attend a disciplinary hearing waives his due process objections when it occurs through no fault of prison authorities. *Tafari v. McCarthy,* 714 F.Supp.2d 317, 380 (N.D.N.Y.2010) (citing *Howard v. Wilkerson,* 768 F.Supp. 1002, 1006 (S.D.N.Y.1991)). Accordingly, Judge Feldstein's conclusion that Plaintiff's own actions justified holding the hearing in his absence is entitled to preclusive effect in the instant action. [13] *See Williams v. Pepin,* 2011 WL 7637552, \*6 (N.D.N.Y. Dec. 23, 2011) (holding that plaintiff's due process claims which were rejected in an earlier Article 78 action were precluded from being re-litigated in a subsequent § 1983 action under the doctrine of collateral estoppel).

Accordingly, Plaintiff's due process rights were not violated when his third disciplinary hearing was held in his absence.

### c. Some Evidence

It is clear that Defendant Uhler's disciplinary determination was supported by sufficient reliable evidence. Specifically, Defendant Uhler read the following into the record:

> The first report is by Officer Gravlin.... On 1/19/11 at approximately 9:45 AM, I conducted a pat frisk of inmate Hinton ... on 11 A 1 Gallery.... Inmate Hinton had a total of 29 pills in his front right pocket. The block nurse identified the pills as neurontin, baclofen. Both are prescription medication given to the inmate on medication rounds.... The second Report [states] ... January 19th, 2011 10:20 A.M.... On the above date and time I CO Bogardus ... was helping give inmate Hinton his level one property after being transferred from eleven building to ten building. As I was going through the letters I noticed envelopes with no addresses with objects in them sealed. I opened the envelopes and found pills. After opening all the envelopes I took the pills to the block Nurse Holmes identified them and counted them which is what came up with [sic] 319 neurontin 600 milligram, 205 baclofen 10 milligram, 100 amlodipine 5.

3rd Disciplinary Hr'g Tr. at p. 4.

Given the specificity of these reports as well as the fact that they were authored by officers with first hand knowledge of the events, no rational juror could conclude that Defendant Uhler lacked sufficient reliable evidence to support his determination. *See Thomas v. Connolly,* 2012 WL 3776698, at \*23; *Creech v. Schoellkoph,* 688 F.Supp.2d 205, 214–15 (W.D.N.Y.2010) (finding disciplinary determination relying on misbehavior report was sufficient for purposes of "some evidence" standard

where "the misbehavior report was made by the officer personally involved in the ... incident, and is based on his first hand observation, and contains a detailed account of that incident, including the time, place, circumstances, and names of participants").

### d. Written Decision

It is undisputed that Plaintiff did not receive a formal written statement of the third disciplinary determination "until at least six months after the hearing was actually held." Pl.'s Opp'n at Ex. A, Hinton Aff. [14]

**\*16** It is clear that Plaintiff's due process rights were violated by Defendants' failure to provide him with a copy of this statement. *See Lunney v. Brureton,* 2007 WL 1544629, at \*28 (S.D.N.Y. May 29, 2007) (surveying cases for the proposition that "the right to receive a written statement of the disposition is a requirement that has been in place since the Supreme Court's decision in *Wolff v. McDonnell*" ) (internal quotation marks, alterations, and citations omitted). However, notwithstanding this violation, Plaintiff is not entitled to anything other than nominal damages in the instant case because he has failed to establish an actual injury. *See McCann v.. Coughlin,* 698 F.2d 112, 126 (2d Cir.1983) (citing *Carey v. Piphus,* 435 U.S. 247, 266–67 (1978), for the proposition that "[i]t is well established that to collect compensatory damages in an action brought pursuant to 42 U.S.C. § 1983, a plaintiff must prove more than mere violation of his constitutional rights. He must also demonstrate that the constitutional deprivation caused him some actual injury"); *Thomas v. Annucci,* 2008 WL 3884371, at \*5 (N.D.N.Y. Aug. 19, 2008) (citing, *inter alia, McCann v. Coughlin* for the same proposition).

Here, notwithstanding the fact that Plaintiff's constitutional rights were violated, he cannot establish actual injury. To begin with, Plaintiff cannot argue that the failure to provide him with a written notice of the determination caused him to be sentenced to a term of SHU imprisonment; indeed, that determination was made before the duty to provide Plaintiff with a copy of the notice even arose. *Cf. McCann v. Coughlin,* 698 F.2d at 126 (noting that "the failure to provide McCann with a written statement of the Committee's decision and underlying reasons could not have caused his injury. If he had received such a written statement, it would have been after the Committee rendered its decision."). Thus, in

order to establish that the Defendants' failure to provide him with a copy of the notice caused him actual injury, Plaintiff would have to show that because he did not have access to the information contained in the notice, he was unable to mount a meritorious appeal, and therefore, was forced to remain in SHU longer than necessary. *Cf. Miner v. City of Glens Falls,* 999 F.2d 655, 660 (2d Cir.1993) (citing *McCann v. Coughlin,* 698 F.2d at 126, for the proposition that "[i]n this Circuit, the burden is normally on the plaintiff to prove each element of a § 1983 claim, including those elements relating to damages.... It was therefore Miner's burden to show that the property or liberty deprivation for which he sought compensation would not have occurred had proper procedure been observed.").

Yet, despite the fact that he ultimately received a copy of the notice prior to commencing the instant action, Plaintiff fails to allege that had he known the evidentiary basis for his conviction as contained in the notice earlier, he would have been able to successfully appeal the determination. Indeed, according to his Complaint, despite the fact that Judge Feldestein explicitly granted him the right to file additional appeals after he had obtained a copy of the notice, his subsequent attempts were unsuccessful. *See* Compl. at p. 6; *see also* Pl.'s App. at Sec. III, Ex. A, at pp. 5–6. [15] Thus, Plaintiff's claim fails because he cannot establish that the failure to provide him with a copy of the hearing disposition in a timely manner caused him to suffer any actual injury. [16]

**\*17** Moreover, Plaintiff is not entitled to punitive damages in the instant action. "Courts may award punitive damages in situations where a defendant's conduct is 'willful or malicious,' or where defendants have demonstrated 'reckless intent' or 'callous indifference.' " *Giano v. Kelly,* 2000 WL 876855, at \*26 (W.D.N.Y. May 16, 2000) (quoting *Memphis Comty. School Dist. v. Stachura,* 447 U.S. 299, 306 (1986)). Here, nothing in the record establishes that Defendant Uhler acted maliciously or willfully with regard to his failure to provide Plaintiff with a copy of the notice. Therefore, the court recommends **DENYING** plaintiff's request for punitive damages.

Having failed to establish any actual injury, Plaintiff is only entitled to receive nominal damages in the amount of one dollar. *McCann v. Coughlin,* 698 F.2d at 126. Accordingly, we recommend that Defendants'

Cross–Motion for Summary Judgment be **GRANTED** as to Plaintiff's claim that he was unlawfully excluded from the third disciplinary hearing and **DENIED** as to Plaintiff's claim that he was not provided with a copy of the hearing disposition in a timely manner. We further recommend that Plaintiff's Motion for Summary Judgment be **GRANTED** with respect to his claim that Defendants failed to provide him with a written disposition of the third disciplinary hearing, and that, in full satisfaction of his constitutional deprivation, he be awarded the sum of one dollar in nominal damages.

### e. Defendants Venettozzi, Prack, and Rock

Plaintiff claims that "[s]ince Venettozzi, Prack[,] and Rock all had [a] hand in affirming the [third disciplinary] decision, they as well are liable." Pl.'s Mem. of Law at p. 27. Courts within the Second Circuit are split over whether the mere allegation that a supervisory official affirmed a disciplinary determination is sufficient to establish personal liability. We subscribe to the affirmance plus standard, which holds that the mere rubber-stamping of a disciplinary determination is insufficient to plausibly allege personal involvement. *See Brown v. Brun,* 2010 WL 5072125, at *2 (W.D.N.Y. Dec. 7, 2010) (noting that courts within the Second Circuit are split with regards to whether the act of affirming a disciplinary hearing is sufficient to allege personal involvement of a supervisory official, and concluding that the distinction appears to hinge upon whether the official proactively participated in reviewing the administrative appeal or merely rubber-stamped the results). Here, Plaintiff fails to make a single non-conclusory allegation from which a reasonable juror could conclude that Defendants Venettozzi, Prack, and Rock did anything other than rubberstamp Plaintiff's disciplinary determination.

Accordingly, we recommend that Plaintiff's Motion for Summary Judgment as to his claims against Defendants Venettozzi, Prack, and Rock, for affirming the third disciplinary disposition be **DENIED,** and that Defendants' Motion be **GRANTED** with respect to the same, and that this claim be **DISMISSED.**

## B. Qualified Immunity

**\*18** Defendants argue that they are entitled to qualified immunity. Defs.' Mem. of Law at pp. 23–24. However, given that we have recommended dismissing all of Plaintiff's claims except his claim against Defendant Uhler, we do not discuss whether any of the other Defendants are entitled to qualified immunity. *See Saucier v. Katz,* 533 U.S. 194, 201 (2001) ("If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity."). However, some limited discussion is necessary with regard to Plaintiff's due process claim against Defendant Uhler for the failure to provide Plaintiff with a written copy of the disposition.

The doctrine of qualified immunity shields public officials from suit for conduct undertaken in the course of their duties if it "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982); *Eng v. Coughlin,* 858 F.2d 889, 895 (2d Cir.1988). Whether an official protected by qualified immunity may be held liable for an alleged unlawful action turns on the objective legal reasonableness of the action assessed in light of the legal rules that were clearly established at the time the action was taken. *Anderson v. Creighton,* 483 U.S. 635, 639 (1987); *Lewis v. Cowan,* 165 F.3d 154, 166 (2d Cir.1999). Until recently, courts faced with qualified immunity defenses have applied the procedure mandated in *Saucier v. Katz,* 533 U.S. 194 (2001). That case set forth a two-pronged approach whereby the court must first decide whether the facts alleged, or shown, make out a violation of a constitutional right. If yes, the court must then decide whether the right at issue was "clearly established" at the time of the alleged misconduct. *Saucier v. Katz,* 533 U.S. 194 at 201–02. Recently, however, the Supreme Court softened the rigid approach enunciated in *Saucier. See Pearson v. Callahan,* 555 U.S. 223 (2009). Now, the *Saucier* two-pronged test is not mandated in terms of the order in which the prongs may be addressed, though the sequence of review may remain appropriate or beneficial. *Id.* at 818.

To determine whether a right was clearly established for purposes of qualified immunity, courts must consider "whether the right was defined with reasonable specificity; whether decisional law of the Supreme Court and the [Second Circuit] supports its existence; and whether, under preexisting law, a defendant official would have reasonably understood that his [or her] actions were

unlawful." *Rodriguez v. Phillips,* 66 F.3d 470, 476 (2d Cir.1995); *see also Nicholas v. Miller,* 189 F.3d 191, 195 (2d Cir.1999).

A party is entitled to summary judgment on qualified immunity grounds if the court finds that the rights asserted by the plaintiff were not clearly established, or that "no reasonable jury, looking at the evidence in the light most favorable to, and drawing all inferences most favorable to, the plaintiff [ ], could conclude that it was objectively unreasonable for the defendant to believe that he was acting in a fashion that did not clearly violate an established federally protected right." *Lee v. Sandberg,* 136 F.3d 94, 102 (2d Cir.1997) (citations omitted).

**\*19** As discussed *supra,* the right to receive a written copy of the hearing disposition, including the evidence relied upon and the reasons for the sentence, has been clearly established since *Wolff v. McDonnell. Lunney v. Brureton,* 2007 WL 1544629, at \*28. Moreover, no rational juror could conclude that it was objectively reasonable for Defendant Uhler not to provide Plaintiff with a copy of his third disciplinary hearing disposition. Accordingly, Defendant Uhler is not entitled to qualified immunity with respect to this claim.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED,** that Plaintiff's Motion for Summary Judgment (Dkt. No. 39) be **GRANTED** in part and **DENIED** in part as follows:

1. **GRANTED** to the extent that Plaintiff is entitled to summary judgment as to the issue of whether Defendant Uhler violated his right to due process by failing to provide him with a copy of the hearing disposition from his third disciplinary hearing, **HOWEVER,** in light of Plaintiff's inability to

establish actual injury, we further recommend that he be awarded nominal damages in the amount of one dollar; and

2. **DENIED** in all other respects; and it is further

**RECOMMENDED,** that Defendants Cross–Motion for Summary Judgment (Dkt. No. 42) be **GRANTED** in part and **DENIED** in part as follows:

1. **DENIED** with respect to Plaintiff's due process claim against Defendant Uhler for his failure to provide Plaintiff with a copy of his hearing disposition from the third disciplinary hearing; and

2. **GRANTED,** with respect to all of Plaintiff's other claims, which should be **DISMISSED;** and it is further

**ORDERED,** that the Clerk of the Court **TERMINATE** Sgt. Gower from this action; [17] and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs .,* 892 F.2d 15 (2d Cir.1989)); *see also* 28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

Date: August 14, 2014.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 4627120

---

Footnotes

1    We agree. In the instant case, Plaintiff has alleged that he spent a total of 910 consecutive days in SHU as a result of the three disciplinary hearings at issue. Dkt. No. 39–2, Pl.'s Mem. of Law, dated Nov. 8, 2013, at p. 2. The Second Circuit has held that "[o]verlapping disciplinary penalties may, under some circumstances, have to be aggregated for purposes of determining whether a liberty interest was violated." *Reynoso v. Selsky,* 292 F. App'x 120, 122 (2d Cir.2008) (citing *Sims v. Artuz,* 230 F.3d 14, 23–24 (2d Cir.2000)); *see also Koehl v. Bernstein,* 2011 WL 2436817, at \*7 (S.D.N.Y. June 17, 2011) (citing *Sealey v. Giltner,* 197 F.3d 578 (2d Cir.1999), for the proposition that "the Second Circuit suggested that

consecutive sentences resulting from separate hearings adjudicating different misbehavior reports should be aggregated for the purpose of determining whether the confinement constitutes atypicality.").

2  A transcript of the September 7–13 disciplinary hearing was not provided to the Court as part of his disciplinary record.

3  In addition to time in SHU, Plaintiff also lost several months of good time credits as a result of his disciplinary hearings. *See* 1st Hr'g Tr. at p. 1; Haug Decl., Ex. A, Disciplinary Hr'g Report; 3rd Hr'g Tr. at p. 1. Ordinarily, a prisoner cannot seek monetary damages for a due process violation arising out of a prison disciplinary hearing where the loss of good time credits affects the overall length of the plaintiff's sentence without first seeking a reversal or expungement of the disciplinary conviction. *See Heck v. Humphrey,* 512 U.S. 477, 486–87 (1994)) (holding "that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254. A claim for damages bearing that relationship to a conviction or sentence that has *not* been so invalidated is not cognizable under § 1983."). However, in the instant case, Plaintiff is serving a life sentence, and accordingly, the loss of good time credits neither affects the overall length of his sentence nor prevents him from filing the instant action. *See* New York State Inmate Lookup for Inmate DIN # 96–A–0837, Leonard Hinton, http://nysdoccslookup.doccsny.gov (last checked July 31, 2014); *see also Holmes v. Grant,* 2006 WL 851753, at *18 (S.D.N.Y. Mar. 31, 2006) (surveying cases in support of the proposition that *"Heck [v. Humphrey]* does not apply [w]here, ... plaintiff is serving a life sentence, [because] the loss of good time credits ... has no effect on the length of his sentence"); N.Y. CORR. LAWW § 803(1)(a) (noting that inmates serving a maximum life sentence are not eligible for reduced sentence based on good behavior).

4  Sgt. Gower was dismissed from this action by the Honorable Lawrence E. Kahn, Senior United States District Judge, during the Court's initial review on March 7, 2013. *See* Dkt. No. 4, Dec. & Order, dated Mar. 7, 2013, at p. 5. Nonetheless, Sgt. Gower was served with process and joined in Defendants' Answer. *See* Dkt. Nos. 7 & 23. In light of his earlier dismissal and notwithstanding the subsequent errors which occurred, the Clerk of the Court is ordered to terminate Sgt. Gower from this action.

5  Document Number 42–1 is listed as Plaintiff's Affidavit. However, this document contains both sworn statements and legal arguments, in non-sequentially numbered paragraphs. Accordingly, we make reference to the page numbers assigned by Plaintiff.

6  In his Article 78 proceeding, Plaintiff challenged the sufficiency of the notice on the grounds that it omitted the specific dates of the events in question. *See generally* Pl.'s App., Sec. I, Ex. H. While it does not appear that Plaintiff intended to re-raise that issue here, to the extent that he may have intended to do so, such an argument would be unavailing. Although the date of the misbehavior report was actually the date Sgt. Gower conducted his investigation rather than the date that the actual events giving rise to the report occurred, this omission was by no means fatal given the specific nature of the charges against Plaintiff. Indeed, it is clear that Plaintiff was able to understand the nature of the charges against him and to prepare a defense. *See id.* (finding that "the report provided adequate detail to apprise [Plaintiff] of the charges and afford him the opportunity to prepare his defense") (internal quotations and citation omitted); *see also Sira v. Morton,* 380 F.3d at 71 (citing *Quinones v. Ricks,* 288 A.D.2d 568, 568–69 (N.Y.App. Div.2d Dep't 2001), for the proposition that "failure to include specific date in misbehavior report may be excused if the report otherwise provides sufficient details to permit the inmate to fashion a defense"); *Cepeda v. Urban,* 2014 WL 2587746, at *6 (W .D.N.Y. June 10, 2014) (reaching similar conclusion).

7  Indeed, the New York State Appellate Division, Fourth Department, held that the evidence adduced at Plaintiff's disciplinary hearing was sufficiently adequate to meet the "substantial evidence" standard; a burden which is much higher than the "some evidence" standard applicable to the instant action. *See* Pl.'s App., Sec. I, Exs. H, Dec. & Order, dated Oct. 26, 2011; & I, Order, dated Nov. 9, 2012; *Smith v. Fischer,* 2010 WL 145292, at *9 (N.D.N.Y. Jan. 11, 2010) (citing *Sira v. Morton,* 380 F.3d at 76 n. 9, for the proposition that the substantial evidence " "requirement is sterner than the 'some evidence' standard necessary to afford due process" ").

8  It is also worth noting that it is not entirely clear that Inmate Veach's refusal to testify was actually a recantation of his earlier statements to Sgt. Gower. Inmate Veach stated in his refusal form that he knew nothing about any incident which occurred on July 25, 2010. Pl.'s App., Sec. I, Ex. C, Inmate Refusal Form, dated Oct. 8, 2010. However, July 25, 2010 was the day that Sgt. Gower was informed about the alleged violations, not the dates that the alleged violations occurred. *See supra* Note 6. Thus, this statement is not necessarily at odds with Veach's earlier statements to Sgt. Gower.

9  Neither Sergeant Betti nor Corrections Officer Ruggerio are Defendants in this action.

10  These individuals are not Defendants in the instant action.

11   It is clear from Plaintiff's Opposition to Defendant's Cross–Motion for Summary Judgment that Plaintiff was aware of Defendants' claim that he failed to identify how he was prejudiced by Defendant Haug's failure to call these witnesses. *See* Pl.'s Opp'n at pp. 6–7. However, rather than explain how he was prejudiced, Plaintiff argued that the Article 78 determination constituted "law of the case" and that Defendants' reliance on the harmless error standard was misplaced. *Id.*

12   On July 18, 2014, we stayed the parties pending Cross–Motions for Summary Judgment and ordered them to brief the Court as to whether Judge Feldstein's prior conclusion in Plaintiff's Article 78 action, that Plaintiff was properly excluded from his disciplinary hearing based on his failure to conform to facility security protocols, precluded him from arguing in the instant case that he was unlawfully excluded from attending the third disciplinary hearing. Dkt. No. 54, Order, dated July 18, 2014. In his Reply to the Defendants' Letter–Brief, Plaintiff conceded that Judge Feldstein's determination in this regard does preclude him from re-raising this issue in the instant matter. *See* Dkt. Nos. 55, Defs.' Lt.-Br., dated July 21, 2014, & 56, Pl.'s Reply Lt.-Br., dated July 25, 2014.

13   Moreover, even if the issue were not precluded, it is unlikely that Plaintiff's claim would have succeeded because Plaintiff fails to allege any resulting prejudice from this alleged error. *See Lunney v. Brureton,* 2007 WL 1544629, at *28 (S.D.N.Y. May 29, 2007) (citing *Powell v. Coughlin,* 953 F.2d 744, 750 (2d Cir.1991) for the proposition that "[p]rison disciplinary hearings are subject to a harmless error analysis."). Indeed, Plaintiff fails to allege that had he been offered the opportunity, he would have presented evidence or called witnesses on his own behalf, let alone that such evidence would have been likely to affect the outcome of his disciplinary determination.

14   Defendants fail to adequately contest Plaintiff's contention that he was not served a written copy of the determination; indeed, with the exception of their unsupported statement that they "[d]eny information and belief about when plaintiff received a copy of the hearing determination," they fail to address the issue whatsoever. *See* Dkt. No. 42–1, Defs.' Reply to Pl.'s 7.1 Statement, at ¶ 35; *see also Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991) (finding that mere conclusory allegations, unsupported by the record, are insufficient to defeat a motion for summary judgment).

15   Plaintiff also claims that he initially appealed his disciplinary determination on February 3, 2011, the day that it was imposed. Compl. at p. 6. However, he provides conflicting and wholly inadequate explanations for the type and content of the notice he received. *See id.* at p. 8 n. 3; *see also* Pl.'s Opp'n at Ex. A, Hinton Aff. And, although it is unclear what the bases of Plaintiff's February 3 appeal were, it is axiomatic that Plaintiff would have known at that time that he was excluded from the hearing and had not received proper notice, and accordingly, the lack of notice did not prevent him from raising either of these grounds at that time. Moreover, as a result of this appeal, Plaintiff's disciplinary determination was modified, and his sentence was reduced from thirty-six months SHU to eighteen months. Pl.'s Mem. of Law at p. 26; Uhler Decl. at Ex. B, Review of Sup't Hr'g, dated Mar. 29, 2011.

16   To be sure, we are not positing that the relief Plaintiff received from his Article 78 action somehow extinguished any due process violation that he may have suffered between the time that violation accrued, and the time the Article 78 Petition was granted in his favor. Rather, we are merely noting the fact that Plaintiff was unable to file a successful administrative grievance appeal at the prison once he was provided with a copy of the formal notice as evidence that nothing within the notice provided Plaintiff with a meritorious ground for appeal. Therefore, the fact that he did not receive the formal notice sooner did not prejudice him. *Compare Bogle v. Murphy,* 2003 WL 22384792, at *5 (W.D.N.Y. Sept. 9, 2003) (noting that once a due process violation accrues, a subsequent Article 78 determination in the plaintiff's favor does not rectify the harm caused); *with Lunney v. Brureton,* 2007 WL 1544629, at *27–29 (dismissing due process claim based on undisputed failure to provide timely written disposition to plaintiff, in part on the basis that after receiving a transcript of the hearing, which included a statement of the evidence relied upon, Plaintiff failed to add any new substantive arguments).

17   *See supra* Note 4.

---

2015 WL 791547
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Eugene JONES, Plaintiff,

v.

ROCK, Superintendent, Upstate Correctional
Facility; J. Marienelli, MHU Counselor, Upstate
Correctional Facility; John Doe # 3, Mental Health
Doctor, Upstate Correctional Facility; Michael
Hogan, Mental Health Commissioner; J. Healy,
Co., Upstate Correctional Facility; John Doe #
2, Co., Upstate Correctional Facility; John Doe
# 3, Co., Upstate Correctional Facility; Laveen,
C .O., Upstate Correctional Facility; Dwyer, C.O.,
Upstate Correctional Facility; John Doe # 4,
Lt., Upstate Correctional Facility; S. Santamore,
Sgt., Upstate Correctional Facility; Burgess, Co.,
Upstate Correctional Facility; John Doe # 5, Co.,
Upstate Correctional Facility; John Doe # 6, CO.,
Upstate Correctional Facility; Jerry Miller, Dental
Doctor, Upstate Correctional Facility, Defendants.

No. 9:12–cv–0447 (NAM/TWD).
|
Signed Feb. 24, 2015.

**Attorneys and Law Firms**

Eugene Jones, Dannemora, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General of the State
of New York, Colleen Galligan, Esq, Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

*ORDER*

NORMAN A. MORDUE, Senior District Judge.

**\*1** The above matter comes to me following a Report–
Recommendation by Magistrate Judge Therese Wiley
Dancks, duly filed on the 31st day of January 2015.
Following fourteen (14) days from the service thereof, the
Clerk has sent me the file, including any and all objections
filed by the parties herein.

After careful review of all of the papers herein, including
the Magistrate Judge's Report–Recommendation, and no
objections submitted thereto, it is

ORDERED that:

1. The Report–Recommendation is hereby adopted in its
entirety.

2. The defendants' motion for summary judgment (Dkt.
No. 46) is granted in its entirety.

3. The plaintiff's claims against John Doe defendants # 1–
6 are dismissed without prejudice from this action due to
plaintiffs failure to prosecute.

4. The Clerk of the Court shall serve a copy of this Order
upon all parties and the Magistrate Judge assigned to this
case.

**IT IS SO ORDERED.**

*ORDER AND REPORT–RECOMMENDATION*

THÉRÈSE WILEY DANCKS, United States Magistrate
Judge.

**I. INTRODUCTION**

Plaintiff Eugene Jones commenced this *pro se* civil rights
action under 42 U.S.C. § 1983 for the violation of his
Eighth Amendment right to be free from cruel and
unusual punishment while he was confined in the Upstate
Correctional Facility ("Upstate"). (Dkt. No. 1.) Plaintiff
asserted claims in his Complaint for: (1) deliberate
indifference to his serious mental health needs against
Defendants Upstate Superintendent Rock ("Rock"),
Upstate Mental Health Unit ("MHU") Psychologist 2,
J. Marinelli, incorrectly sued as Marienelli ("Marinelli"),
MHU Unit Chief T. Kemp ("Kemp"), Mental Health
Doctor John Doe # 1, and Mental Health Commissioner
Michael Hogan ("Hogan"), *id.* at ¶ 72; (2) excessive
force and deliberate indifference to Plaintiff's serious
mental health and medical needs against Defendants
Corrections Officer Healy ("Healy"), and Corrections
Officers John Doe # 2 and John Doe # 3, *id.* at ¶ 73;
(3) conditions of confinement against Defendant Rock;
*id.* at ¶ 74; (4) sexual harassment, assault, and excessive
force against Defendants Lt. John Doe # 4, Sgt. S.

Santamore ("Santamore"), Corrections Officer Lavigne, incorrectly sued as Laveen ("Lavigne"), and Corrections Officer Dyer, incorrectly sued as Dwyer ("Dyer"), *id.* at ¶ 75; and (5) deliberate indifference to Plaintiff's serious dental needs against Defendants Corrections Officer John Doe # 6, Doctor Jerry Miller ("Dr. Miller" or "Miller").

Defendants moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure after filing an Answer to the Complaint. (Dkt. No. 23.) Plaintiff opposed the motion. (Dkt. No. 27.) The Hon. Norman A. Mordue, Senior D.J., adopting the Report and Recommendation of this Court (Dkt. No. 30), granted Defendants motion in part and denied it in part. (Dkt. No. 31.) Dismissed on the motion were: (1) all of Plaintiffs claims seeking money damages against all Defendants in their official capacity with prejudice on Eleventh Amendment grounds; (2) claim for deliberate indifference to Plaintiff's serious mental health needs as against Defendant Hogan only; (3) claim for conditions of confinement against Defendant Rock; (4) claims for sexual harassment, assault and excessive force against Defendants Lavigne, Dyer, and Santamore; and (5) claim for deliberate indifference to Plaintiff's serious dental needs as against Defendants Burgess and Santamore. [1]

**\*2** Defendants Marinelli, Kemp, Healy, Dyer, and Miller have now moved for summary judgment on Plaintiff's remaining Eighth Amendment claims: (1) Count # 1 for deliberate indifference to Plaintiff's serious medical (mental health) needs against Defendants Marinelli and Kemp; (2) Count # 2 for deliberate indifference to Plaintiff's serious medical (mental health) needs and excessive force against Defendant Healy; and (3) Count # 5 for deliberate indifference to Plaintiff's serious medical (dental) needs against Defendants Miller and Dyer. (Dkt.Nos.46, 46–2.)

The grounds for summary judgment asserted by Defendants are: (1) Plaintiff's failure to exhaust administrative remedies as to Counts # 1 and # 2 against Marinelli, Kemp, and Healy; (2) Plaintiff's inability to state a prima facie claim of deliberate indifference with regard to medical (mental health) care against Defendants Kemp or Marinelli and medical (dental) care against Defendants Miller and Dyer; (3) Defendants Kemp and Miller's lack of personal involvement in the alleged violation of Plaintiffs Eighth Amendment rights; and (4)

Defendants Kemp, Marinelli, Dyer, and Miller's right to qualified immunity. (Dkt. No. 46–2 at 2–3.) [2]

Plaintiff has not opposed Defendants' summary judgment motion. For the reasons that follow, the Court recommends that Defendants' motion (Dkt. No. 46) be **GRANTED** in its entirety and further recommends the *sua sponte* dismissal of the action against Defendants John Does # 1–6 for failure to prosecute.

## II. STANDARD OF REVIEW

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Under those standards, the party seeking summary judgment bears the initial burden of showing, through the submission of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). A dispute is "genuine" if the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin,* 467 F.3d at 272–73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact. *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998).

In determining whether a genuine issue of material fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994); *see also Ruotolo v.*

*IRS,* 28 F.3d 6, 8 (2d Cir.1994) (district court "should have afforded [*pro se* litigants] special solicitude before granting the ... motion for summary judgment"). However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* No. 93 Civ. 5981(WHP) JCF, 1999 WL 983876 at *3, U.S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28, 1999) [3] (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

**\*3** Plaintiff's failure to oppose Defendants' summary judgment motion does not mean that the motion is to be granted automatically. An unopposed motion for summary judgment may be granted "only if the facts as to which there is no genuine dispute show that the moving party is entitled to judgment as a matter of law." [4] *Champion v. Artuz,* 76 F.3d 483, 486 (2d Cir.1996) (citations and internal quotation marks omitted); *see also Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d. Cir.2004) (where "the non-moving party 'chooses the perilous path of failing to submit a response to a summary judgment motion, the district court may not grant the motion without first examining the moving party's submissions to determine if it has met its burden of demonstrating that no material issue of fact remains for trial.' ") (quoting *Amaker v. Foley,* 274 F.3d 677, 681 (2d Cir.2001)).

Recently, in *Jackson v. Federal Exp.,* 766 F.3d 189, 198 (2d Cir.2014), the Second Circuit made clear that "[i]n the case of a *pro se,* the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate." In doing so, "the court may rely on other evidence in the record, even if uncited." *Id.* at 194 (citing Fed.R.Civ.P. 56(c)(3)). "A verified complaint is to be treated as an affidavit ... and therefore will be considered in determining whether material issues of fact exist ...." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) (internal citations omitted). [5]

This Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion. *Amnesty Am. v. Town of West Hartford,* 288 F.3d 467, 470 (2d Cir.2002). [6] For this reason, courts in this district have routinely enforced L.R. 7.1(a)(3) [7] in cases in which the non-movant

has failed to respond to the movant's Rule 7.1 Statement of Material Facts by deeming the facts to have been admitted where: (1) the facts are supported by evidence in the record; [8] and (2) the nonmovant, if proceeding *pro se,* has been specifically advised of the possible consequences of failing to respond to the motion. [9] *See Champion,* 76 F.3d at 486; *see also Jackson,* 766 F.3d at 194 (a non-movant who fails to respond to a summary judgment motion "runs the risk of unresponded-to-statements of undisputed facts proffered by the movant being deemed admitted.") While *pro se* litigants are undeniably "entitled to some measure of forbearance when defending against summary judgment motions, the deference owed to *pro se* litigants ... does not extend to relieving them of the ramifications associated with the failure to comply with the courts local rules." *Literati v. Gravelle,* No. 9:12–CV–00795 (MAD/DEP), 2013 WL 5372872, at *6, 2013 U.S. Dist. LEXIS 137826, at *8 (N.D.N.Y. Sept.24, 2013) (internal citations and punctuation omitted).

**\*4** In light of Plaintiff's failure to oppose Defendants' summary judgment motion, the facts set forth in Defendants' Statement Pursuant to Rule 7.1(a)(3) (Dkt. No. 46–1) that are, as shown below, supported by record evidence and are uncontroverted by nonconclusory factual allegations in Plaintiffs verified Complaint, are accepted as true. *See McAllister v. Call,* No. 9:10–CV–610, 2014 WL 5475293 (FJS/CFH), at *3, 2014 U.S. Dist. LEXIS 154422, at *3 (N.D.N.Y. Oct. 29, 2014) (finding allegations in plaintiff's verified complaint sufficient to controvert properly supported facts set forth in a L.R. 7.1(a)(3) statement of material facts where plaintiff did not oppose defendant's motion for summary judgment); *Douglas v. Perrara,* No. 9:11–CV–1353 (GTS/RFT), 2013 WL 5437617, at *3, 2013 U.S. Dist. LEXIS 14125, at * 6 (N.D.N.Y. Sept.27, 2013) ("Because Plaintiff[, who filed no opposition,] has failed to raise any question of material fact, the Court will accept the facts as set forth in Defendants' Statement Pursuant to Rule 7.1(a)(3) ..., supplemented by Plaintiff's verified Complaint ..., as true."). As to any facts not contained in Defendants' Statement Pursuant to Rule 7.1, in light of the procedural posture of this case, the Court is "required to resolve all ambiguities and draw all permissible factual inferences" in favor of Plaintiff. *Literati,* 2013 WL 5372872, at *7 (quoting *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003)).

## III. BACKGROUND

### A. Plaintiff's Mental Health Issues

Plaintiff has been incarcerated in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS") since the fall of 1995. (Dkt. Nos. 46–1 at ¶ 1; 47 at ¶ 6.) [10] Because Plaintiff had received psychiatric services while in the Niagara County Jail, he was seen by a psychiatrist when he entered the DOCCS system and placed on the New York State Office of Mental Hygiene ("OMH") service. (Dkt. Nos. 46–1 at ¶ 2; 47 at ¶ 7; 47–1 at 13.) He has received mental health services from OMH off and on since his incarceration. (Dkt. Nos. 46–1 at ¶ 3; 47 at ¶ 8; 47–1 at 12–21.)

During his incarceration, Plaintiff's "Mental Health Level" has fluctuated from Level 1 to Level 6 on a scale of 1 to 6. (Dkt. Nos. 46–1 at ¶ 4; 47 at ¶ 9.) The Treatment Needs Service Level UCR Policy defines Level 1 as the most serious and includes major mental illnesses such as schizophrenia and psychotic disorders requiring active treatment, and not having six months of psychiatric stability; those with documented psychotic or bipolar illness who are on certain drugs; and those with psychiatric hospitalizations within the past three years, significant or repeated suicide attempts and/or self-abuse history within the past three years, or suicide attempts resulting in in-patient hospitalization within the last six months. (Dkt. Nos. 46–1 at ¶ 5; 47 at ¶ 10; 47–1 at 9.)

Level 6 is defined as "Mental health assessment completed does not require mental health services." (Dkt. Nos. 46–1 at ¶ 6; 47–1 at 9.) Although Plaintiff's mental health status improved between 2005 and 2010, in August of 2009, while he was in the Special Housing Unit ("SHU") at Great Meadow Correctional Facility ("Great Meadow"), his mental health level was downgraded to Level 3, defined as "Needs/may need short term chemotherapy for disorders such as anxiety, moderate depression, or adjustment disorders OR suffer from a mental disorder which is currently in remission and can function in a dormitory facility which has part-time Mental Health staff." (Dkt. Nos. 46–1 at ¶ 8; 47–1 at ¶¶ 12–13; 47–1 at 1, 10.) While Plaintiff was confined at Great Meadow, Psychiatrist Kalyana Battau prescribed Topamax for his psychiatric symptoms. (Dkt. Nos. 46–1 at ¶ 9; 47 at ¶ 14; 47–1 at 63.)

**\*5** Plaintiff was transferred from Great Meadow to Upstate on September 17, 2009, and arrived with a diagnosis of Antisocial Personality Disorder ("ASPD"), and a prescription for Topamax. (Dkt. Nos. 46–1 at ¶ 11; 47 at ¶¶ 15–16; 47–1 at 8, 9, 44.) The Transfer Progress Notes prepared by a Great Meadow's Social Worker state that Plaintiffs mental status was "Alert, oriented. No evidence of thought disorder. Mood generally neutral, stable." (Dkt. Nos. 46–1 at ¶ 11; 47–1 at 44.)

According to Plaintiff, Upstate is a maximum security prison in which seventy-five percent of the inmates are housed in SHU. (Dkt. No. 1 at ¶ 14.) Plaintiff was confined in SHU in a single cell in A–Block in 11–Building where mentally ill inmates were housed together. *Id.* at ¶¶ 15, 26. Defendant Marinelli, employed by OMH as a Psychologist 2 at the Central New York Psychiatric Center ("CNYPC") satellite unit at Upstate, first saw Plaintiff on September 21, 2009. (Dkt. Nos. 1 at ¶ 15; 46–1 at ¶ 12; 48 at ¶ 8; 48–1 at 46–47.) Plaintiff has alleged in his Complaint that he told Marinelli he had a long history of mental illness and treatment both before and during his incarceration. (Dkt. No. 1 at ¶ 16.) Marinelli observed no concerns or issues at that time. (Dkt. Nos. 46–1 at ¶ 12; 48 at ¶ 8; 48–1 at 46–47.) He placed Plaintiff on "active status" so he would continue to receive OMH services. (Dkt. No. 48–1 at 46–47.)

On September 23, 2009, Marinelli prepared a Mental Health Treatment Plan ("Plan") for Plaintiff based upon his mental health history, diagnosis of ASPD, and current mental status. (Dkt. Nos. 46–1 at ¶ 13; 48 at ¶ 9; 48–1 at 23–34.) The Plan included Plaintiff being placed on Marinelli's service so that he would be seen regularly at his cell, monthly call-outs for private mental health interviews, and continuation of his prescribed medication Topamax. *Id.* The Plan was approved by OMH Staff Psychiatrist Bezalel Wurzberger ("Dr.Wurzberger") on October 2, 2009. (Dkt. Nos. 46–1 at ¶ ; 48 at ¶ 12.)

When Marinelli saw Plaintiff for a cell-side visit on September 29, 2009, Plaintiff was doing well and had no current health concerns. (Dkt. Nos. 46–1 at ¶ 14; 48, at ¶ 11; 48–1 at 48.) When he met with Plaintiff for a private therapy session on October 7, 2009, Marinelli observed no active mental illness and Plaintiff had no health complaints. (Dkt. Nos. 46–1 at ¶ 15; 48 at ¶¶ 11; 48–1 at 49.)

Plaintiff saw Dr. Wurzberger for an evaluation on October 9, 2009. (Dkt. Nos. 1 at ¶ 17; 23 at ¶ 14; 46–1 at ¶ 18; 47–1 at 30.) Wurzberger's Psychiatric Progress Note states in part:

**COMPLAINTS/CURRENT ISSUES:**

Inmate recently transferred to this facility; gives a history of "ups and downs and anxiety"; says that he was treated with multiple medications in the past; reports "doing alright now", rates himself "in the middle" on the 0–10 moods scale; sleep and appetite are adequate; has no complaints.

**\*6** The record indicates an extensive history of behavioral problems, characterologically driven, for which he was referred twice to the [Behavioral Health Unit] BHU.

**MENTAL STATUS EXAMINATION AND CHANGES:**

Is alert, oriented, coherent and relevant; mood and affect are appropriate; there are no signs of abnormal psychomotor activity; denies hallucinations; denies self harm thoughts or intent; cognitive functions adequate.

**SUICIDE RISK ASSESSMENT:**

No current warning signs of suicidality.

**PLAN:**

Discussed treatment options, including risks and benefits involved; he is psychiatrically stable, with no objective evidence of a mood disorder or a thought disorder; discussed with him the fact that Topamax has no psychiatric indications, is non-formulary, and is not indicated for his clinical presentation; I suggested a trial of an SSRI for the anxiety symptoms he described; he told me "thank you, but no thank you", and refused to consider other alternatives; we'll monitor for changes and reassess treatment options as needed.

(Dkt. Nos. 46–1 at ¶ 18; 47–1 at 30.) Dr. Wurzberger discontinued Plaintiffs Topamax on October 9, 2009. (Dkt. Nos. 46–1 at ¶ 19; 48 at ¶ 15.) Marinelli and Kemp did not make the decision to discontinue the Topamax. (Dkt. Nos. 46–1 at ¶¶ 43–44; 47 at ¶ 40; 48 at ¶ 48; 48–1 at 64.) According to Kemp, the discontinuance was proper because there is no psychiatric indication for the use of Topamax. (Dkt. Nos. 46–1 at 46; 47 at ¶ 50; 48–1 at 30.)

When Marinelli saw Plaintiff for his weekly cell-side visits on October 13, 2009, October 23, 2009, and November 9, 2009, after discontinuance of the Topamax, Plaintiff denied mental health issues or concerns, and Marinelli observed no evidence of mental illness or ongoing mental health issues or concerns. (Dkt. Nos. 46–1 at ¶¶ 20–22; 48 at ¶¶ 16–18; 48–1 at 50–53.) At a private therapy session with Marinelli on November 13, 2009, Plaintiff discussed efforts to make positive changes in his life, his relationship with his family, and how his early experiences affected how he related to authority figures. (Dkt. Nos. 46–1 at ¶ 23; 48 at ¶ 19; 48–1 at 50.)

The reports from Marinelli's cell-side visits with Plaintiff on November 25, 2009, and December 16 and 31, 2009, and his private mental health interview with Plaintiff on December 15, 2009, all reflect Marinelli's observation that Plaintiff had no current mental health issues. (Dkt. Nos. 46–1 at ¶¶ 24–26; 48 at ¶¶ 20–23; 48–1 at 53–55.) On November 25, 2009, Plaintiff reported he was happy that he had been moved to the PIMS [11] gallery, which was a quieter gallery, and on December 31, 2009, reported that he liked his new "hood." (Dkt. Nos. 46–1 at ¶ 24; 48 at ¶¶ 20 and 23 .) Plaintiff had also told Marinelli he liked his current housing situation at a private mental health interview on December 15, 2009. (Dkt. Nos. 46–1 at ¶ 25; 48 at ¶ 29; 48–1 at 53.)

**\*7** However, in a January 13, 2010, letter to Defendant Kemp, a Licensed Clinical Social Worker employed by the NYS OMH as Unit Chief for the CNYPC mental health unit at Upstate, Plaintiff complained of being taken off the medication he was on when he arrived at Upstate, and that despite really trying, he was having a lot of symptoms of mental illness and couldn't keep living like that. Plaintiff claimed that he tried to talk to Marinelli, "but he thinks it's a game or something." Plaintiff asked Kemp to change his therapist to someone who would treat his mental health issues rather than treating them like a joke. (Dkt. Nos. 1 at ¶ 20; 27–1 at 10.) Plaintiff claims to have received no reply from Kemp, and Defendants have not referenced the letter in their statement of material facts. (Dkt. Nos. 1 at ¶ 20; 46.) According to Plaintiff, every time he wrote to Kemp, Marinelli would appear at his cell door and warn him against writing the complaints and telling him "not to go over his head." (Dkt. No. 1 at ¶ 20.)

On January 25, 2010, Plaintiff refused to attend his private interview with Marinelli, and Marinelli noted that termination of Plaintiff's mental health services should be considered based upon his stability and lack of reported or observed mental health concerns. (Dkt. Nos. 46–1 at ¶ 28; 48 at ¶ 24; 48–1 at 55.) Marinelli thereafter had a cell-side meeting with Plaintiff on January 29, 2010, and noted that no mental health concerns were reported or observed. (Dkt. Nos. 46–1 at ¶ 29; 48 at ¶ 25; 48–1 at 56.) Marinelli and Plaintiff discussed whether mental health treatment should be discontinued, and according to Marinelli, Plaintiff wanted to wait a month before discontinuing services. *Id.* Marinelli had cell-side visits with Plaintiff on February 18, 2010, February 25, 2010, March 16, 2010, and March 30, 2010. (Dkt. Nos. 46–1 at ¶¶ 31–34; 48 at ¶¶ 27–30; 48–1 at 58–61.) According to Marinelli, Plaintiff denied any mental health issues, and Marinelli did not observe any mental health concerns. *Id.*

On March 30, 2010, Marinelli prepared Termination Transfer Notes recommending that Plaintiff be terminated from OMH service and a Treatment Needs/ Service Level Designation recommending that Plaintiff's Mental Health Level be changed to Level 6. (Dkt. Nos. 46–1 at ¶¶ 35–36; 48 at ¶¶ 31–32; 48–1 at 11, 62.) Kemp reviewed the recommendation and Plaintiff's mental health records and approved the change in Mental Health Level and Plaintiff's removal from OMH services. (Dkt. Nos. 46–1 at ¶ 37; 47 at ¶ 42; 47–1 at 11.) Even after Plaintiff's termination from the OMH caseload, he continued to receive regular mental health evaluations by OMH staff every ninety days due to his SHU placement. (Dkt. Nos. 46–1 at ¶ 42; 48 at ¶ 39; 48–1 at 3–6.)

On March 22, 2010, prior to the termination, Plaintiff had written to Kemp, identifying the subject of the letter as "I want to know why you are trying to ruin my life worse than it already is." (Dkt. Nos. 1 at ¶ 22; 27–1 at 9.) In the letter, Plaintiff asked why every time he wrote to Kemp complaining about Marinelli, Marinelli would show up bragging that Kemp had given him a copy of the letter. (Dkt. No. 27–1 at 9.) He asked Kemp why he couldn't help him to see a doctor so he could get some medication to stop the voices in his head and told him that when he talked to Marinelli about seeing a doctor, he laughed in his face. *Id.* Again, according to Plaintiff, he received no reply or visit from Kemp regarding the letter. (Dkt. No. 1 at ¶ 20.) The letter is not referenced in Defendants' statement of material facts. (Dkt. No. 46–1.)

**\*8** On May 3, 2010, Plaintiff wrote to NYS Commissioner of Mental Health Michael Hogan ("Commissioner Hogan" or "Hogan") explaining that the only reason he was bothering him was that Kemp either wouldn't reply to his letters or would keep sending Marinelli to his cell to harass him about writing to Kemp. (Dkt. Nos. 1 at ¶ 21; 27–1 at 8.) Plaintiff explained to Hogan that he had a long history of mental health problems and taking medication. Plaintiff told Hogan that his medication had been taken away, and he felt himself slipping back into mental illness. Plaintiff also complained of hearing people talking and not knowing if the voices were real or in his head. (Dkt. No. 27–1 at 8.) Hogan did not reply. (Dkt. No. 1 at ¶ 21.) The letter is not referenced in Defendants' statement of material facts. (Dkt. No. 46–1.)

Marinelli conducted a SHU 90–day mental health examination of Plaintiff on June 3, 2010, which confirmed that his Mental Health Level was 6, and that he did not require mental health services at that time. (Dkt. Nos. 46–1 at ¶ 38; 48 at ¶ 34; 48–1 at 3–4.) On June 17, 2010, Plaintiff wrote a second letter to Kemp informing Kemp that he had written to his boss about the conditions in SHU and the fact that Kemp and Marinelli had refused to treat mentally ill inmates or let them see mental health doctors. (Dkt. Nos. 1 at ¶ 20; 27–1 at 13.) Kemp did not reply. (Dkt. No. 1 at ¶ 20.) The letter is not addressed in Defendants' statement of material facts. (Dkt. No. 46–1.)

Plaintiff claims that on August 30, 2010, he used a piece of metal to cut his arms, and when Plaintiff showed Marinelli, he said "they don't look that bad," and told Plaintiff to run some water on the cuts and he would be fine. (Dkt. No. 1 at ¶ 22.) Plaintiff claims that he started screaming and Marinelli just walked away. *Id.* Plaintiff wrote to Kemp the same day. In the letter, Plaintiff told Kemp that he had attempted suicide by cutting his arms open, and Marinelli laughed when he showed him. (Dkt. Nos. 1 at ¶ 20; 27–1 at 13.) Plaintiff asked Kemp to arrange for him to talk to someone other than Marinelli and informed Kemp that the next time he tried suicide, he would not just cut himself but would hang himself and make no mistakes. *Id.* Kemp did not respond. (Dkt. No. 1 at ¶ 20.) The letter is not referenced in Defendants' statement of material facts. (Dkt. No. 46.) Marinelli denies the incident occurred and claims that if it had, he would not have responded in the manner Plaintiff has alleged.

(Dkt. Nos. 46–1 at ¶ 36; 48 at ¶ 36.) Plaintiff's mental health records, which have been submitted by Defendants, include no reference to the suicide attempt Plaintiff claims to have made. (*See* Dkt. Nos. 47–1 and 48–1.)

On September 10, 2010, Marinelli conducted another SHU 90–day mental health evaluation of Plaintiff, which confirmed that Plaintiff's Mental Health Level remained at Level 6 and did not require any mental health treatment at that time. (Dkt. Nos. 46–1 at ¶ 39; 48 at ¶ 35; 47–1 at 5–6.) On September 21, 2010, Plaintiff wrote a second letter to Hogan. (Dkt. Nos. 1 at ¶ 21; 27–1 at 7.) In the letter, Plaintiff asked Hogan to come visit Upstate to see what was going on and to help him. According to Plaintiff, the inmates on the mental health caseload were off their medications and were screaming, banging, and throwing things. Plaintiff claimed to be unable to sleep, or eat, and told Hogan that when the mental health staff came around, including Marinelli, they just laughed at everyone and didn't try to talk or do anything about the situation. *Id.* Hogan did not respond. (Dkt. No. 1 at ¶ 21.) There is no reference to the letter in Defendants' statement of material facts. (Dkt. No. 46–1.)

**\*9** Plaintiff wrote to Kemp again on October 14, 2010. (Dkt. Nos. 1 at ¶ 20; 27–1 at 12.) In the letter, Plaintiff told Kemp that he had been reading and found out that Kemp and his friends had been violating the law by not treating people for their mental illnesses, and that he planned to sue him. Plaintiff wrote that he could not understand how people could look at a person like him as the scum of the earth but see Kemp as a good guy that he would never treat people the way Kemp did. (Dkt. No. 27–1 at 12.) Kemp did not reply. (Dkt. No. 1 at ¶ 20.) There is no reference to the letter in Defendants' statement of material facts. (Dkt. No. 46–1.)

On November 8, 2010, Plaintiff sent a formal complaint against Marinelli to Hogan "as outlined in NYCRR § 701.2(A), (C), (E)," and requested that Hogan follow the regular procedure of the Grievance Committee. (Dkt. Nos. 1 at ¶ 21; 27–1 at 5.) In the letter, Plaintiff referenced his previous complaints to Hogan of May 3 and September 21, 2010, and Hogan's failure to take action. (Dkt. No. 27–1 at 5.) The gist of Plaintiff's complaint against Marinelli was that Plaintiff disclosed his long history of mental illness and that the parole board had informed him he needed to take a mental health unit program before he could be released. *Id.* Marinelli said

he had reviewed Plaintiffs file and would help him. *Id.* Instead, Plaintiff was taken off his medication and received no treatment at all. *Id.* Plaintiff described the single cell SHU section where he was housed as being filled with mentally ill inmates who were not being treated by the mental health staff and were banging and screaming all night, cutting themselves, smearing feces, and refusing to eat. *Id.* Plaintiff informed Hogan of the letters he had sent to Kemp with no response, and that Marinelli had done nothing to improve the situation. *Id.* Hogan did not respond. (Dkt. No. 1 at ¶ 21.) The formal complaint is not referenced in Defendants' statement of material facts. (Dkt. No. 46–1.)

Plaintiff was transferred from Upstate to Clinton Correctional Facility on November 15, 2010. (Dkt. Nos. 46–1 at ¶ 40; 48 at ¶ 37.) At that time, Plaintiff's Mental Health Level was still 6, and he did not require any mental health services. *Id.*; Dkt. No. 48–1 at 1.

## B. Healy [12]

According to Plaintiff, in the early morning of October 21, 2010, he made a rope from his sheets and hanged himself in the shower. (Dkt. No. 1 at ¶ 23.) In his Complaint, Plaintiff alleged that Healy and two other corrections officers entered Plaintiff's cell and cut him down and then began beating him with their hands and feet. *Id.* Plaintiff begged them to stop. *Id.* Healy and the other two officers made Plaintiff promise not to hang himself again and left his cell. *Id.* Healy warned Plaintiff that if he tried writing up the incident he would really wish he were dead. *Id.* Later in the day, Plaintiff cut his wrist and showed Healy, who again did not obtain help for Plaintiff from the mental health or medical staffs. *Id.* at ¶ 24.

## C. Plaintiff's Alleged Lack of Proper and Adequate Dental Care

**\*10** On August 29, 2010, while eating breakfast, one of Plaintiffs teeth cracked and lost its filling, which left Plaintiff in pain and unable to eat on one side of his mouth. (Dkt. No. 1 at ¶ 48.) Plaintiff claims that he thereafter submitted a number of sick call slips to the dental department requesting assistance and sent letters to Defendant Miller, a dentist at Upstate, asking for help on September 6 and 14, 2010. [13] *Id.* at ¶ 29.

On October 5, 2010, Plaintiff submitted Grievance No. UST 44009–10, in which he complained that he had been in pain for over a month because of a lost filling and had written to the dental department several times but had not been called out. (Dkt. Nos. 46–1 at ¶ 74; 49–2 at 4.) In his Declaration, Dr. Miller has stated that he investigated the claim and determined that no dental call out slips had been received from Plaintiff during that time period, as Plaintiff has claimed (*see* Dkt. No. 1 at ¶ 49), but made no mention of Plaintiff's September 6 and 14, 2010, letters. [14] (Dkt. Nos. 46–1 at ¶ 75; 49 at ¶ 19.)

Prior to filing the grievance, Plaintiff had gone to a dental appointment on September 29, 2010. (Dkt. Nos. 1 at ¶ 50; 46–1 at ¶ 51; 49 at 3.) When he arrived for the appointment, he learned from the hygienist that he was there for a cleaning, not to treat his lost filling and cracked tooth. (Dkt. No. 1 at ¶ 50.) Plaintiff's dental records confirm his claim that he informed the dental hygienist of the lost filling at the September 29th appointment, and Miller acknowledges that Plaintiff's dental records reflect that he informed the hygienist about the lost filling, and states that Plaintiff was scheduled for a follow-up appointment on November 3, 2010, to address the lost filling concern. (Dkt. Nos. 46–1 at ¶¶ 51, 53–54; 49 at ¶¶ 10–13; 49–1 at 3.) The hygienist's note did not indicate that Plaintiff complained of pain from the lost filling, and Dr. Miller has opined that a lost filling without significant pain is not emergent and does not require immediate dental treatment. (Dkt. Nos. 46–1 at ¶¶ 78–79; 49 at ¶¶ 22–23.)

On November 3, 2010, Dyer and Corrections Officer Burgess escorted Plaintiff from his cell for an Alcohol and Substance Abuse Treatment Program ("ASAT") evaluation and a dental call-out. (Dkt. Nos. 46–1 at ¶¶ 55–56; 51–2 at ¶¶ 6–7.) The ASAT evaluation was to be conducted in the room next to the block dental office. *Id.* Plaintiff claims that he told Dyer he wanted to refuse the ASAT call out because he was really in pain and couldn't eat or sleep and really needed to see the dentist. (Dkt. No. 1 at ¶ 55.) Dyer is alleged to have told Plaintiff that he made the rules, and the rules were that if Plaintiff refused one call out, he refused both. (Dkt. No. 1 at ¶ 56.) Dyer denies that Plaintiff ever told him he was in pain or that he wanted to skip the ASAT evaluation in order to see the dentist sooner. (Dkt. Nos. 46–1 at ¶ 57; 51–2 at ¶ 8.)

*11 Plaintiff was placed in a holding pen, and while he was waiting to see the dentist, Dyer escorted him to the ASAT evaluation. (Dkt. Nos. 46–1 at ¶¶ 58–59; 51–2 at ¶ 10.) After the ASAT evaluation, Plaintiff was returned to the holding pen to wait for the dentist. (Dkt. Nos. 46–1 at ¶ 60; 51–2 at ¶ 11.) According to Dyer, while Plaintiff was waiting in the holding pen, he began yelling at the dental escort that he was going to be seen next by the dentist. (Dkt. No. 46–1 at ¶ 61; 51–2 at ¶ 12.) Plaintiff claims that when a corrections officer tried to take Plaintiff to see the dentist, Dyer waived him away and told Plaintiff if he made it into the dentist at all he would be last, and he might not get in there at all. (Dkt. No. 1 at ¶ 57.) Dyer contends that he did not threaten Plaintiff in any way, and the only thing he said to him was "Jones, stop causing a disturbance," when Plaintiff was yelling at the dental escort. (Dkt. Nos. 46–1 at ¶¶ 62–63; 51–2 at ¶ 13.)

According to Dyer, Santamore spoke to the dentist, who said he had priority cases ahead of Plaintiff. (Dkt. Nos. 46–1 at ¶ 64; 51–2 at ¶ 14.) Plaintiff was told to quiet down or he would be returned to his cell, and when he continued to yell and create a disturbance, Santamore ordered Plaintiff returned to his cell. (Dkt. Nos. 46–1 at ¶¶ 65–66; 51–2 at ¶ 16.) Dyer claims he had no interest or intent in interfering with Plaintiff's dental care and was only complying with Santamore's order in taking Plaintiff back to his cell. (Dkt. Nos. 46–1 at ¶¶ 67–68; 51–2 at ¶¶ 17–19.) Dyer does not address Plaintiff's execution of a Refusal of Medical Examination And/Or Treatment with regard to the dental work he was supposed to have done on November 3, 2010, or the notation by Plaintiff "I've been waiting & staff refuse to let me see dental staff. I can see a number of inmates going in but corrections staff refuse to let me see dental staff." (Dkt. Nos. 46–1 at ¶ 70; 49–1 at 6.) Plaintiff claims that it was dismissed Defendant Burgess who demanded Plaintiff sign the dental form and go back to his cell or he would be seeing more than the dentist with a visit to the facility hospital. (Dkt. No. 1 at ¶ 59.) According to Dr. Miller, he did not see Plaintiff on November 3, 2010, and was not involved in obtaining the refusal signed by Plaintiff. (Dkt. Nos. 46–1 at ¶ 72; 49 at ¶ 16.)

Plaintiff's tooth was not fixed before he left Upstate, but according to Plaintiff, he was seen by dental approximately a week after being transferred to Clinton and received a temporary filling. (Dkt. No. 1 at ¶ 63.)

## IV. ANALYSIS

### A. Exhaustion of Administrative Remedies with Regard to Claims Against Defendants Healy, Marinelli, and Kemp

Defendants Healy, Marinelli, and Kemp seek summary judgment dismissing Plaintiffs' Eighth Amendment claims against them on the ground that Plaintiff failed to exhaust his administrative remedies. (Dkt. Nos. 46–2 at 4–7; 46–4 at ¶¶ 11–12.) The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, and expressly requires that no action shall be brought with respect to prison conditions under § 1983, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted. "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution in which they are confined. *Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (citing *Woodford v. Ngo,* 548 U.S. 81, 88, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)).

#### 1. *DOCCS Internal Grievance Program*

**\*12** In New York State prisons, DOCCS has a well-established three-step Internal Grievance Program ("IGP"). *See* N.Y. Comp.Codes R. & Regs. ("NYCRR") tit. 7, Part 701 (2013); (Dkt. Nos. 46–1 at ¶¶ 82–84; 46–4 at ¶¶ 4–6.) The first step requires an inmate to file a grievance complaint with the facility's IGP clerk within twenty-one days. *Id.* at § 701.5(a). If there is no informal resolution, the Inmate Grievance Resolution Committee ("IGRC") holds a hearing. *Id.* at § 701.5(b)(2). If the grievance is denied by written decision of the IGRC, *id.* at § 701.5(b)(3), the grievant may appeal the IGRC's decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* at 701.5(c) (1). The appeal of a grievance involving an institutional issue is decided by the superintendent of the facility. *Id.* at § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the Central Review Committee ("CORC") for a decision under the process applicable to the third step. *Id.* at 701.5(c) (3)(i). The third step is an appeal to CORC, *id.* at 701.5(d) (1)(i), which issues a written decision. *Id.* at 701.5(d)(3) (ii).

If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford,* 548 U.S. at 93. Because failure to exhaust is an affirmative defense, defendants bear the burden of showing by a preponderance of the evidence that a plaintiff has failed to exhaust his available administrative remedies. *See Murray v. Palmer,* No. 9:03–CV–1010 (GTS/GHL), 2010 WL 1235591, at *4, 2010 U.S. Dist. LEXIS 32014, at *16 (N.D.N.Y. Mar.31, 2010); *Bailey v. Fortier,* No. 09–CV–0742 (GLS/DEP), 2012 WL 6935254, at *6, 2012 U.S. Dist. LEXIS 185178, at *14–15 (N.D.N.Y. Oct.4, 2012) (the party asserting failure to exhaust bears the burden of proving its elements by a preponderance of the evidence).

An exhaustion review does not end when defendants are found to have met the burden of establishing a plaintiff's failure to exhaust. "Once a defendant has adduced reliable evidence that administrative remedies were available to Plaintiff and that Plaintiff nevertheless failed to exhaust those administrative remedies, Plaintiff must then 'counter' Defendants' assertion by showing exhaustion unavailability, estoppel, or 'special circumstances' [under *Hemphill v. State of New York,* 380 F.3d 680, 686 (2d Cir.2004) ]." *Murray,* 2010 WL 1235591, at *4. *Hemphill* sets forth a three-part inquiry for district courts. First, courts must determine if administrative remedies were in fact available to plaintiff.

Second, courts must determine if the defendants are estopped from presenting non-exhaustion as an affirmative defense because they prevented the plaintiff inmate from exhausting his administrative remedies by "beating him, threatening him, denying him grievance forms and writing implements, and transferring him to another correctional facility." *Hemphill,* 380 F.3d at 688 (citing *Ziemba v. Wezner,* 366 F.3d 161, 162 (2d Cir.2004)). Generally, defendants cannot be estopped from asserting a non-exhaustion affirmative defense based upon the actions or inaction of other individuals. *Murray,* 2010 WL 1235591, at *5 & n. 26 (collecting cases).

**\*13** Third, the Second Circuit explained in *Hemphill* that there are certain "special circumstances" in which even

though administrative remedies may have been available and the defendants may not be estopped from asserting a non-exhaustion defense, the inmate's failure to exhaust may be justified.[15] *Hemphill,* 380 F.3d at 686. "Special circumstances" have been found to include an incorrect but reasonable interpretation of DOCCS' regulations or failing to file a grievance in the precise manner prescribed by DOCCS as a result of threats. *See, e.g., Giano v. Goord,* 380 F.3d 670, 675–76 (2d Cir.2004) (failure to exhaust was justified where plaintiff inmate's interpretation of regulations was reasonable and prison official threatened inmate).

### 2. Exhaustion as to Healy

Plaintiff's allegations with respect to his Eighth Amendment deliberate indifference and excessive force claims are set forth in paragraphs 23 and 24 of his Complaint. (Dkt. No. 1 at ¶¶ 23–24.) Plaintiff has alleged in his Complaint that he "used the prisoner grievance procedure available at Upstate on 1/13/10 to exhaust all remedies were exhausted on 10/14/10 for issues in paragraph # 23 and # 24." (Dkt. No. 1 at ¶ 66.) The dates provided by Plaintiff make no sense given that Plaintiffs claims against Healy arise out of an incident that allegedly occurred on October 21, 2010. *Id.* at ¶¶ 23–24. Furthermore, as discussed below, the documentary evidence in the summary judgment record establishes that Plaintiff never appealed a grievance arising out of that incident to CORC. (Dkt. Nos. 46–1 at ¶ 88; 46–4 at ¶ 12 and 4.)

Jeffrey Hale (Hale"), Assistant Director of the IGP, is the custodian of records maintained by CORC, which renders the final administrative decisions under the DOCCS IGP. (Dkt. No. 46–4 at ¶ 2.) According to Hale, the issues alleged in Plaintiffs Complaint are proper subjects for grievances under the DOCCS IGP. (Dkt. Nos. 46–1 at ¶ 86; 46–4 at ¶¶ 8–9.) DOCCS Directive # 4040 stipulates that when an inmate appeals a grievance to CORC, it is DOCCS' policy to maintain grievance files for the current year and four prior years. (Dkt. Nos. 46–1 at ¶ 85; 46–4 at ¶ 7.) CORC maintains records in accordance with that policy and, in fact, the CORC computer database contains records of all appeals of grievances received from the IGP Supervisor, as well as those reviewed under the expedited procedure at § 701.8, since 1990. *Id.* Hale conducted a diligent search for appeals filed by Plaintiff based on grievances filed at the facility level and has submitted true

and correct copies of records maintained by CORC which show that Plaintiff did not appeal any grievance filed under §§ 701.5 or 701.8 claiming he was denied adequate mental health treatment or subjected to excessive force by Healy while he was confined at Upstate.[16] (Dkt. Nos. 46 at ¶ 87; 46–4 at ¶ 11 and 4.) Inasmuch as Plaintiff has failed to complete all of the steps of the DOCCS IGP with regard to his Eighth Amendment claim against Healy for deliberate indifference to his serious mental health needs and excessive force, he has failed to exhaust his administrative remedies. *See Woodford,* 548 U.S. at 90 (PLRA requires a plaintiff to complete all of the steps of the applicable IGP and to do so properly to exhaust administrative remedies).

**\*14** Plaintiff fairs no better under the three-part *Hemphill* inquiry. As to the first question, New York's IGP is "recognized as an 'available' remedy for purposes of the PLRA." *Taylor v. Chalom,* No. 9:10 CV 1494 (NAM/ DEP), 2011 WL 6942891, at *4, 2011 U .S. Dist. LEXIS 150512, at *12 (N.D.N.Y. Dec.13, 2011). That the grievance procedure was made available to, and actually used by, Plaintiff during his incarceration, is clear from his history of grievances revealed by Hale, and the grievance Plaintiff filed regarding his lost filling. (Dkt. Nos. 46–1 at ¶¶ 74, 82–85; 46–4 at 6–77; 49–2 at 4.)

Furthermore, there is no evidence in the record that Healy interfered in any way with efforts by Plaintiff to file a grievance against him under the IGP and, therefore, no basis for an estoppel. Third, the record is devoid of evidence of "special circumstances" excusing Plaintiff's failure to exhaust. To the contrary, Plaintiff has alleged in conclusory fashion in his Complaint that he did exhaust. *See Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) (conclusory assertions are not enough to avoid summary judgment when the movant has set out a documentary case).

Therefore, the Court finds that Plaintiff has failed to exhaust his administrative remedies with regard to his Eighth Amendment claims against Defendant Healy and recommends that Healy be granted summary judgment on that ground.

### 3. Exhaustion as to Marinelli and Kemp

In his Complaint, Plaintiff has alleged that he filed complaints regarding his claims against Marinelli and

Kemp with the OMH all the way up the chain to the OMH Commissioner. (Dkt. No. 1 at ¶ 65.) Although Plaintiff alleged that he also filed a grievance with Upstate, presumably under the IGP, and appealed the results to be sure exhaustion was complete, Hale's search of CORC records revealed no appeal by Plaintiff of a grievance complaining of his mental health treatment by Marinelli and Kemp. (Dkt. Nos. 1 at ¶ 65; 46–1 at ¶ 87; 46–4 at ¶ 11 and 4.) Therefore, the Court finds that Plaintiff did not exhaust his claims against Marinelli and Kemp under the IGP. *See* *Woodford,* 548 U.S. at 90.

That, however, does not end the Court's inquiry on the exhaustion because issues remain as to whether administrative remedies were in fact available to Plaintiff under the IGP with respect to his claims against Marinelli and Kemp [17] and whether there were special circumstances excusing exhaustion. *See* *Hemphill,* 380 F.3d at 686.

Plaintiff was questioned at his deposition [18] as to whether he filed a grievance against Marinelli:

> Q. Did you file any grievances against Mr. Marienelli (sic)?
>
> A. I think I did, yes.
>
> Q. Okay.
>
> A. I'm pretty sure I did. Or—because also, when you're dealing with M.H.U., you can't really grieve them. You have to write a complaint through—
>
> Q. To the medical—.
>
> A. —to the mental health department.
>
> Q. Right. Right. So the mental health issues go to mental health and the medical issues go to the medical director.
>
> **\*15** A. Go to medical, right.
>
> Q. Yes, okay.
>
> A. So even though you could write it, but its not going to get anywhere. So you have to they tell you

> Q. That's why you wrote to Kemp?
>
> A. Kemp, exactly.
>
> Q. Yup. Okay.
>
> A. That's the whole reason why, because you know, even they they're not even allowed to discuss your mental health file with the grievance people because of confidentiality. So that's kind of like a catch twenty-two.
>
> Q. So you complained to Kemp because, as you understood it, that's the proper process?
>
> A. Right.

(Dkt. No. 46–3 at 35–36.)

In determining whether administrative remedies are available to a particular inmate, a court should "be careful to look at the applicable set of grievance procedures, whether city, state, or federal." *Abney v. McGinnis,* 380 F.3d 663, 668 (2d Cir.2004) (citation and internal quotation marks omitted). Administrative remedies are not available "where the relevant administrative procedure lacks authority to provide any relief or to take any action whatsoever in response to a complaint." *Booth v. Churner,* 532 U.S. 731, 736, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001).

Hale has described Plaintiff's Eighth Amendment claims against Marinelli and Kemp as the "proper subject for DOCCS grievance procedures as outlined under 7 NYCRR § 701.1 et seq." (Dkt. No. 46–4 at ¶ 9.) However, both Marinelli and Kemp are OMH, not DOCCS employees, and § 701.3(f) provides:

> (f) Outside agencies excluded.
>
> Any policy, regulation or rule of an outside agency (e.g., the division of parole, immigration and customs enforcement, the office of mental health, etc.) or action taken by an entity not under the supervision of the commissioner is not within the jurisdiction of the IGP.

7 NYCRR, § 701.3(f).

Grievances involving actions taken by OMH have in at least some instances been determined by DOCCS to be outside the jurisdiction of the DOCCS IGP based upon § 701.3(f). *See, e.g., Westmoreland v. Conway,* No. 07–

CV–104(Sr.), 2009 WL 2991817, at * 3–4, 2009 U.S. Dist. LEXIS 83993, at * 9–10 (W.D.N.Y. Sept.15, 2009) (plaintiff's allegation that his grievance was dismissed because the IGRC lacked authority over the OMH found to comport with 7 NYCRR § 701.3(f)); *Christian v. Goord,* No. 9:03–CV–901 (FJS/GJD), 2006 WL 1459805, at * 5, 2006 U.S. Dist. LEXIS 32143 (N.D.N.Y. May 22, 2006) (both the IGRC and Superintendent on appeal concluding that the OMH is outside the purview of DOCCS and the IGP).

Given the foregoing, the Court cannot conclude that administrative remedies under the IGP were available to Plaintiff with regard to his claims against OMH employees Marinelli and Kemp, or that Plaintiff's understanding that the IGP did not apply to OMH employees did not constitute a special circumstance excusing failure to exhaust, and recommends that Marinelli and Kemp be denied summary judgment on exhaustion grounds.

## B. Merits of Plaintiff's Eighth Amendment Claim Against Marinelli and Kemp

**\*16** Defendants Marinelli and Kemp also seek summary judgment on the merits. Claims that prison officials have intentionally disregarded an inmate's serious medical needs fall under the Eighth Amendment umbrella of protection from the imposition of cruel and unusual punishments. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). Prison officials must ensure, among other things, that inmates receive adequate medical care. *Id.* (citing *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). The requirement extends to adequate mental health care. *See Langley v. Coughlin,* 888 F.2d 252, 254 (2d Cir.1989) ("We think it plain that from the legal standpoint psychiatric or mental health care is an integral part of medical care. It thus falls within the requirement of *Estelle v. Gamble,* [429 U.S. 97, 104 (1976) ], that it must be provided to prisoners."); *Guarneri v. Hazzard,* No. 9:06–CV–985 (NAM/DRH), 2010 WL 1064330, at 16, 2010 U.S. Dist. LEXIS 26966, at *52 (N.D.N.Y. Mar.22, 2010) (the denial of mental health care may constitute a violation of the Eighth Amendment).

To state a claim for denial of medical or mental health care, a prisoner must demonstrate (1) a serious medical (mental) condition, and (2) deliberate indifference. *Farmer,* 511 U.S. at 834–35; *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994) ("*Hathaway I*"). The first prong is an objective standard and considers whether the medical condition is sufficiently serious. *See Caiozzo v. Foreman,* 581 F.3d 63, 72 (2d Cir.2009) (citation and punctuation omitted). A "serious medical condition" has been described as "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) (citations omitted), *accord Hathaway I,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). Relevant factors to consider when determining whether an alleged medical or mental health condition is sufficiently serious include, but are not limited to: (1) the existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; (2) the presence of a medical condition that significantly affects an individual's daily activities; and (3) the existence of chronic and substantial pain. *Chance,* 143 F.3d at 702–03.

The second prong is a subjective standard. Medical mistreatment rises to the level of deliberate indifference only when it "involves culpable recklessness, i.e., an act or a failure to act ... that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Id.* at 703 (quoting *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996)) ("*Hathaway II*" ). "Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm." *Hathaway I,* 37 F.3d at 66. To establish deliberate indifference, an inmate must prove that (1) a prison medical care provider was aware of facts from which the inference could be drawn that the inmate had a serious medical need; and (2) the medical care provider actually drew that inference. *Farmer,* 511 U.S. at 837; *Chance,* 143 F.3d at 702. The inmate then must establish that the provider consciously and intentionally disregarded or ignored that serious medical need. *Farmer,* 511 U.S. at 835. An "inadvertent failure to provide adequate medical care" does not constitute "deliberate indifference." *Estelle,* 429 U.S. at 105–06. Moreover, "a complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim ... under the Eighth Amendment." *Id.* at 106. Stated another way, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." *Id.; see also Smith v. Carpenter,* 316 F.3d 178, 184 (2d Cir.2003) ( "Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation.")

**\*17** The record evidence does not support Plaintiffs claim that he suffered from a serious mental illness during his time at Upstate. [19] Furthermore, even though Plaintiff was deemed to have some degree of mental illness during at least a part of his time at Upstate, given the evidence of the mental health treatment Plaintiff received from OMH during his time there, no reasonable jury could find that either Marinelli or Kemp had been deliberately indifferent to Plaintiff's mental health issues and treatment needs. [20] *See Selevan v. N. Y. Thruway Auth.,* 711 F.3d 253, 256 (2d Cir.2013) (finding summary judgment appropriate where the nonmovant fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim") (internal quotation marks omitted).

Plaintiff arrived at Upstate with a diagnosis of ASPD, a prescription for Topamax, a Mental Health Level of 3, and a Transfer Progress note from Great Meadow stating his mental status was alert and oriented, with no evidence of a thought disorder, and a generally neutral and stable mood. (Dkt. Nos. 46–1 at ¶¶ 2–11; 47–1 at ¶¶ 5–16.) When Plaintiff was seen by Marinelli for a mental health assessment less than a week after his arrival at Upstate in September of 2009, Marinelli observed no mental health concerns or issues. (Dkt. Nos. 46–1 at ¶ 12; 48 at ¶ 12.)

Marinelli nonetheless placed Plaintiff on "active status" so he would continue to received OMH services and continued to see Plaintiff either cell-side or for a private therapy session on a regular basis until he was terminated from service on March 30, 2010, with Kemp's approval, after Plaintiff had denied the need for services and his Mental Health Level had been upgraded to a Level 6. (Dkt. Nos. 46–1 at ¶¶ 13–17, 19–36; 47–1 at 1; 48 at ¶¶ 30–33.) During that time, Plaintiff generally reported no mental health issues or concerns, and Marinelli reported that he observed no evidence of mental health issues. *Id.* Marinelli's notes are largely in accord with Dr. Wurzberger's positive assessment of Plaintiff's mental status on October 9, 2009, when he, not Marinelli or Kemp as Plaintiff claims, took Plaintiff off Topamax. (Dkt. Nos. 46–1 at ¶¶ 18–19, 43–44.)

Even after Plaintiff's OMH services were terminated, Marinelli continued to do SHU 90–day mental health evaluations, which confirmed that Plaintiff's Mental Health Level remained at Level 6 from March 30, 2010,

until his transfer to Clinton on November 15, 2010. (Dkt. No. 46–1 at ¶¶ 38–40; 47–1 at 1; 48 at ¶¶ 34–35, 37.)

While Plaintiff claims that Marinelli responded to his attempt at suicide by cutting his arms with a piece of metal by telling him it did not look too bad and to run water on the cuts (Dkt. No. 1 at ¶ 22), Marinelli denies the incident ever occurred, and there is no evidence of such an incident in Plaintiff's mental health records. (Dkt. Nos. 46–1 at ¶ 36; 48–1 at 1–118.) Even assuming, *arguendo,* that the incident did occur, Plaintiff has failed to present evidence that the cuts he inflicted were severe enough to cause serious injury or constitute what could reasonably have been construed by Marinelli as a serious attempt at suicide, and that Marinelli showed deliberate indifference.

**\*18** In light of the foregoing, the Court recommends that Defendants Marinelli and Kemp be granted summary judgment on the merits on Plaintiffs Eighth Amendment medical indifference claim.

### C. Eighth Amendment Claim Against Dyer

Plaintiff claims that Defendant Dyer, a corrections officer, showed deliberate indifference to his serious dental needs by preventing him from seeing the dentist for his lost filling on November 3, 2010. (Dkt. No. 1 at ¶¶ 55–58.) Although medical deliberate indifference claims are most-often asserted against medical personnel, non-medical personnel may also be held liable for deliberate indifference to medical needs, in this case dental needs, when a plaintiff proves that "prison personnel intentionally delayed access to medical care when the inmate was in extreme pain and has made his medical problem known to the attendant prison personnel." *Hodge v. Coughlin,* No. 92 Civ. 0622(LAP), 1994 WL 519902, at \* 11, 1994 U.S. Dist. LEXIS 13409, at \* 31 (S.D.N.Y. Sept.22, 1994) (citations and internal quotation marks omitted), *aff'd,* 52 F.3d 310 (2d Cir.1995) (table); *Baumann v. Walsh,* 36 F.Supp.2d 508, 512 (N.D.N.Y.1999) (same).

The record evidence shows that on November 3, 2010, Dyer was tasked with escorting Plaintiff to an ASAT evaluation and an appointment with the dentist to have his lost filling addressed. (Dkt. Nos. 1 at ¶ 55; 46–1 at ¶¶ 55–56; 51–2 at ¶¶ 22–23.) Dyer took Plaintiff to his ASAT evaluation while Plaintiff was waiting to see the dentist, and after the evaluation returned Plaintiff to the holding pen to wait to see the dentist. (Dkt. No. 46–1 at ¶¶ 58–

60; 51–2 at ¶¶ 10–11.) There is no evidence in the record indicating that Plaintiff would have seen the dentist any sooner had he not gone to the ASAT evaluation.

According to Dyer, while waiting to see the dentist, Plaintiff created a disturbance by yelling at the dental escort that he was going to be seen next by the dentist and was told to quiet down or he would be returned to his cell. (Dkt. Nos. 46–1 at ¶¶ 61–63; 51–2 at ¶¶ 12, 16.) At his deposition, Plaintiff admitted that he had started complaining and had called out to the dentist that he needed to see him. (Dkt. No. 46–3 at 53.) Dyer told Plaintiff to "stop causing a disturbance." (Dkt. Nos. 46–1 at ¶¶ 62–63; 51–2 at ¶ 13.)

Corrections Sergeant Santamore spoke to the dentist and was told there were priority cases ahead of Plaintiff. (Dkt. Nos. 46–1 at ¶ 64; 51–2 at ¶ 14.) Plaintiff continued to yell and create a disturbance, and Santamore ordered Dyer to take Plaintiff back to his cell. (Dkt. No. 46–1 at ¶¶ 65–66; 51–2 at ¶ 16.) Dyer followed the order and returned Plaintiff to his cell. (Dkt. No. 46–1 at ¶¶ 67–68; 51–2 at ¶¶ 17–19.)

Even if Dyer was aware that Plaintiff was "really in pain," as Plaintiff has alleged and Dyer has denied (Dkt. Nos. 1 at ¶ 55; 46–1 at 46–1 at ¶ 57; 51–2 at ¶ 8), there is no evidence in the record supporting Plaintiff's claim that Dyer intentionally delayed his access to dental care, or that Dyer was responsible for Plaintiff missing his dental appointment on November 3, 2010. Therefore, the Court recommends that Dyer be granted summary judgment on Plaintiff's Eighth Amendment claim for deliberate indifference to his serious dental needs.

### D. Eighth Amendment Claim Against Miller

*19 Plaintiff claims that Dr. Miller was deliberately indifferent to his serious dental needs in violation of the Eighth Amendment by his failing to attend to a lost filling in a timely manner. (Dkt. Nos. 1 at ¶¶ 49, 76.) Plaintiff must, as with his claim for indifference to his serious mental health needs, show that he had a serious dental condition and that it was met with deliberate indifference from Miller. *See Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000); *Chance,* 143 F.3d at 702. A serious medical, or in this case dental condition, exists where "the failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain .' " *Chance,* 143 F.3d at 702 (citing

*Gutierrez v. Peters,* 111 F.3d 1364, 1373 (7th Cir.1997). Specifically, "[a] cognizable claim regarding inadequate dental care ... can be based on various factors, such as the pain suffered by the plaintiff ... the deterioration of the teeth due to a lack of treatment ... or the inability to engage in normal activities." *Chance,* 143 F.3d at 703 (citations omitted); *see also Berry v. Wright,* No. 04–CV–0074(Sr.), 2011 WL 231626, at *5, 2011 U.S. Dist LEXIS 6347, at * 12–13 (W.D.N.Y. Jan.24, 2011) ("[a]lthough delay in providing a prisoner with dental treatment, standing alone, does not constitute an eighth amendment violation, ... a prisoner can state a claim of deliberate medical indifference under section 1983 if 'the delay was deliberate and that it caused him to suffer unnecessary and wanton infliction of pain.' ") (quoting *Hunt v. Dental Dep't,* 865 F.2d 198, 200 (9th Cir.1989)).

"When the basis of a prisoner's Eighth Amendment claim is a temporary delay ... in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay ... in treatment rather than the prisoner's underlying medical condition alone in analyzing whether the alleged deprivation is, in 'objective terms, sufficiently serious' to support an Eighth Amendment claim." *Washington v. Farooki,* No. 9:11–CV–1137 (TJM), 2013 WL 3328240, at *6, 2013 U.S. Dist. LEXIS 92623, at *16 (N.D.N.Y. July 2, 2013) (quoting *Brunskill v. Cnty. of Suffolk,* No. 11–CV–586 (SJF)(ETB), 2012 WL 2921180, at *3, 2012 U.S. Dist. LEXIS (E.D.N.Y. July 11, 2012)).

Dr. Miller has opined that "the loss of a filling without significant pain is not an emergent situation and does not require immediate dental treatment." (Dkt. Nos. 46–1 at ¶ 79; 49 at ¶ 23.) In this case, however, Plaintiff claims that the lost filling caused him a great deal of pain, left him unable to eat out of one side of his mouth, and prevented him from sleeping. (Dkt. Nos. 1 at ¶ 48; 27–1 at 31–32; 49–2 at 4.) There is no evidence to the contrary in the summary judgment record. Plaintiff lost the filling on August 29, 2010, was not scheduled to have the lost filling addressed by the dentist until November 3, 2010, more than two months later, and ultimately did not have the lost filling taken care of until shortly after he was transferred to Clinton on November 15, 2010. (Dkt. Nos. 1 at ¶¶ 48, 63; 46–1 at ¶¶ 54, 72.) Even assuming without deciding that the great pain and problems with eating and sleeping Plaintiff claims resulted from the lost filling, when considered with the delay in treatment, constituted a serious dental condition, Dr. Miller is entitled to summary

judgment because the record evidence does not show deliberate indifference on his part. *See Hunt,* 865 F.2d at 200 (deliberate indifference where the delay was deliberate and caused plaintiff to suffer unnecessary and wanton infliction of pain).

**\*20** The note in Plaintiff's dental records from his September 29, 2010, cleaning, which Miller acknowledged seeing noted only that Plaintiff had complained of a lost filling and said nothing about being in pain as a result. (Dkt. Nos. 46–1 at ¶ 51; 49–1 at 3.) Because in Miller's opinion, absent a report of significant pain, the lost filling was not emergent (Dkt. Nos. 46–1 at 79; 49 at ¶ 23), failure to schedule an appointment to fix the tooth until November 3, 2010, does not show culpable recklessness on his part. *See Hathaway II,* 99 F.3d at 553.

While Plaintiff claims to have submitted a number of sick call slips to the Dental Department requesting assistance, Miller investigated Plaintiff's chart in response to an October 5, 2010, grievance filed by Plaintiff and determined that no call-out slips from Plaintiff had been received by the Dental Department during the relevant time period. (Dkt. Nos. 46–1 at ¶ 75; 49 at ¶ 19.) Moreover, while Plaintiff also claims to have sent letters of September 6 and September 14, 2010, to Miller advising him of his great pain and requesting assistance regarding the lost filling (Dkt. Nos. 1 at ¶¶ 49; 27–1 at 31–32), Dr. Miller has stated in his Declaration that he was not aware of any request by Plaintiff for dental treatment in the fall of 2010 that he ignored. (Dkt. Nos. 46–1 at ¶ 80; 49 at ¶ 24.) There is no evidence in the record refuting that statement, no evidence that Dr. Miller ever saw the dental slips Plaintiff claims to have submitted or the letters Plaintiff claims to have sent to him. Given Plaintiff's failure to respond to Defendants' L.R. 7.1 Statement of Material Facts, he is deemed to have admitted that Miller's investigation revealed no call-out slips regarding Plaintiff's lost filling, and Miller was not aware of any request by Plaintiff for dental treatment in the fall of 2010 that was ignored. (Dkt. Nos. 46–1 at ¶¶ 75, 80; 49 at ¶¶ 19, 24.)

Finally, the evidence shows that an appointment was scheduled for November 3, 2010, for Plaintiff's lost filling to be addressed, and Miller had no part in Plaintiff being returned to his cell before seeing him, or in the execution of the Refusal of Medical Examination and/or Treatment form. (Dkt. Nos. 46–1 at ¶¶ 67, 72; 49 at ¶ 16; 51–2 at ¶ 17.) Plaintiff was transferred to Clinton shortly thereafter

where his tooth was fixed. (Dkt. No. 46–1 at ¶ 73; 49 at ¶ 17.)

In light of the foregoing, the Court recommends that Miller be granted summary judgment on Plaintiff's Eighth Amendment deliberate indifference claim against him.

### E. Qualified Immunity
Defendants contend that if the Court were to find that their actions violated Plaintiff's rights, they are entitled to qualified immunity. (Dkt. No. 46–2 at 15–18.) Inasmuch as the Court is recommending that Defendants be granted summary judgment on other grounds, it finds it unnecessary to reach the qualified immunity argument.

### F. John Doe Defendants # 1–6
**\*21** Plaintiff has asserted claims against John Doe Defendants # 1–6 in this action. There is nothing in the record showing that any of the John Doe Defendants have been identified and served in this lawsuit which was commenced nearly three years ago. (Dkt. No. 1.) The discovery completion deadline in the case was January 18, 2014, more than a year ago. (Dkt. No. 32.) The Court finds that Plaintiff has had ample time and opportunity to discover the identity of the John Doe Defendants and serve them. Given Plaintiff's failure to do so, the Court recommends the *sua sponte* dismissal of John Doe # 1–6 from the action for failure to prosecute. *See Delrosario v. City of N.Y,* No. 07 Civ.2027(RJS), 2010 WL 882990, at * 5, 2010 U.S. Dist. LEXIS 20923, at * 12 (S.D.N.Y. Mar.4, 2010) (*sua sponte* dismissing claims against John Doe Defendants for failure to prosecute "[w]here discovery was closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants ."); *Coward v. Town & Vill. of Harrison,* 665 F.Supp.2d 281, 301 (S.D.N.Y.2009) ("Where a plaintiff has had ample time to identify a John Doe defendant but gives no indication that he has made any effort to discover the defendant's name, the plaintiff simply cannot continue to maintain a suit against the John Doe defendant.") (citation and internal quotation marks and punctuation omitted).

**ACCORDINGLY,** it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 46) be **GRANTED IN ITS ENTIRETY;** and it is further

**RECOMMENDED** that Plaintiff's claims against John Doe Defendants # 1–6 be **DISMISSED WITHOUT PREJUDICE** from this action due to Plaintiff's failure to prosecute; and it is hereby

**ORDERED,** that the Clerk provide Plaintiff with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision m *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72.

Dated: January 30, 2015.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 791547

**Footnotes**

1 Although with the exception of the claims dismissed on Eleventh Amendment grounds, Plaintiff was granted leave to amend, no amended complaint has been filed.

2 References to page numbers in citations to documents filed with the Clerk refer to the page numbers assigned by the Court's electronic filing system.

3 Plaintiff will be provided with copies of unpublished decisions cited herein in accordance with *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2008) (per curiam).

4 N.D.N.Y. L.R. ("L.R.") 7.1(b)(3) provides that '[w]here a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers as this Rule requires shall be deemed as consent to the granting or denial of the motion, as the case may be, unless good cause is shown."

5 Plaintiff's Complaint in this case was properly verified under 28 U.S.C. § 1746. (Dkt. No. 1 at 17–18.) *See LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham,* 185 F.3d 61, 65–66 (2d Cir.1999) (use of the language "under penalty of perjury" substantially complies with § 1746).

6 *See also Carmen v. San Francisco Unified Sch. Dist.,* 237 F.3d 1026, 1030–31 (9th Cir.2001) (holding it unfair to the district court, other litigants, and the movant to impose a duty on the district court to "search and sift the factual record for the benefit of a defaulting party.")

7 The Second Circuit has recognized that district courts "have the authority to institute local rules governing summary judgment submissions, and have affirmed summary judgment rulings that enforce such rules. Rules governing summary judgment practice are essential tools for district courts permitting them to efficiently decide summary judgment motions by relieving them of the onerous task of hunting through voluminous records without guidance from the parties ." *N.Y. State Teamsters Confer, Pension and Ret. Fund v. Express Servs., Inc.,* 426 F.3d 640, 647 (2d Cir.2005) (citation and internal punctuation and quotation marks omitted).

  L.R. 7.1(a)(3) provides that on a summary judgment motion movants submit a "Statement of Material Facts" setting forth in numbered paragraphs, each material fact about which the moving party contends there is no genuine issue. Each fact shall set forth a specific citation to the record where the fact is established .... The moving party shall also advise pro se litigants about the consequences of their failure to respond to a motion for summary judgment .... The opposing party shall file a response to the Statement of Material Facts .... *The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert."*

8 *See Vermont Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d. Cir.2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts]. It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

9 Defendants have complied with L.R. 7.1(a)(3) and L.R. 56.2 by providing Plaintiff with the requisite notice of the consequences of his failure to respond to their summary judgment motion. (Dkt. No. 46.)

10 Where a fact has been included in Defendants' Statement Pursuant to Rule 7.1(a)(3) (Dkt. No. 46–1), docket references are made herein to both the Statement and the record evidence cited in support of the fact.

11    According to Marinelli, PIMS stands for "Progressive Inmate Movement System," established for the standardization of a system of progressive advancements for SHU inmates based upon behavioral adjustment. (Dkt. No. 48 at ¶ 20 n. 3.)

12    Defendant Healy seeks summary judgment solely on failure to exhaust grounds and has submitted no factual evidence with regard to Plaintiff's Eighth Amendment claim against him. (*see* Dkt. No. 46–1 at ¶¶ 82–86, 88.) The background facts included herein are from Plaintiff's verified Complaint.

13    Copies of the letters, which were identified as exhibits in the Complaint were submitted by Plaintiff in opposition to Defendants' earlier motion to dismiss and are considered herein as a part of Plaintiff s Complaint. (Dkt. Nos. 1 at ¶ 49; 27–1 at 31–32.)

14    In its denial of Plaintiff's grievance, the Internal Grievance Resolution Committee wrote "Grievant should write to the Dental Dept. and address his concerns and to be scheduled. writing to the IGRC isn't the proper procedure to obtain an appt." (Dkt. No. 49–2 at 3.) The Committee appears to have made no reference to the September 6 and 14, 2010, letters Plaintiff claims to have sent to Miller. *Id.;* Dkt No. 27–1 at 31–32.

15    Subsequent to *Hemphill,* the Supreme Court decided *Woodford v. Ngo,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The question addressed in *Woodford* was whether "a prisoner can satisfy the [PLRA's] exhaustion requirement by filing an untimely or otherwise procedurally defective administrative grievance or appeal." *Id.* at 83–84. The Supreme Court resolved the question in the negative, explaining that the PLRA requires "proper exhaustion" "using all steps that the agency holds out, and doing so properly (so that the agency addressed the issues on the merits)." *Id.* at 90 (citation omitted). Although the Second Circuit has acknowledged that there is some question as to whether the estoppel and special circumstances inquiries in *Hemphill* survived *Woodford,* the Court has as yet found it unnecessary to decide the issue and appears to still be considering all three *Hemphill* inquiries in exhaustion cases. *See, e.g., Amador v. Andrews,* 655 F.3d 89, 102–03 (2d Cir.2011) (finding it unnecessary to decide whether *Hemphill* is still good law because plaintiff had failed to establish that defendants were estopped from raising non-exhaustion as an affirmative defense).

16    Defendants have submitted the grievance files on the grievances listed as having been appealed to CORC by Plaintiff (Dkt. No. 46–4 at 4) so that the Court has been able to ascertain that none of them involved Plaintiff's claims against Healy. *Id.* at 8–77.

17    As noted above, Defendants have the burden of showing that the administrative remedy was actually "available" to Plaintiff. *See Murray,* 2010 WL 1235591, at *4.

18    Defendants submitted Plaintiff's deposition transcript in support of their summary judgment motion. (Dkt. No. 46–3.)

19    Plaintiff's letters to Kemp and Hogan regarding his mental health problems and alleged lack of proper care, with the exception of his complaints about Marinelli's reaction to his alleged suicide attempt discussed below, were far too general and conclusory to create an issue of material fact as to the seriousness of his mental health issues in light of the mental health records submitted by Defendants. (Dkt. No. 27–1 at 5–13.)

20    A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong,* 143 F.3d at 703. Nor does the fact that an inmate feels that he did not get the level of medical attention he deserved, or that he might prefer an alternative treatment support a constitutional claim. *Sonds v. St. Barnabas Hosp. Correc. Health Services,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001) (citing *Dean v. Coughlin,* 804 F.2d 207 (2d Cir.1986).

---

**End of Document**                                       © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2010 WL 882990
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Jairo DELROSARIO, Plaintiff,
v.
The CITY OF NEW YORK, et al., Defendants.

No. 07 Civ.2027(RJS).
|
March 4, 2010.

West KeySummary

1    **Civil Rights**

👉 Criminal Law Enforcement; Prisons

Neither official in charge of prisoner movement
nor official in charge of security had authority
to make final policy decisions for the city
with respect to the protection or housing of
prisoners at penal institution, as required to
hold the city liable under § 1983 for officials'
alleged unconstitutional acts. Inmate alleged that
officials deliberately ignored a known risk to
his safety from fellow prisoners, who repeatedly
threatened and assaulted inmate for cooperating
with authorities, but the only reference to them
was prosecutor's identification of their respective
roles at institution. No information was given
with respect to what authority each had, what
guidelines and policies they were subject to, and
what oversight was in place. 42 U.S.C.A. § 1983.

Cases that cite this headnote

**Attorneys and Law Firms**

Robert B. Marcus, Schwartzapfel, Truhowsky, Marcus, P.C.,
Jericho, N.Y., for Plaintiff.

Mark D. Zuckerman, Office of the Corporation Counsel of
the City of New York, New York, N.Y., for Defendants.

MEMORANDUM AND ORDER

RICHARD J. SULLIVAN, District Judge.

**\*1** Plaintiff Jario Delrosario brings this action against the
City of New York ("the City"), Manhattan Assistant District
Attorney Susan Lanzatella, and ten John Doe Defendants
pursuant to 42 U.S.C. § 1983 for alleged deprivations of his
civil rights. Now before the Court is Defendants' motion to
dismiss Plaintiff's claims pursuant to Federal Rule of Civil
Procedure 12(b)(6). In the alternative, Defendants move for
summary judgment pursuant to Rule 56(a). For the reasons
set forth below, Defendants' motion for summary judgment
is granted.

I. BACKGROUND

Plaintiffs lawsuit stems from injuries inflicted by other
inmates while he was incarcerated at Riker's Island
Correctional Facility ("Riker's"), located in Bronx County,
New York and part of the New York City Department of
Corrections ("DOC"). Plaintiff alleges that, although he was
repeatedly threatened and assaulted by other inmates for
acting as a cooperating witness, Defendants failed to take
steps necessarv to protect him from further violence. In
addition, Plaintiff alleges that Riker's personnel denied him
medical care after he was assaulted.

A. Facts

1. Plaintiff's Arrest, Attack, and Injury

Plaintiff was arrested on September 1, 2005 and charged
with various crimes under New York state law arising out
of a "sting" operation. (Defs.' 56.1 ¶ 3.) After he was
arrested, Plaintiff was taken to and detained at Riker's. (*Id.*
¶ 4.) Defendant Lanzatella, an assistant district attorney
and chief of the Narcotics Gang Unit of the New York
City Special Narcotics Prosecutor's Office ("SNPO"), was
assigned to prosecute Delrosario and his co-defendants. (*Id.*
¶ 7.) Lanzatella was assisted by the only attorney under her
supervision at that time, Nigel Farinha. (Pl.'s 56.1 ¶ 3; Defs.'
56.1 ¶ 25.)

Within two months of his arrest, Plaintiff became a cooperating witness. (Defs.' 56.1 ¶ 11.) In the course of his cooperation, Plaintiff was removed from Riker's and taken to the SNPO as many as 60 times for interviews with investigators and prosecutors. (Decl. of Robert B. Marcus ("Marcus Deck") Ex. A (Dep. Tr. of Susan Lanzatella ("Lanzatella Dep. Tr.")) at 65:25–66:2.) Throughout his cooperation, Plaintiff was repeatedly threatened by his co-defendants on account of the cooperation that they suspected he was providing to authorities. (Pl.'s 56.1 ¶ 8.) Plaintiff's attorney in the state criminal matter, Barry Weinstein, testified that he repeatedly advised both Lanzatella and Farinha of the threats against Plaintiff. (Pl.'s 56.1 ¶ 9; Marcus Decl. Ex. C (Dep. Tr. of Barry Weinstein ("Weinstein Dep. Tr.")) at 12:21–14:21.) [1]

In January 2006, Plaintiff was assaulted at Riker's. (Pl.'s 56.1 ¶ 10; Weinstein Dep. Tr. at 18:7–12.) Weinstein testified that he quickly contacted either Lanzatella or Farinha and so informed him. (*Id.* at 19:7.) It is unclear whether this attack was connected to Plaintiffs cooperation. Plaintiff testified that he did not know why he was attacked (Delrosario Dep. Tr. at 50:10–11), but he also testified that "the same people on my case" were responsible for the attack (*id.* 48:9). Lanzatella states that she was not aware of any January assault. (Supp. Lanzatella Decl. ¶ 3.)

**\*2** After the January assault, Plaintiff was moved to another Riker's building, which he describes as unit C73. (Delrosario Dep. Tr. at 52:5–7.) Plaintiff continued to be threatened in his new housing unit. (*Id.* at 53:13–56:25.) The record indicates that Plaintiff was again assaulted on March 1, 2006. (Weinstein Dep. Tr. at 15:19–20; Marcus Decl. Ex. E (Report of Arthur Elias).) [2] Weinstein testified that Plaintiff was then brought before Lanzatella on March 3, 2006 for further interviews. (Weinstein Dep. Tr. at 16:l–5.) [3] Weinstein testified that after the March 3, 2006 meeting, Lanzatella or Farinha informed Weinstein that Lanzatella was sending a letter "immediately" or "right away" to have Plaintiff moved from Riker's to another facility. (*Id.* at 17:10–13; 26:20–27:10; 27:17–25.)

Plaintiff testified that on March 8, 2009, fearing further violence, he contacted his attorney and asked to be relocated. (Delrosario Dep. Tr. at 60:4–22.) In response, prison officials prepared him to be moved and transferred him to a holding cell. (*Id.* at 60:15–22.) While awaiting transfer to another facility on March 9, 2006, Plaintiff was assaulted by another inmate and suffered serious facial injuries, including a broken

jaw. (Pl.'s 56.1 ¶ 16.) Plaintiff does not know the identity of his assailant or whether the assault was related to his cooperation. (Delrosario Dep. Tr. at 61:8–62:13.)

What steps, if any, were taken by officials between the March 1 and March 9 assaults remains unclear. During discovery, Defendants produced a letter written by Lanzatella and addressed to either Captain Vasatoro, the captain in charge of prisoner movement at Riker's, or Captain Boden, the captain in charge of security at Riker's. (Lanzatella Dep. Tr. at 102:10–103:3.) [4] The letter bears the date of March 3, 2006 and states:

> I am requesting that the above-named inmate [Delrosario] be moved for security reasons from GMDC [at Riker's] where he is currently being held to BBKC [another DOC facility]. The above-named inmate, who was arrested in an armed robbery conspiracy with ten co-defendants, has been repeatedly assaulted while being held at GMDC in the past few weeks, including most recently when his jaw was broken. The inmate is needed as a witness in an ongoing investigation.
>
>> Thank you for your assistance in this matter and please feel free to call should you have any additional questions. (Zuckerman Decl. Ex. F.) The letter is a copy retrieved from Lanzatella's computer; no originals were found. (*See* Lanzatella Dep. Tr. at 104:16–21.) It also references Plaintiff's broken jaw, which did not occur until March 9, 2006. (Pl.'s 56.1 ¶ 16.) Lanzatella speculates that she first wrote a draft on March 3, 2006, in response to an attack on Plaintiff, but did not send it because she then learned that the attack was unrelated to his cooperation. (Lanzatella Dep. Tr. at 122:24–123:24.) She then edited and sent it after the March 9, 2006 attack. (*Id.*)

**\*3** Weinstein testified, however, that Lanzatella or Farinha informed him that a letter was sent on March 3, 2006, the date appearing in the letter. (Weinstein Dep. Tr. at 17:10–13; 26:20–27:10; 27:17–25.) Further, he testified that Farinha told him that the letter had been sent but was disregarded by officials at the DOC because of animus towards Delrosario. (Weinstein Dep. Tr. at 16:10–17:6.) Farinha denies that he made such statements. (Marcus Decl. Ex. B (Dep. Tr. of Nigel Farinha (Farinha Dep. Tr.)) at 84:4–22.) Because the final version contains information concerning the March 9, 2006 attack, and based on Farinha's representations to Weinstein that it was originally sent on March 3, Plaintiff concludes that the letter was originally sent on March 3 and was edited

and resubmitted on March 15, 2006. This conclusion is partially corroborated by information taken from Lanzatella's computer, which indicates the letter was created March 3, 2006 and modified on March 15, 2006. (Marcus Decl. Ex. F.)

After spending time at Bellevue hospital and recovering from his injuries, Plaintiff was transferred to the Manhattan Detention Center, often referred to as the "Tombs." (Delrosario Dep. Tr. at 66:14–15.) After some of his co-defendants were also sent to the Tombs, Plaintiff was again transferred, this time to the Vernon C. Bain Correctional Center, or the "Boat," another City correctional facility. (*Id.* at 67:1–6.) Finally, Plaintiff was transferred to federal custody.

### 2. Procedures or Practices for Cooperating Witnesses

The DOC policies and procedures allow an "inmate [to] be placed into Close Custody Housing either by his or her own request or pursuant to the Department's determination that such housing is necessary and appropriate." (Decl. of Harry Ahl Ex. C III.C.) Close Custody Housing can be used for inmates' own protection. (*Id.* at II.A.) The procedures specifically require that anytime a staff member has reason to believe that an inmate is in danger, or anytime an inmate so requests, he must be placed in Close Custody Housing until a captain arrives. (*Id.* III.C.2.a.) The policy lays out further procedures for determining when an inmate qualifies for such housing, as well as his right to a hearing and other administrative process. (*Id.*)

Lanzatella's practice was "not to get involved with the protection of cooperating witnesses while they were in custody because NYC Department of Corrections has its own criteria for housing inmates" that the DA's office was not involved with. (Def.'s 56.1 ¶ 12.) Further, any requests or recommendations that her office made were "non-binding and whether NYC Department of Corrections honored it was out of [Lanzatella's] hands." (*Id.* ¶ 13.) She testified that if there was a risk to any witness, however, she would inform the DOC. (*See* Lanzatella Dep. Tr. at 112:8–15.)

### B. Procedural History

Plaintiff filed this lawsuit on March 9, 2007, and it was assigned to the Honorable Kenneth M. Karas, District Judge. On September 4, 2007, the case was reassigned to the docket of the undersigned. Plaintiff filed the Amended Complaint

("AC") on May 20, 2009, after discovery had closed. On July 17, 2009, Defendants moved to dismiss the Amended Complaint or, in the alternative, for summary judgment and submitted their Local Rule 56.1 statement. Plaintiff submitted its opposition and own Rule 56.1 statement on September 8, 2009. The motion became fully submitted on September 17,2009.

**\*4** The Amended Complaint purports to contain a single claim under Section 1983. (AC ¶ 64.) Read more closely, however, the Amended Complaint actually asserts several claims against various Defendants. "Count One" alleges that Defendants acted with "deliberate indifference in failing to transfer Plaintiff to another facility and/or remove him from the general population and/or place him in protective custody." (AC ¶ 68.) It also alleges that "Defendants acted with deliberate indifference in intentionally denying and/or delaying Plaintiff's access to medical care and/or attention." (*Id.* ¶ 69.) Finally, it alleges that the Defendants were "supervisors and/or final decision makers" who acted with deliberate indifference towards Plaintiff in failing to adequately supervise, train, or discipline Defendants, "thereby causing said Defendants in this case to engage in the above-mentioned conduct." (*Id.* ¶¶ 71–72.)

Thus, the AC seeks redress from Defendants for both failing to prevent Plaintiffs injuries and for refusing or delaying medical treatment after the March 9, 2006 attack. Liberally construed, the Amended Complaint seeks to impose municipal liability on the City for DOC's failure to adequately safeguard Plaintiff, DOC's failure to timely treat Plaintiff after the March 9, 2006 attack, and Lanzatella's failure to prevent the March 9, 2006 attack. In addition, the Amended Complaint can be read to set forth a claim against Lanzatella in her individual capacity for failing to prevent the assaults, as well as individual claims against the John Doe Defendants for both injuries.

Because Plaintiff has utterly failed to produce evidence to support many of the allegations in the Amended Complaint, the Court will, for reasons of judicial economy, treat Defendants motion as one for summary judgment.

## II. DISCUSSION

### A. Legal Standard

Pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, a court may not grant a motion for summary judgment unless "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Bronx Household of Faith v. Bd. of Educ. of City of N.Y.,* 492 F.3d 89, 96 (2d Cir.2007). The moving party bears the burden of showing that he or she is entitled to summary judgment. *See Anderson v. Liberty lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004); *see Anderson,* 411 U.S. at 248 (holding that summary judgment is unwarranted if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party"). As such, "if 'there is any evidence in the record from any source from which a reasonable inference in the [nonmoving party's] favor may be drawn, the moving party simply cannot obtain a summary judgment.' " *Binder & Binder PC v. Barnhart,* 481 F.3d 141, 148 (2d Cir.2007) (quoting *R.B. Ventures, Ltd. v. Shane,* 112 F.3d 54, 59 (2d Cir.1997)) (alteration in original).

**B. Claims Against John Doe Defendants**

**\*5** Plaintiff's claims against the John Doe Defendants must be dismissed for failure to prosecute. Where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants, it is appropriate to dismiss these Defendants without prejudice. *See Coward v. Town and Village of Harrison,* 665 F.Supp.2d 281, 300–01 (S.D.N.Y.2009); *Jeanty v. County of Orange,* 379 F.Supp.2d 533, 536 n. 3 (S.D.N.Y.2005). Therefore, Plaintiff's claims against the John Doe Defendants are dismissed without prejudice.

**C. Municipal Liability for the Acts of Prison Officials**

Plaintiff alleges that the City is liable for the DOC's failure to adequately transfer, segregate, or otherwise protect him while he was in custody. (AC ¶¶ 68, 71.) Similarly, Plaintiff seeks to hold the City liable for the DOC's failure to timely treat Plaintiffs injuries after the March 9, 2006 attack. (AC

¶¶ 69, 71.) These allegations attempt to state a claim against New York City for liability under *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Defendants move for summary judgment on this claim, arguing, *inter alia,* that Plaintiff has not identified a causal link between any municipal custom or policy and the alleged constitutional violations. (Defs.' Mem. at 7.) For the reasons stated below, the Court grants Defendants' motion for summary judgment with respect to these claims.

**1. Applicable Law**

"A municipality may be held liable as a 'person' for purposes of Section 1983 when a civil rights violation results from a municipality's policy or custom." *Koulkina v. City of N.Y.,* 559 F.Supp.2d 300, 314 (S.D.N.Y.2008). "A plaintiff making a *Monell* claim against a municipality must establish three elements: '(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right.' " *Blazina v. Port Auth.,* No. 06 Civ. 481(KNF), 2008 WL 919671, at \*6 (S.D.N.Y. Apr.1, 2008) (quoting *Batista v. Rodriguez,* 702 F.2d 393, 397 (2d Cir.1983)).

An official policy or custom can be demonstrated in a number of ways. First, such a policy can be shown where the agency "promulgates an official policy," or "a municipal employee with final policymaking authority" undertakes an unconstitutional act. *Warheit v. City of N.Y.,* No. 02 Civ. 7345(PAC), 2006 WL 2381871, at \*12 (S.D.RY. Aug. 15, 2006); *accord Pembaur v. City of Cincinnati,* 475 U.S. 469, 480, 106 S.Ct. 1292, 89 L.Ed.2d 452 (1986). Second, a custom or practice may be demonstrated through behavior that is " 'so well settled and widespread that the policymaking officials of the municipality can be said to have either actual or constructive knowledge of it yet did nothing to end the practice.' " *Davis v. City of N.Y.,* 228 F.Supp.2d 327, 337 (S.D.N.Y.2002) (quoting *Silva v. Worden,* 130 F.3d 26, 31 (1st Cir.1997)). Third, an official policy can be established by a municipality's failure to adequately train or supervise its agents or employees. *See Amnesty Am.,* 361 F.3d at 127–28 & 127 n. 8. Finally, a plaintiff can state a *Monell* claim where he or she demonstrates that the municipality failed to discipline employees or agents who violate civil rights because "the persistent failure to discipline [can] give rise to an inference of an unlawful municipal policy of ratification of unconstitutional conduct within the meaning of *Monell."* *Batista,* 702 F.3d at 397.

2. Analysis

a. Decisions by Final Policymakers

**\*6** Plaintiff alleges that Captains Boden and Vasaturo deliberately ignored Lanzatella's or Farinha's March 3, 2006 letter request to move Plaintiff. The Weinstein deposition provides the chief support for this allegation. (Weinstein Dep. Tr. at 16:10–17:6.) Undoubtedly, such an allegation would be sufficient to state a claim for relief against Boden and Vasaturo individually, if they were defendants in this action. *See Heisler v. Kralik,* 981 F.Supp. 830, 837– 38 (S.D.N.Y.1997). Because Boden and Vasaturo are not defendants, however, Plaintiff must succeed in demonstrating that they are municipal policymakers on the subject of protecting inmates. *See Chin v. N.Y. City Nous. Auth.,* 575 F.Supp.2d 554, 561–62 (S.D.N.Y.2008).

Although *Monell* liability may attach for the decisions of final policymakers, "[t]he fact that a particular official— even a policymaking official—has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on an exercise of that discretion." *Pembaur,* 475 U.S. at 481. Rather, a deliberate choice must be made "from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Id.* at 483. Whether or not an official is a "policy-making official" for purposes of imposing *Monell* liability is a question of state law determined by the Court. *See Jett v. Dallas Indep. Sch. Dist.,* 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). Plaintiff bears the burden of showing that Boden and Vasaturo are officials with final policymaking authority. *See Jeffes v. Barnes,* 208 F.3d 49, 57–58 (2d Cir.2000).

Plaintiff has failed to demonstrate that either Boden or Vasaturo make final policy decisions for the City with respect to the protection or housing of inmates. The only reference to them in the record is Lanzatella's statement that they were "in charge" of "security" and "prisoner movement," respectively. (Lanzatella Dep. Tr. at 102:14–15, 103:2–3.) Plaintiff did not, however, interview or depose any prison officials, including Boden and Vasaturo, or produce any discovery relating to the role of Boden and Vasaturo at Riker's. Plaintiff has produced no evidence as to what authority each had, what guidelines and policies they were subject to, and what oversight was in place. Accordingly, the Court cannot allow this claim to go forward on a theory that either Captain Vasaturo or Boden had

final policymaking authority. *See, e.g., Cruz v. Liberatore,* 582 F.Supp.2d 508, 521 (S.D.N.Y.2008) (granting summary judgment where plaintiff failed to provide "any documentary evidence or testimony suggesting that" the named official was the defendant municipality's final policymaker); *Springle v. Metro. Transp. Auth.,* No. 06 Civ. 734(GEL), 2008 WL 331362, at \*7 (S.D.N.Y. Feb.1, 2008).

b. Deliberate Indifference to a Widespread Practice

To the extent that Plaintiff argues that the City was aware of similar constitutional violations but failed to do anything to end the practice, Plaintiff has failed to adduce any evidence of widespread constitutional violations by DOC personnel.

**\*7** Plaintiff argues that a lawsuit by another prison inmate in this District, *Shuford v. City of N.Y.,* No. 09 Civ. 945(PKC), as well as a recent article in the *New York Times,* provide ample evidence of a policy or practice of the DOC. (*See* Pl.'s Mem. 6–7; Marcus Decl. Exs. G, H.) Neither of these documents, however, is admissible evidence. [5] Although this Court can take judicial notice of filings in other courts, it can do so only to acknowledge the existence of the lawsuit or filing, not for the truth of matters asserted in those claims. *See Kramer v. Time Warner, Inc.,* 937 F.2d 767, 774 (2d Cir.1991); *see also Boyd v. City of Oakland,* 458 F.Supp.2d 1015, 1047–48 (N.D.Cal.2006) (declining to take notice of similar lawsuits to establish policy or practice for purposes of *Monell* claim). Newspaper articles are hearsay when introduced to prove the truth of the matter asserted, and also must not be admitted. *See Griffin v. City of N.Y.,* 287 F.Supp.2d 392, 395 n. 8 (S.D.N.Y.2003); *McAllister v. N.Y. City Police Dep't,* 49 F.Supp.2d 688, 706 n. 12 (S.D.N.Y.1999) ("Newspaper articles are hearsay, however, and therefore are not admissible evidence of New York City Police Department policy or custom.").

Similarly, Plaintiff's Rule 56.1 statement cites no evidence, admissible or otherwise, that the DOC ever denied Plaintiff medical care at any time other than on March 9, 2006, when Plaintiff alleges that his "requests for medical care and attention were ignored, and [P]laintiff was told by the corrections officers that if he sought medical care or informed anyone of his requests for care he would receive an infraction and/or be placed in solitary confinement." (Pl.'s 56.1 ¶ 20.) Such a single isolated incident, especially one involving only low-level or non-policymaking employees, is insufficient to

support a *Monell* claim. *See Ricciuti v. N.Y. City Transit Auth.,* 941 F.2d 119, 123 (2d Cir.1991).

### c. Failure To Train, Supervise, and Discipline

To succeed on a theory of liability based on either failure-to-train or failure-to-supervise, a plaintiff must make three showings.

> First, to reach the jury, the plaintiff must offer evidence from which a reasonable jury could conclude that a policy-maker knows to a moral certainty that her employees will confront a given situation. Next, the plaintiff must show that the situation either presents the employee with a difficult choice of the sort that training or supervision will make less difficult or that there is a history of employees [sic] mishandling the situation. Finally, the plaintiff must show that the wrong choice by the city employee will frequently cause the deprivation of a citizen's constitutional rights.

*Green v. City of N.Y.,* 465 F.3d 65, 80 (2d Cir.2006) (quotations and citations omitted); *accord Walker v. City of N. Y.,* 974 F.2d 293, 297–98 (2d Cir.1992).

Additionally, to survive summary judgment on a failure-to-train claim, a plaintiff must "identify a specific deficiency in the city's training program and establish that that deficiency is closely related to the ultimate injury, such that it actually caused the constitutional deprivation." *Amnesty Am.,* 361 F.3d at 129; *accord Jenkins v. City of N.Y.,* 478 F.3d 76, 94 (2d Cir.2007); *Amensty Am.,* 361 F.3d at 127 n. 8 ("[A] failure to train claim also requires evidence as to the city's training program and the way in which that program contributed to the violation."). In this case, Plaintiff has failed to conduct any discovery as to the training that prison officials undergo regarding the housing of cooperating witnesses, the provision of medical care or—for that matter—any training at the DOC in general.

**\*8** To succeed on a failure-to-supervise claim, Plaintiff "must establish [Defendant's] deliberate indifference by showing that 'the need for more or better supervision to

protect against constitutional violations was obvious,' " but that the municipality "made 'no meaningful attempt' to forestall or prevent the unconstitutional conduct.' " *Amnesty Am.,* 361 F.3d at 127 (quoting *Vann v. City of N.Y.,* 72 F.3d 1040, 1049 (2d Cir.1995)). Plaintiff has failed to adduce any evidence of a causal connection between the supervision received by unnamed prison employees and the alleged failure to transfer or segregate Plaintiff or provide him with medical care on March 9, 2006. In fact, the only evidence in the record about DOC procedure is the DOC Directive entitled Restrictive Housing Due Process and its replacement, Close Custody Housing. (*See* Decl. of Harry Ahl Ex. C.) Neither references how employees are supervised. Accordingly, there is no evidence in the record that could support a claim that the City's supervision over prison employees was insufficient.

Finally, Plaintiff has failed to put forth any evidence that the City or DOC failed to adequately discipline its personnel. The record is completely silent with respect to how the DOC responded to complaints against its personnel.

Because Plaintiff has offered no admissible evidence that will support a *Monell* claim for failure to train, supervise, or discipline, the City is entitled to summary judgment.

### D. Municipal Liability for Lanzatella

Plaintiff likewise seeks to hold the City liable for Lanzatella's alleged failure to take steps to ensure his safety. Plaintiff has produced no evidence that the City failed to adequately train, supervise, or discipline Lanzatella. Accordingly, Plaintiff can only succeed if Lanzatella herself is "responsible for establishing final government policy." *Pembaur,* 475 U.S. at 482; *accord Gronowski v. Spencer,* 424 F.3d 285, 298 (citing *Pembaur* ) (2d Cir.2005) ( "Even one episode of [unconstitutional conduct] may establish municipal liability under § 1983 if ordered by a person whose edicts or acts represent official city policy."). Because Lanzatella is not a final policymaker, however, the City is entitled to summary judgment on this claim as well.

*Section 177–c of the New York Judiciary Law* provides authority for the district attorneys of the counties comprising large New York cities to create a plan for a special narcotics prosecuting unit. *See* N.Y. Judiciary Law § 177–c. The SNPO is one of these units and it was created by agreement among the district attorneys of the five counties that make up New

York City. (*See* Decl. of Kristine Hamann (Hamann Decl.) Ex. E.) The plan calls for the appointment of one Special Assistant District Attorney, who "[u]nder the policy direction of the five District Attorneys" will "formulate policies, procedures and standards for the prosecution of cases" in that unit. (*Id.* at 3.) That Special Assistant District Attorney is Bridget Brennan. (*See* Defs.' 56.1 ¶ 29.) In addition to Brennan, an Executive Staff supervises the different bureaus and units within the SNPO. (*Id.* ¶¶ 30–31.) The Narcotics Gang Unit is one of these subunits. (*Id.*)

**\*9** Lanzatella is an ADA in the SNPO and the chief of the Narcotics Gang Unit. (Defs.' 56.1 ¶ 7.) Her duties are limited to "supervising the lawyers and staff people in the Narcotics Gang Unit, interacting with detectives, going to court and handling cases in court, interviewing witnesses, and motion and grand jury practice ." (*Id.* ¶ 26.) At the time of the events that gave rise to Plaintiff's claim, Lanzatella supervised only one other attorney, Farinha. (*Id.* ¶ 25.)

Based on New York state law and the uncontroverted evidence in the record regarding the structure of the SNPO, Lanzatella cannot be said to have final responsibility for establishing governmental policy with respect to the handling of cooperating witnesses or ensuring inmate safety. *See Peterson v. Tomaselli,* 469 F.Supp.2d 146, 169–70 (S.D.N.Y.2007) (concluding that unit chief in same office was not a final policymaker, Plaintiff has adduced no evidence or legal authority indicating otherwise).

Accordingly, the City is entitled to summary judgment on Plaintiff's *Monell* claim for Lanzatella's conduct.

### E. Individual Claims Against Lanzatella

Plaintiff also asserts claims against Lanzatella in her individual capacity. Lanzatella argues that all claims brought against her must be dismissed under the doctrines of absolute or qualified immunity.

### 1. Absolute Immunity

Prosecutors have absolute immunity for claims for damages arising out of duties that "are intimately associated with the judicial phase of the criminal prosecution." *Imbler v. Pachtman,* 424 U.S. 409, 430, 96 S.Ct. 984, 47 L.Ed.2d 128 (1976). Actions are not, however, immune simply because they are performed by a prosecutor. *See Buckley v. Fitzsimmons,* 509 U.S. 259, 113 S.Ct. 2606, 125 L.Ed.2d 209. 273 (1993). "[W]hen a prosecutor performs an investigative or administrative function"—functions not accorded immunity at common law—"absolute immunity is not available." *Barbera v. Smith,* 836 F.2d 96, 99 (2d Cir.1987). To determine whether absolute or qualified immunity attaches to particular conduct, courts apply a functional approach. *See Cornejo v. Bell,* 592 F.3d 121, 126 (2d Cir.2010) ("The real distinction between whether an executive employee is entitled to absolute or qualified immunity turns on the kind of function the employee is fulfilling in performing the acts complained of."). When asserting absolute immunity, the official claiming the privilege "shoulders the burden of establishing the existence of immunity for the function in question." *Hill v. City of N.Y.,* 45 F.3d 653, 660 (2d Cir.1995).

Prosecutors are entitled to absolute immunity only for "conduct 'intimately associated with the judicial phase of the criminal process,' " *Hill,* 45 F.3d at 661 (quoting *Imbler,* 424 U.S. at 430), including the initiation of prosecutions, the presentation of evidence at trial, preparatory functions such as evaluating and organizing evidence and presenting it to a grand jury, and the decision of which criminal charges to bring, *id.* Put another way, those functions a prosecutor carries out not as an advocate, but as an investigator and administrator, are not accorded absolute immunity. *See Buckley,* 509 U.S. at 273–274 ("When a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.' " (quoting *Hampton v. Chicago,* 484 F.2d 602, 608 (7th Cir.1973))).

**\*10** This is not to say that the functional approach draws a bright line between in-the-courtroom and out-of-the-courtroom tasks. As the Supreme Court stated in *Buckley,*

> [w]e have not retreated, however, from the principle that acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity. Those acts must include the professional evaluation of the evidence assembled by the police and appropriate preparation for

its presentation at trial or before a grand jury after a decision to seek an indictment has been made.

*Buckley,* 509 U.S. at 273.

The Second Circuit has twice considered what immunities attach to a prosecutor's dealings with a cooperating witness. First, in *Barbera v. Smith,* the estate of a murdered cooperating witness brought suit against an Assistant United States Attorney for negligently disclosing the witness's cooperation and for denying the witness's requests for protection. *See Barbera,* 836 F.2d at 98–99. In rejecting absolute immunity, the court characterized the prosecutor's activity as the "supervision of and interaction with law enforcement agencies in acquiring evidence which might be used in prosecution." *Id.* at 100. The *Barbera* court noted that, at the time the cooperating witness was put at risk and killed, "the government was still seeking evidence, including testimony from witnesses such as Barbera, that would enable it to prosecute" the targets of the investigation. *Id.* at 101. The *Barbera* decision did "not foreclose the possibility in an appropriate case" of absolute immunity for such a claim; it merely concluded that on the facts before the court, the prosecutor's "activities at the time of the alleged conduct ... seem[ed] to have involved primarily" investigative functions. *Id.*

Similarly, in *Ying Jing Gan v. City of New York,* the Second Circuit found that a prosecutor's failure to protect a witness was "not integral either to a decision of whether or not to institute a prosecution or to the conduct of judicial proceedings." 996 F.2d 522, 531 (2d Cir.1993). Although the investigation was, as in *Barbera,* in its preliminary stages at the time of the witness's death, the Circuit held that the plaintiff complained of "conduct that plainly is not integral to a decision of whether or not to institute a prosecution or the conduct of judicial proceedings," and accordingly found that it was not entitled to the protection of absolute immunity. *Id.*

As in *Barbera* and *Gan,* the record reveals that the primary role of Plaintiff's cooperation was to develop evidence, both for the prosecution of Plaintiff's co-defendants and for new prosecutions. "Lanzatella was debriefing ... Delrosario to determine whether or not he had information about other potential criminal activity. That investigation eventually led to another prosecution." (Farinha Dep. Tr. at 14:5– 13.) Although Lanzatella testified that her interviews of Plaintiff were intended "to obtain information about the defendants he was arrested with and their criminal activities

*and others,"* (Lanzatella Dep. Tr. at 71:13–16 (emphasis added)), she also testified that a primary purpose of Plaintiff's cooperation was to "develop additional cases about others and additional crimes" (*id.* 72:17–20). In fact, most of the cooperation sessions that Lanzatella "sat in on had to do with other people that [Delrosario] knew that were involved in criminal activity." (*Id.* 73:3–6.) Similarly, Farinha testified at his deposition that "Lanzatella is primarily responsible for conducting investigations." (Farinha Dep. Tr. at 13:9–13.) Because Lanzatella's primary purpose in signing Delrosario up as a cooperator was investigating criminal activity, both Plaintiff's own and that of others, rather than "a decision with regard to whether or not to institute a prosecution" or the "performance of [her] litigation-related duties," *Gan,* 996 F.2d at 530, her conduct is not shielded by the doctrine of absolute immunity.

### 2. Qualified Immunity

**\*11** " 'The doctrine of qualified immunity shields government employees acting in their official capacity from suits for damages under 42 U.S.C. § 1983, unless their conduct violated clearly established rights of which an objectively reasonable official would have known.' " *Peterson v. Tomaselli,* No. 02 Civ. 6325(DC), 2003 WL 22213125, at \*5 (S.D.N.Y. Sept.29, 2003) (quoting *Lowth v. Town of Cheektowaga,* 82 F.3d 563, 568–69 (2d Cir.1996)). "Even when a plaintiff's federal rights are well-defined, a defendant may successfully claim qualified immunity 'if it was objectively reasonable for the public official to believe that his acts did not violate those rights.' " *Id.* (quoting *Kaminsky v. Rosenblum,* 929 F.2d 922, 925 (2d Cir.1991)). When an official asserts the privilege of qualified immunity, a Court should uphold that immunity "unless the 'contours of the right' were 'sufficiently clear that a reasonable official would understand that what he is doing violates that right.' " *Gan,* 996 F.2d at 531 (quoting *Anderson v. Creighton,* 483 U.S. 635, 640, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)).

"As a general matter, a State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." *Gan,* 996 F.2d at 533 (quoting *DeShaney v. Winnebago Cty. Dep't of Soc. Servs.,* 489 U.S. 189, 197, 109 S.Ct. 998, 103 L.Ed.2d 249 (1989)); *accord Matican v. City of N.Y.,* 524 F.3d 151, 155 (2d Cir.2008). The Supreme Court has, however, recognized two exceptions to this broad principle. First, "the state or its agents may owe a constitutional obligation to the victim of private violence

if the state had a 'special relationship' with the victim." *Matican,* 524 F.3d at 155. "Second, the state may owe such an obligation if its agents in some way had assisted in creating or increasing the danger to the victim." *Matican,* 524 F.3d at 155 (quotations and citations omitted).

The *DeShaney* line of cases recognizes that "when the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney,* 489 U.S. at 199–200 (citing *Youngberg v. Romeo,* 457 U.S. 307, 317, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982)); *accord Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("The [Eighth] Amendment also imposes duties on these officials, who must provide humane conditions of confinement; prison officials must ensure that inmates receive adequate food, clothing, shelter, and medical care, and must 'take reasonable measures to guarantee the safety of the inmates.' " (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–527, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984)). Accordingly, courts have found that liability can be imposed on prison officials where a prisoner faces an objectively serious risk of harm and the prison official acts with deliberate indifference towards the inmate's safety. *See Farmer,* 511 U.S. at 834.

At least with respect to non-custodial cooperating witnesses, however, the Second Circuit has made clear that no special relationship exists such that a prosecutor is responsible for the safety of a witness. *See Gan,* 996 F.2d at 535; *Barbera,* 836 F.2d at 102. This case thus present the question of whether Plaintiffs incarceration imposed upon Lanzatella a "clearly established" duty to take affirmative steps to ensure his safety like the one imposed upon prison officials in *Farmer.* A constitutional right is clearly established where "(1) the law is defined with reasonable clarity (2) the Supreme Court or the Second Circuit has recognized the right; and (3) a reasonable defendant would have understood from the existing law that his conduct was unlawful." *Reuland v. Hynes,* 460 F.3d 409, 420 (2d Cir.2006) (citation omitted).

**\*12** In this case, Plaintiff has cited no authority, and this Court can find none, that requires prosecutors to step into the shoes of prison officials and safeguard prisoners. *Cf. Newman v. Gonzalez,* 05 Civ. 5215(LB), 2007 WL 674698, \*2 (E.D.N.Y. Mar. 5, 2007) ("[*Barbera* ] held that a prosecutor

was entitled to qualified immunity because there was no clearly established duty to protect the witness at the time of his death. *No right has since been established.*" (omissions and internal citations omitted; emphasis added)). While cognizant of the special relationship that exists between prison officials and inmates, *see Morales v. N.Y. State Dep't of Corrections,* 842 F.2d 27, 30 (2d Cir.1998), that relationship has not been extended to reach other state actors.

As recently as 2000, a court in this District addressed a nearly identical set of facts and found that no clearly established legal duty existed. In *Johnson v. City of New York,* the plaintiff sued the City and its officials for failing to protect him from attacks by fellow inmates against whom he had agreed to testify. *See Johnson v. City of N.Y.,* No. 00 Civ. 3626(SHS), 2000 WL 1335865, at \*1 (S.D.N.Y. Sept.15, 2000). Despite allegations that an assistant district attorney had assured the plaintiff that he would be protected from fellow inmates, Judge Stein concluded that "it cannot be said that it was clearly established that [the assistant district attorney] had created or assumed a special relationship with [plaintiff] imbuing him with a constitutional duty to protect him." *Id.* at \*4.

Based on the lack of case law establishing a duty of prosecutors to protect inmates from the violence of other inmates, the Court finds that Lanzatella did not have a clearly established duty to protect Plaintiff. Accordingly, she is protected from these allegations by qualified immunity.

### III. CONCLUSION

For the foregoing reasons, Defendants City of New York and Lanzatella's motion for summary judgment is granted in its entirety, The claims against the John Doe Defendants are dismissed without prejudice. The Clerk of the Court is respectfully directed to terminate the motion docketed as Doc. No. 84, to enter judgment accordingly, and to close this case.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2010 WL 882990

Footnotes

1   Lanzatella disputes that she was informed of such threats prior to the March 9, 2006 incident. (*See* Defs.' Reply 56.1 ¶ 8.)

2   Defendants object to Weinstein's testimony on this point on hearsay grounds. Defendants object to Elias's report on the grounds that no foundation has been laid for the expert report. Because this evidence does not change the outcome, the Court need not resolve the objection.

3   Defendants also object to this testimony on hearsay grounds because Weinstein was not sure whether or not he was there himself. Because this evidence does not alter the outcome of Defendants' motion, the Court need not resolve the objection.

4   The intended recipient of the letter is unclear. While the inside address contains the name of Captain Vasatoro, the greeting is addressed to Captain Boden. (Decl. of Mark D. Zuckerman (Zuckerman Decl.) Ex. F.)

5   It is true that in considering a deliberate indifference claim, including claims for failure to supervise or discipline, a Court may consider complaints made against a municipality *and its response to them to* determine whether the municipality acted with deliberate indifference. *See Fiacco v. City of Rensselaer,* 783 F.2d 319, 327–28 (2d Cir.1986). Plaintiff, however, simply cites to allegations of misconduct to support the proposition that the conduct occurred, or, in the alternative, cites to the allegations of misconduct without investigating how the City responded. Neither supports an inference of deliberate indifference.

---

**End of Document**                                        © 2016 Thomson Reuters. No claim to original U.S. Government Works.

**WESTLAW**   © 2016 Thomson Reuters. No claim to original U.S. Government Works.   10

🚩 KeyCite Yellow Flag - Negative Treatment
Distinguished by Mena v. City of New York, S.D.N.Y., July 19, 2016

2016 WL 3729383
Only the Westlaw citation is currently available.
United States Court of Appeals,
Second Circuit.

Mark Williams, Plaintiff–Appellant,

v.

Correction Officer Priatno, Correction Officer Gammone, Defendants–Appellees, Correction Officer John DOE, State of New York, New York State Department of Corrections and Community Service, Defendants.*

Docket No. 14-4777
|
August Term, 2015
|
Argued: February 29, 2016
|
Decided: July 12, 2016

**Synopsis**

**Background:** Former state inmate brought § 1983 action against two corrections officers, alleging that they violated his Eighth Amendment rights by beating him for talking back to another officer when he was incarcerated at state corrections facility. The United States District Court for the Southern District of New York, Seibel, J., dismissed the action. Inmate appealed.

**[Holding:]** The Court of Appeals, Katzmann, Chief Judge, held that prisoner satisfied Prison Litigation Reform Act's (PLRA) exhaustion requirement.

Reversed and remanded.

West Headnotes (7)

**[1]** **Federal Courts**

Dismissal or nonsuit in general

Court of Appeals reviews a grant of a motion to dismiss de novo.

Cases that cite this headnote

**[2]** **Federal Courts**

Imprisonment and incidents thereof

Issue of whether a plaintiff has exhausted administrative remedies under Prison Litigation Reform Act (PLRA) is a question reviewed de novo. Civil Rights of Institutionalized Persons Act § 7, 42 U.S.C.A. § 1997e(a).

Cases that cite this headnote

**[3]** **Federal Courts**

Pleadings; Dismissal

In reviewing district court's grant of motion to dismiss, the Court of Appeals accepts all factual allegations in the complaint as true.

Cases that cite this headnote

**[4]** **Federal Civil Procedure**

Pro Se or Lay Pleadings

On a motion to dismiss for failure to state a claim, where the complaint was filed pro se, it must be construed liberally with special solicitude and interpreted to raise the strongest claims that it suggests. Fed. R. Civ. P. 12(b)(6).

1 Cases that cite this headnote

**[5]** **Prisons**

Pleading

Failure to exhaust administrative remedies is an affirmative defense under the Prison Litigation Reform Act (PLRA), not a pleading requirement. Civil Rights of Institutionalized Persons Act § 7, 42 U.S.C.A. § 1997e(a).

2 Cases that cite this headnote

[6] Prisons

   👉 Exhaustion of Other Remedies

Although inmates are not required to specially plead or demonstrate exhaustion in their complaints, a district court still may dismiss a complaint for failure to exhaust administrative remedies if it is clear on the face of the complaint that the plaintiff did not satisfy the Prison Litigation Reform Act (PLRA) exhaustion requirement. Civil Rights of Institutionalized Persons Act § 7, 42 U.S.C.A. § 1997e(a).

1 Cases that cite this headnote

[7] Prisons

   👉 Particular cases

Prison grievance procedures that were technically available to state inmate who claimed he was beaten by correction officers were so opaque and confusing that they were incapable of use, and therefore, inmate exhausted all administrative remedies that were available to him, as required before filing suit under Prison Litigation Reform Act (PLRA), by giving his complaint to a correction officer to forward to the grievance clerk; confusing grievance process that provided an appeal "to the next step" did not contemplate inmate's situation in which correction officer did not file the grievance, which made it practically impossible for him to ascertain whether and how he could pursue his grievance. Civil Rights of Institutionalized Persons Act § 7, 42 U.S.C.A. § 1997e(a); N.Y. Comp. Codes R. & Regs. tit. 7, § 701.7.

3 Cases that cite this headnote

Plaintiff–Appellant Mark Williams appeals from an order of the District Court for the Southern District of New York that dismissed his claim under 42 U.S.C. § 1983 and the Eighth Amendment for failure to exhaust all available administrative remedies as required by the Prison Litigation Reform Act, 42 U.S.C. § 1997e(a). We conclude that administrative remedies beyond the

submission of his initial complaint were unavailable to Williams because the applicable grievance procedures are "so opaque" and confusing that they were, "practically speaking, incapable of use." Ross v. Blake, ––– U.S. ––––, 136 S.Ct. 1850, 1859, ––– L.Ed.2d ––– (2016). Accordingly, we reverse the decision of the district court and remand for further proceedings consistent with this opinion.

**Attorneys and Law Firms**

BRIAN M. FELDMAN (Michael J. Rooney, on the brief), Harter Secrest & Emery LLP, Rochester, NY, for Plaintiff–Appellant.

HOLLY A. THOMAS (Barbara D. Underwood and Anisha S. Dasgupta, on the brief), for Eric T. Schneiderman, Attorney General of the State of New York, New York, NY, for Defendants–Appellees.

Before: Katzmann, Chief Judge, Sack and Lohier, Circuit Judges.

**Opinion**

Katzmann, Chief Judge:

**\*1** Plaintiff–Appellant Mark Williams alleges in this 42 U.S.C. § 1983 case that Defendants–Appellees Correction Officer Priatno and Correction Officer Gammone violated his Eighth Amendment rights when they brutally beat him for talking back to another officer when he was an inmate at Downstate Correctional Facility ("Downstate") in New York. We are presented with the threshold question of whether Williams exhausted all available administrative remedies prior to filing this lawsuit in the United States District Court for the Southern District of New York, as required by the Prison Litigation Reform Act ("PLRA"), 42 U.S.C. § 1997e(a). More specifically, we must decide whether the prison's grievance process was actually "available" to Williams in light of the extraordinary circumstances of his case. We conclude that that process was not available to Williams because the applicable grievance procedures are "so opaque" and confusing that they were, "practically speaking, incapable of use." Ross v. Blake, ––– U.S. ––––, 136 S.Ct. 1850, 1859, ––– L.Ed.2d ––– (2016). We reverse the decision of the district court that granted defendants' motion to dismiss and remand for further proceedings consistent with this opinion.

## I. BACKGROUND

*A. Department of Corrections and Community Supervision Grievance Procedures*

The New York State Department of Corrections and Community Supervision ("DOCCS") regulations outline the procedures that apply to the Inmate Grievance Program ("IGP") at Downstate. The grievance process begins with the filing of a complaint within 21 days of an alleged incident. N.Y. Comp. Codes R. & Regs. ("NYCRR") tit. 7, § 701.5(a)(1). Typically, inmates file grievances with the grievance clerk. *Id.* However, if an inmate is housed in the special housing unit ("SHU"), and therefore segregated from the regular prison population, he may give the grievance complaint to a correction officer to file for him. *See id.* § 701.7. Upon filing, the grievance clerk numbers and logs the grievances. *Id.* § 701.5(a)(2).

Ordinarily, there are three levels of review of a grievance. The first is by the inmate grievance resolution committee ("IGRC"); the second is by the facility superintendent; and the third is by the central office review committee ("CORC"). *Id.* §§ 701.1(c), 701.5. However, "harassment grievances"—those that involve "employee misconduct meant to annoy, intimidate or harm an inmate," *id.* § 701.2(e)—are subject to expedited first-level review by the facility superintendent, *id.* § 701.8. When the grievance clerk identifies a harassment grievance, the clerk must forward the grievance to the superintendent on the same day that the grievance was filed. *Id.* § 701.8(b). If the grievance presents a bona fide harassment issue, then the superintendent must initiate an investigation, render a decision on the grievance, and inform the inmate of the decision within 25 days of receipt of the grievance. *Id.* § 701.8(d), (f). "If the superintendent fails to respond within the required 25 calendar day time limit the grievant may appeal his/her grievance to CORC." *Id.* § 701.8(g); *see also id.* § 701.6(g)(2) (stating generally that matters not decided within designated time limits "may be appealed to the next step").

**\*2** If an inmate is transferred to another facility while a grievance is pending, a response to the grievance shall be mailed to the inmate at the new facility. *Id.* § 701.6(h)(1). "If the grievant wishes to appeal, he or she must mail the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed within seven calendar days after receipt." *Id.* § 701.6(h)(2). If an inmate wishes to file a new grievance about an incident that occurred prior to a transfer, he must file the grievance in the facility where he is currently housed, "even if it pertains to another facility." *Id.* § 701.5(a)(1).

*B. Facts and Procedural History*

Williams was formerly incarcerated at Downstate. He alleges that, on December 31, 2012, he was in a search room (also known as a "drafting" room) while his personal items were being searched. A correction officer was "thoroughly probing [his] legal work" and he asked her to stop. Joint App. at 32. Williams explains that the legal papers were related to a separate action seeking damages for an assault he experienced while an inmate at Rikers Island. The officer instructed Williams to sit down, which he did while "admonishing" her. *Id.* At that point, defendant correction officers Priatno and Gammone approached Williams. They grabbed Williams and dragged him to another room that had no cameras, where they were out of eyesight of the other 15 to 20 inmates who were seated in the drafting room. Williams alleges that the officers proceeded to assault him—thrusting his forehead against the wall, causing him to fall to the ground, and then kicking and stomping on any uncovered part of his body. Defendant Gammone allegedly picked him up and said, "this is what running your mouth gets you," and punched him on his right eye. *Id.* at 37. Williams fell to the floor again, and defendant Priatno allegedly kicked his face and head. Following the assault, the officers sent him to the infirmary. He suffered injuries to his head, knee, eye, elbow, lower back, jaw, and nose, and he now takes medication for anxiety and panic attacks.

Williams alleges that on January 15, 2013, while he was housed in the SHU at Downstate, he drafted a grievance detailing the officers' misconduct. [1] He gave the grievance to a correction officer to forward to the grievance office on his behalf, in accordance with DOCCS grievance procedures that apply to inmates in the SHU. *See* NYCRR tit. 7, § 701.7. One week later, Downstate superintendent Ada Perez was making rounds in the SHU. Williams told her about the incident and said he had not yet received a response to his grievance. Perez told him she had no knowledge of the grievance and that she would look into it. About a week after that conversation, Williams was transferred to another facility. He never received a response to the grievance and alleges that the

correction officer in the SHU never filed it for him. There is no dispute that Williams never appealed the grievance.

Proceeding pro se, Williams filed a complaint in the United States District Court for the Southern District of New York on January 13, 2014, asserting a claim under 42 U.S.C. § 1983 and the Eighth Amendment. The initial complaint named as defendants Correction Officer Priatno, Correction Officer John Doe, the State of New York, and DOCCS. Pursuant to screening procedures that apply to pro se complaints under 28 U.S.C. § 1915A, the district court dismissed the claims against the State and DOCCS and directed the Attorney General's Office to ascertain the identity of defendant John Doe and provide that information to Williams. Williams filed an amended complaint on February 19, 2014, naming correction officers Priatno and Gammone as defendants.

**\*3** Defendants moved to dismiss the complaint on the basis that Williams failed to exhaust administrative remedies as required by the PLRA, citing records that show Williams never filed an appeal. In a decision dated December 10, 2014, the district court (Seibel, *J.*) granted defendants' motion. The court reasoned that, even if Williams's grievance had never been filed, he still could have appealed the grievance to the next level because the regulations allow an appeal in the absence of a response. The district court also *sua sponte* denied Williams leave to file a second amended complaint, concluding that "better pleading would not lead to a different result." Joint App. at 66.

Williams filed a timely notice of appeal and subsequently moved for appointment of pro bono counsel. In granting his motion, we directed pro bono counsel to brief, among other issues, the following questions:

> (1) whether the framework in *Hemphill v. New York*, 380 F.3d 680 (2d Cir.2004) for excusing non-compliance with exhaustion of administrative remedies is still good law in light of *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006); and (2) if so, whether a prison's failure to respond to a grievance renders an administrative remedy "unavailable" so as to excuse

the prisoner's non-compliance with administrative exhaustion.

Motion Order, filed Mar. 18, 2015, Docket No. 33. While this case was pending, the Supreme Court decided *Ross v. Blake*, ––– U.S. ––––, 136 S.Ct. 1850, ––– L.Ed.2d –––– (2016), which clarified the framework under which courts should assess whether a prisoner has complied with the PLRA exhaustion requirement. Because that framework can be easily applied to the parties' arguments and the record on appeal, we review the district court's decision under *Ross* and conclude that the court erred in granting defendants' motion to dismiss. Accordingly, we reverse and remand for further proceedings.

## II. DISCUSSION

**[1]  [2]  [3]  [4]** We review a grant of a motion to dismiss *de novo*. *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir.2011). Specifically, the issue of "[w]hether a plaintiff has exhausted administrative remedies under the [PLRA] is also a question reviewed *de novo*." *Amador v. Andrews*, 655 F.3d 89, 94–95 (2d Cir.2011). For purposes of this review, we accept all of the factual allegations in the complaint as true, *see Erickson v. Pardus*, 551 U.S. 89, 94, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007), and, because Williams appeared pro se before the district court, we are "constrained to conduct our examination with 'special solicitude,' interpreting the complaint to raise the 'strongest claims that it suggests,' " *Hill*, 657 F.3d at 122 (alterations omitted) (quoting *Triestman v. Fed. Bureau of Prisons*, 470 F.3d 471, 474–75 (2d Cir.2006) (per curiam)).

**[5]  [6]** The PLRA instructs that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983] ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Failure to exhaust administrative remedies is an affirmative defense under the PLRA, not a pleading requirement. *Jones v. Bock*, 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Grullon v. City of New Haven*, 720 F.3d 133, 141 (2d Cir.2013). Accordingly, "inmates are not required to specially plead or demonstrate exhaustion in their complaints." *Jones*, 549 U.S. at 216, 127 S.Ct. 910. However, a district court still may dismiss a complaint for failure to exhaust administrative remedies if it is clear on the face of the complaint that the plaintiff

did not satisfy the PLRA exhaustion requirement. *See id.* at 215, 127 S.Ct. 910.

In *Hemphill v. New York*, 380 F.3d 680 (2d Cir.2004), we set forth a three-part inquiry to guide our analysis of whether a plaintiff has satisfied the PLRA. *See id.* at 686–91. The first part involves an assessment whether administrative remedies were in fact available to the plaintiff; the second part instructs courts to consider whether defendants forfeited the affirmative defense of exhaustion by failing to preserve it or should be estopped from raising it because their own actions inhibited the plaintiff's ability to exhaust administrative remedies; and the third part directs courts to determine whether special circumstances existed that justified a plaintiff's failure to exhaust remedies that were available and not subject to estoppel. *See Amador*, 655 F.3d at 102 (summarizing *Hemphill* inquiry).

**\*4** Two years later, in *Woodford v. Ngo*, 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006), the Supreme Court weighed in on the importance of the PLRA exhaustion requirement without directly opining on the validity of the exceptions we outlined in *Hemphill*. In *Woodford*, a prisoner's grievance was denied because it was not timely filed. *Id.* at 86–87, 126 S.Ct. 2378. He then filed a lawsuit in federal court and argued he should be relieved from the PLRA exhaustion requirement on the basis that, as a result of his untimely filing, the grievance process was no longer available to him. *Id.* The Court rejected this position, emphasizing that the PLRA "requires proper exhaustion," *id.* at 93, 126 S.Ct. 2378, "which 'means using all steps that the [prison grievance system] holds out, and doing so *properly* (so that the [prison grievance system] addresses the issues on the merits),' " *id.* at 90, 126 S.Ct. 2378 (emphasis in original) (quoting *Pozo v. McCaughtry*, 286 F.3d 1022, 1024 (7th Cir. 2002)). "Proper exhaustion demands compliance with [a prison grievance system's] deadlines and other critical procedural rules because no adjudicative system can function effectively without imposing some orderly structure on the course of its proceedings." *Id.* at 90–91, 126 S.Ct. 2378.

In the aftermath of *Woodford*, we were left to determine the extent to which our *Hemphill* framework remained intact. The text of the statute convinced the court that the first part of our inquiry—the determination of whether an administrative remedy was in fact "available" to the inmate—was still valid. *See, e.g.*, *Macias v.*

*Zenk*, 495 F.3d 37, 44–45 (2d Cir.2007) (discussing *Woodford* and analyzing whether the grievance process was actually available to the plaintiff); *Johnston v. Maha*, 460 Fed.Appx. 11, 15 n. 6 (2d Cir. 2012) (summary order) ("Although [*Woodford*] requires that prisoners 'properly' exhaust the available remedies under the PLRA, it certainly does not abrogate the unavailability defense to nonexhaustion."); *see also Woodford*, 548 U.S. at 85, 126 S.Ct. 2378 (focusing its analysis on "all 'available' remedies"). However, the continued viability of *Hemphill's* inquiries regarding estoppel and special circumstances was less clear. *See, e.g.*, *Amador*, 655 F.3d at 102; *Macias*, 495 F.3d at 43 n. 1; *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d Cir.2006).

The Supreme Court's recent decision in *Ross v. Blake*, ––– U.S. ––––, 136 S.Ct. 1850, ––– L.Ed.2d ––––– (2016), squarely addresses that ambiguity and guides our decision here. In *Ross*, the Court held that, aside from the "significant" textual qualifier that "the remedies must indeed be 'available' to the prisoner," there are "no limits on an inmate's obligation to exhaust—irrespective of any 'special circumstances.' " *Id.* at 1856. The Court stressed "the mandatory nature of [the PLRA's] exhaustion regime," *id.* at 1857, noting that the text of the PLRA and its legislative history refute the existence of a special circumstances exception to the statute's exhaustion requirement, *id.* at 1857–58. Therefore, to the extent that our special circumstances exception established in *Giano v. Goord*, 380 F.3d 670, 675–76 (2d Cir.2004), and *Hemphill*, 380 F.3d at 689–91, permits plaintiffs to file a lawsuit in federal court without first exhausting administrative remedies that were, *in fact*, available to them, those aspects of *Giano* and *Hemphill* are abrogated by *Ross*. Indeed, *Ross* largely supplants our *Hemphill* inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate. *See Ross*, 136 S.Ct. at 1858–59.

Accordingly, we will shift our focus to an analysis of whether the PLRA's textual "unavailability" exception applies here. Our decision in *Hemphill* touches on that question, noting that "the behavior of the defendants may render administrative remedies unavailable." 380 F.3d at 686. But we are significantly aided by *Ross* in interpreting the meaning of the word "available" as used in the PLRA. In *Ross*, the Court highlights "three kinds of circumstances in which an administrative remedy, although officially on the books, is not capable

of use to obtain relief." *Ross,* 136 S.Ct. at 1859. [2] First, an administrative remedy may be unavailable when "it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* Second, "an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." *Id.* In other words, "some mechanism exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.* Third, an administrative remedy may be unavailable "when prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.

**\*5** **[7]** Turning to the facts of this case, we assume for purposes of our analysis that an administrative remedy was "officially on the books." *Id.* at 1859. Prison regulations provide that inmates in the SHU may file grievances by giving the complaint to a correction officer to forward to the grievance clerk. *See* NYCRR tit. 7, § 701.7. The regulations also provide that an inmate may appeal a grievance "to the next step" if he does not receive a timely response. *Id.* § 701.6(g)(2); *see also id.* § 701.8(g). Defendants assert that, even if Williams's grievance had not been filed and despite the fact that he had been transferred to a new facility prior to receiving a response, he still could have attempted to appeal the grievance in accordance with sections 701.6(g)(2) and 701.8(g).

However, even if Williams technically could have appealed his grievance, we conclude that the regulatory scheme providing for that appeal is "so opaque" and "so confusing that ... no reasonable prisoner can use [it]." *Ross,* 136 S.Ct. at 1859 (quoting Tr. of Oral Arg. 23). The regulations simply do not contemplate the situation in which Williams found himself, making it practically impossible for him to ascertain whether and how he could pursue his grievance.

We accept as true Williams's allegation that the correction officer never filed his grievance. [3] *See Erickson,* 551 U.S. at 94, 127 S.Ct. 2197. Under that circumstance, the regulations do not adequately outline the process to appeal or otherwise exhaust administrative remedies. On their face, the regulations only contemplate appeals of grievances that were actually filed. For example, if the grievance had never been filed, the superintendent would never have received it and the timeline for her to provide a response within 25 days "of receipt of the grievance"

would never have been triggered. NYCRR tit. 7, § 701.8(f). In turn, the textual provision allowing a grievant to appeal to the CORC would never have come into effect. *See id.* § 701.8(g) ( "If the superintendent fails to respond within the required 25 calendar day time limit the grievant may appeal his/her grievance to CORC."). Accordingly, the regulations give no guidance whatsoever to an inmate whose grievance was never filed.

Defendants assure us, however, that if Williams had attempted to appeal his grievance, it would have "allow[ed] the facility to alert the inmate that his original complaint ha[d] not been received, and to inform him about how to proceed with his complaint." Post–Argument Letter from Holly A. Thomas, Special Counsel to the Solicitor Gen., State of N.Y. Office of the Attorney Gen. ("Defendants' Post–Argument Letter") (Mar. 16, 2016), Docket No. 97, at 1. At oral argument, counsel for defendants stated that there is no time limit to appeal to the next step if an inmate does not receive a response to a grievance. *See* Oral Arg. Recording at 1:59:13–38. In their post-argument letter, defendants explain how this would work in practice by outlining three options that would be presented to an inmate following his appeal of an unfiled grievance: (1) if it is still within 21 days of the incident, the inmate can re-file the complaint; (2) if it is beyond 21 days but within 45 days of the incident, the inmate can request an exception to the 21–day time limit if he can show mitigating circumstances; or (3) if it is more than 45 days since the incident, the inmate may file a separate complaint grieving the denial of an extension to the time limit. Defendants' Post–Argument Letter, at 2–3; *see also id.*, App. 1b, 2c. [4]

**\*6** These options are pieced together from various provisions in the regulations that do not involve appeals of grievances but provide instructions on the timelines that apply to the filing of new complaints. *See* NYCRR tit. 7, § 701.5(a)(1); *id.* § 701.6(g)(1)(i)(a); *id.* § 701.6(g)(1)(ii). A close review of the regulations shows, contrary to defendants' assertions at oral argument, that an "appeal" in Williams's circumstance is, indeed, subject to time limitations and procedural hurdles that in all but the rarest of circumstances would preclude him from pursuing his unfiled and unanswered grievance, and that are, in any event, "so confusing that ... no reasonable prisoner can use them." *Ross,* 136 S.Ct. at 1859 (quoting Tr. of Oral Arg. 23).

Looking at the first option, an inmate does not even have the right to appeal a grievance to the next step until the time for the superintendent to respond has already passed —a date which, in the case of a harassment grievance, is already well beyond 21 days of the incident. *See id.* §§ 701.5(a)(1), 701.8(g). Regarding the second option, for similar reasons, the window to request an extension between 21 and 45 days of the incident will occur only where the inmate took less than the allowed 21 days to submit his original complaint. If the inmate took full advantage of the time the regulations give him to act and then had to wait 25 days for a response, 46 days will have passed before he learns with certainty that the superintendent failed to respond. [5] Finally, where options one and two are unavailable, the third option is wholly inapplicable as a mechanism to appeal an unfiled grievance, because the regulations state unequivocally that "[a]n exception to the time limit may not be granted if the request was made more than 45 days after an alleged occurrence." *Id.* § 701.6(g)(1)(i)(a). Therefore, even though option three suggests that an inmate could file a separate complaint grieving the denial of an exception to the filing deadline, such a grievance would be futile given that the regulations do not give the IGP supervisor authority to grant an exception beyond 45 days of the initial incident.

In sum, the regulations plainly do not describe a mechanism for appealing a grievance that was never filed. Moreover, the purported options for relief provided by defendants, to the extent they are even available to an inmate in Williams's situation, only increase confusion regarding the avenues available to pursue an appeal. For these reasons, the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it. [6]

 **\*7** Furthermore, if the regulations outlined above, as applied to a prisoner in Williams's situation, were not already "so confusing" that "no ordinary prisoner can discern or navigate [them]," *Ross*, 136 S.Ct. at 1859, their

obscurity was compounded by the fact that Williams was transferred to another facility approximately two weeks after giving his grievance to the correction officer. Defendants contend that a transfer does not affect an inmate's ability to appeal his grievance to the next step, pointing to a provision in the regulation that provides: "If the [transferred] grievant wishes to appeal, he or she must mail the signed appeal form back to the IGP supervisor at the facility where the grievance was originally filed within seven calendar days after receipt." *NYCRR tit. 7, § 701.6(h)(2)*. However, this provision presumes not only that the grievance was actually filed, but also that the inmate received an appeal form that he can sign and mail back. The regulations plainly do not provide guidance on how a transferred inmate can appeal his grievance with the original facility without having received a response.

For the foregoing reasons, we conclude that the grievance procedures that were technically available to Williams are so opaque and confusing that they were, "practically speaking, incapable of use." *Ross*, 136 S.Ct. at 1859. Accordingly, in giving his grievance to the correction officer, Williams exhausted all administrative remedies that were available to him. *42 U.S.C. § 1997e(a).* [7] To avoid confusion going forward, we recommend that DOCCS revise its grievance procedures to instruct inmates how to appeal grievances that were not properly filed by prison staff, and how to appeal a grievance, to which the inmate never received a response, after being transferred.

### III. CONCLUSION

Having concluded that Williams satisfied the PLRA's exhaustion requirement, we **REVERSE** the judgment of the district court and **REMAND** for further proceedings in accordance with this opinion.

**All Citations**

--- F.3d ----, 2016 WL 3729383

Footnotes

\*    The Clerk of Court is directed to amend the caption to conform to the listing above.

1    Some allegations concerning the circumstances of Williams's attempted filing of his grievance are taken from his pro se opposition to the motion to dismiss, which we may consider in resolving this appeal. *See Wright v. Comm'r of Internal Revenue*, 381 F.3d 41, 44 (2d Cir.2004) (construing pro se submissions "liberally"); *Ortiz v. McBride*, 323 F.3d 191, 194 (2d Cir.2003) ("The rule favoring liberal construction of *pro se* submissions is especially applicable to civil rights claims.").

2   We note that the three circumstances discussed in *Ross* do not appear to be exhaustive, given the Court's focus on three kinds of circumstances that were "relevant" to the facts of that case. *Ross*, 136 S.Ct. at 1859. Because those circumstances are also relevant to the facts of this case, we do not opine on what other circumstances might render an otherwise available administrative remedy actually incapable of use.

3   We consider this claim to be plausible given Williams's allegations that he asked superintendent Perez about his grievance one week after giving it to the correction officer and Perez said that she had no knowledge of it. There is no question that Williams's grievance was a harassment grievance. *See* NYCRR tit. 7, § 701.2(e) (defining harassment grievances). Had the correction officer filed it, it should have been forwarded to Perez the same day in accordance with procedures that govern the processing of harassment grievances. *See* NYCRR tit. 7, § 701.8(b). At the motion to dismiss stage, the allegation that she had no knowledge of the grievance supports Williams's allegation that it was not filed.

4   Defendants offer a fourth option for an inmate to address an unfiled grievance: submitting "a new complaint grieving the alleged willful mishandling of his original complaint by DOCCS's personnel." Defendants' Post–Argument Letter at 3. However, because such a grievance would not itself address the substantive allegations in the original unfiled grievance —and it is unclear how prevailing on the former would affect the ability to pursue the latter—under the circumstances of this case, it is at a minimum a roundabout, if not ineffectual, means for an inmate to attain relief.

5   Even when an inmate submits his initial grievance before the 21–day deadline specified in section 701.5(a)(1), and, therefore, it is possible that he could have filed a request for an extension under the second option, he would still not learn of that option until the prison responds to his "appeal" of the unanswered grievance and informs him of these options. In the examples provided by defendants, the amount of time the prison takes to provide a response to these types of inquiries varies. *See, e.g.*, Defendants' Post–Argument Letter, App. 1 (1 day); App. 2 (7 days); App. 3 (3 days); App. 4 (1 day); App. 5 (17 days).

6   Defendants argue that an inmate's claim that he submitted a grievance that was unfiled and unanswered (which the district court would accept as true at the motion to dismiss stage), and that was not appealed, cannot excuse compliance with the PLRA's exhaustion requirement. If the inmate's allegation to that effect alone sufficed for purposes of the PLRA, he could thereby "avoid the prison grievance process altogether ... without the administrative process ever having been initiated." Defendants' Br. at 22–23. Indeed, many district courts have concluded that a "nonresponse" to a grievance "must be appealed" in order to exhaust administrative remedies under the PLRA. *See, e.g.*, *Smith v. Kelly*, 985 F.Supp.2d 275, 281 (N.D.N.Y.2013); *see also id.* at 281 n. 8 (collecting cases). Nonetheless, defendants bear the initial burden of establishing the affirmative defense of non-exhaustion "by pointing to 'legally sufficient sources' such as statutes, regulations, or grievance procedures" which demonstrate that "a grievance process exists and applies to the underlying dispute." *Hubbs v. Suffolk Cty. Sheriff's Dep't*, 788 F.3d 54, 59 (2d Cir.2015) (alteration omitted) (quoting *Mojias v. Johnson*, 351 F.3d 606, 610 (2d Cir.2003)). Because, as we explained above, the process of appealing an unfiled grievance is practically unavailable to inmates under current DOCCS regulations, defendants have not met their initial burden here.

7   In light of this conclusion, we need not decide whether administrative remedies also may have been unavailable to Williams for other reasons, such as officer misconduct. *See Ross*, 136 S.Ct. at 1860.

---

**End of Document**                                           © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2014 WL 2505218
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Joseph JACKSON, Plaintiff,

v.

Mark BRADT, Superintendent; W. Murray.
Lieutenant; C. Monin, Correction Officer;
Wagner, Correction Officer; and Albert Prack,
Special Housing Unit Director, Defendants.

No. 13–CV–0004M.
|
Signed May 28, 2014.
|
Filed May 29, 2014.

**Attorneys and Law Firms**

Joseph Jackson, Pine City, NY, pro se.

ORDER

JOHN T. CURTIN, District Judge.

**\*1** Plaintiff, Joseph Jackson, an inmate at the Southport Correctional Facility commenced this *pro se* action under 42 U.S.C. § 1983 alleging various violations of his constitutional rights that occurred when he was an inmate at the Attica Correctional Facility ("Attica CF"). Upon initial review of the complaint pursuant to 28 U.S.C. § § 1915(e)(2)(B) and 1915A, the Court (Hon. Frank P. Geraci, Jr.): (1) dismissed certain claims with prejudice, (2) dismissed certain claims without prejudice with leave to amend such claims, and (3) directed certain claims to proceed to service pending the filing of an amended complaint, if any. (Docket No. 7, Decision and Order, filed August 26, 2013 ("Decision and Order"). The following claims were dismissed but with leave to amend: (1) the retaliation claims against D. O'Connell *only* relating to the November 5, 2011 visit and the November 6, 2011 Misbehavior Report arising from said visit (*id.,* pp. 7–10, *supra* ); and (2) the due process claims against Superintendent Mark Bradt and Lieutenant Murray relating to the November 10, 2011 Disciplinary Hearing held in relation to the November 6, 2011 Misbehavior Report (*id.,* pp. 11–15, *supra* ). Only the retaliation and

excessive force claims against defendants Wagner and Monin arising from a March 6, 2012 cell search were allowed to proceed to service without amendment. (*Id.,* pp. 19–20, 25; Docket No. 1, Complaint, ¶ ¶ 34; pp. 18–20). Service however was stayed pending the filing of an amended complaint. [1] Plaintiff has filed an amended complaint, which is now subject to screening pursuant to 28 U.S.C. § § 1915(e)(2)(B) and 1915A.

Plaintiff has also filed a motion for the appointment of counsel which is denied at this time without prejudice as premature. A more fully developed record will be necessary before the Court can determine whether plaintiff's chances of success warrant the appointment of counsel. Therefore, plaintiff's motion is denied without prejudice to its renewal at such time as the existence of a potentially meritorious claim may be demonstrated. *See Hendricks v. Coughlin,* 114 F.3d 390, 392 (2d Cir.1997) (when determining whether to appoint counsel, the Court must first look to the "likelihood of merit" of the underlying dispute).

DISCUSSION

**A. STANDARD OF REVIEW**
In evaluating the amended complaint, the Court must accept as true all of the factual allegations and must draw all inferences in plaintiff's favor. *See Larkin v. Savage,* 318 F.3d 138, 139 (2d Cir.2003) (per curiam); *King v. Simpson,* 189 F.3d 284, 287 (2d Cir.1999). While "a court is obliged to construe [*pro se* ] pleadings liberally, particularly when they allege civil rights violations," *McEachin v. McGuinnis,* 357 F.3d 197, 200 (2d Cir.2004), even pleadings submitted *pro se* must meet the notice requirements of Rule 8 of the Federal Rules of Civil Procedure. *Wynder v. McMahon,* 360 F.3d 73 (2d Cir.2004). "Specific facts are not necessary," and the plaintiff "need only 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.' " *Erickson v. Pardus,* 551 F.3d 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) (quoting *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007) (internal quotation marks and citation omitted).

**B. PLAINTIFF'S CLAIMS**

1. *First Claim*

 **\*2**  Plaintiff's amended complaint is brought against Bradt, Superintendent; Murray, Lieutenant/Hearing Officer; O'Connell, Sergeant; Monin, CO.; Wagner, CO.; and Prack, Special Housing Unit Director. It raises two separate claims. The First Claim ("Claim I") again alleges that on October 1, 2010, Conway, Attica C.F.'s former Superintendent had suspended the visitation privileges of Brenda Crawley for one year and that on October 26, 2011, Bradt sanctioned both plaintiff and Crawley by limiting them to non-contact visits for six months. (Docket No. 8, ¶ 33–35.) [2] On October 29, 2011, Crawley visited plaintiff and, when registering for the visit, she informed the desk officer that her name had changed to Adams. After registering she was allowed to visit plaintiff. (Amended Complaint, ¶ 37.) On November 5, 2011, Adams again visited plaintiff but during the course of the visit defendant O'Connell interrupted and asked Adams if she had changed her name. Adams explained that she had changed her name after her divorce and that she had informed the desk officer of the name change. After O'Connell confirmed that Adams had changed her name, he allowed the visit to continue. (*Id.,* ¶ 38.)

On November 6, 2011, plaintiff was placed on keeplock and issued a Misbehavior Report by O'Connell for failing to inform officers that he was permitted only non-contact visits with Crawley (Adams). Plaintiff immediately filed a grievance against O'Connell based on the issuance of the Misbehavior Report and his "altogether harassment." (*Id.,* ¶ 39–40, Exh. A–2, p. 4.) Plaintiff alleges that the Tier III Misbehavior Report was issued by O'Connell based on "harassment, discriminatory and[/] or retaliation." He claims that O'Connell had an alleged verbal altercation with Adams at some time wherein he had advised her that she could not enter the facility, which plaintiff's claims was contrary to Bradt's authorization to allow Adams to re-enter the facility. This, plaintiff claims, was all part of O'Connell's harassment and retaliation against him. (*Id.,* ¶ ¶ 43–44, 48.)

The Tier III Hearing before Murray was held on November 10, 2011, and plaintiff alleges that Murray was biased and denied plaintiff the opportunity to adequately question the witnesses by interjecting and rephrasing plaintiff's questions to the witnesses in a leading manner. (*Id.,* ¶ 146–47, 49.) Murray found plaintiff guilty and sentenced him to two months keeplock, and six months

loss of privileges, including visits with Adams. Plaintiff claims "he was sent to Special Housing Unit ["SHU]."

Plaintiff alleges that his claims arise under the First and Fourteenth Amendments and the Court construes them, as it did when the claims were raised in the complaint initially, as claims of retaliation against O'Connell (First Amendment) and a violation of due process against Murray and Prack, who affirmed Murray's disposition (Fourteenth Amendment).

The Decision and Order, which dismissed the retaliation claims against O'Connell without prejudice, noted that "a complaint which alleges retaliation in wholly conclusory terms may be safely dismissed on the pleadings alone [because] [i]n such a case, the prisoner has no factual basis for the claim. *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).* Plaintiff's claims still lack any factual support that O'Connell issued the Misbehavior Report on November 6, 2011 in retaliation for some protected conduct engaged in by plaintiff. Plaintiff's allegations that "O'Connell violated policy and due process when he wrote misbehavior report to harass and retaliate against plaintiff and[/]or Ms. Adams after, alleged, verbal dispute with Ms. Adams to deprive plaintiff of his liberty and his property, and due to their being no DOCCS [3] Rule to match the [allegations set forth in] the Misbehavior Report ..." are simply insufficient to support a claim of retaliation against O'Connell. Accordingly, the Court finds that plaintiff's allegations of retaliation with respect to the issuance of the November 6, 2011 Misbehavior Report must be dismissed with prejudice because they fail to state a claim upon which relief can be granted.

 **\*3**  With respect to the due process claim against Murray, the claim pled in the complaint was dismissed because plaintiff failed to allege whether he was sentenced to some form of disciplinary confinement and what the circumstances of any such confinement was, and because plaintiff failed to allege sufficiently that Murray was biased and denied him due process at the Hearing. (Decision and Order, pp. 13–14.) The amended complaint alleges that plaintiff was sentenced to two months keeplock, which apparently was served in Attica C.F.'s SHU, and a six month loss of privileges, including visitation with Adams. It also alleges that Murray interjected during plaintiff's questioning of witnesses which constructively denied him the right to call witnesses and present a defense.

A state inmate's liberty interest is implicated by prison discipline only if the discipline "imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *see also Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) ("A prisoner's liberty interest is implicated by prison discipline, such as SHU confinement, only if the discipline 'imposes [an] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' ") (quoting *Sandin,* 515 U.S. at 484). *Sandin* "established an analysis under which the degree and duration of an inmate's restraint are the key considerations to determine the existence of a state-created liberty interest[ ]" for purposes of determining whether there was a due process violation in the context of prison discipline. *Arce v. Walker,* 139 F.329, 335 (2d Cir.1998). The Court of Appeals for the Second Circuit has "explicitly avoided a bright line rule that a certain period of SHU confinement automatically fails to implicate due process rights" and has "explicitly noted that SHU confinements of fewer than 101 days could constitute atypical and significant hardships if the conditions were more severe than the normal SHU conditions ... or a more fully developed record showed that even relatively brief confinements under normal SHU conditions were, in fact, atypical." *Palmer,* 364 F.3d at 64–65.

When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including an analysis of both the length and conditions of confinement. *See Sealey v. Giltner,* 197 F.3d 585, 586 (2d Cir.1999); *Arce,* 139 F.3d at 335–36; *Brooks v. DiFasi,* 112 F.3d 46, 48–49 (2d Cir.1997). In cases involving shorter periods of segregated confinement where the plaintiff has not alleged any unusual conditions, however, a detailed explanation of this analysis is not necessary. *See Hynes v. Squillace,* 143 F.3d 653, 658 (2d Cir.1998); *Arce,* 139 F.3d at 336.

"[C]ourts within the Second Circuit have repeatedly found that periods of SHU confinement under normal conditions 'lasting fewer than 101 days have been found not to amount to [an] atypical and significant hardship.' " *Mosley v. Woodly,* 2013 WL 5347272, at *8 (N.D.N.Y. Sept.23, 2010) (Adopting Report and Recommendation) (finding 67 days in SHU did not implicate a liberty interest) (citing *Dawkins v. Gonyea,* 646 F.Supp.2d 594,

606 (S.D.N.Y.2009) (citing *Sealey,* 197 F.3d at 588–90). This District in *Edmonson v. Coughlin,* 1996 WL 622626, at *4–5 (W.D.N.Y. Oct.4, 1996), found that courts within the Second Circuit tend to rule, as a matter of law, that "disciplinary keeplock or SHU confinement to 60 days or less in New York prisons is not an atypical or significant hardship in relation to the ordinary incidents of prison life.") (collecting cases). *See also McEachin v. Sealey,* 2010 WL 3259975, at *9 (N.D.N.Y., March 30, 2010) ("Nevertheless, courts within the Second Circuit tend to rule, as a matter of law, that 'disciplinary keeplock or SHU confinement to 60 days or less in New York prisons is not an atypical or significant hardship in relation to the ordinary incidents of prison life.' ") (quoting *Edmonson,* 1996 WL 622626, at*4–5); *Alvarado v. Kerrigan,* 152 F.Supp.2d 350, 355 (S.D.N.Y.2001) (93 days) (citing *Williams v. Goord,* 111 F.Supp.2d 280, 289 (S.D.N.Y. July 28, 2000) (75 days confinement); *Jackson v. Johnson,* 15 F.Supp.2d 341, 361–62 (S.D.N.Y.1998) (99 days); *Trice v. Clark,* 1996 WL 257578, at *3 (S.D.N.Y. May 16, 1996) (150 days)).

**\*4** As noted, plaintiff has alleged that he was sentenced to 60 days keeplock, which he served in SHU, and a loss of privileges for six months. He does not allege, however, that the conditions of his confinement "differed from the ordinary incidents of prison life as experienced by other SHU or general population inmates." *Mosley,* 2013 WL 5347272, at *8 (finding 67 days in SHU did not implicate a liberty interest). The Court therefore finds that plaintiff has not stated a claim under *Sandin* and his due process claim against both Murray and Prack in relation to the Tier III Hearing regarding the November 6, 2011 Misbehavior Report must be dismissed with prejudice.

As to defendant Prack,[4] the only allegation is that he affirmed Murray's disposition. (*Id.,* ¶ 53). This allegation alone is insufficient to state a claim against Prack. *See Woodward v. Mullah,* 2009 WL 4730309, at*2–3(W.D.N.Y. Dec. 7, 2009) (McCarthy, M.J.) ("while personal involvement cannot be founded solely on supervision, liability can be found if the official proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results.") (internal quotations and citations omitted) (Report and Recommendation adopted by Arcara, J.).

Even if plaintiff had alleged a cognizable liberty interest and thus a right to procedural due process at his

Hearing, he has not alleged a violation of due process when he alleges that Murray interjected during plaintiff's questioning of CO. Kozakiewicz and rephrased a question plaintiff had asked. Plaintiff had asked Kozakiewicz "why he did not follow DOCCS policy by writing plaintiff a Misbehavior Report if he felt that plaintiff violated DOCCS Rules on the day of the incident." Rather than allowing Kozakiewicz to answer, Murray interjected and asked Kozakiewicz, "did you not write the ticket because Sergeant O'Connell wrote the ticket already." Kozakiewicz answered "yes." (Amended Complaint, ¶ 46.) This is insufficient to allege that plaintiff was denied a meaningful opportunity to present a defense.

"[I]t is well settled that an inmate does not possess a constitutional right to confront or cross-examine witnesses in prison disciplinary hearings." *Fernandez v. Callens,* 2010 WL 4320362, *11 (W.D.N.Y.2010) (Schroeder, M.J.) (citing *Wolff v. McDonnell,* 418 U.S. 539, 567 68 (1974); *see also Silva v. Casey,* 992 F.2d 20, 22 (2d. Cir.1993) ("an inmate has no constitutional right of confrontation"); *Sowell v. Harris,* 2013 WL 3324049 at *10 (W.D.N.Y. July 1, 2013) ("As a matter of federal constitutional law, an inmate does not have a right to cross-examine adverse witnesses at a disciplinary hearing"); *Toliver v. New York City Department of Corrections,* 2013 WL 3779125, *10–11 (S.D.N.Y. July 8, 2013) ("Mr. Toliver also claims that he was denied his right to call the officers, who had issued him [the infraction], to testify at the hearing. However, due process protection does not provide inmates right to confront and cross-examine those furnishing evidence against the inmate"). The Court finds that Hearing Officer Murray's limited interjection and rephrasing of the question as alleged in the complaint did not deprive plaintiff of a meaningful opportunity to present a defense.

**\*5** Plaintiff's allegations that Murray was biased or partial and ruled against him is also insufficient to allege that he was denied due process at the Hearing. An impartial hearing officer is "one who, inter alia, does not prejudge the evidence and who cannot say ... how he would assess the evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 569–70 (2d Cir.1990). "The degree of impartiality required of prison administrators does not rise to the level of that required of judges generally." *Allen v. Cuomo,* 100 F.3d 253, 259 (2d Cir.1996). "An inmate's own subjective relief that the hearing officer was biased is insufficient to create a genuine issue of

material fact." *See Johnson v. Fernandez,* 2011 WL 7629513, at *11 (N.D.N.Y. March 1, 2011) (Report and Recommendation) (citing *Francis v. Coughlin,* 891 F.2d 43, 46 (2d Cir.1989); *Clyde v. Schoellkopf,* 714 F.Supp.2d 432, 437–38 (W.D.N.Y.2010) (Larimer, J.)).

Other than plaintiff's allegation that Murray interfered with his questioning of Kozakiewicz and that Kozakiewicz lied when asked "why the visit [with Adams] was not terminated if the alleged violation took place" (Amended Complaint, ¶ 49), plaintiff's claim that Murray was biased is not supported by facts which would establish such bias. Accordingly, any claims that plaintiff was denied due process at the Hearing fail to state a claim upon which relief can be granted.

*2. Second Claim*
The Second Claim alleges, as the complaint did, that defendant Monin and CO. Gallagher searched plaintiff's cell and that at some time during or following the search Monin ripped plaintiff's legal documents, grabbed him, slapped him, slammed him to the bed and stated to him, " 'you like to write grievances don't you tough guy' " and " '[i]f you write any more grievances on Sergeant O'Connell we'll be back.' " (Amended Complaint, ¶¶ 54–55). Wagner, who had followed plaintiff into his cell and was in the cell at the time Monin allegedly slapped and slammed plaintiff to the bed, asked Monin, " 'are you sure there's [sic] no weapons in here?,' " insinuating they could plant one in the cell and set plaintiff up if they wanted. (*Id.,* ¶ 55.) [5]

Plaintiff immediately filed a grievance and the next day, March 7, 2012, plaintiff was issued a Misbehavior Report authored by CO. Galloway, who was the CO. that searched plaintiff's cell along with Monin, charging him with a number of violations of Inmate Rules: possessing an authorized item that has been altered (113.11); altering or revising an electrical device (118.31); altering personal property without authorization (116.11); exchanging a personally owned articles without authorization (113.15); possessing unauthorized jewelry (113.17); and smuggling (114.10). (Amended Complaint, ¶ 56, Exh. B–6.)

Plaintiff alleges that Hearing Officer Murray denied plaintiff the right to question Monin about what occurred during the cell search and rephrased plaintiff's questions of other witnesses thereby leading the witnesses to

answer "yes" or "no" only and preventing the witnesses from "giv[ing] up" any information on or for the record." (Amended Complaint, ¶¶ 57–59.) [6] Plaintiff also alleges that Murray made a biased statement after dismissing the smuggling charge: " 'I still believe you smuggled this ring in somewhere.' " (*Id.,* ¶ 59.) Murray found plaintiff guilty of the remaining charges and sentenced plaintiff to six days time served for the Tier II infractions (*id.,* ¶ 60, Exh. B–6). [7]

**\*6** As noted, above, a prisoner does not have a cognizable liberty interest unless he has suffered an "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin,* 515 U.S. at 484. A disciplinary sentence of six days time served, in the absence of any allegations regarding how the conditions of said confinement was atypical and significant, fails to state a cognizable liberty interest. *See, e.g., Brown v. Graham,* 2010 WL 6428251, at *9 (N.D.N.Y. March 30, 2010) (Report & Recommendation), *adopted by District Judge,* 2011 WL 1213482 (March 31, 2011) ("The federal district courts in New York, applying *Sandin,* have been consistent in holding that terms of SHU or 'keeplock' of approximately 30 days or less, and the related loss of privileges, do not *aff'd* 470 Fed.Appx. 11 (2d Cir.2012)). Accordingly, plaintiff's due process claims arising from the March 7, 2012 Misbehavior Report and Tier II Hearing are dismissed in their entirety.

### *CONCLUSION*

For the reasons discussed above, the claims set forth in plaintiffs amended complaint are dismissed with prejudice pursuant to 28 U.S.C. § § 1915(e)(2)(B)(ii) and 1915A, except that part of the the Second Claim only which alleges retaliation and use of excessive force as against defendants Monin and Wagner, and the U.S. Marshal is directed to

serve the summons and amended complaint on Monin and Wagner regarding those remaining claims.

### *ORDER*

IT HEREBY IS ORDERED, that plaintiff's amended complaint is dismissed with prejudice, except as to that part of the Second Claim which alleges retaliation and use of excessive force against defendants Monin and Wagner;

FURTHER, that the Clerk of the Court is directed to terminate defendants Mark L. Bradt, W. Murray, D. O'Connell, and Albert Prack as parties to this action

FURTHER, that plaintiff's motion for the appointment of counsel (Docket No. 9) is denied without prejudice;

FURTHER, that the Clerk of the Court is directed to cause the United States Marshal to serve copies of the Summons, Amended Complaint, this Order and the Order, filed August 26, 2013 (Docket No. 7) upon defendants Monin and Wagner without plaintiff's payment therefor, unpaid fees to be recoverable if this action terminates by monetary award in plaintiff's favor; [8]

FURTHER, the Clerk of the Court is directed to forward a copy of this Order by email to Michael Russo, Assistant Attorney General in Charge, Buffalo Regional Office <Michael.Russo@ag.ny.gov>;

FURTHER, that pursuant to 42 U.S.C. § 1997e(g)(2), the defendants are directed to respond to the complaint.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2014 WL 2505218

---

Footnotes

1    The following claims were dismissed with prejudice: (1) the claims against James T. Conway and Mark Bradt in theirentirety relating to the visitation sanction imposed and extended against plaintiff and Brenda Crawley (Decision and Order, pp. 4–7); (2) the Eighth Amendment claim against Sgt. D. O'Connell relating to the November 5, 2011 visit by Crawley (*id.,* pp. 7–8, *supra*); (3) the due process and retaliation claims as against C.O. Kozakiewiez and Lt. Kaczmarek relating to the November 6, 2011 Misbehavior Report and subsequent Disciplinary Hearing (*id.,* pp. 11–15); (4) the claims relating to plaintiff's sister's visit on October 29 2011 and the failure to file or process plaintiff's grievances as against C.O. Sekuterski, Pam Korozko, I.G.P. Supervisor M. Janes, and I.G.O. Director Karen Bellamy (*id.,* pp. 15–18); and (5) the

retaliation (cell search, racial slurs and urinalysis test) and excessive force claims against all defendants, except Monin and Wagner, based on a criminal complaint filed by plaintiff on February 23, 2012 (*id.* pp. 18–20).

2    Any First (association claims) and Fourteenth (due process claims) Amendment claims related to the suspension or denial of visits were dismissed previously with prejudice. (Decision and Order, pp. 3–7.)

3    DOCCS refers to the New York State Department of Corrections and Community Supervision.

4    The complaint appeared to allege that it was the Superintendent, either Bradt or Conway, who affirmed Murray's disposition of the Tier III Hearing (Decision and Order, pp. 14), which was cleared up in the amended complaint when plaintiff alleges that he appealed to Prack and Prack affirmed the disposition. (Amended Complaint, ¶ 53.) Tier II appeals are made to the Commissioner of DOCCS who regularly assigns them to a designee, whereas Tier I and II appeals are made to the Superintendent of the Facility.

5    To the extent that plaintiff claims that Monin and Wagner violated the First (retaliation) and Eighth (excessive force) Amendments, the Court had initially allowed those claims to proceed to service pending receipt of the amended complaint. (Decision and Order, at 19–20.)

6    The complaint did not allege specifically a due process claim relating to the March 7, 2012 Misbehavior Report and subsequent Hearing. It only alleged that plaintiff was found guilty after a hearing on all the charges and this his appeal, presumably to Bradt, was denied. The Court therefore did not construe the complaint as alleging a due process claim. (Decision and Order, at 19–21.) The Court does, however, construe the amended complaint as asserting such a claim.

7    DOCCS has a three tier disciplinary system and conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the Special Housing Unit ("SHU"). Tier III hearings concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246, 142 L.Ed.2d 202 (1998).

8    Pursuant to a Standing Order of Court, filed September 28, 2012, a defendant will have 60 days to file and serve an answer or other responsive pleading, *see* Fed. R.Civ. P. 12(a)-(b), if the defendant and/or the defendant's agent has returned an Acknowledgment of Receipt of Service by Mail Form within 30 days of receipt of the summons and complaint by mail pursuant to N.Y.C.P.L.R. § 312–a.

---

**End of Document**        © 2016 Thomson Reuters. No claim to original U.S. Government Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Joseph PARKS, Plaintiff,
v.
Joseph T. SMITH, et al., Defendants.
No. 9:08–CV–0586 (TJM/GHL).

March 29, 2011.
Joseph Parks, Wallkill, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, Aaron M. Baldwin, Esq., of Counsel, Albany, NY, for Defendants.

### REPORT–RECOMMENDATION

GEORGE H. LOWE, United States Magistrate Judge.

**\*1** This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation by the Honorable Thomas J. McAvoy, Senior United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Plaintiff Joseph Parks alleges that Defendants violated his right to exercise his religion when they disciplined him for attempting to mail a photograph of himself with his hands in what he characterizes as a prayer pose and Defendants characterize as a gang sign. Currently pending before the Court is Defendants' motion for summary judgment. (Dkt. No. 51.) For the reasons that follow, I recommend that Defendants' motion be granted.

### I. FACTUAL AND PROCEDURAL BACKGROUND

Plaintiff, who is now and was at all relevant times an inmate at Shawangunk Correctional Facility ("Shawangunk"), was raised as a Jehovah's Witness, but did not fully accept the religion until 2000 or 2001. (Dkt. No. 51–8 at 6:11.[FN1]) Thereafter, Plaintiff prayed five or six times per day. *Id.* at 22:6–11. Each time he prayed, Plaintiff placed his hands in a meditative hand position. *Id.*

at 17:17–18:5.) He assumed this hand position so that he could "make sure [he] went before [his] Father clean. Not just physically but mentally." *Id.* at 22:16–21. The hand position is not mandated for all Jehovah's Witnesses, but Plaintiff's own research and study led him to believe that he, personally, is required to use the hand position "[b]ecause where I am spiritually and what I know pertaining to the Bible as well as research. What you know holds you accountable." *Id.* at 24:11–17; 25:7–26:6. Plaintiff believes that he cannot pray without using the hand position. *Id.* at 12:13–13:13, 31:3–18.

> FN1. Page numbers refer to the page number assigned by the Court's electronic filing system.

On February 27, 2007, Plaintiff attempted to mail a letter and photograph to a personal ad service. (Dkt. No. 51–4 at 2 ¶ 6.) The photograph depicted Plaintiff, clad in a shirt and red pants, sitting on a chair. (Dkt. No. 51–6; Dkt. No. 51–8 at 16:14–18.) Plaintiff's feet were placed wide apart and his elbows were resting on his thighs. (Dkt. No. 51–6.) His hands were pressed together with his fingertips pointed downward and his thumbs meeting at the top to form a heart or diamond shape. *Id.* At his deposition, Plaintiff testified that he was not praying or meditating when the picture was taken. (Dkt. No. 51–8 at 28:14–16.) Rather, he "was just trying to relax and in the course of just trying to relax," he made the hand sign. *Id.* at 28:14–23. In the letter that accompanied the photograph, Plaintiff indicated that he wanted "to begin a good friendship" with "someone special" and hoped to "find my ideal woman who can complete me ... as I complete her." (Dkt. No. 51–5 at 7.) In the letter, Plaintiff referred to himself several times as a "spiritual" person, but did not mention that he is a Jehovah's Witness. (*Id.;* Dkt. No. 51–8 at 36:3–7.) At his deposition, Plaintiff testified that he included the photograph with the letter to "have a resemblance of me.... [t]o show what I looked like." (Dkt. No. 51–8 at 16:19–23.) In a declaration submitted in opposition to Defendants' motion for summary judgment, Plaintiff states that he "included the photo, not only to show what I look like but to attract someone who practices the same religion I do." (Dkt. No. 55 at 36.)

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

**\*2** The photograph was taken in the gym at Shawangunk, and DOCS personnel screened it before allowing Plaintiff to leave the gym with it. (Dkt. No. 51–8 at 15:4–23.) However, when Defendant Corrections Officer Kim Skwera, who was assigned to review outgoing inmate mail on February 27, 2007, saw the photograph, she "suspected that the photograph depicted [Plaintiff] making a gang sign with both his hands." (Dkt. No. 51–4 at 2 ¶¶ 6–7.) Based on this suspicion, Defendant Skwera "consulted with [Defendant] Senior Counselor Luis Franco," who had training in these matters and was one of the staff members who regularly reviewed incoming media and other materials to ensure that they do not contain any unauthorized gang material." *Id.* ¶ 8.

There is no written DOCS policy, procedure, or directive governing specifically how to identify gang insignia or materials. (Dkt. No. 51–3 at 3 ¶ 12.) Rather, staff members such as Defendant Franco receive training from the DOCS Central Intelligence/Special Investigations Unit. *Id.* ¶ 13. During this training, staff hear oral instruction and see examples of gang signs and symbols. *Id.* ¶ 15. The training includes "information on particular groups, such as 'The United Bloods Nation,' also known as 'The Bloods,' which is an unauthorized organization that is active and making an adverse impact within DOCS ." *Id.* at 4 ¶ 16. Staff learn that "The Bloods original color is RED ... Members' display of hand signs varies depending on the Set they belong to. The most common hand sign is indicated by making a circle with the thumb and index finger, touching at the finger's tip and extending the remainder of the fingers." *Id.* ¶ 17 (emphasis in original).

Based on this training, Defendant Franco concluded that the photograph depicted Plaintiff making a Bloods hand sign. *Id.* at 5 ¶ 22. He reached that conclusion because of the "manner in which the plaintiff is holding his hands together, facing downwards, in a heart or triangular shaped fashion with the fingers and thumbs touching" and because Plaintiff was wearing red pants in the picture. *Id.* at ¶¶ 23–24.

Accordingly, Defendant Skwera wrote a misbehavior report charging Plaintiff with, *inter alia,* violating DOCS

Rule 105.12. (Dkt. No. 51–4 at 2 ¶ 10.) That rule, which has since been repealed, stated that "an inmate shall not engage in or encourage others to engage in unauthorized organizational activities or meetings, or display, wear, possess, distribute or use unauthorized organizational insignia or materials." N.Y. Comp.Codes R. & Regs. tit. 7, § 270.2 (2004).

The disciplinary hearing regarding the misbehavior report was held on March 2 and 7, 2007. (Dkt. No. 51–5 at 3, 13.) Defendant Lt. G. Gardner served as the hearing officer. *Id.* at 3. Plaintiff alleges that Defendant Gardner "created a hostile environment, using intimidation tactics of taunting and facial gestures." (Dkt. No. 1 at 8 ¶ 16.)

**\*3** Plaintiff called Defendants Skwera and Franco as witnesses. (Dkt. No. 51–5 at 3.) Defendant Skwera testified that she did not speak to anyone other than Defendant Franco about the hand sign. *Id.* at 6. Defendant Franco testified that, based on his experience, Plaintiff's hand position was "clearly ... an unauthorized hand sign." *Id.* at 9. Plaintiff showed Defendant Franco pictures of several meditation hand signs and asked if he was familiar with them. *Id.* at 9–10. Defendant Franco testified that the "only religious ... group that comes close to that type of hand sign ... would be the Rastafarians.... [T]hat's the only one I'm familiar with. I am not familiar with ... meditation ... at all." *Id.* at 12.

Plaintiff told Defendant Gardner that he is a religious man, that there is a religious justification for the hand gesture, and that because he had "been trained for a period of time within my meditation ... I reacted when trying to get calm for the picture ." *Id.* at 12, 14.

Defendant Gardner found Plaintiff guilty of the unauthorized organizations and activities charge. *Id.* at 16. He stated that he relied on Defendant Skwera's report, Plaintiff's testimony that the hand sign was a form of meditation, Defendant Franco's testimony "verifying that the hand sign is that of an unauthorized organization known as the Bloods," and the photograph itself in reaching his decision. *Id.* at 17. He imposed a penalty of fifteen days' keeplock, thirty days' loss of packages and events, and fifteen days' loss of commissary and phone privileges. *Id.* He stated that the reason for his decision

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

was "to impress upon the inmate that unauthorized organizations or displays with the hand signs are prohibited." *Id.*

Plaintiff appealed Defendant Gardner's decision. (Dkt. No. 51–5 at 18.) In his appeal, he stated that the hand sign he made in the photograph was "an unconscious gesture that is relevant to my religious beliefs ... so to find me guilty is to infringe on my Constitutional rights that guarantee[ ] me freedom of religion, and freedom of speech and equal protection under the law." *Id.* at 40. Defendant John Maly, acting as Defendant Superintendent Joseph T. Smith's designee, affirmed the disposition on March 21, 2007. *Id.* at 18.

On March 12, 2007, Plaintiff filed a grievance with Defendant J. Krom, the facility's inmate grievance supervisor, alleging that Defendant Gardner was biased, had deprived Plaintiff of due process, and had deprived Plaintiff of the free exercise of his religion. (Dkt. No 1 at 9 ¶ 21.) Plaintiff also alleged that Defendant Smith allowed "a pattern of unchecked, unconstitutional conduct to take place at the hearings ... due to an unwritten Shawangunk policy promoting, encouraging and/or condoning such." *Id.* When Krom did not reply within three weeks, Plaintiff filed an appeal of his grievance with Defendant Smith. *Id.* ¶ 22. When Plaintiff did not receive a reply within four weeks, he appealed to Defendant Thomas G. Egan, the facility's inmate grievance director. *Id.* at 9–10 ¶ 23. Plaintiff did not receive a response. *Id.* at 10 ¶ 24.)

*4 Plaintiff filed the complaint in this action on June 4, 2008. (Dkt. No. 1.) Plaintiff's complaint asserted eight causes of action: (1) a First Amendment free exercise claim or, in the alternative, a claim under the Religious Land Use and Institutionalized Persons Act of 2000 ("RLUIPA"); (2) a claim that Defendants "retaliated against Plaintiff due to him exercising his right to express his religious views"; (3) a claim under the Equal Protection Clause, claiming that Defendants deprived "Plaintiff[ ] of free exercise of religion, while allowing other religious groups free exercise of religion"; (4) a First Amendment freedom of expression claim; (5) a claim that Defendants violated the Due Process Clause by "refusing to provide [Plaintiff] with a tier hearing consistent with his

constitutionally protected rights"; (6) a claim that Defendants violated the Due Process Clause by failing to respond to his grievance; (7) a claim of racial discrimination; and (8) a claim that Defendants conspired to violate his constitutional rights. (Dkt. No. 1 at 11–12.) Plaintiff requests $1,000.00 for each day he was deprived of his right to practice his religion, the reversal of his disciplinary sentence, and costs. *Id.* at 13.

Defendants moved for judgment on the pleadings. (Dkt. No. 20.) As a result of that motion, the Court dismissed six of Plaintiff's claims. (Dkt. No. 30.) Plaintiff's sole remaining claims are that Defendants violated his religious rights under the First Amendment and RLUIPA and retaliated against him for exercising his religious rights. Defendants now move for summary judgment of those claims. (Dkt. No. 51.) Plaintiff has opposed the motion. (Dkt. No. 55.) Defendants have filed a reply. (Dkt. No. 56–2.)

## II. APPLICABLE LEGAL STANDARDS

### A. Legal Standard Governing Motions for Summary Judgment

Under Federal Rule of Civil Procedure 56, summary judgment is warranted if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 272–73 (2d Cir.2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id.* The nonmoving party must do more than "rest upon the mere allegations ... of his pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino,* 542 F.3d 290, 309 (2d Cir.2008).

> FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson,* 477 U.S. at 248.

**B. Legal Standard Governing Motion to Dismiss for Failure to State a Claim**

**\*5** To the extent that a defendant's motion for summary judgment under Federal Rule of Civil Procedure 56 is based entirely on the allegations of the plaintiff's complaint, such a motion is functionally the same as a motion to dismiss for failure to state a claim under Federal Rule of Civil Procedure 12(b)(6). *Schwartz v. Compagnise Gen. Transatlantique,* 405 F.2d 270, 273 (2d Cir.1968) (citations omitted). As a result, "[w]here appropriate, a trial judge may dismiss for failure to state a cause of action upon motion for summary judgment." *Id.; accord, Katz v. Molic,* 128 F.R.D. 35, 37–38 (S.D.N.Y.1989) ("This Court finds that ... a conversion [of a Rule 56 summary judgment motion to a Rule 12(b)(6) motion to dismiss the complaint] is proper with or without notice to the parties."). Accordingly, it is appropriate to summarize the legal standard governing Federal Rule of Civil Procedure 12(b)(6) motions to dismiss.

A defendant may move to dismiss a complaint under Federal Rule of Civil Procedure 12(b)(6) on the ground that the complaint fails to state a claim upon which relief can be granted. In order to state a claim upon which relief can be granted, a complaint must contain, *inter alia,* "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). The requirement that a plaintiff "show" that he or she is entitled to relief means that a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is *plausible* on its face.' " *Ashcroft v. Iqbal,* —— U.S. ——, ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)) (emphasis added). "Determining whether a complaint states a plausible claim for relief ... requires the ... court to draw on its judicial experience and common sense ... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the

complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 1950 (internal citation and punctuation omitted).

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor ." *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (citation omitted). Courts are "obligated to construe a *pro se* complaint liberally." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir.2009). However, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

**III. ANALYSIS**

**A. RLUIPA**

Plaintiff claims that Defendants violated his rights under RLUIPA. (Dkt. No. 1 at 11.) RLUIPA provides that

**\*6** [n]o government shall impose a substantial burden on the religious exercise of a person residing in or confined to an institution [FN3] ... unless the government demonstrates that imposition of the burden on that person (1) is in furtherance of a compelling governmental interest; and (2) is the least restrictive means of furthering that compelling governmental interest.

> FN3. An "institution" is, *inter alia,* "a jail, prison, or other correctional facility." 42 U.S.C. § 1997(1)(B)(ii) (2003).

42 U.S.C. § 2000cc–1(a).

Defendants argue that Plaintiff's RLUIPA claim should be dismissed because (1) Plaintiff was not disciplined for engaging in a "religious exercise"; (2) even if Plaintiff was engaged in a religious exercise, it was not substantially burdened by the misbehavior report and disciplinary sentence; (3) Defendants acted in furtherance of a compelling governmental interest and used the least

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

restrictive means of furthering that interest; and (4) RLUIPA does not authorize money damages. (Dkt. No. 51–10 at 6–13.)

1. *Whether Plaintiff Was Engaged in a Religious Exercise*

Defendants argue that they are entitled to judgment because Plaintiff has not raised a triable issue of fact that he was disciplined for engaging in a "religious exercise." (Dkt. No. 51–10 at 8–9.) I find that Plaintiff has raised a triable issue of fact on this issue.

Under RLUIPA, a "religious exercise" is "any exercise of religion, whether or not compelled by, or central to, a system of religious belief." 42 U.S.C. § 2000cc–5(7)(A). Defendants argue that Plaintiff was not engaged in an "exercise" because "[P]laintiff admits that he was neither praying nor meditating in the photograph that gave rise to the misbehavior report." (Dkt. No. 51–10 at 8.)

The evidence shows that while Plaintiff was not actively praying or meditating in the photograph, he has maintained since the incident occurred that his hand gesture in the photograph was the result of his prayer practice. At his disciplinary hearing, he told Defendant Gardner that because he had "been trained for a period of time within my meditation," he "reacted" with the hand sign "when trying to get calm for the picture." (Dkt. No. 51–5 at 12, 14.) Plaintiff testified at his deposition that he "fell into [his] meditation gesture unconsciously" as he was "trying to relax for the picture." (Dkt. No. 51–8 at 29:7–11.) Defendants have not cited, nor can I find, any case law discussing whether such an unconscious manifestation of one's faith (which seems akin to the practice of some Catholics to reflexively cross themselves in moments of stress) is an "exercise" within the meaning of RLUIPA. Because the burden on a motion for summary judgment is on the moving party, and because I must view the facts in the light most favorable to Plaintiff, I therefore find that Defendants have not established as a matter of law that Plaintiff was not engaged in an "exercise" of religion.

Defendants argue that even if Plaintiff was engaged in an "exercise," it was not "religious" because (1) the Jehovah's Witness religion does not require adherents to

assume any special position when praying; and (2) the way Plaintiff is holding his hands in the photograph is different than the hand poses depicted in the book from which Plaintiff says he adopted the prayer practice. (Dkt. No. 51–10 at 8–9.)

**\*7** Courts analyzing RLUIPA claims use the First Amendment "sincerely held religious beliefs" standard to determine whether a plaintiff was engaged in a "religious" exercise. *See, e.g., Pugh v. Goord,* 571 F.Supp.2d 477, 504–05 (S.D.N.Y.2008); *Singh v. Goord,* 520 F.Supp.2d 487, 498 (S.D.N.Y.2007). Under that standard, a religious belief is "sincerely held" when the plaintiff subjectively and sincerely holds a particular belief that is religious in nature. *Ford v. McGinnis,* 352 F.3d 582, 590 (2d Cir.2003).

Courts have routinely expressed reticence about deciding, on summary judgment, whether or not an individual's beliefs are sincere. As the Second Circuit has noted, "the judiciary is singularly ill-equipped to sit in judgment on the verity of an adherent's religious beliefs" because the "[s]incerity analysis is exceedingly amorphous, requiring the factfinder to delve into the claimant's most veiled motivations...." *Patrick v. LeFevre,* 745 F.2d 153, 157 (2d Cir.1984).

The fact that the prayer gesture employed by Plaintiff is not mandated by any central authority of the Jehovah's Witness faith is immaterial to the sincerity analysis. As the Supreme Court has noted:

Intrafaith differences ... are not uncommon among followers of a particular creed, and the judicial process is singularly ill equipped to resolve such differences in relation to the Religion Clauses.... [T]he guarantee of free exercise is not limited to beliefs which are shared by all of the members of a religious sect. Particularly in this sensitive area, it is not within the judicial function and judicial competence to inquire whether [a party or another member of his faith] more correctly perceived the commands of their common faith. Courts are not arbiters of scriptural interpretation.

*Thomas v. Review Bd. of the Indiana Empl. Sec. Div.,* 450 U.S. 707, 715–16, 101 S.Ct. 1425, 67 L.Ed.2d

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

624 (1981) (holding that one Jehovah's Witness's belief that his religion prevented him from working in area of factory that produced tank turrets was sincere, despite fact that another Jehovah's Witness believed that such work did not violate the faith).

Similarly, I cannot conclude as a matter of law that Plaintiff's conduct was not sincere because his hand position in the photograph did not perfectly match the pictures in the book from which he adopted the pose. As a matter of fact, of course, a reasonable juror could consider this issue and conclude that the imperfection of the hand pose is evidence that Plaintiff's assertion is insincere and that he was, in fact, making a gang sign. But a reasonable juror could also conclude that the imperfection of the hand pose supports Plaintiff's claim that he unconsciously assumed the position, honed from years of using it to pray five or six times per day, in order to relax. But as a matter of law, I cannot credit one interpretation over the other. The Supreme Court has cautioned that the "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit ... protection." *Thomas*, 450 U.S. at 714. Further, "[c]ourts should not undertake to dissect religious beliefs because the ... [plaintiff's] beliefs are not articulated with the clarity and precision that a more sophisticated person might employ." *Id.* at 715.

**\*8** Finally, I note that *Farid v. Smith,* 850 F.2d 917 (2d Cir.1988), cited by Defendants, is distinguishable. In that case the plaintiff "neither alleged nor submitted any proof that he sincerely h[eld] to any religious belief that mandates the use of Tarot cards ..." *Farid,* 850 F.2d at 926. Here, Plaintiff has maintained since before filing this lawsuit that the hand gesture in the photograph was religious in nature and has submitted voluminous declarations to that effect.

Therefore, I find that Plaintiff has raised a triable issue of fact that he was engaged in a "religious exercise."

2. *Substantial burden*

RLUIPA prohibits only government action that places a "substantial burden" on religious exercise. 42 U.S.C. § 2000cc–1(a). Defendants argue that even if Plaintiff was

disciplined for engaging in a religious exercise, that punishment did not place a "substantial burden" on Plaintiff. (Dkt. No. 51–10 at 9–11.) I find that Plaintiff has raised a triable issue of fact on this issue.

A prisoner's sincerely held religious belief is substantially burdened "where the state puts substantial pressure on an adherent to modify his behavior and to violate his beliefs." *Jolly v. Coughlin,* 76 F.3d 468, 477 (2d Cir.1996) (punctuation omitted).

Defendants argue that Plaintiff's religious exercise has not been substantially burdened because Plaintiff can still pray in the privacy of his living quarters or "in designated religious areas whenever feasible as determined by the Superintendent" and because "Plaintiff is allowed to use ... meditation poses ... while praying ...." (Dkt. No. 51–10 at 10.) Defendants cite Defendant Franco's declaration as support for the latter assertion. In the cited paragraph, Defendant Franco declares that "Plaintiff would be allowed to use those 'meditation poses' depicted in his Complaint while praying ..., *which poses are different from that unauthorized group symbol made by the plaintiff in the photograph* ...." (Dkt. No. 51–3 at 6 ¶ 33, emphasis added.) In other words, Defendants argue that Plaintiff's religious exercise has not been substantially burdened because he can still pray, but only if he does it in designated areas and only so long as he does not use the prayer gesture he unconsciously assumed on February 27, 2007. I cannot find as a matter of law that such restrictions do not place substantial pressure on Plaintiff to modify his behavior and to violate his beliefs. A reasonable juror could conclude that this pressure was substantial, and another reasonable juror could conclude that this pressure was not substantial. Therefore, Plaintiff has raised a triable issue of fact that Defendants substantially burdened his religious exercise.

3. *Least Restrictive Means of Furthering a Compelling Governmental Interest*

Under RLUIPA, government officials may substantially burden an inmate's religious exercise if they are motivated by a compelling governmental interest and use the least restrictive means of furthering that interest. 42 U.S.C. § 2000cc–1(a). The burden of proving this element is on Defendants. *Redd v. Wright,* 597 F.3d 532,

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

536 (2d Cir.2010) ("[T]he state may overcome a RLUIPA claim by demonstrating that the challenged policy or action furthered a compelling governmental interest and was the least restrictive means of furthering that interest.").

**\*9** Defendants argue that they were motivated by the compelling governmental interest of preventing gang activity and that their "zero tolerance" policy is the least restrictive means of furthering that interest. (Dkt. No. 51–10 at 11.) Defendant Franco's declaration discusses, at length, the security problems posed by gang activity within the DOCS system. Defendant Franco declares that "DOCS has seen an increase" in gang activity "in recent years that has compelled the Department to take steps to slow the growth of these groups and monitor them closely." (Dkt. No. 51–3 at 2 ¶ 5.) Defendant Franco declares that gangs:

> often use seemingly innocuous but covert means of identifying themselves and communicating with other members both within and outside correctional facilities. These include the use of code words, slang, hidden messages (sometimes contained in letters or newspaper classified advertisements), and signs, symbols, and insignia which can range from anything [from] wearing certain color clothing or jewelry, to tattoos, and the use of hand signs, symbols and gestures, whether in person or in photographs.

> *Id.* ¶ 6.

"Prison security and penological institutional safety goals are indeed a most compelling governmental interest ..." *Campos v. Coughlin,* 854 F.Supp. 194, 207 (S.D.N.Y.1994) (Sotomayor, J.); *see also Orafan v. Goord,* 411 F.Supp.2d 153, 160 (N.D.N.Y.2006), *rev'd on other grounds, Orafan v. Rashid,* 249 Fed. App'x 217 (2d Cir.2007). Courts must be sensitive to these interests and apply RLUIPA's "compelling interest" standard "with 'due deference to the experience and expertise of prison and jail administrators in establishing necessary regulations and procedures to maintain good order, security, and discipline, consistent with consideration of costs and limited resources.' " *Cutter v. Wilkinson,* 544 U.S. 709, 723, 125 S.Ct. 2113, 161 L.Ed.2d 1020 (2005). This, however, does not end the inquiry.

In *Jova v. Smith,* 582 F.3d 410, 415 (2d Cir.2009), the Second Circuit noted with approval that "[o]ther circuits have ... recognized that the state may not merely reference an interest in security ... in order to justify its actions...." Indeed, "inadequately formulated prison regulations and policies grounded on mere speculation, exaggerated fears, or post-hoc rationalizations will not suffice to meet [RLUIPA's] requirements." *Id.* at 416 (quoting 146 Cong. Rec. S7775 (daily ed. July 27, 2000) (joint statement of Sens. Hatch and Kennedy on RLUIPA)). The Second Circuit also noted with approval that "[o]ther circuits ... have required that, for a state to demonstrate that its practice is the least restrictive means, it must show that it 'actually considered and rejected the efficacy of less restrictive measures before adopting the challenged practice.' " *Id.* (quoting *Warsoldier v. Woodford,* 418 F.3d 989, 999 (9th Cir.2005)). As another district court has noted, *Jova* thus suggests that Defendants are required to present evidence of having considered less restrictive practices. *Forde v. Baird,* 720 F.Supp.2d 170, 180 (D.Conn.2010).

**\*10** Defendant Franco declares that an "absolute ban or 'zero tolerance policy' enforceable through the disciplinary system when rule violations occur for displaying, wearing, possessing, distributing or using unauthorized organizational insignia or materials is the only way that DOCS can meaningfully attempt to prevent and curtail unauthorized group activity in this regard in correctional facilities." (Dkt. No. 51–3 at 3 ¶ 9.) Otherwise, he states:

> it would be unduly burdensome on facility staff, if not impossible, to prevent the unlimited dissemination or use of unauthorized organizational insignia or materials throughout the correctional systems which would be highly dangerous. Without a zero tolerance policy, the prohibitions could also be applied ... inconsistently from one situation to another.

> *Id.* ¶ 10.

Although this is a close question, I find that Defendant Franco's declaration adequately meets Defendants' burden of showing, as a matter of law, that they had a compelling interest and used the least

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

restrictive means to further that interest when they disciplined Plaintiff for attempting to mail a photograph of himself wearing red pants and making a hand gesture that resembled one used by the Bloods. If Plaintiff had been punished simply for making the hand sign, particularly in his cell or in some other area designated for inmate prayer, I would likely recommend that the Court deny Defendants' motion for summary judgment. However, Plaintiff was attempting to disseminate the photograph and, in DOCS' experience, gang members sometimes use hidden messages in newspaper classified advertisements to communicate. (Dkt. No. 51–3 at 2 ¶ 6.) Accordingly, applying the due deference I must give to prison administrators in establishing necessary procedures to maintain security, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's RLUIPA claim.

### 5. *Availability of Money Damages*

Defendants argue that even if Plaintiff had raised a triable issue of fact and could proceed to trial on his RLUIPA claim, he would be entitled only to injunctive relief. (Dkt. No. 51–10 at 13.) Defendants are correct.

RLUIPA allows prevailing plaintiffs to recover "appropriate relief against a government." 42 U.S.C. § 2000cc–2(a). The United States Courts of Appeals are divided on the issue of whether "appropriate relief" includes money damages. *Compare Madison v. Commonwealth of Virginia,* 474 F.3d 118, 131–32 (4th Cir.2006) (money damages not available) *with Smith v. Allen,* 502 F.3d 1255, 1265 (11th Cir.2007) (money damages available). The Second Circuit has not resolved the issue. The consensus of opinion among district courts in the Second Circuit is that RLUIPA does not authorize suits for money damages. *See Pugh v. Goord,* 571 F.Supp.2d 477, 506–09 (S.D.N.Y.2008). The issue is currently pending before the Supreme Court in *Sossamon v. Texas,* 560 F.3d 316 (5th Cir.2009), *cert. granted* ––– U.S. ––––, 130 S.Ct. 3319, 176 L.Ed.2d 1218 (2010) (argued Nov. 2, 2010). In the event that the District Court concludes that Plaintiff has raised a triable issue of fact as to his RLUIPA claim and, at that time, the Supreme Court has not yet issued a decision in *Sossamon,* I would recommend that the Court allow only Plaintiff's RLUIPA claim for injunctive relief to proceed.

### B. Free Exercise Clause Claim

**\*11** Plaintiff claims that Defendants violated his First Amendment right to freely exercise his religion. (Dkt. No. 1 at 11.) Defendants argue that they are entitled to summary judgment dismissing Plaintiff's claim, for the same reasons that they asserted regarding the RLUIPA claim. (Dkt. No. 51–10 at 6–13.) Defendants are correct.

Under the Free Exercise Clause of the First Amendment, a prison regulation or individualized decision to deny a prisoner the ability to engage in a religious exercise "is judged under a reasonableness test less restrictive than that ordinarily applied [to burdens on fundamental rights]: a regulation that burdens a [prisoner's] protected right passes constitutional muster if it is reasonably related to legitimate penological interests." *Salahuddin v. Goord,* 467 F.3d 263, 274 (2d Cir.2006) (quoting *O'Lone v. Estate of Shabazz,* 482 U.S. 342, 349, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987) (punctuation omitted).

To establish a free exercise claim, a prisoner "must show at the threshold that the disputed conduct substantially burdens [FN4] his sincerely held religious beliefs." *Salahuddin,* 467 F.3d at 274–75 (citing *Ford,* 352 F.3d at 591). Once a plaintiff establishes that a sincerely held religious belief has been substantially burdened,"[t]he defendants then bear the relatively limited burden of identifying the legitimate penological interests that justify the impinging conduct; the burden remains with the prisoner to show that these articulated concerns were irrational." *Salahuddin,* 467 F.3d at 275 (quoting *Ford,* 352 F.3d at 595) (punctuation omitted). When determining whether the burden imposed by the defendants is reasonable rather than irrational, a court evaluates four factors: (1) whether the action had a valid, rational connection to a legitimate governmental objective; (2) whether the prisoner has an alternative means of exercising the burdened right; (3) the impact on guards, inmates, and prison resources of accommodating the right; and (4) the existence of alternative means of facilitating the plaintiff's exercise of the right that have only a *de minimis* adverse effect on valid penological interests. *Salahuddin,* 467 F.3d at 274.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

FN4. Although the Second Circuit has applied the "substantial burden" test in its most recent prison free exercise cases, it has done so while explicitly refusing to adopt or endorse the test. "The *Ford* court noted that the Circuits apparently are split over whether prisoners must show a substantial burden on their religious exercise in order to maintain free exercise claims. Nevertheless, the *Ford* court held that since the plaintiff had not challenged the application of the substantial burden requirement, the court would proceed as if the requirement applied. Likewise, the *Salahuddin* court noted that '[r]esolution of this appeal does not require us to address Salahuddin's argument that a prisoner's First Amendment free-exercise claim is not governed by the 'substantial burden' threshold requirement,' because defendants 'never proceed to argue that we should find any particular burdened religious practice to be peripheral or tangential to [plaintiff's] religion.' The court then proceeded as if the substantial burden requirement applied." *Pugh v. Goord,* 571 F.Supp.2d 477, 497 n. 10 (S.D.N.Y.2008) (citations and some punctuation omitted).

Here, as discussed above, Defendants have established that they are entitled to judgment under the strict RLUIPA compelling interest standard. Accordingly, they are also entitled to judgment under the less stringent First Amendment standard. Therefore, I recommend that the Court grant Defendants' motion for summary judgment and dismiss Plaintiff's claim under the Free Exercise Clause.

**C. Retaliation**

Plaintiff claims that Defendants retaliated against him for exercising his right to freely exercise his religion. (Dkt. No. 1 at 11.)

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill,* 389 F.3d at 381–383. Because of the relative ease with which claims

of retaliation can be incanted, however, courts have scrutinized such retaliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

**\*12** [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkewicz v. Sorema N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a retaliation claim under 42 U.S.C. § 1983, a plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff—namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 (2d. Cir.2001)).

Defendants argue that Plaintiff's conduct was not protected because Plaintiff "was not praying or meditating in the photograph which led to the misbehavior report." (Dkt. No. 51–10 at 11–12.) As discussed above, Plaintiff has raised a triable issue of fact that he was engaged in a religious exercise in the photograph. Therefore, I find Defendants' argument regarding the first prong to be without merit.

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

Regarding the second prong, Defendants concede that "the misbehavior report constitutes adverse action ..." (Dkt. No. 51–10 at 11.)

Regarding the third prong:

[t]o satisfy the causal-connection prong of a retaliation claim, an inmate must show that the protected conduct was a substantial or motivating factor in the prison officials' decision to take action against the plaintiff. The court may consider a number of factors when determining whether a causal connection exists, including (1) the temporal proximity between the protected activity and the alleged retaliatory act; (2) the inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation.

*Vega v. Artus,* 610 F.Supp.2d 185, 207 (N.D.N.Y.2009) (citations and punctuation omitted) (Suddaby, J.).

Here, there is simply no evidence in the record from which a reasonable juror could conclude that Defendants were substantially motivated by Plaintiff's religion. Defendants Franco and Skwera have both filed declarations stating that they were not aware of Plaintiff's religion until they heard him testify at the disciplinary hearing. (Dkt. No. 51–3 at 5–6 ¶¶ 27–30; Dkt. No. 51–4 at 4–5 ¶¶ 21–25.) Although Defendant Gardner was aware of Plaintiff's faith when he found Plaintiff guilty of the disciplinary charge, there is no evidence in the record that he was substantially motivated by Plaintiff's religion to punish Plaintiff. Although the complaint characterizes Defendant Gardener's conduct at the hearing as "hostile" and "intimidating" (Dkt. No. 1 at 8 ¶ 16), nothing in the transcript indicates that Defendant Gardener said anything derogatory about Jehovah's Witnesses or people who use hand poses to pray. As for the other defendants, Plaintiff asserts that they must have known about his religion because, when he became a Jehovah's Witness, he filled out a form designating Jehovah's Witness as his religion. (Dkt. No. 51–8 at 6:2–20.) However, there is no evidence that any of the named defendants were aware of that form. Accordingly, I find that Plaintiff has not raised a triable

issue of fact that there was a causal connection between his protected conduct and the adverse action. Therefore, I recommend that the Court grant Defendants' motion and dismiss Plaintiff's retaliation claim.

**D. Personal Involvement**

*13 Defendants argue that, even if Plaintiff had raised a triable issue as to any of his substantive claims, the claims against several Defendants should be dismissed for lack of personal involvement. (Dkt. No. 51–10 at 18–22.) Defendants are correct.

Under Second Circuit precedent, " 'personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983.' " *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (quoting *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991)). In order to prevail on a § 1983 cause of action against an individual, a plaintiff must show some tangible connection between the unlawful conduct and the defendant. *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). If the defendant is a supervisory official, a mere "linkage" to the unlawful conduct through "the prison chain of command" (i.e., under the doctrine of *respondeat superior* ) is insufficient to show his or her personal involvement in that unlawful conduct. *Polk County v. Dodson,* 454 U.S. 312, 325, 102 S.Ct. 445, 70 L.Ed.2d 509 (1981); *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501; *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985). In other words, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). Rather, supervisory personnel may be considered "personally involved" if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995).[FN5]

FN5. In *Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009), the

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

Supreme Court ruled that where the underlying constitutional claim is a claim of intentional discrimination, a supervisory official's liability must be judged by the official's purpose rather than the official's knowledge of subordinates' actions or policies. The Second Circuit has not yet issued a decision discussing *Iqbal*'s effect on the *Colon* categories. Several district courts in the Second Circuit have determined that *Iqbal* nullified some of the *Colon* categories. *See Sash v. United States,* 674 F.Supp.2d 531, 543–44 (S.D.N.Y.2009) (collecting cases). I will assume for the purposes of this motion that *Colon* remains good law.

### 1. *Claims Against Defendant Smith*

Plaintiff claims that Defendant Smith violated his constitutional rights by (1) designating Plaintiff's appeal of the disciplinary decision to Defendant Maly, who then affirmed the decision (Dkt. No. 1 at 9 ¶¶ 19–20); (2) ignoring Plaintiff's grievance (Dkt. No. 1 at 9–10 ¶¶ 22–23); and (3) allowing "a pattern of unchecked, unconstitutional conduct to take place at the hearings ... due to an unwritten Shawangunk policy promoting, encouraging and/or condoning such." (Dkt. No 1 at 9 ¶ 21.) Even if Plaintiff had raised a triable issue of fact as to his substantive claims, he has not raised a triable issue of fact that Defendant Smith was personally involved.

Regarding the appeal, the evidence shows that Defendant Smith personally took no action at all. Even if he had handled Plaintiff's appeal personally rather than designating the task to Defendant Maly, courts have held that "merely affirming the hearing determination is not a sufficient basis to impose liability." *Woodward v. Mullah,* No. 08–CV–463A, 2009 WL 4730309, at *2–3 (W.D.N.Y. Dec.7, 2009).[FN6] Although the Second Circuit once held that allegations that a superintendent affirmed a prisoner's conviction on administrative appeal were sufficient to allow the case to survive summary judgment [FN7], district courts in this Circuit have often distinguished that case by noting that liability only attaches if the supervisory official "proactively participated in reviewing the administrative appeals as opposed to merely rubber-stamping the results." *Woodward,* 2009 WL 4730309, at *2–3. Here, there is no evidence that

Defendant Smith proactively participated in the review.

> **FN6.** The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009).

> **FN7.** *Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986).

**\*14** A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement. *Rivera v. Goord,* 119 F.Supp.2d 327, 344–45 (S.D.N.Y.2000). *See also Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997) ("The law is clear that allegations that an official ignored a prisoner's letter are insufficient to establish liability."). Thus, Defendant Smith's alleged failure to respond to Plaintiff's grievance does not constitute personal involvement.

Finally, Plaintiff has not produced any evidence of "a pattern of unchecked, unconstitutional conduct" at hearings, much less any that occurred "due to an unwritten Shawangunk policy promoting, encouraging and/or condoning such." (Dkt. No 1 at 9 ¶ 21.) Therefore, Plaintiff has not raised a triable issue of fact that Defendant Smith was personally involved in any alleged constitutional violations.

### 2. *Claims Against Defendant Maly*

Plaintiff's only claim against Defendant Maly is that he affirmed the disciplinary conviction. (Dkt. No 1 at 9 ¶¶ 19–20.) As discussed above, such a claim is insufficient to establish personal involvement unless there is evidence that the defendant was proactively involved in the appeal. Here, there is no such evidence regarding Defendant Maly. Therefore, Plaintiff has not raised a triable issue of fact that Defendant Maly was personally involved in any alleged constitutional violations.

### 3. *Claims Against Defendants Krom and Egan*

Plaintiff's only claim against Defendants Krom and Egan is that they ignored his grievance. (Dkt. No. 1 at 9–10 ¶¶ 22–24.) As discussed above regarding Defendant

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)

(Cite as: 2011 WL 4055415 (N.D.N.Y.))

Smith, this is insufficient to establish personal involvement. Therefore, Plaintiff has not raised a triable issue of fact that Defendants Krom and Egan were personally involved in any alleged constitutional violations.

**ACCORDINGLY,** it is

**ORDERED** that the Clerk provide Plaintiff with a copy of *Woodward v. Mullah,* No. 08–CV–463A, 2009 WL 4730309 (W.D.N.Y. Dec.7, 2009) in accordance with the Second Circuit's decision in *LeBron v. Sanders,* 557 F.3d 76 (2d Cir.2009); and it is further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 51) be ***GRANTED.***

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2011.

Parks v. Smith
Not Reported in F.Supp.2d, 2011 WL 4055415 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055414 (N.D.N.Y.)

(Cite as: 2011 WL 4055414 (N.D.N.Y.))



Only the Westlaw citation is currently available.
United States District Court,

N.D. New York.
Joseph PARKS, Plaintiff,
v.
Joseph T. SMITH, et al., Defendants.
No. 9:08–CV–0586 (TJM/GHL).

Sept. 12, 2011.
Joseph Parks, Wallkill, NY, pro se.

Aaron M. Baldwin, New York State Attorney General, Albany, NY, for Defendant.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.
**I. INTRODUCTION**

　**\*1** This *pro se* action brought pursuant to 42 U.S.C. § 1983 was referred by this Court to the Hon. George H. Lowe, United States Magistrate Judge, for a Report and Recommendation pursuant to 28 U.S .C. § 636(b) and Local Rule N.D.N.Y. 72.3(c). In his March 29, 2011 Report–Recommendation, Magistrate Judge Lowe recommended that Defendants' motion for summary judgment (Dkt. No. 51) be granted. Plaintiff has filed objections to this recommendation.
**II. STANDARD OF REVIEW**

　When objections to a magistrate judge's report and recommendation are lodged, the district court makes a *"de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." *See* 28 U.S.C. § 636(b)(1)(C). General or conclusory objections, or objections which merely recite the same arguments presented to the magistrate judge, are reviewed for clear error. *Farid v. Bouey,* 554 F.Supp.2d 301, 306 n. 2 (N.D.N.Y.2008); *see Frankel v. N.Y.C.,* 2009 WL 465645 at \*2 (S.D.N.Y. Feb.25, 2009).[FN1] After reviewing the Report–Recommendation,

the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions." 28 U.S.C. § 636(b)(1)(C).

　　FN1. The Southern District wrote in *Frankel:*

　　The Court must make a *de novo* determination to the extent that a party makes specific objections to a magistrate's findings. *United States v. Male Juvenile,* 121 F.3d 34, 38 (2d Cir.1997). When a party makes only conclusory or general objections, or simply reiterates the original arguments, the Court will review the report strictly for clear error. *See Pearson–Fraser v. Bell Atl.,* No. 01 Civ. 2343, 2003 W L 43367, at \*1 (S.D.N.Y. Jan. 6, 2003); *Camardo v. Gen. Motors Hourly–Rate Employees Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992). Similarly, "objections that are merely perfunctory responses argued in an attempt to engage the district court in a rehashing of the same arguments set forth in the original [papers] will not suffice to invoke de novo review." *Vega v. Artuz,* No. 97 Civ. 3775, 2002 W L 31174466, at \*1 (S.D.N.Y. Sept.30, 2002).

　　2009 W L 465645, at \*2.

**III. DISCUSSION**

　　Having reviewed *de novo* those portions of the Report–Recommendation that Plaintiff has lodged objections to, the Court determines to adopt the recommendations for the reasons stated in Magistrate Judge Lowe's thorough report.
**IV. CONCLUSION**

　　Therefore, the Court **ADOPTS** the recommendations made by Magistrate Judge Lowe in their entirety. Accordingly, it is hereby **ORDERED** that Defendants' motion for summary judgment (Dkt. No. 51) is

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 4055414 (N.D.N.Y.)

(Cite as: 2011 WL 4055414 (N.D.N.Y.))

**GRANTED** and the remaining claims in this action are **DISMISSED.** The Clerk is instructed to enter judgment and close the file in this matter.

  **IT IS SO ORDERED.**

N.D.N.Y.,2011.

Parks v. Smith
Not Reported in F.Supp.2d, 2011 WL 4055414 (N.D.N.Y.)
END OF DOCUMENT

© 2013 Thomson Reuters. No Claim to Orig. US Gov. Works.

2009 WL 4730309
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Shawn WOODWARD, Plaintiff,

v.

Correctional Officer MULLAH, et al., Defendants.

No. 08–CV–463A.
|
Dec. 7, 2009.

**Attorneys and Law Firms**

Shawn Woodward, Alden, NY, pro se.

David Joseph State, NYS Attorney General's Office, Buffalo, NY, for Defendants.

ORDER

RICHARD J. ARCARA, Chief Judge.

**\*1** The above-referenced case was referred to Magistrate Judge Jeremiah J. McCarthy, pursuant to 28 U.S.C. § 636(b)(1)(B). On November 4, 2009, Magistrate Judge McCarthy filed a Report and Recommendation, recommending that defendant Norman Bezio's motion for dismissal be granted and that defendants' motion to stay discovery be denied as moot.

The Court has carefully reviewed the Report and Recommendation, the record in this case, and the pleadings and materials submitted by the parties, and no objections having been timely filed, it is hereby

ORDERED, that pursuant to 28 U.S.C. § 636(b)(1), and for the reasons set forth in Magistrate Judge McCarthy's Report and Recommendation, defendant Norman Bezio's motion for dismissal is granted and defendants' motion to stay discovery is denied as moot.

The case is referred back to Magistrate Judge McCarthy for further proceedings.

SO ORDERED.

REPORT, RECOMMENDATION AND ORDER

JEREMIAH J. McCARTHY, United States Magistrate Judge.

This case was referred to me by Hon. Richard J. Arcara for supervision of pretrial proceedings in accordance with 28 U.S.C. § 636(b)(1)[9]. [1] Before me are defendants' motions to dismiss plaintiff's complaint as against defendant Norman Bezio [4] and to stay discovery as to him [7]. For the following reasons, I recommend that defendants' motion for dismissal be GRANTED, and I order that defendants' motion to stay discovery be DENIED as moot.

BACKGROUND

Plaintiff, an inmate, commenced this 42 U.S.C. § 1983 action *pro se* against defendants, employees of the New York State Department of Correctional Services ("DOCS"). Complaint [1]. Plaintiff alleges that defendant correctional officers Joseph Mullah, Paul Riccione and Joel Burridge assaulted him on March 22, 2008 at the Attica Correctional Facility and submitted false misbehavior reports regarding the incident (complaint [1], first cause of action), defendant Correctional Officer Brenda Post conspired with these defendants to retaliate against plaintiff and violate his due process rights (*id.,* second cause of action), defendant Lieutenant Thomas Monin violated his due process rights during the tier III disciplinary hearings arising from the assault (*id.,* third cause of action), defendant Superintendent James Conway violated plaintiff's constitutional rights by denying plaintiff's grievances that led to the assault (*id.,* fourth cause of action), and that defendant Bezio, Director of Special Housing Unit, violated plaintiff's constitutional rights by denying plaintiff's tier III appeal on June 16, 2008 (*id.,* fifth cause of action).

ANALYSIS

**A. Standard of Review**

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face .... A claim has facial plausibility when the plaintiff pleads factual content

that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged .... The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Ashcroft v. Iqbal,* ——U.S. ——, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009).

**\*2** "In keeping with these principles a court considering a motion to dismiss can choose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth. While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations. When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id.* at 1950.

## B. Plaintiff Has Failed to Allege Sufficient Personal Involvement by Defendant Bezio

It is the well settled law of this Circuit that a defendant must be personally involved in an alleged constitutional deprivation for a court to award damages under § 1983. *See Provost v. City of Newburgh,* 262 F.3d 146, 154 (2d Cir.2001). The Second Circuit has found that the personal involvement of a supervisory defendant may be shown by evidence that:

"1) the defendant participated directly in the alleged constitutional deprivation, (2) *the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong,* (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (emphasis added).

Plaintiff alleges that defendant Bezio "denied plaintiff's tier three appeal on June 16, 2008 thus allowing the above defendants to get away with violating plaintiff's Constitutional Rights and allowing plaintiff to remain in SHU confinement." Complaint [1], fifth cause of action. Defendants argue that defendant Bezio's conduct in merely denying plaintiff's appeal is insufficient to establish

his personal involvement in the underlying alleged due process violation. Defendants' Memorandum of Law [4–2], Point I.

Some courts have found that affirming a hearing officer's determination on appeal alone is sufficient to establish personal involvement under the second *Colon* factor. *See, e.g., Cepeda v. Coughlin,* 785 F.Supp. 385, 391 (S.D.N.Y.1992) ("The Complaint alleges that '[t]he Commissioner and/or his designee entertained plaintiffs appeal and also affirmed.' ... [T]he allegation that supervisory personnel learned of alleged misconduct on appeal yet failed to correct it constitutes an allegation of personal participation. Assuming that this allegation is true, as this court must on a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6) ..., Cepeda has pleaded personal involvement by Commissioner Coughlin sufficiently to withstand this motion."); *Johnson v. Coombe,* 156 F.Supp.2d 273, 278 (S.D.N.Y.2001) ("The Second Circuit has held that allegations that a superintendent affirmed a prisoner's conviction on administrative appeal were sufficient to allege that the superintendent was personally involved in depriving the prisoner of his due process right to call witnesses. This case is unlike those in which there is no allegation that the supervisor or commissioner had actual or constructive notice of the deprivation in that the prisoner alleges a formal appeals process through which both defendants were on notice. Accordingly, the complaint is not dismissed on these grounds." (*citing Williams v. Smith,* 781 F.2d 319 (2d Cir.1986)).

**\*3** However, other courts have concluded that merely affirming the hearing determination is not a sufficient basis to impose liability. *See, e.g., Abdur–Raheem v. Selsky,* 598 F.Supp.2d 367, 370 (W.D.N.Y.2009) (Larimer, J.) ("The only allegation concerning Selsky in the case at bar is that he affirmed the disposition of plaintiff's administrative segregation hearing, pursuant to which plaintiff was confined to SHU.... That is not enough to establish Selsky's personal involvement."); *Ramsey v. Goord,* 2005 WL 2000144, \*6 (W.D.N.Y.2005) (Skretny, J.) ("the fact that Commissioner Goord and SHU Director Selsky, as officials in the DOCS 'chain of command,' affirmed defendant Ryerson's determination on appeal is not enough to establish personal involvement of their part").

The distinction between these cases appears to be that "while personal involvement cannot be founded solely

on supervision, liability can be found if the official proactively participated in reviewing the administrative appeals as opposed merely to rubber-stamping the results." *Hamilton v. Smith,* 2009 WL 3199531, *22 (N.D.N.Y.2009), report and recommendation adopted as modified, 2009 WL 3199520. See also *Odom v. Calero,* 2008 WL 2735868, *7 (S.D.N.Y.2008)* ("The reference in case law to an official who 'fails to remedy' a violation logically applies only to ongoing, and therefore correctable, constitutional violations-not to a specific event that is later subject to formal review by designated officials once the constitutional violation has already concluded.").

Based upon the limited allegations of the complaint, I find that plaintiff has failed to sufficiently allege defendant Bezio's personal involvement in the underlying alleged due process violation. Therefore, I recommend that defendants' motion to dismiss be granted and that the plaintiff's claim against defendant Bezio be dismissed, without prejudice to repleading.

## CONCLUSION

For these reasons, I recommend that defendants' motion to dismiss [4] be GRANTED and that plaintiff's claims against defendant Bezio be dismissed, without prejudice to repleading. I also order that defendants' motion to stay discovery as to defendant Bezio [7] be DENIED as moot. Pursuant to 28 U.S.C. § 636(b)(1), it is hereby

ORDERED, that this Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within ten (10) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72.3(a)(3).

The district judge will ordinarily refuse to consider de novo arguments, case law and/or evidentiary material which could have been, but was not presented to the magistrate judge in the first instance. See, e.g., *Patterson–Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir.1988).

**\*4** The parties are reminded that, pursuant to Rule 72.3(a)(3) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." Failure to comply with the provisions of Rule 72.3(a)(3), or with the similar provisions of Rule 72.3(a)(2) (concerning objections to a Magistrate Judge's Report, Recommendation and Order), may result in the District Judge's refusal to consider the objection.

## SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2009 WL 4730309

Footnotes

1    Bracketed references are to the CM/ECF docket entries.

**End of Document**                    © 2016 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1500422
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Troy SMITH, Plaintiff,

v.

C. ROSATI, et al., Defendants.

Civil Action No. 9:10–CV–1502
(DNH/DEP). | Feb. 20, 2013.

**Attorneys and Law Firms**

Troy Smith, Elmira, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney
General, Michael G. McCartin, Esq., Assistant Attorney
General, of Counsel, Albany, NY, for Defendants.

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, United States Magistrate Judge.

*1 *Pro se* plaintiff Troy Smith, a New York State
prison inmate, has commenced this action, pursuant to
42 U.S.C. § 1983, against the Commissioner of the New
York State Department of Corrections and Community
Supervision ("DOCCS") and several DOCCS employees,
alleging deprivation of his civil rights. In general terms,
plaintiff's amended complaint alleges that two defendants
assaulted him at the instruction of other defendants, that one
defendant failed to intervene and protect him from the assault,
that two defendants failed to provide him with adequate
medical care, that several defendants conspired to conceal the
assault, and that he was deprived procedural due process at a
disciplinary hearing arising from the event.

Currently pending before the court in connection with the
action is defendants' motion for the entry of partial summary
judgment. Specifically, defendants seek dismissal of all
claims against all defendants with the exception of those
asserted against defendants Rosati and St. John, who, plaintiff
alleges, assaulted him. For the reasons set forth below, I
recommend that defendants' motion be granted except as
it relates to the failure to intervene claim asserted against
defendant Fraser and the retaliation claim interposed against
defendant Goodman.

## I. BACKGROUND [1]

Plaintiff is a New York State prison inmate currently being
held in the custody of the DOCCS. *See generally* Am. Compl.
(Dkt. No. 7). Although he is currently confined elsewhere,
at all times relevant to this action, Smith was confined in
the Great Meadow Correctional Facility ("Great Meadow"),
located in Comstock, New York. *Id.* at 1. Two series of
events, separately discussed below, give rise to this action.

### A. *Mattress Incident*

In January 2010, plaintiff attempted to trade in his old
mattress to defendant B. Mars, the laundry supervisor
at Great Meadow, in return for a new one. Plf.'s Dep.
Tr. (Dkt. No. 79, Attach.3) at 9. According to plaintiff,
defendant Mars improperly ordered plaintiff to pay the
full price for the new mattress because she believed that
plaintiff had purposely damaged his old one. *Id.* at 9–
10. Defendant Mars issued a misbehavior to plaintiff, and
plaintiff filed a grievance against defendant Mars with the
Inmate Grievance Resolution Committee ("IGRC"), both as
a result of the incident. *Id.* at 10. Defendant Craig Goodman,
a corrections captain employed by the DOCCS, presided over
the disciplinary hearing that resulted from the misbehavior
report issued by defendant Mars. *Id.* at 11; Goodman Decl.
(Dkt. No. 79, Attach.12) at ¶ 1. According to plaintiff, at that
hearing, defendant Goodman acknowledged that plaintiff's
old mattress was damaged as a result of normal wear-and-
tear, promised to testify on plaintiff's behalf at the IGRC
hearing, and dismissed the misbehavior report. Plf.'s Dep. Tr.
(Dkt. No. 79, Attach.3) at 11. Plaintiff alleges, however, that
defendant Goodman ultimately refused to testify on his behalf
at the IGRC hearing, and denied that he told plaintiff his
mattress was damaged as a result of normal wear-and-tear. *Id.*
at 12. As a result, in January or February 2010, plaintiff filed
a grievance with the IGRC alleging that defendant Goodman
lied to him. *Id.* at 15, 17.

*2 In May 2010, plaintiff tested positive for marijuana use,
and was issued a misbehavior report. Plf.'s Dep. Tr. (Dkt. No.
79, Attach.3) at 13. Defendant Goodman presided over the
ensuing disciplinary hearing and, after finding plaintiff guilty,
sentenced him principally to twelve months of disciplinary
confinement in the Special Housing Unit ("SHU"). *Id.* at
18, 21. Due to plaintiff's mental health status, however,
this sentence was subsequently modified by the facility
superintendent to six months in keeplock confinement. *Id.* at

23. On or about June 11, 2010, plaintiff arrived in keeplock at Great Meadow. *Id.*

**B.** *Assault*

On June 18, 2010, defendant Paul Zarnetski, a corrections lieutenant employed by the DOCCS, instructed defendant Craig Rosati, a corrections officer also employed by the DOCCS, to escort plaintiff to his scheduled disciplinary hearing. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 87; Zarnetski Decl. (Dkt. No. 79, Attach.14) at ¶¶ 1, 4. At approximately 12:45 p.m. on the same date, defendant Rosati retrieved plaintiff from his cell for the escort. Am. Compl. (Dkt. No. 7) at 9; Goodman Decl. Exh. (Dkt. No. 79, Attach.15) at 1. As the two entered a nearby stairway, an altercation occurred between them, which resulted in both plaintiff and defendant Rosati falling down the stairs. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 31; Goodman Decl. Exh. (Dkt. No. 79, Attach.15) at 1. Plaintiff alleges that defendant Rosati pushed him down the stairs and then jumped on him. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 31, 35. Defendant Rosati, on the other hand, reported that plaintiff turned toward him in a threatening manner, causing him to use force that consisted of a strike to plaintiff's forehead with a closed fist. Goodman Decl. Exh. (Dkt. No. 79, Attach.13) at 1. It is undisputed, however, that, after plaintiff and defendant Rosati fell down the stairs, defendant Chad St. John, another corrections officer, arrived at the scene. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 35–36; Goodman Decl. Exh. (Dkt. No. 79, Attach.13) at 1. Plaintiff alleges that defendant St. John began kicking him while he was still on the ground. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 35–36. Defendants, however, maintain that defendant St. John used force that consisted only of applying mechanical hand restraints. Goodman Decl. (Dkt. No. 79, Attach.13) at 1.

Shortly after the arrival of defendant St. John, defendant C. Fraser, a corrections sergeant at Great Meadow, also arrived on the scene. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 37; Goodman Decl. Exh. (Dkt. No. 79, Attach.13) at 1. The parties dispute whether defendant Fraser witnessed a further use of force by defendant Rosati when defendant Rosati pushed plaintiff's face into a wall and threatened to kill him. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 38; Defs.' L.R. 7.1 Statement (Dkt. No. 79, Attach.16) at ¶ 9. It is undisputed, however, that defendant Fraser ordered that a video camera be brought to the scene; upon its arrival, a corrections officer began filming plaintiff's escort from the stairway to the Great Meadow hospital. Lindemann Decl. Exhs. (Dkt. No. 79, Attach.10) (traditionally filed, not electronically filed).

**\*3** Upon his arrival at the hospital, Smith was examined by defendant David Lindemann, a DOCCS registered nurse. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 40; Lindemann Decl. (Dkt. No. 79, Attach.7) at ¶¶ 1, 4. As a result of his examination and interview of plaintiff, defendant Lindemann noted plaintiff's complaints of a sore left shoulder, pain to his left rib area, and facial area pain, but observed no decrease in plaintiff's range of motion in his shoulder and no visible injuries to his rib area. Lindemann Decl. (Dkt. No. 79, Attach.7) at ¶ 5; Lindemann Decl. Exhs. (Dkt. No. 79, Attachs.8, 9). Defendant Lindemann observed a swollen area on plaintiff's head and a laceration of approximately one and one-half inches in length above plaintiff's left eye, for which he referred plaintiff to defendant Nesmith for stitches. *Id.* Defendant Ted Nesmith, a physicians assistant employed by the DOCCS, closed plaintiff's laceration above his left eye with eight stitches. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 79–80; Nesmith Decl. (Dkt. No. 79, Attach.6) at ¶ 5.

As a result of the incident, plaintiff was issued a misbehavior report accusing him of engaging in violent conduct, attempted assault on staff, and refusing a direct order. McCartin Decl. Exhs. (Dkt. No. 79, Attach.5) at 2–3. A Tier III disciplinary hearing was subsequently convened by defendant Andrew Harvey, a commissioner's hearing officer, to address the charges. [2] *Id.* at 2. Plaintiff was assigned a corrections counselor, defendant Torres, to help him prepare his defense at the disciplinary hearing. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 75–79. At the close of that hearing, plaintiff was found guilty on all three counts, and was sentenced to a six-month period of disciplinary SHU confinement, together with a loss of packages, commissary, and telephone privileges for a similar period. *Id.* at 21.

In the months that followed the incident involving defendants Rosati and St. John, both plaintiff and his mother, Linda Terry, wrote letters to defendant Fischer, the DOCCS Commissioner, complaining of the alleged assault. Plf.'s Resp. Exhs. (Dkt. No. 87, Attach.2) at 5, 8–12. On September 15, 2010, defendant Lucien LeClaire, the Deputy DOCCS Commissioner, responded by letter, advising plaintiff that defendant Fischer had referred plaintiff's complaint to him, and that he, in turn, had referred the matter to the Office of Special Housing/Inmate Disciplinary Programs. *Id.* at 6. The next day, defendant Albert Prack, the acting director of the Office of Special Housing/Inmate Disciplinary Programs, wrote a letter to plaintiff indicating that his letters to defendant Fischer, which he construed as a request for reconsideration of

his appeal of the disciplinary conviction, was without merit, and advising plaintiff that "[n]o further administrative action will be taken." *Id.* at 7.

## II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on December 13, 2010, and on February 14, 2011, filed an amended complaint as a matter of right. Dkt. Nos. 1, 7. Those named as defendants in plaintiff's amended complaint include DOCCS Commissioner Brian Fischer; DOCCS Chief Counsel and Deputy Commissioner Anthony J. Annucci; DOCCS Deputy Commissioner Lucien LeClaire, Jr.; DOCCS Inspector General Richard Roy; Deputy Superintendent for Security at Great Meadow Charles Kelly; Deputy Superintendent for Administration at the Great Meadow D. Lindstrand; Corrections Captains Joseph Carey and Craig Goodman; [3] Corrections Sergeants D. Bebee and C. Fraser; Corrections Lieutenants T. Pray and Paul Zarnetski; [4] Commissioner's Hearing Officer Andrew Harvey; Corrections Counselor Torres; Corrections Officers Craig P. Rosati and Chad W. St. John; Physicians Assistant Ted Nesmith; [5] Register Nurse David Lindemann; [6] Laundry Supervisor B. Mars; and Acting Director of the Office of Special Housing/Inmate Disciplinary Programs Albert Prack. [7]

**\*4** Liberally construed, plaintiff's amended complaint asserts eight causes of action, claiming (1) the use of excessive force by defendants Rosati and St. John; (2) conspiracy to conceal the alleged assault by defendants Rosati and St. John against defendants Rosati, St. John, Fraser, Bebee, Kelly, Lindemann, Nesmith, Lindstrand, Goodman, Torres, and Harvey; (3) deliberate indifference to plaintiff's serious medical needs against defendants Lindemann and Nesmith; (4) retaliation against defendants Goodman, Rosati, and St. John; (5) failure to enforce DOCCS regulations against defendants Fischer, Annucci, Roy, and LeClaire; (6) withholding personal property against defendant Mars and Goodman; (7) procedural due process against defendants Harvey, Torres and Prack; and (8) failure to train and supervise against defendants Fischer, Annucci, LeClaire, Roy, Kelly, and Lindstrand. [8] Am. Compl. (Dkt. No. 7) at 19–20. Plaintiff seeks declaratory and injunctive relief, as well as compensatory and punitive damages.

By decision and order dated June 23, 2011, following an initial review of plaintiff's amended complaint, pursuant to 28 U.S.C. §§ 1915(e) and 1915A, the court *sua sponte*

dismissed all of plaintiff's claims against defendants Kelly, Lindstrand, Carey, Bebee, and Pray, without prejudice, as well as plaintiff's equal protection claims against defendants Mars and Goodman, also without prejudice, and otherwise authorized the action to go forward. Dkt. No. 10.

On May 14, 2012, following the close of discovery, defendants moved for the entry of partial summary judgment dismissing the majority of the claims made in plaintiff's amended complaint. Dkt. No. 79. In their motion, defendants argue that (1) defendants Fischer, Annucci, LeClaire, Roy, and Prack are entitled to dismissal based upon the lack of their personal involvement in the alleged constitutional violations; (2) the record fails to support a claim of deliberate medical indifference against defendant Nesmith and Lindemann; (3) the record does not disclose a basis to hold defendant Fraser liable for failure to protect or intervene; (4) plaintiff's claims against defendant Zarnetski are subject to dismissal, based upon his lack of prior knowledge of and involvement in the assault; (5) plaintiff's verbal harassment claim against defendant Goodman is not cognizable under section 1983; (6) plaintiff's procedural due process cause of action against defendant Harvey lacks merit; (7) plaintiff's claim based upon the payment of $65 for a new mattress does not state a cognizable constitutional claim; and (8) in any event, all defendants, except for defendants Rosati and St. John, are entitled to qualified immunity. Defs.' Memo. of Law (Dkt. No. 79, Attach.17). Defendants' motion, to which plaintiff has since responded, Dkt. No. 87, is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72(3)(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Summary Judgment Standard*

**\*5** Summary judgment motions are governed by Rule 56 of the Federal Rules of Civil Procedure. Under that provision, the entry of summary judgment is warranted "if the movant shows that there is no genuine dispute as to any material facts and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247 (1986); *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 82–83 (2d Cir.2004). A fact is "material" for purposes of this inquiry, if it "might affect the outcome of the suit under the governing law." *Anderson,* 477 U.S. at 248; *see also Jeffreys v. City of New York,* 426

F.3d 549, 553 (2d Cir.2005) (citing *Anderson* ). A material fact is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

A party moving for summary judgment bears an initial burden of demonstrating that there is no genuine dispute of material fact to be decided with respect to any essential element of the claim in issue; the failure to meet this burden warrants denial of the motion. *Anderson,* 477 U.S. at 250 n.4; *Sec. Ins. Co.,* 391 F.3d at 83. In the event this initial burden is met, the opposing party must show, through affidavits or otherwise, that there is a material dispute of fact for trial. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 324; *Anderson,* 477 U.S. at 250.

When deciding a summary judgment motion, a court must resolve any ambiguities and draw all inferences in a light most favorable to the nonmoving party. *Jeffreys,* 426 F.3d at 553; *Wright v. Coughlin,* 132 F.3d 133, 137–38 (2d Cir.1998). The entry of summary judgment is justified only in the event of a finding that no reasonable trier of fact could rule in favor of the non-moving party. *Bldg. Trades Employers' Educ. Ass'n v. McGowan,* 311 F.3d 501, 507–08 (2d Cir.2002); *see also Anderson,* 477 U.S. at 250 (finding summary judgment appropriate only when "there can be but one reasonable conclusion as to the verdict").

**B.** *Personal Involvement*
In their motion, defendants seek dismissal of all claims against defendants Fischer, Annucci, LeClaire, Roy, and Prack based upon lack of personal involvement. Plaintiff responds by arguing that, through his letters, those individuals were or should have been aware of plaintiff's circumstances, but were deliberately indifferent, and additionally were derelict in the performance of their duties and in supervising subordinates, permitting the alleged constitutional deprivations to occur.

"Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under [section] 1983." *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991); *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show "a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986). It is well established that a supervisor cannot be liable for damages under section 1983 solely by

virtue of being a supervisor because there is no *respondeat superior* liability under section 1983. [9] *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003). A supervisor, however, may be held responsible for a civil rights violation when it is established that he (1) has directly participated in the challenged conduct; (2) after learning of the violation through a report or appeal, failed to remedy the wrong; (3) created or allowed to continue a policy or custom under which unconstitutional practices occurred; (4) was grossly negligent in managing subordinates who caused the unlawful event; or (5) failed to act on information indicating that unconstitutional acts were occurring. *Iqbal v. Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007), *rev'd on other grounds sub nom., Ashcroft v. Iqbal,* 556 U.S. 662 (2009); *see also Richardson,* 347 F.3d at 435; *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995). [10]

**1.** *Defendant Fischer*
 *6 At his deposition, plaintiff testified that he sued DOCCS Comissioner Fischer for two reasons: (1) he wrote defendant Fischer about the alleged assault by defendants Rosati and St. John, and defendant Fischer failed to respond; and (2) as the DOCCS Commissioner, defendant Fischer is responsible for the actions of his subordinate employees. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 55–57. Neither of these reasons provides an adequate basis for suit under section 1983. *See, e.g., Hernandez v. Keane,* 342 F.3d 137, 144 (2d Cir.2003) ("[S]upervisor liability in a [section] 1983 action ... cannot rest on *respondeat superior.*" ); *Parks v. Smith,* No. 08–CV– 0586, 2011 WL 4055415, at *14 (N.D.N.Y. Mar. 29, 2011) (Lowe, M.J.), *adopted by* 2011 WL 4055414 (N.D.N.Y.2011) (McAvoy, J.) ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement."). [11] Except for this testimony by plaintiff, there is no other record evidence relating to defendant Fischer. As a result, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Fischer was personally involved in any of the allegations giving rise to this action.

**2.** *Defendant Annucci*
At his deposition, plaintiff testified that he sued DOCCS Chief Counsel and Deputy Commissioner Annucci in this action for four reasons: (1) he is at the top of the chain of command as Deputy Commissioner of DOCCS; (2) he failed to investigate the alleged assault on plaintiff; (3) he merely passed the letters from plaintiff and plaintiff's family

down the chain of command; (4) he did not do his job. Plf.'s Dep. Tr. (Dkt. No. 79, Attach 3) at 57–59. Plaintiff's argument that defendant Annucci did not do his job by failing to investigate is based on plaintiff's unsupported assumption that defendant Fischer forwarded plaintiff's letter to defendant Annucci and instructed him to investigate. *See id.* at 58 ("[Defendant Annucci] didn't do what I figured he was told to be done by investigating[.]"). Indeed, there is no record evidence, including any testimony from plaintiff, that plaintiff or any members of his family wrote a letter or complaint directly to defendant Annucci. In any event, even assuming that defendant Annucci received plaintiff's letters, defendant Annucci's failure to respond to them is not sufficient to give rise to personal involvement under section 1983. *Parks,* 2011 WL 4055415, at *14 ("A prisoner's allegation that a supervisory official failed to respond to a grievance is insufficient to establish that official's personal involvement."). For these reasons, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Annucci was personally involved in any of the allegations giving rise to this action.

### 3. *Defendant LeClaire*

At his deposition, plaintiff testified that he sued Deputy DOCCS Commissioner LeClaire because defendant LeClaire forwarded plaintiff's letter addressed to defendant Fischer regarding the alleged assault to the Office of Special Housing/ Inmate Disciplinary Programs. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 60; Plf.'s Resp. Exhs. (Dkt. No. 87, Attach.2) at 6. That allegation is insufficient to raise a dispute of material fact as to whether defendant LeClaire is personally involved in any of the allegations giving rise to this action. *See, e.g., Ward v. LeClaire,* No. 07–CV–0026, 2010 WL 1189354, at *5 (N.D.N.Y. Mar. 24, 2010) (Suddaby, J.) ("[I]t is well settled that referring letters and grievances to staff for investigation is not sufficient to establish personal involvement." (internal quotation marks and alterations omitted)). Because there is no other record evidence that relates to defendant LeClaire, I find that no reasonable factfinder could conclude that he was personally involved in any of the allegations giving rise to this action.

### 4. *Defendant Roy*

**\*7** At his deposition, plaintiff stated that he sued defendant Roy because he has not received a response from the Inspector General's Office, where defendant Roy heads the Internal Affairs Department, regarding plaintiff's grievance. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 61. Plaintiff testified that

he gave a copy of his grievance regarding the alleged assault to an Internal Affairs employee while at Great Meadow, and was later interviewed regarding the incident, but has not yet received a result of the investigation. *Id.* at 61–64. Importantly, plaintiff testified that he has no personal knowledge that defendant Roy, as the head of Internal Affairs, was ever personally aware of the investigation. *Id.* Because there is no *respondeat superior* liability under section 1983, this evidence is not sufficient to support a claim against defendant Roy. *Hernandez,* 342 F.3d at 144. For that reason, I find that no reasonable factfinder could conclude, based on the record evidence, that defendant Roy was personally involved in any of the allegations giving rise to this action.

### 5. *Defendant Prack*

At his deposition, plaintiff testified that he sued defendant Prack because Prack cursorily reviewed plaintiff's appeal of his disciplinary conviction in his capacity as the acting director of the Office of Special Housing/Inmate Disciplinary Programs. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 92; Plf.'s Resp. Exhs. (Dkt. No. 87, Attach.2) at 7. A review of the record evidence reveals that defendant Prack did, in fact, respond to plaintiff's appeal of his disciplinary conviction, and that defendant Prack indicated in that response that plaintiff's appeal was meritless. Plf.'s Resp. Exhs. (Dkt. No. 87, Attach.2) at 7.

Whether review of an inmate's disciplinary conviction by a person in defendant Prack's position is sufficient to establish personal involvement in section 1983 cases is the subject of debate in this circuit. Some courts have determined that the review and response to an appeal of a disciplinary conviction are sufficient to establish personal involvement because that conduct implicates the second of the five potential grounds for supervisor liability under *Colon.* [12] *See Baez v. Harris,* No. 01–CV–0807, 2007 WL 446015, at *2 (N.D.N.Y. Feb. 7, 2007) (Mordue, C.J.) (finding that the response of "the Director of the Special Housing/Inmate Disciplinary Program" to the plaintiff's appeal is "sufficient to withstand summary judgment on the issue of personal involvement"); *Ciaprazi v. Goord,* No. 02–CV–0915, 2005 WL 3531464, at *16 (N.D.N.Y. Dec. 22, 2005) (Sharpe, J., *adopting report and recommendation by* Peebles, M.J.) (recommending that [the director of Office of Special Housing/Inmate Disciplinary Programs] not be dismissed for lack of personal involvement because a "review of [the plaintiff's appeal from a disciplinary conviction] sufficiently establishes his personal involvement based upon [the defendant] being positioned

to discern and remedy the ongoing effects of any such violations"); *Johnson v. Coombe,* 156 F.Supp.2d 273, 278 (S.D.N.Y.2001) (finding that plaintiff's complaint sufficiently alleged personal involvement of the superintendent and DOCCS commissioner to withstand motion to dismiss because the complaint alleged that both defendants had actual or constructive notice of the alleged constitutional violation that occurred at the disciplinary hearing); *Gilbert v. Selsky,* 867 F.Supp. 159, 166 (S.D.N.Y.1994) ("If a supervisory official learns of violation through ... an appeal, but fails to remedy the wrong, that may constitute a sufficient basis for liability."); *Cepeda v. Coughlin,* 785 F.Supp. 385, 391 (S.D.N.Y.1992) (holding that, on a motion to dismiss, the allegation that the DOCCS's commissioner "entertained" and "affirmed" the plaintiff's appeal is sufficient to state a claim against the commissioner because "the allegation that supervisory personnel learned of alleged misconduct on appeal yet failed to correct it constitutes an allegation of personal participation").

**\*8** On the other hand, some courts have concluded otherwise, holding that the mere allegation that a defendant reviewed a disciplinary conviction appeal is insufficient to find that defendant personally involved. *See Tafari v. McCarthy,* 714 F.Supp.2d 317 (N.D.N.Y.2010) (Hurd, J., *adopting report and recommendation by* Lowe, M.J .) ("The affirming of a disciplinary conviction does not constitute personal involvement in a constitutional violation."); *Abdur-Raheem v. Selsky,* 598 F.Supp.2d 367, 370 (W.D.N.Y.2009) ("The only allegation concerning [the director of the Special Housing/Inmate Disciplinary Program] ... is that he affirmed the disposition of plaintiff's administrative segregation hearing, pursuant to which plaintiff was confined to SHU. That is not enough to establish [his] personal involvement." (internal citation omitted)); *Odom v. Calero,* No. 06–CV–15527, 2008 WL 2735868, at \*7 (S.D.N.Y. Jul. 10, 2008) (holding that the allegation that the director of the Special Housing/Inmate Disciplinary Program was personally involved as a result his denial of the plaintiff's appeal of his disciplinary conviction was not sufficient to trigger the second category establishing personal involvement under *Colon* because, "[o]nce the [disciplinary] hearing was over and [the defendant's] decision was issued, the due process violation was completed"); *Ramsey v. Goord,* No. 05–CV–0047A, 2005 WL 2000144, at \*6 (W.D.N.Y. Aug. 13, 2005) ("[T]he fact that [the DOCCS commissioner and SHU director], as officials in the DOC[C]S 'chain of command,' affirmed [a] determination on appeal is not enough to establish personal involvement of their part.");

*Joyner v. Greiner,* 195 F.Supp.2d 500, 506 (S.D.N.Y.2002) ("The fact that Superintendent Greiner affirmed the denial of plaintiff's grievance—which is all that is alleged against him—is insufficient to establish personal involvement or to shed any light on the critical issue of supervisory liability, and more particularly, knowledge on the part of the defendant." (internal quotation marks omitted)).

At this time, I am inclined to agree with those courts that have determined that a defendant's review and response to an appeal of a disciplinary conviction is sufficient under *Colon* to find that defendant personally involved. Mindful that on a motion for summary judgment I must view the facts, and draw all inferences, in the light most favorable to the non-movant, I find that a reasonable factfinder could conclude, if plaintiff's testimony is credited, that defendant Prack's review of plaintiff's disciplinary conviction revealed a due process violation, and by defendant Prack dismissing plaintiff's appeal, he failed to remedy that violation. Additionally, because it appears that plaintiff was still serving the sentence imposed at the disciplinary hearing where his alleged due process violation occurred, I find that any violation that may have occurred was ongoing, and defendant Prack was in a position to remedy that violation, at least in part, at the time plaintiff appealed his conviction. All of this is enough to find that there is a dispute of material fact as to whether defendant Prack was personally involved in the allegations giving rise to plaintiff's due process claim by way of the second of the five potential grounds for supervisor liability under *Colon. Cf. Black v. Coughlin,* 76 F.3d 72, 75 (2d Cir.1996) ("We disagree, however, with the district court's denial of leave to amend to add [the director of the Special Housing/Inmate Disciplinary Program], who [was] personally involved in [the plaintiff's] disciplinary proceedings[.]"). [13]

**\*9** In summary, I recommend that defendants' motion for summary judgment on the basis of personal involvement be granted with respect to defendants Fischer, Annucci, LeClaire, and Roy, but denied as it relates to defendant Prack.

## C. *Deliberate Indifference Claims Against Defendants Nesmith and Lindemann*

Defendants next seek dismissal of plaintiff's Eighth Amendment deliberate indifference claims against defendants Nesmith and Lindemann, arguing that the record lacks any evidence of their deliberate indifference to plaintiff's serious medical needs. In his amended complaint, plaintiff contends that defendants Nesmith and Lindemann

failed to provide him with proper medical treatment for back pain, blurred vision, and hearing loss resulting from alleged assault by defendants Rosati and St. John on June 18, 2010. Am. Compl. (Dkt. No. 7) at 12.

The Eighth Amendment prohibits punishment that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society [,]' or which 'involve the unnecessary and wanton infliction of pain [.]' " *Estelle v. Gamble,* 429 U.S. 97, 102–03 (1976) (quoting *Trop v. Dulles,* 356 U.S. 86, 100–01 (1958) and *Gregg v. Georgia,* 428 U.S. 153, 169–73 (1976) (internal citations omitted)). While the Eighth Amendment " 'does not mandate comfortable prisons,' neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)).

"These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration." *Estelle,* 429 U.S. at 103. Failure to provide inmates with medical care, "[i]n the worst cases, ... may actually produce physical torture or lingering death, [and] ... [i]n less serious cases, ... may result in pain and suffering no one suggests would serve any penological purpose." *Id.*

A claim alleging that prison officials have violated an inmate's Eighth Amendment rights by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v.. Goord,* 554 F.3d 255, 268 (2d Cir.2009); *Price v. Reilly,* 697 F.Supp.2d 344, 356 (E.D.N.Y.2010). To satisfy the objective requirement, the Second Circuit has said that

> [d]etermining whether a deprivation is an objectively serious deprivation entails two inquiries. The first inquiry is whether the prisoner was actually deprived of adequate medical care. As the Supreme Court has noted, the prison official's duty is only to provide reasonable medical care .... Second, the objective test asks whether the inadequacy in medical care is sufficiently serious. This inquiry requires the court to examine how the offending conduct is inadequate and what harm, if any, the inadequacy

has caused or will likely cause the prisoner.

*Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006) (internal citations omitted).

**\*10** The second inquiry of the objective test requires a court to look at the seriousness of the inmate's medical condition if the plaintiff alleges a complete failure to provide treatment. *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find it important and worthy of comment, whether the condition significantly affects an individual's daily activities, and whether it causes chronic and substantial pain.' " *Salahuddin,* 467 F.3d at 280 (internal quotation marks and alterations omitted).

If, on the other hand, a plaintiff's complaint alleges that treatment was provided but was inadequate, the second inquiry of the objective test is narrowly confined to that specific alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin,* 467 F.3d at 280. "For example, if the prisoner is receiving ongoing treatment and the offending conduct is an unreasonable delay or interruption in that treatment, [the focus of the] inquiry [is] on the challenged delay or interruption in treatment, rather than the prisoner's underlying medical condition alone." *Id.* (quoting *Smith,* 316 F.3d at 185) (internal quotations marks omitted).

To satisfy the subjective requirement, a plaintiff must demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). "In medical-treatment cases ..., the official's state of mind need not reach the level of knowing and purposeful infliction of harm; it suffices if the plaintiff proves that the official acted with deliberate indifference to inmate health." *Salahuddin,* 467 F.3d at 280. "Deliberate indifference," in a constitutional sense, "requires that the charged official act or fail to act while actually aware of a substantial risk that serious inmate harm will result." *Id.* (citing *Farmer,* 511 U.S. at 837; *see also Leach v. Dutrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Farmer* ); *Waldo v. Goord,* No. 97–CV–1385, 1998 WL 713809, at \*2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.) (same). "Deliberate indifference is a mental state equivalent to subjective recklessness, as the term is used in criminal law." *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839–40).

Here, after carefully reviewing the record evidence, I find that no dispute of material fact exists as to whether defendants Nesmith and Lindemann were deliberately indifferent to plaintiff's medical needs as a result of the alleged assault by defendants Rosati and St. John. More specifically, although plaintiff testified at his deposition that defendant Nesmith did not follow "his procedure as being a physician" and failed to follow-up with plaintiff, plaintiff also testified that defendant Nesmith cleaned plaintiff's laceration and closed it with eight stitches. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 79–80. Importantly, plaintiff testified that, on the date of the alleged assault, defendant Nesmith did everything that plaintiff requested of him. *Id.* at 80, 81. The record also reflects that defendant Lindemann completed an examination of plaintiff upon his arrival at the Great Meadow hospital, and that he completed a two-page "Use of Force Report" and one-page "Alleged Fight Exam" report during his examination of plaintiff. [14] Lindemann Decl. (Dkt. No. 79, Attach.7) at ¶ 4; Lindemann Decl. Exhs. (Dkt. No. 79, Attachs.7, 8); Nesmith Decl. (Dkt. No. 79, Attach.6) at ¶ 4. I have also reviewed the videotape submitted by defendants that recorded the treatment that defendants Nesmith and Lindemann provided plaintiff following the alleged assault by defendants Rosati and St. John. Lindemann Decl. Exhs. (Dkt. No. 79, Attach.10) (traditionally filed, not electronically filed). This recording did not display anything unusual, and, although the recording did not include any sound, it appeared that defendants Lindemann and Nesmith asked plaintiff questions, responded to plaintiff's answers, and provided plaintiff with thorough medical care for his reported injuries. *See generally id.* After carefully reviewing all of this evidence, including plaintiff's testimony, I conclude that no reasonable factfinder could find that the care defendants Nesmith and Lindemann provided plaintiff was inadequate, or that they acted with the requisite deliberate indifference when providing medical treatment to plaintiff.

 **\*11** As it relates to plaintiff's allegations that he received inadequate follow-up medical treatment, the record evidence does not support this allegation. Specifically, plaintiff testified that defendant Nesmith removed his stitches. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 83. Additionally, a review of plaintiff's ambulatory health record reveals that plaintiff was subsequently treated by other medical staff members at Great Meadow on several occasions, including on June 20 and 25, 2010; July 1, 6, 20, 23, 27, and 29, 2010; and August 3, 2010. Lindemann Decl. Exhs. (Dkt. No. 79, Attach 11). While some of those visits reference symptoms that

plaintiff now attributes to the alleged assault on June 18, 2010, including a notation that plaintiff was scheduled to see an eye doctor (June 25, 2010), others involved matters unrelated to the alleged assault, including missing dentures (July 20, 2010), bug bites (July 23, 2010) and a request for toenail clippers (July 29, 2010). *Id.* Even considered in the light most favorable to plaintiff, the cumulation of this evidence leads me to find that a reasonable factfinder could not conclude that plaintiff received inadequate follow-up medical care by any of the named-defendants, including defendants Nesmith and Lindemann, or that any of the nameddefendants acted with the requisite deliberate indifference.

In summary, I find that there is no record evidence to support a reasonable factfinder's determination that, objectively, defendants Nesmith and Lindemann provided plaintiff with inadequate treatment for a serious medical need, or that, subjectively, they knew of but disregarded an excessive risk to plaintiff's health or safety. I therefore recommend dismissal of plaintiff's deliberate medical indifference claim against those two defendants.

### D. *Plaintiff's Claims Against Defendant Fraser*

Defendants next seek dismissal of all claims asserted in plaintiff's amended complaint against defendant Fraser. A careful review of plaintiff's amended complaint reveals that it asserts three causes of action against defendant Fraser, including (1) conspiracy to cover-up the alleged assault on June 18, 2010; (2) the issuance of a false misbehavior report; and (3) failure to intervene. In their motion, defendants only specifically seek dismissal of a perceived excessive force claim, and the issuance of a false misbehavior report claim against defendant Fraser. For the sake of completeness, I will nonetheless address all of the claims asserted against defendant Fraser.

To the extent that plaintiff's amended complaint may be construed as asserting an excessive force claim against defendant Fraser, I recommend dismissal of that claim because there is no record evidence that defendant Fraser used any force against plaintiff. Specifically, a review of both plaintiff's amended complaint and his deposition transcript do not reveal an allegation that defendant Fraser used any force against him. Plaintiff only alleges that defendants Rosati and St. John used force, which is not sufficient to support an excessive force claim against defendant Fraser.

 **\*12** The remaining claims asserted against defendant Fraser, except for plaintiff's failure to intervene cause of action,

are also easily discounted. Plaintiff's conspiracy claim fails against defendant Fraser, as well as defendants Rosati, St. John, Harvey and Torres, Am. Compl. (Dkt. No. 7) at 19, because there is no record evidence that these defendants agreed to violate any of plaintiff's constitutional rights. *See Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir.1999) ("To prove a [section] 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."). Specifically, plaintiff did not testify at his deposition to the existence of any agreement among those defendants, and the only mention of such an agreement is a conclusory allegation in plaintiff's amended complaint. *See* Am. Compl. (Dkt. No. 7) at 19 ("Defendant[ ]s Fraser, Rosati, St. John, Harvey, and Torres conspired to use Tier III hearing to deflect official misconduct for exercising a protected right[.]"). Mere conclusory allegations that are unsupported by any record evidence are insufficient to give rise to a genuine dispute of material fact. *See, e.g., Hilson v. Maltese,* No. 09–CV–1373, 2012 WL 6965105, at *6 n.10 (N.D.N.Y. Dec. 14, 2012) (Baxter, M.J.), *adopted by* 2013 WL 375489 (N.D.N.Y. Jan. 30, 2013) (Mordue, J.) ("Plaintiff's conclusory assertion ... is not sufficient to establish a material issue of fact[.]" (listing cases)).

Plaintiff's claim that defendant Fraser issued a false misbehavior report against him is not cognizable under section 1983. *See Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) ("[A] prison inmate has no general right to be free from being falsely accused in a misbehavior report.").

The allegations in plaintiff's amended complaint related to defendant Fraser's failure to adhere to DOCCS's regulations or policies, do not give rise to a cognizable claim under section 1983. *See Bolden v. Alston,* 810 F.2d 353, 358 (2d Cir.1987) ("State procedural requirements do not establish federal constitutional rights."); *Barnes v. Henderson,* 628 F.Supp.2d 407, 411 (W.D.N .Y.2009) ("[A] violation of New York State regulations concerning disciplinary hearings does not in itself establish a due process violation.").

Plaintiff's failure to intervene claim against defendant Fraser, however, cannot be dismissed at this juncture. "[A]ll law enforcement officials have an affirmative duty to intervene to protect the constitutional rights of citizens from infringement by other law enforcement officers in their presence." *Anderson v. Branen,* 17 F.3d 552, 557 (2d Cir.1994), *accord,*

*Curley v. Village of Suffern,* 268 F.3d 65, 72 (2d Cir.2001); *see also Mowry v. Noone,* No. 02–CV–6257, 2004 WL 2202645, at *4 (W.D.N.Y. Sept. 30, 2004) ("Failure to intercede results in liability where an officer observes the use of excessive force or has reason to know that it will be used."). To establish liability on the part of a defendant under this theory, "the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene." *Henry v. Dinelle,* No. 10–CV–0456, 2011 WL 5975027, at *4 (N.D.N.Y. Nov. 29, 2011) (Suddaby, J.) (citing *JeanLaurent v. Wilkinson,* 540 F.Supp.2d 501, 512 (S.D.N.Y.2008)).

**\*13** Here, a review of the record evidence reveals the existence of a genuine dispute of material fact as to whether defendant Rosati's continued use of force against plaintiff triggered defendant Fraser's duty to intervene. Although defendants cite plaintiff's deposition testimony for the proposition that "no further assault occurred after Defendant Fraser's arrival on the scene," Defs.' L.R. 7.1 Statement (Dkt. No. 79, Attach.16) at ¶ 9, the record does not support this fact. Instead, during two separate lines of questioning, plaintiff testified at his deposition that, after defendant Fraser arrived to the scene, defendant Rosati "pushed" or "mushed" plaintiff's face into the wall and threatened to kill him. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 38, 65. Because this testimony clearly indicates that defendant Fraser was present for this alleged use of force by defendant Rosati, and because the record evidence does not conclusively support a finding that defendant Rosati's additional use of force was unconstitutional, [15] I find that a reasonable factfinder could conclude, based on the record evidence now before the court, that defendant Fraser's duty to intervene was triggered by defendant Rosati's conduct.

In summary, I recommend that all claims against defendant Fraser be dismissed, with the exception of the failure to intervene claim.

### E. *Plaintiff's Claims Against Defendant Zarnetski*

Defendants next seek dismissal of all claims against defendant Zarnetski. Plaintiff's amended complaint alleges that defendant Zarnetski is liable for the force used by defendant Rosati because he should have predicted that, when he instructed defendant Rosati to escort plaintiff to

the disciplinary hearing, defendant Rosati would assault him. Although such an allegation, if properly supported by the record, may give rise to a failure to intervene or conspiracy to use excessive force claim, the evidence in this case does not support either claim.

In his verified amended complaint, plaintiff avers that defendant Zarnetski sent defendant Rosati to escort him to his disciplinary hearing, and on the way to the hearing, defendant Rosati assaulted him. Am. Compl. (Dkt. No. 7) at 17. During his deposition, plaintiff elaborated on this allegation only to the extent of testifying that it is "known" at Great Meadow that defendant Rosati "is a hothead," and, as a result of this common prison knowledge, defendant Zarnetski should have predicted that defendant Rosati would assault plaintiff. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 88–89. Plaintiff also admitted, however, that, in order to attend his disciplinary hearing, he was required to be escorted by a corrections officer. *Id.* at 88. In his affidavit, defendant Zarnetski avers that he "had absolutely no foreknowledge that C.O. Rosati and plaintiff would be involved in a use of force on June 18, 2010." Zarnetski Decl. (Dkt. No. 79, Attach.14) at ¶ 4. Because, in the face of defendant Zarnetski's denial, plaintiff's allegations amount to nothing more than his rank speculation that defendant Zarnetski knew or should have known that defendant Rosati would assault plaintiff, I find that no reasonable factfinder could conclude that defendant Zarnetski had a duty to intervene. *See Henry,* 2011 WL 5975027, at *4 (finding that, to establish liability on the part of a defendant for failure to intervene, "the plaintiff must adduce evidence establishing that the officer had (1) a realistic opportunity to intervene and prevent the harm, (2) a reasonable person in the officer's position would know that the victim's constitutional rights were being violated, and (3) that officer does not take reasonable steps to intervene."). In addition, because none of this evidence raises a genuine dispute of material fact as to whether defendants Zarnetski and Rosati agreed to use force against plaintiff, I find that no reasonable factfinder could conclude that defendant Zarnetski conspired to violate plaintiff's constitutional rights. *See Pangburn,* 200 F.3d at 72 ("To prove a [section] 1983 conspiracy, a plaintiff must show: (1) an agreement between two or more state actors or between a state actor and a private entity; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages."). For all of these reasons, I recommend dismissing all of plaintiff's claims against defendant Zarnetski.

### F. *Plaintiff's Claims Against Defendant Lieutenant Goodman*

**\*14** In his amended complaint, plaintiff alleges that defendant Goodman conspired with defendants Rosati and St. John to effectuate the alleged assault on plaintiff because plaintiff successfully modified a disciplinary sentence imposed by defendant Goodman. Am. Compl. (Dkt. No. 7) at 8. Plaintiff supports this contention with a further allegation that, three days after the alleged assault by defendants Rosati and St. John, defendant Goodman said to plaintiff, " 'That is what you get for getting my sentence modified [.]' " *Id.* at 14. Defendants properly construe these allegations as plaintiff's assertion of a First Amendment retaliation claim, and seek its dismissal. Defendants also seek dismissal of plaintiff's verbal harassment claim asserted against defendant Goodman.

### 1. *First Amendment Retaliation*

A cognizable section 1983 retaliation claim lies when prison officials take adverse action against an inmate, which is motivated by the inmate's exercise of a constitutional right, including the free speech provisions of the First Amendment. *See Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000) ( "In general, a section 1983 claim will lie where the government takes negative action against an individual because of his exercise of rights guaranteed by the Constitution or federal laws."). To state a *prima facie* claim under section 1983 for retaliatory conduct, a plaintiff must advance non-conclusory allegations establishing that (1) the conduct at issue was protected, (2) the defendants took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action—in other words, that the protected conduct was a "substantial or motivating factor" in the prison officials' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Dillon v. Morano,* 497 F.3d 247, 251 (2d Cir.2007); *Garrett v. Reynolds,* No. 99–CV–2065, 2003 WL 22299359, at *4 (N.D.N.Y. Oct. 3, 2003) (Sharpe, M.J.).

Here, it is well settled that plaintiff's appeal of defendant Goodman's disciplinary sentence is constitutionally protected conduct, satisfying the first prong of a retaliation claim. *See, e.g., Santiago v. Holden,* No. 11–CV–0567, 2011 WL 7431068, at *5 (N.D.N.Y. Nov. 29, 2011) (Homer, M.J.), *adopted by* 2012 WL 651871 (N.D.N.Y. Feb. 28, 2012) (Suddaby, J.) ("There is no question that [the plaintiff's] conduct in filing grievances and appeals was conduct protected by the First Amendment."); *Brown v. Bascomb,*

No. 05–CV–1466, 2008 WL 4283367, at *6 (N.D.N.Y. Sept. 16, 2008) (Mordue, C.J.). In addition, being assaulted plainly constitutes an adverse action sufficient to satisfy the second prong of a retaliation claim. *See Cole v. N.Y. S. Dep't of Corrs. Svcs.,* 2012 WL 4491825, at *13 (N.D.N.Y. Aug. 31, 2012) (Dancks, M . J.), *adopted by* 2012 WL 4506010 (N.D.N.Y. Sept. 28, 2012) (Mordue, J.) ("An assault by corrections officers is sufficient to chill a person of ordinary firmness from continuing to engage in his First Amendment activity." (internal quotation marks omitted)). Turning to the third requirement for a retaliation claim, requiring that a plaintiff to establish a casual connection between the protected conduct and adverse action, drawing all inferences in favor of plaintiff, I find that both plaintiff's amended complaint and his deposition testimony, if credited by a factfinder, may serve to support the allegation that defendant Goodman did, in fact, conspire with defendants Rosati and St. John to assault plaintiff. More specifically, if plaintiff's testimony regarding defendant Goodman's statements three days after the assault is credited, a reasonable factfinder could conclude that this statement was an admission by defendant Goodman that he orchestrated, in some way, the assault on plaintiff. However, because defendant Goodman explicitly denied conspiring with defendants Rosati and St. John to assault plaintiff, Goodman Decl. (Dkt. No. 79, Attach.12) at ¶¶ 3, 4, I find that a genuine dispute of fact exists as to whether defendant Goodman conspired with defendants Rosati and St. John to retaliate against plaintiff for having exercised his First Amendment rights. For this reason, I recommend that defendants' motion for summary judgment be denied as it relates to plaintiff's retaliation claim against defendant Goodman.

**2. *Verbal Harassment***

 **\*15** To the extent that plaintiff's amended complaint may be construed as asserting a verbal harassment claim against defendant Goodman for allegedly stating to plaintiff, " 'That is what you get for getting my sentence modified,' " Am. Compl. (Dkt. No. 7) at 14, that claim is not cognizable under section 1983. *See, e.g., Moncrieffe v. Witbeck,* No. 97–CV–0253, 2000 WL 949457, at *3 (N.D.N.Y. June 29, 2000) (Mordue, J.) ("A claim for verbal harassment is not actionable under 42 U.S.C. § 1983."). For this reason, I recommend that plaintiff's verbal harassment claim asserted against Goodman be dismissed. [16]

## G. *Plaintiff's Claims Against Defendants Harvey, Torres, and Prack*

Defendants next seek dismissal of plaintiff's procedural due process claims asserted against defendants Harvey, Torres, and Prack. Defendant Harvey served as the hearing officer who presided at plaintiff's Tier III disciplinary hearing arising from the incident on June 18, 2010. Defendant Torres was assigned to assist Smith in his defense at that disciplinary hearing. Plaintiff's amended complaint also alleges that defendants Harvey and Torres conspired with others to use the Tier III hearing to conceal official misconduct. Additionally, as was briefly noted above, plaintiff's amended complaint asserts a due process claim against defendant Prack.

**1. *Due Process Claims***

To establish a procedural due process claim under section 1983, a plaintiff must show that he (1) possessed an actual liberty interest, and (2) was deprived of that interest without being afforded sufficient process. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996).

The procedural safeguards to which a prison inmate is entitled before being deprived of a constitutionally cognizable liberty interest are well established, the contours of the requisite protections having been articulated in *Wolff v. McDonnell,* 418 U .S. 539, 564–67 (1974). Under *Wolff,* the constitutionally mandated due process requirements, include (1) advanced written notice of the charges, (2) a hearing in which the inmate is provided the opportunity to appear at a disciplinary hearing and present witnesses and evidence, (3) a written statement by the hearing officer explaining his decision and the reasons for the action being taken, and, in some circumstances, (4) the right to assistance in preparing a defense. *Wolff,* 418 U.S. at 564–70; *see also Eng v. Coughlin,* 858 F.2d 889, 897–98 (2d Cir.1988). In order to pass muster under the Fourteenth Amendment, a hearing officer's disciplinary determination must garner at least "some eviden[tiary]" support. *Superintendent, MA Corr. Inst., Walpole v. Hill,* 472 U.S. 445, 455 (1985).

Here, as it relates to defendant Harvey, plaintiff's amended complaint alleges that defendant Harvey failed to provide plaintiff with a timely hearing. Am. Compl. (Dkt. No. 7) at 13. To the extent that plaintiff bases this claim on an allegation that defendant Harvey violated a state agency's regulation, that claim fails as a matter of law. *See Bolden,* 810 F.2d at 358 ("State procedural requirements do not establish

federal constitutional rights."); *Barnes,* 628 F.Supp.2d at 411 ("[A] violation of New York State regulations concerning disciplinary hearings does not in itself establish a due process violation.").

 **\*16** As it relates to defendant Torres, plaintiff's allegation that she failed to call or interview witnesses on his behalf is unsupported by the record evidence. Specifically, plaintiff admitted at his deposition that he has no basis to believe that defendant Torres failed to interview the people identified by plaintiff as potential witnesses to the alleged assault. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 75–76. In addition, plaintiff admitted that defendant Torres returned to plaintiff with a list of witnesses that would or would not testify on his behalf. *Id.* at 77. Finally, plaintiff admitted that he did, in fact, call as witnesses those people that agreed to testify on his behalf. *Id.* at 78. From this record evidence, I find that no reasonable factfinder could conclude that defendant Torres denied plaintiff due process based on a failure to assist plaintiff in identifying and calling witnesses on his behalf.

As it relates to defendant Prack, plaintiff's amended complaint alleges that defendant Prack "failed to stop the torture in SHU." Am. Compl. (Dkt. No. 7) at 19. The court construes this allegation to suggest that, because defendant Prack denied plaintiff's appeal of his disciplinary conviction, he contributed to whatever procedural due process violations occurred during the disciplinary hearing below. The record evidence, however, does not support this conclusion because, as discussed above, defendant was provided the opportunity to investigate and present witnesses on his behalf, and he was appointed a corrections counselor to assist in the preparation of his defense. Plf.'s Dep. Tr. (Dkt. No. 79, Attach.3) at 75, 77–78. Moreover, a careful review of the Tier III hearing transcript, submitted by defendants in support of their motion, reveals that plaintiff was provided adequate due process during the disciplinary hearing from which plaintiff appealed to defendant Prack. McCartin Decl. Exhs. (Dkt. No. 79, Attach.5). All of this evidence leads the court to conclude that no reasonable factfinder could find that defendant Prack's determination that plaintiff's appeal contributed to a due process violation.

For all of these reasons, I recommend that plaintiff's procedural due process claim asserted against defendant Harvey, Torres, and Prack be dismissed.

**2. *Conspiracy Claim***

To the extent it is alleged that defendants Harvey and Torres conspired to conceal the June 18, 2010 assault, such claims are not cognizable under section 1983. *De Ponceau v. Bruner,* No. 09–CV–0605, at \*7 (N.D.N.Y. Feb. 21, 2012) (Peebles, M.J.), *adopted by* 2012 WL 1014821 (N.D.N.Y. Mar. 23, 2012) (Suddaby, J.). In any event, as was discussed above in determining that plaintiff's conspiracy claim asserted against defendant Fraser, there is no record evidence that defendants Harvey and Torres engaged in an agreement to violate any of plaintiff's constitutional rights. For these reasons, I recommend that plaintiff's conspiracy claim asserted against defendants Harvey and Torres be dismissed.

**H. *Plaintiff's Claims Against Defendant Mars***

 **\*17** Defendants next seek dismissal of all claims against defendant Mars, including plaintiff's claim that she violated his Fourteenth Amendment rights by making him pay $65 to replace a damaged mattress. The Fourteenth Amendment, however, does not give rise to a claim that a defendant deprived a plaintiff of private property; it only protects a plaintiff's right to due process as a result of a deprivation of private property. *See, e.g., Edwards v. Bezio,* No. 08–CV–0256, 2010 WL 681369, at \*5 (N.D.N.Y. Feb. 24, 2010) (Kahn, J., *adopting report and recommendation by* Treece, M.J.) ("The lynchpin of a due process claim based on a state actor's unauthorized deprivation of private property is the availability of post-deprivation remedies provided by the state, not the deprivation itself .... Plaintiff does not allege that New York State has failed to provide a meaningful post-deprivation remedy, and, in fact, New York provides a venue for challenging such appropriations in the New York State Court of Claims."). For this reason, I recommend that any claim asserted by plaintiff against defendant Mars based on an allegation that she charged him too much money for his new mattress be dismissed.

Defendants also seek dismissal of plaintiff's claim against defendant Mars relating to the issuance of a false misbehavior report. The mere allegation of the issuance of a false misbehavior report against an inmate, however, is not cognizable under section 1983. *See Boddie,* 105 F.3d at 862 ("[A] prison inmate has no general right to be free from being falsely accused in a misbehavior report."). Moreover, even assuming that defendant Mars did issue a false misbehavior report, whatever wrong arose out of that conduct is rectified by the court's finding that plaintiff received adequate due process at the ensuing disciplinary hearing. *See, e.g.,* Plf .'s Dep. Tr. (Dkt. No. 79, Attach.3) at 12–13. *See Jones v. Coughlin,* 45 F.3d 677, 679 (2d Cir.1995) (finding that, where

an alleged false misbehavior report is filed against a prisoner, his "due process rights are protected if he is granted a hearing on the charges and given an opportunity to rebut them").

Finally, defendants seek dismissal of plaintiff's equal protection claim asserted against defendant Mars based on plaintiff's admission that defendant Mars did not single him out or treat him differently than other inmates based on his race. Plaintiff's equal protection claim against defendant Mars, however, was previously dismissed by the court, and it has not been revived by plaintiff's amended complaint. Dkt. No. 10 at 16.

For all of these reasons, I recommend that all of plaintiff's claims asserted against defendant Mars be dismissed.

## I. *Qualified Immunity*

Because I recommend that one claim against each defendant Fraser and defendant Goodman survive defendants' pending motion for summary judgment, I will only address defendants' defense of qualified immunity as it relates to those two defendants.

**\*18** "Qualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Reichle v. Howards,* 132 S.Ct. 2088, 2093 (2012); *see also Pearson v. Callahan,* 555 U.S. 223, 231 (2009); *Sudler v. City of New York,* 689 F.3d 159, 174 (2d Cir.2012). The law of qualified immunity seeks to strike a balance between "the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson,* 555 U.S. at 231. Government officials are shielded from liability by qualified immunity when making "reasonable mistakes" concerning the lawfulness of their conduct. *Sudler,* 689 F.3d at 174 (citing *Saucier v. Katz,* 533 U.S. 194, 206 (2001), *abrogated on other grounds by Pearson,* 555 U.S. 223).

The determination of whether a government official is immune from suit is informed by two factors. *Doninger v. Niehoff,* 642 F.3d 334, 345 (2d Cir.2011). The inquiry turns on whether the facts alleged, taken in a light most favorable to the plaintiff, show that the conduct at issue violated a constitutional right, and if so, whether that right is clearly established at the relevant time. *Ashcroft v. al-Kidd,* 131 S.Ct. 2074, 2080 (2011); *Nagle v. Marron,* 663 F.3d 100, 114 (2d Cir.2011); *Doninger,* 642 F.3d at 345 (citing cases). To be clearly established, a right must be sufficiently clear "that every reasonable official would have understood that what he is doing violates that right." *Ashcroft,* 131 S.Ct. at 2083 (internal quotation marks omitted). Until recently, courts were required to analyze qualified immunity by considering the two factors in order. *Doninger,* 642 F.3d at 345 (citing *Saucier,* 533 U.S. at 201). Following the Supreme Court's decision in *Pearson,* however, courts are no longer wedded to the *Saucier* "two step," and instead retain the discretion to decide the order in which the two relevant factors are to be considered. [17] *Id.; see also Okin v. Vill. of Cornwall–On–Hudson Police Dep't,* 577 F.3d 415, 429 n.9 (2d Cir.2009).

To prevail on a qualified immunity defense, a defendant must establish that "(1) the officers' actions did not violate clearly established law, or (2) it was objectively reasonable for the officers to believe that their actions did not violate such law." *Green v. Montgomery,* 219 F.3d 52, at 59 (2d Cir.2000).

### 1. *Defendant Fraser*

Because the right to be free from excessive force is a clearly established right, the relevant qualified immunity inquiry turns on whether a reasonable officer in defendant Fraser's position would have known that defendant Rosati's conduct amounted to excessive force. *See Green,* 219 F.3d at 59 ("It is beyond dispute that the right to be free from excessive force has long been clearly established."). Defendants have already acknowledged that whether defendant Rosati's use of force against plaintiff constitutes excessive force is a question for the jury, and I agree. As a result, I cannot conclude that defendant Fraser is entitled to qualified immunity as it relates to plaintiff's failure to intervene claim.

### 2. *Defendant Goodman*

**\*19** As noted earlier, an inmate's right to appeal a disciplinary sentence is protected by the First Amendment. *Santiago,* 2011 WL 7431068, at \*5. Therefore, the relevant inquiry is whether a reasonable officer in defendant Goodman's position would have known that conspiring with other corrections officers to have plaintiff assaulted in retaliation for plaintiff appealing the sentence violated his clearly established First Amendment right. Because that answer is clearly, "yes," I cannot conclude that defendant Goodman is entitled to qualified immunity as it relates to plaintiff's retaliation claim.

In summary, I recommend that defendants' motion for summary judgment be denied as it relates to defendants' qualified immunity defense.

### IV. *SUMMARY AND RECOMMENDATION*

At the center of plaintiff's amended complaint in this action is his claim that he was assaulted by defendants Rosati and St. John, two corrections officers stationed at Great Meadow, during an escort from his cell to a disciplinary hearing. While defendants have moved for summary judgment dismissing many of plaintiff's other claims, they do not challenge that cause of action at this juncture, acknowledging that its resolution will undoubtedly turn upon credibility determinations, which are not properly made on a motion for summary judgment.

After carefully reviewing the record evidence in this case, I recommend that all of plaintiff's claims against all of the remaining defendants be dismissed, with the exception of plaintiff's failure to intervene claim against defendant Fraser, and plaintiff's retaliation claim against defendant Goodman. As it relates to those two remaining claims, I conclude that a reasonable factfinder could determine, if plaintiff's testimony is credited, that defendant Fraser's duty to intervene was triggered, and that defendant Goodman conspired with defendants Rosati and St. John to retaliate against plaintiff. Additionally, at this juncture, the record evidence does not establish a basis to find that defendants Fraser or Goodman are entitled to qualified immunity.

Addressing plaintiff's remaining claims, I find that the record before the court fails to establish a proper basis to conclude that defendants Fischer, Annucci, LeClaire, and Roy were personally involved in any of the allegations giving rise to this action. The record also reflects that no reasonable factfinder could conclude that defendant Nesmith and Lindermann are liable for deliberate medical indifference to plaintiff's serious medical needs. Similarly, plaintiff has stated no claim against defendant Zarnetski associated with the assault or otherwise, nor has he stated a cognizable due process claim against defendants Harvey, Torres or Prack. Finally plaintiff's claims against defendant Mars, related to the requirement that he pay $65 to replace a damaged mattress, and the issuance of a false misbehavior report, lack merit. Based upon the foregoing, it is hereby respectfully,

**\*20** RECOMMENDED that defendants' summary judgment motion (Dkt. No. 79) be GRANTED, in part, as it relates to all of plaintiff's claims against all defendants, with the exception of (1) plaintiff's claims against defendants Rosati and St. John, (2) plaintiff's failure to intervene claim against defendant Fraser, and (3) plaintiff's First Amendment retaliation claim against defendant Goodman.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules; and it is further

ORDERED that the clerk is respectfully directed to amend court records to reflect the correct name spellings of defendants Zarnetski, Nesmith, Lindemann, and Prack.

### All Citations

Not Reported in F.Supp.2d, 2013 WL 1500422

### Footnotes

1    In light of the procedural posture of the case, the following recitation is derived from the record now before the court, with all inferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

2    The DOCCS conducts three types of inmate disciplinary hearings. See 7 N.Y.C.R.R. § 270.3; *see also Hynes v. Squillace,* 143 F.3d 653, 655 n.1 (2d Cir.1998). Tier I hearings address the least serious infractions and can result in minor punishments such as the loss of recreation privileges. *Hynes,* 143 F.3d 655 n.1. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. *Id.* Tier III hearings address the most serious violations and can result in unlimited SHU confinement and the loss of "good time" credits. *Id.*

3    Plaintiff's amended complaint identifies defendant Goodman as a lieutenant. Am. Compl. (Dkt. No. 7) at 5. In his affidavit submitted in support of defendants' pending motion, however, defendant Goodman states that he is a corrections captain. Goodman Decl. (Dkt. No. 79, Attach.12) at ¶ 1.

4    Defendant Zarnetski's name has been spelled by plaintiff in various ways, and is listed on the court's records as Zaratski. The clerk is respectfully directed to amend the court's records to reflect the correct spelling of this defendant's name as Zarnetski.

5    Defendant Nesmith was sued by plaintiff as "Nesmith (Ted) Fisher, III," Am. Compl. (Dkt. No. 7) at 6, and is listed on the court's records as "Nesmith Fisher." The clerk is respectfully directed to amend the court's records to reflect the correct spelling of this defendant's name as Ted Nesmith.

6    Defendant Lindemann was sued by plaintiff as "D. Lindermann," Am. Compl. (Dkt. No. 7) at 6, and is listed on the court's records as "D. Lindermann." The clerk is respectfully directed to amend the court's records to reflect the correct spelling of this defendant's name as David Lindemann.

7    The record reflects that defendant Prack's name has been spelled in a variety of ways, and is listed on the court's records as "Albert Prach." The clerk is respectfully directed to amend the court's records to reflect the correct spelling of this defendant's name as Albert Prack.

8    At several points in his complaint, as amended, plaintiff alleges that defendants violated various regulations regarding such matters as reporting the requirement of prison medical personnel to assess medical conditions, and the requirement that a disciplinary hearing be held within seven days. It is well-established that the violation of a prison regulation is not redressable in a civil rights action brought pursuant to section 1983. *See* Bolden v. Alston, 810 F.2d 353, 358 (2d Cir.1987) ( "State procedural requirements do not establish federal constitutional rights."); Barnes v. Henderson, 628 F.Supp.2d 407, 411 (W.D.N.Y.2009) ( "[A] violation of New York State regulations concerning disciplinary hearings does not in itself establish a due process violation."). Plaintiff's complaint also references 18 U.S.C. § 1351, a criminal statute addressing fraud and foreign labor contracting, as well as the Torture Victim Protection Act of 1991, codified at 28 U.S.C. § 1350, and providing a private right of action by an alien for a tort committed in violation of international law or a United States treaty. Those sections do not appear to have any applicability to the facts of this case.

9    Here, the defendants implicated in this portion of the pending motion are principally supervisory DOCCS employees.

10   The Second Circuit has yet to address the impact of the Supreme Court's decision in *Iqbal* on the categories of supervisory liability under *Colon.* Lower courts have struggled with this issue—specifically in deciding whether *Iqbal* effectively calls into question certain categories of supervisor liability in *Colon. Sash v. United States,* 674 F.Supp.2d 542–44 (S.D.N.Y.2009); *see also* Stewart v. Howard, No. 09–CV0069, 2010 WL 3907227, at *12 n.10 (N.D.N.Y. Apr. 26, 2010) (Lowe, M.J.) ("The Supreme Court's decision in [*Iqbal* ] arguably casts in doubt the continued viability of some of the categories set forth in *Colon."* (citing *Sash* )). In this case, absent any controlling authority to the contrary, the court assumes that all of the *Colon* categories still apply.

11   Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Appended decisions deleted for Westlaw purposes.]

12   *See Colon,* 58 F.3d at 873 ("The personal involvement of a supervisory defendant may be shown by evidence that: ... (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong[.]").

13   Based on the record evidence now before the court, I find that defendant Prack could have been personally involved only in plaintiff's procedural due process claim. As discussed more completely below, however, I recommend dismissal of that claim. Therefore, the finding that a dispute of material fact exists as to whether defendant Prack was personally involved in the allegations giving rise to this action is largely academic.

14   These reports do not include any complaints of hearing loss or blurred vision—complaints that plaintiff has alleged are ongoing and long-term effects of the alleged assault. *See generally* Lindemann Decl. Exhs. (Dkt. No. 79, Attachs.7, 8).

15   In their motion, defendants have expressly represented that they do not move for summary judgment on the excessive force claim asserted against defendants Rosati and St. John because "[t]hat claim ... necessarily involves a credibility determination ... [and] remain[s] for trial." Defs.' Memo of Law (Dkt. No. 79, Attach.17) at 3.

16   In the court's initial order, plaintiff's equal protection cause of action was dismissed against defendants Goodman and Mars. Dkt. No. 10 at 16.

17   Because qualified immunity is "an immunity from suit rather than a mere defense to liability," Mitchell v. Forsyth, 472 U.S. 511, 526 (1985), the Supreme Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." Pearson, 555 U.S. at 231 (internal quotation marks omitted).

---

    © 2015 Thomson Reuters. No claim to original U.S. Government Works.

 © 2015 Thomson Reuters. No claim to original U.S. Government Works.

2013 WL 1501022
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Troy SMITH, Plaintiff,

v.

C. ROSATI, Correctional Officer, Great Meadow
Correctional Facility; C. St. John, Correctional
Officer, Great Meadow Correctional Facility; Brian
Fischer, Commissioner of Corrections; Anthony
J. Annucci, Chief Counsel, Deputy Commissioner;
Lucien Leclaire, Jr.; Richard Roy, Inpsector General;
C. Fraser, Sgt, Great Meadow Correctional Facility;
Goodman, Lt., Great Meadow Correctional Facility;
Harvey, Commissioner's Hearing Officer; C.O.
Torres, Counselor, Great Meadow Correctional
Facility; Ted Nesmith, Physician Assistant; Nurse
David Lindemann, Registered Nurse, Great Meadow
Correctional Facility; B. Mars, Laundry Supervisor,
Great Meadow Correctional Facility; Paul Zarnetski,
Lt., Great Meadow Correctional Facility; and
Albert Prack, Shu Director, Doccs, Defendants.

No. 9:10–CV–1502 (DNH/
DEP).   |   April 10, 2013.

**Attorneys and Law Firms**

Troy Smith, Elmira, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State
of New York, Michael G. McCartin, Esq., Ass't Attorney
General, of Counsel, Albany, NY, for Defendants.

*DECISION and ORDER*

DAVID N. HURD, District Judge.

 **\*1**  Plaintiff brought this civil rights action pursuant to
42 U.S.C. § 1983. On February 20, 2013, the Honorable
David E. Peebles, United States Magistrate Judge, advised, by
Report–Recommendation that defendants' motion for partial
summary judgment be granted in part and denied in part.
Defendant Fraser timely filed objections to the Report–
Recommendation.

Based upon a de novo review, the Report–Recommendation
is accepted. See 28 U.S.C. § 636(b)(1).

Therefore, it is

ORDERED that

1. Defendants' motion for partial summary judgment is
GRANTED in part and DENIED in part; and

2. All claims against all defendants are DISMISSED with
the exception of those asserted against defendants Rosati and
St. John;[1] the failure to intervene claim against defendant
Fraser; and the First Amendment retaliation claim against
defendant Goodman.

IT IS SO ORDERED.

**All Citations**

Not Reported in F.Supp.2d, 2013 WL 1501022

Footnotes

1   Defendants did not move for dismissal of the excessive force claim asserted against defendants Rosati and St. John.

**End of Document**                                                        © 2015 Thomson Reuters. No claim to original U.S. Government Works.